## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

LUCKY'S MARKET PARENT COMPANY, LLC, *et al.*,[1]

Debtors.

Chapter 11

Case No. 20-10166 (JTD)

(Joint Administration Pending)

## MOTION OF DEBTORS FOR APPROVAL OF (I) PROCEDURES FOR STORE CLOSING SALES AND (II) ASSUMPTION OF THE LIQUIDATION CONSULTING AGREEMENT

The above-captioned debtors and debtors in possession (the "**Debtors**") hereby move the

Court (the "**Motion**") for entry of an interim order, substantially in the form attached hereto as

Exhibit A (the "**Proposed Order**"), pursuant to sections 105(a), 363, 365, and 554 of title 11 of

the United States Code (the "**Bankruptcy Code**"); Rules 6003, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

of Delaware (the "**Local Rules**"), granting the Debtors interim authority, but not direction, to  (i)

implement the Store Closing Procedures attached as Exhibit 1 to the Proposed Order and conduct

or continue conducting the Store Closing Sales at the Stores, as applicable; and (ii) assume the

Liquidation Consultant Agreement. In support of the Motion, the Debtors rely upon the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), and Sinoc, Inc. (0723).

72044729.8

*Declaration of Andrew T. Pillari, Chief Financial Officer of Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, filed with the Court concurrently herewith (the "**First Day Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      Debtors commenced these Chapter 11 Cases for the purpose of liquidating all of their stores not included in the proposed sale process discussed below. Prior to the Petition Date, the Debtors and their advisors engaged in a systematic review of each of their 39 open stores and 19 unopened stores, analyzing their performance, profitability, liquidity, and market impact. Historically, the Debtors' underperforming stores are, among other things, in regions over-saturated with competition (new and historical) and/or are too costly for the Debtors to operate. Accordingly, continued operation of such underperforming stores no longer remains viable. Indeed, before the commencement of these Chapter 11 Cases, the Debtors and their advisors identified and commenced the wind down and liquidation of 32 stores (the "**Closing Stores**").

2.      In formulating the list of Closing Stores, the Debtors considered, among other factors, current occupancy costs, historical store profitability, recent and projected sales trends, specific circumstances related to a store's performance, current liquidity, and whether any firm offer for such store was obtained or likely available from third parties. The Debtors estimate that, absent closure, the Closing Stores will collectively generate approximately $30 million in operating losses for the fiscal year 2020.

3.      Leading up to the Petition Date, the Debtors, in consultation with their advisors, developed procedures to sell or otherwise dispose of the inventory and furniture, fixtures, and equipment ("**FF&E**" and, together with applicable inventory, the "**Store Closing Assets**") at the

2

Closing Stores, in each case, free and clear of all liens, claims, interests, and other encumbrances (the "**Store Closing Procedures**," and the liquidation sale, the "**Store Closing Sales**").

4.      The Debtors also conducted an extensive prepetition sales process to sell as many of the Debtors' stores as possible. As a result of these efforts, the Debtors have received indications of interest for the sale of FF&E and transfer of leases for approximately 26 stores to third-party purchasers. The Debtors have executed an Asset Purchase Agreement with Aldi and are negotiating the terms of other Assets Purchase Agreements pursuant to letters of intent that have been received (the "**APAs**") for certain other stores (the "**Sold Stores**"). The Debtors will file separate motions to establish bid procedures for each of the APAs for the sale of certain of the Debtors' assets in connection with the Sold Stores. The Debtors will also file a motion to shorten notice of the bidding procedures in order to run an expedited and cost-efficient post-petition sale process given the extensive prepetition process. As the sale transactions only contemplate the sale of unexpired leases and FF&E, the Store Closing Procedures will also apply to the Sold Stores to the extent applicable.

5.      The Debtors continue to operate 7 stores (the "**Operating Stores**", together with the Closing Stores and the Sold Stores, the "**Stores**"). The Debtors are finalizing the terms of a sale of the Operating Stores, which will be subject to a bidding procedures motion and approval by the Court as well. The Debtors, in their business judgement, believe that sale of the Operating Stores provides value to the Debtors in excess of what would otherwise be realized in a liquidation.

6.      Before commencing any store liquidations, the Debtors and their advisors, formulated a comprehensive store closing schedule. Store Closing Sales at the Closing Stores began on or around January 22, 2020, and are expected to be completed by February 29, 2020, at which time the Debtors will exit the store facility.

3

7.      To maximize the value of the Store Closing Assets and effectuate an orderly liquidation process, the Debtors also seek authority to assume a liquidation consulting agreement dated January 26, 2020 (the "**Liquidation Consulting Agreement**") between Lucky's Market Parent Company, LLC and Great American Global Partners, LLC (referred to hereout as "**Great American**" or the "**Liquidation Consultant**"). The Liquidation Consultant will assist with the sale of FF&E for certain Stores. With the help of the Liquidation Consultant, the Debtors estimate that the sale of the Store Closing Assets in the Stores will yield approximately $1.5 million in gross proceeds.

8.      The relief requested in this Motion is integral to maximizing value for the Debtors' estates and their economic stakeholders. It will permit the Debtors to continue implementing the Store Closing Sales at the Stores, and it will establish fair and uniform Store Closing Procedures to assist the Debtors and their creditors through the Debtors' liquidation and sale processes.

## BACKGROUND

9.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

10.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

11.    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

### JURISDICTION

12.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    Pursuant to Rule 9013–1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### RELIEF REQUESTED

14.    By this Motion, pursuant to sections 105(a), 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 6003, 6004, 6006, and 9014, and Local Rule 9013-1, the Debtors request interim authority, but not direction, to (i) implement the Store Closing Procedures attached as **Exhibit 1** to the Proposed Order granting the relief requested in this Motion on an interim basis and conduct or continue conducting the Store Closing Sales at the Stores, as applicable; and (ii) assume the Liquidation Consulting Agreement attached to the Proposed Order as **Exhibit 2**.

### THE STORE CLOSING PROCEDURES

15.    The Debtors propose implementing the Store Closing Procedures, substantially in the form attached to the Proposed Order, to facilitate seamless Store Closing Sales. The Debtors have determined that, in the exercise of their business judgment and in consultation with their

advisors and their prepetition secured lender, implementing the Store Closing Procedures will provide the most timely and efficient means for maximizing the value of the Store Closing Assets.

16.     Before the commencement of these Chapter 11 Cases, the Debtors notified parties affected by the closure of the Closing Stores, including employees.

17.     Certain states and localities in which the Debtors operate stores have or may have laws, rules, regulations, or ordinances regarding licensing or other requirements governing the conduct of store closings, liquidations, or other inventory clearance sales (collectively, the "**Liquidation Sale Laws**"). Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closing Sales. The Debtors believe that in most cases, the Store Closing Procedures are consistent with Liquidation Sale Laws and with the leases affected by the Store Closing Sales. Certain requirements, however, may hamper the Debtors' efforts to maximize the value of their Store Closing Assets, a significant portion of which consists of perishable inventory. Thus, the Debtors seek authority from the Court to conduct the Store Closing Sales in accordance with the Store Closing Procedures without complying with the Liquidation Sale Laws, when the two are inconsistent.[2]

18.     Similarly, the Debtors respectfully request a finding that any contractual restrictions that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the Store Closing Sales are unenforceable. In certain cases, the Store Closing Sales may be inconsistent with certain provisions of leases, subleases, vendor contracts, or other documents associated with the Stores, including reciprocal easement agreements, agreements containing

---

[2] The Debtors will continue to comply with applicable laws, rules, regulations and ordinances that are for the protection of the health and safety of the public and in support of consumer protection laws.

72044729.8

covenants, conditions, and restrictions, including "go dark" provisions and landlord recapture rights, or other similar documents or provisions.

19.     Accordingly, the Debtors also request that the Court order that no person or entity, including, without limitation, utilities, landlords, contract counterparties, suppliers, creditors, and all persons acting for or on their behalf, shall interfere with or otherwise impede the conduct of the Store Closing Sales, or institute any action against the Debtors or landlords at the Stores in any court (other than in this Court) or before any administrative body in any way that directly or indirectly interferes with, obstructs, or otherwise frustrates the conduct of the Store Closing Sales, including the advertising and promotion (including through the posting of signs) thereof.

## THE LIQUIDATION CONSULTING AGREEMENT

20.     Before engaging the Liquidation Consultant, the Debtors carefully considered the number of stores that would likely need to undergo procedures substantially similar to the Store Closing Procedures, the resources needed to implement such procedures, and the desired timing to complete the process of liquidating and in most instances closing such stores. It was evident that retaining a liquidating firm was warranted under the circumstances and necessary to maximize the value of the Store Closing Assets and minimize burdensome costs to the Debtors' estates.

21.     The Debtors determined that the Agreement with the Consultant reflects current market conditions, pricing, and terms. The Debtors have determined, in an exercise of their business judgment, that (a) the services of the Consultant are necessary for a seamless and efficient large-scale execution of the Store Closing Sales, as is contemplated by this Motion, and to maximize the value of the assets being sold, and (b) the Consultant is capable of performing the required tasks on favorable financial terms, as determined by the evaluation process. Accordingly,

7

the Debtors selected the Liquidation Consultant in accordance with the terms and conditions set forth in the Liquidation Consulting Agreement.

22.   The material terms of the Liquidation Consulting Agreement are summarized below.[3]

| Term | Summary |
| --- | --- |
| **Services Provided by the Liquidation Consultant** | As the Debtors' (the "Seller") exclusive agent in connection with conducting and assisting in the sale of FF&E, the Consultant shall, among other things: <br><br> Sell FF&E, in whole or in part, at public and/or private sale(s) to the highest or best bidder thereof, as determined by the Consultant in an "AS IS" and "WHERE IS" condition without any warranty or guarantee on behalf of, and solely in the name of, the Company.  The Consultant shall conduct the sale in a manner intended to maximize recovery given the time frame provided to vacate the premises by February 29, 2020.  The Consultant will have complete authority to implement commercially reasonable advertising and to conduct the sale in the manner, and utilizing the methods, that Consultant deems, in its professional judgment, to be appropriate and in the best interest of the Seller and subject to the Budget (the "Budget") as included in Exhibit F. |
| **Assets to Be Sold** | The FF&E (the "Assets") are located at the site(s) as listed on Exhibit E, each and collectively referred to as the "Store(s)" or the "Premise(s)." Stores on the Exhibit E have been designated as either "Included Stores", which shall be subject to the sale, exclusivity and all other terms of the Agreement with the Consultant, or "Deferred Stores" which are pending sale to a third party, and may be designated by the Seller as an Included Store at a later date. |
| **Expenses of Consultant** | The Consultant shall also be entitled to reimbursement for all sale related expenses (hereinafter referred to as "Costs") incurred by the Consultant in preparing for and conducting the sale, including labor, marketing, supplies and other related costs.  The Consultant shall not be entitled to reimbursement for Costs in excess of $276,013 for Included Stores and up to $298,245 for Deferred Stores, per the |

[3] Capitalized terms used but not defined in this summary of the Liquidation Consulting Agreement have the meaning ascribed to them therein. To the extent that this summary conflicts with the actual terms of the Liquidation Consulting Agreement, the Liquidation Consulting Agreement shall control. A copy of the Liquidation Consulting Agreement is attached as **Exhibit 2** to the Proposed Order.

| | |
|---|---|
| | attached Budget as Exhibit F, without prior authorization from the Seller.  All Costs shall be documented in the Consultant's final settlement package provided to the Seller.  The following have not been included in the Costs and are not deemed a responsibility of the Consultant: occupancy costs, personal property insurance, data backup, removal and/or destruction (if applicable), freon evacuation, Lucky's Market provided personnel or marketing.  The Budget may only be modified by mutual written agreement of the Merchant and the Consultant (the "Parties").  The Parties acknowledge that the Budget will be updated in connection with any modification of the Included and Deferred Stores and agree to cooperate in good faith with respect to such updates. |
| **Consultant's Fee** | As consideration for its services under the Agreement, the Seller shall pay to the Consultant a base fee equal to (a) fifteen percent (15.0%) of the Gross Sale Price of Assets that are sold. |
| **Seller's Indemnification** | Seller shall and hereby agrees to defend, indemnify, and hold harmless Consultant and its agents, employees, principals and Supervisors from any and all third party Losses arising out of (i) the environmental condition of the real property on which the Premises are located, and/or any asserted damage, if any, to adjacent land owners, all as now or may at any time hereafter be in effect; (ii) the handling by any parties of any Sensitive Information remaining at the Premises or within the Assets sold, discarded or abandoned; (iii) any defect or failure not caused by the grossly negligent and/or intentional misconduct of Consultant in product design or materials or storage, manufacture, distribution, sale or use by any person or entity of any product or goods; (iv) Seller's or Company's failure to pay over to the appropriate taxing authority any taxes required to be paid by Seller or Company during the sale term in accordance with applicable law or to pay any liability referred to in Section 10 of the Liquidation Consulting Agreement; (v) negligent or intentional acts or omissions of Seller, Company or their agents, employees, representatives and principals in connection with the Sale; (vi) liens, claims, interests and encumbrances asserted against the Assets; and/or (vii) the breach by Seller or Company of any of their representations, warranties or other obligations under this Agreement. |
| **Consultant's Indemnification** | Consultant shall reimburse, indemnify, defend and hold the Company and their respective officers, directors, agents, and employees, harmless from and against any damage, loss, expense (including reasonable attorneys' fees) or penalty, or any claim or action therefore, by or on behalf of any person ("Losses"), arising out of (i) any defect or failure in an Asset caused by the grossly negligent and/or intentional misconduct of Consultant in the storage, transportation, sale of the Asset; (ii) negligent or intentional acts or omissions of Consultant or its subcontractor,  agents, employees, representatives |

| | |
|---|---|
| | and principals in connection with this Agreement; (iv) claims asserted by the Consultant's employees or agents, including the Consultant's employees' or agents' payroll claims (wage claims, claims for taxes required to be withheld from wages, social security, etc.), or unemployment compensation claims; (v) any property damage to the premises caused by direct result of Consultant's or its subcontractor, agents, employees, representatives and principals negligence that is not repaired to the condition prior to the damage, excluding any damage caused as the result of a buyer's removal of Assets from the premises; and (vi) the breach by Consultant of any of their representations, warranties or other obligations under the Agreement. |
| **Exclusivity** | Seller retains Consultant to be its sole and exclusive agent to sell the Assets of the Included Stores. With the exception of the Deferred Stores, Seller hereby agrees that it will not effectuate any sale of the Assets on its own without utilizing the services of Consultant in connection therewith.  Upon execution of the Agreement, Seller will turn over all sales or negotiations for sales of the Assets to Consultant, as well as all contact information for parties that have expressed interest in the Assets to Seller.  Except as set forth in this Agreement, Seller agrees not to remove any Assets from the Sale for any reason after execution of the Agreement without prior notice to, and consent of, Consultant.  The sale shall be without reserve. |
| **Seller's Insurance Obligations** | Company shall maintain, throughout the sale term and until the expiration or termination of the Agreement, liability insurance policies (including, without limitation, products liability, comprehensive commercial general liability insurance, and auto liability insurance), with at least the coverage limits currently existing thereunder, covering injuries to persons and property in or in connection with the Stores and/or the Merchandise, and shall cause Consultant to be named an additional insured with respect to all such policies.  At Consultant's request, the Company shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder.  In addition, the Company shall maintain throughout the sale term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all applicable statutory requirements. |
| **Consultant's Insurance Obligations** | Consultant shall maintain, throughout the sale term and until the expiration or termination of this Agreement, liability insurance policies (including, without limitation, products liability, comprehensive commercial general liability insurance, and auto liability insurance), with at least the coverage limits currently existing thereunder, covering injuries to persons and property in or in connection with the Stores and/or the Merchandise, and shall cause Consultant to be named an |

72044729.8

| | additional insured with respect to all such policies.  The Company shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder.  In addition, the Company shall maintain throughout the sale term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all applicable statutory requirements. |
|---|---|

23.     The Debtors believe that the terms of the Liquidation Consulting Agreement are market, reasonable, and that assumption of the Liquidation Consulting Agreement is an exercise of their sound business judgment.

## BASIS FOR RELIEF

### A.     Immediately Implementing the Store Closing Procedures and Continuing Store Closing Sales Constitutes an Exercise of the Debtors' Sound Business Judgment

24.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To obtain Court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a store closing sale, the Debtors need only show a legitimate business justification for the proposed action. *See In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); *see also In re Phoenix Steel Corp.,* 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtors articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

11

objections to the debtors' conduct") (citation omitted). Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.,* 60 B.R. at 616 (citation omitted); *see also In re Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

25. The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under section 363(b) of the Bankruptcy Code. The Debtors and their advisors believe that the Store Closing Procedures represent the most efficient and appropriate means of maximizing the value of the Store Closing Assets, while balancing the potentially competing concerns of affected landlords and other parties in interest.

26. Ample business justification exists to conduct Store Closing Sales at the Closing Stores. Before the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to (a) identify underperforming and unprofitable stores, and (c) determine which stores should be closed immediately to eliminate their ongoing negative impact on the Debtors' financial performance. This process also resulted in the Debtors' identification of the Closing Stores, which they began to close on or about January 22, 2020. Any Store Closing Assets that are not sold during the Store Closing Sales will be transferred to surrounding locations or abandoned as described in further detail below.

27. Any interruption or delay in the Debtors' ability to efficiently close Closing Stores during these chapter 11 cases could have material adverse consequences for the Debtors' estates. The Closing Stores are a financial drain on the Debtors' estates and the sooner the Closing Stores

are liquidated and closed, the more cash the Debtors will have to administer these cases and implement a sales process. Further, delays in commencing Store Closing Sales would have unique implications for the Debtors, as grocers, given the limited shelf-life of much of the inventory they sell. Accordingly, the Debtors believe that the Court should permit the Debtors flexibility to act in the most expeditious and efficient manner possible. The Debtors submit that there is sufficient business justification for the Debtors to continue implementing the Store Closing Procedures.

28.     Courts in this district have approved similar store closing or liquidation sale procedures in chapter 11 cases involving retail debtors. *See, e.g., In re Central Grocers, Inc.,* No. 17-10993 (LSS) (Bankr. D. Del. May 17, 2017) [D.I. 191]; *In re Sports Auth. Holdings, Inc.,* No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1700]; *In re Golfsmith Int'l Holdings, Inc.,* No. 16-12033 (LSS) (Bankr. D. Del. Sept. 15, 2016) [D.I. 66]; *In re Haggen Holdings, LLC,* No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) [D.I. 447]; *In re Quiksilver, Inc.,* No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) [D.I. 72]; *In re RadioShack Corp.,* No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) [D.I. 106]; *In re Coldwater Creek,* No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [D.I. 355]; *In re Anchor Blue Retail Group, Inc.,* No. 09-11770 (LSS) (Bankr. D. Del. June 18, 2009) [D.I. 182]; *In re Goody's Family Clothing, Inc.,* No. 08-11153 (CSS) (Bankr. D. Del. June 13, 2008) [D.I. 116]; and *In re Sharper Image Corp.,* No. 08-10322 (KG) (Bankr. D. Del. Mar. 14, 2008) [D.I. 271].

29.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

13

title." 11 U.S.C. § 105. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.,* 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.),* 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee").

### B. Sales of the Store Closing Assets Free and Clear of All Liens, Claims, and Encumbrances Is Warranted

30.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(i) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(ii) such entity consents;

(iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5).

31.     To the extent there are liens on the Store Closing Assets that would be the subject of the Store Closing Sales, the Debtors' prepetition secured lender has consented and all other

14

known holders of any liens on such assets, have each consented or the Debtors anticipate will each consent to the sales thereof because such sales provide the most effective, efficient, and time-sensitive approach to realizing the maximum value for the Store Closing Assets to the benefit of all stakeholders. In any event, the Debtors believe that all lienholders, including the Debtors' prepetition secured lender, could be compelled in a legal or equitable proceeding to accept money satisfaction of their interests. In furtherance of the foregoing, any and all liens on the Store Closing Assets sold in the Store Closing Sales would be satisfied or would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on the Store Closing Assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto.

32.     In addition, all known lienholders will receive notice and will be given opportunity to object to the relief requested herein on a final basis. Any lienholders that do not object to the sale of applicable Store Closing Assets should be deemed to have consented to such sale. *See Futuresource LLC v. Reuters Ltd.,* 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted)); *Hargrave v. Twp. of Pemberton* (*In re Tabone, Inc.),* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2) of the Bankruptcy Code); *Citicorp Homeowners Serv., Inc. v. Elliot* (*In re Elliot),* 94 B.R. 343, 345-46 (E.D. Pa. 1988) (same); *see also In re Enron Corp.,* Case No. 01-16034, 2003

15

WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

33.    Accordingly, the sale of the Store Closing Assets satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should be free and clear of any liens, claims, encumbrances, and other interests.

### C.    The Court Should Invalidate Contractual Restrictions That Impair the Debtors' Ability to Conduct the Store Closing Sales

34.    Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions in recorded documents, contracts, or agreements purporting to forbid such sales. Indeed, any such contract or agreement is unenforceable against the Debtor pending assumption or rejection thereof. *See In re Univ. Med. Ctr.,* 973 F.2d 1065, 1075 (3d Cir. 1992) (citing *In re Bildisco,* 465 U.S. 513, 532 (1984)); *In re Nat'l Steel Corp.,* 316 B.R. 287, 302-07 (Bankr. N.D. Ill. 2004).

35.    Courts in this district have entered orders deeming such restrictive contractual provisions unenforceable in the context of store closing or liquidation sales. *See, e.g., In re Central Grocers, Inc*., No. 17-10993 (LSS) (Bankr. D. Del. May 17, 2017) [D.I. 191]; *In re Sports Auth. Holdings*, No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1700]; *In re Haggen Holdings, LLC*, No. 15-11874 (KG) (Bankr D. Del. Oct. 15, 2015) [D.I. 447]; *In re Quiksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) [D.I.72]; *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) [D.I. 106]; and *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [D.I. 355]. Moreover, the Store Closing Procedures, like the liquidation sale guidelines approved in other cases cited above, provide the appropriate protections for any legitimate concerns that landlords or other affected parties might otherwise have with respect to the conduct of the Store Closing Sales.

16

36.     Accordingly, the Debtors request that the Court authorize the Debtors to conduct the Store Closing Sales consistent with the Store Closing Procedures, without interference by any utilities, landlords, suppliers, vendors, contract counterparties, or other persons affected, directly or indirectly, by the Store Closing Sales.

### D.     The Court Should Waive Compliance With Any Liquidation Sale Laws That Restrict Store Closing Sales

37.     There is ample support for granting the Debtors' request for a waiver of the requirement to comply with applicable Liquidation Sale Laws that are inconsistent with the Store Closing Procedures. First, Liquidation Sale Laws often provide that, if a liquidation or bankruptcy sale is authorized by a court, then a company need not comply with the Liquidation Sale Laws. Second, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws.

38.     Third, this Court will be able to supervise the Store Closing Sales because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. Creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of this Court. Moreover, section 959 of title 28 of the United States Code, which requires debtors to comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales. *See, e.g., In re Borne Chemical Co.,* 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only when property is being managed or operated for the purpose of continuing operations, not liquidations). Relatedly, and as further adequate protection, paragraph 12 of the Proposed Order includes a procedure whereby aggrieved parties can seek relief from this Court in the event that there is a dispute relating to any Liquidation Sale Law.

17

39.    Fourth, even if a Liquidation Sale Law does not expressly exempt bankruptcy sales from its ambit, the Debtors believe that if such law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2. To hold otherwise would severely impair the relief available under section 363 of the Bankruptcy Code. Consistent with this premise, Bankruptcy Courts have recognized that federal bankruptcy laws preempt state and local laws that contravene the underlying policies of the Bankruptcy Code. *See, e.g., Belculfine v. Aloe (In re Shenango Grp., Inc.),* 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code"). Although preemption of state law is not always appropriate, as when the protection of public health and safety is involved, *see In re Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake),* 35 F.3d 1348, 1353–54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. *See id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

40.    Similar relief has been granted in other bankruptcy cases in this district. *See, e.g., In re Central Grocers, Inc.,* No. 17-10993 (LSS) (Bankr. D. Del. May 17, 2017) [D.I. 191]; *In re Golfsmith Int'l Holdings, Inc.,* No. 16-12033 (LSS) (Bankr. D. Del. Sept. 15, 2016) [D.I. 66]; *In re Sports Auth. Holdings,* No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1700]; *In re Haggen Holdings, LLC,* No. 15-11874 (KG) (Bankr D. Del. Oct. 15, 2015) [D.I. 447]; *In re Quiksilver, Inc.,* No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) [D.I. 72]; *In re RadioShack*

18

*Corp.,* No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015) [D.I. 106]; and *In re Coldwater Creek,*
No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) [D.I. 355].

41.     Accordingly, the Debtors further request that the Court authorize the Debtors to
conduct the Store Closing Sales consistent with the Store Closing Procedures, without any other
person or entity, including any lessor or federal, state, or local agency, department, or
governmental authority, being allowed to take any action to prevent, interfere with, or otherwise
hinder consummation of the Store Closing Sales or the advertising and promotion (including
through the posting of signs) thereof.

### E.     Abandonment of the De Minimis Assets Should Be Approved

42.     The Debtors also request authority to abandon any property, including certain
surplus, burdensome, or non-core assets, which may include Store Closing Assets, remaining at
the leased premises after the completion of the applicable Store Closing Sales therein or on the
effective date of rejection of the applicable underling lease that the Debtors do not sell and
determine is too difficult to remove or expensive to store (such that such that the economic benefits
of removing or storing such property would by outweighed by the attendant costs) (collectively,
the "**De Minimis Assets**").

43.     Under section 554(a) of the Bankruptcy Code, a debtor, after notice and a hearing,
is authorized to "abandon any property of the estate that is burdensome to the estate or that is of
inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v.
Tyco Indus., Inc.,* 500 F.2d 654, 657 (3d Cir. 1974) ("[A trustee] may abandon his claim to any
asset, including a cause of action, he deems less than valuable than the cost of asserting that
claim."); *In re Contract Research Solutions, Inc.,* 2013 WL 1910286, at *4 (Bankr. D. Del. May
1, 2013) ("[A debtor] need only demonstrate that [it] has exercised sound business judgment in

making the determination to abandon.") (citations omitted). The right to abandon property is, except for certain exceptions inapplicable in the present case, unfettered. *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494, 506–07 (1986) (noting one such exception and holding that section 554(a) does not preempt state laws aimed at protecting the public's health and safety).

44.     Although the Debtors will have, in their business judgment, removed personal property at the Closing Stores and other leased premises if feasible and of value to the Debtors' ongoing operations or to their estates, a minimal amount of the Debtors' personal property is expected to remain at certain properties. The De Minimis Assets will primarily consist of miscellaneous FF&E, advertising displays, and other store equipment that is of inconsequential value or benefit to the Debtors' estate or would be cost prohibitive to remove. Any landlord or other designee will be free to dispose of the De Minimis Assets after the effective date of rejection of the applicable underlying lease or after completion of the applicable Store Closing Sales without notice or liability to any party. To the best of the Debtors' knowledge, the abandonment of the property would not be in violation of any state or local statutes or regulations reasonably designed to protect the public health or safety. Accordingly, abandonment of the De Minimis Assets as of the effective date of rejection of the applicable underlying leases or after completion of the applicable Store Closing Sales should be approved.

45.     Courts in this district and elsewhere have previously approved similar relief in other chapter 11 cases involving retail debtors. *See, e.g., In re Central Grocers, Inc.,* No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) [D.I. 336]; *In re Sports Auth. Holdings, Inc.,* No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1700] (authorizing the debtors to abandon any unremoved or unsold furniture, fixtures, and equipment at a closing store); *In re Great Atl. & Pac. Tea Co., Inc.,* No. 15-23007 (RDD) (Bankr. S.D.N.Y. Jan. 22, 2016) [ECF No. 2367] (authorizing

the debtors to abandon furniture, fixtures, and equipment as of a retroactive rejection date); *In re Am. Apparel, Inc.,* No. 15-12055 (BLS) (Bankr. D. Del. Nov. 20, 2015) [D.I. 364] (authorizing the debtors to dispose of or abandon property of their estates left in stores after the completion of store closing sales); *In re RadioShack Corp.,* No. 15-10197 (BLS) (Bankr. D. Del. Feb. 2, 2015) [D.I. 455] (authorizing the debtors to abandon all unsold assets located at any of the closing stores); and *In re Metropark USA, Inc.,* No. 11-22866 (RDD) (Bankr. S.D.N.Y. May 5, 2011) [ECF No. 50] (authorizing the debtor to reject a lease and abandon certain furniture, fixtures, and equipment on the leased premises).

### F. Assumption of the Liquidation Consulting Agreement is in the Best Interests of the Debtors and Their Estates.

46.     Under section 365(a) of the Bankruptcy Code, a debtor may assume or reject any executory contract or unexpired lease of the debtor provided that such assumption or rejection satisfies the business judgment test. The Debtors' decision to utilize and pay for the services provided by the Liquidation Consultant is a reasonable exercise of their business judgment. Given the number of Stores that will need to be simultaneously liquidated or closed, a nationally-recognized liquidator, such as Great American, with significant experience managing large-scale liquidations is best equipped to ensure a smooth liquidation process that will maximize the value of the Store Closing Assets. The Liquidation Consultant has extensive expertise in conducting store closing sales and can oversee, and assist in the management and implementation of, the Store Closing Sales in an efficient and cost-effective manner. The Liquidation Consulting Agreement will enable the Debtors to utilize the experience, skills, and resources of the Liquidation Consultant to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the value to be received through the Store Closing Sales for the benefit of all stakeholders.

21

47.     The Liquidation Consultant's fees will be based on the successful sale of the Store FF&E. The Debtors believe that the prepetition proposal and negotiation process has ensured that the fee structure set forth in the Liquidation Consulting Agreement is reasonable, market based, and consistent with the fees this Court and other courts have approved in connection with entry into liquidating consulting agreements. *See, e.g., In re Central Grocers, Inc.,* No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) [D.I. 336] (authorizing a fee equal to 1.5% of gross sales if such sales exceed the cost value of the merchandise and 15% of proceeds from sales of furniture, fixtures, and equipment); *In re Golfsmith Int'l Holdings, Inc.,* No. 16-12033 (LSS) (Bankr. D. Del. October 13, 2016) [D.I. 267] (authorizing a fee equal to .75% of gross proceeds of sales of merchandise and 15% of proceeds from sales of furniture, fixtures, and equipment); *In re The Great Atlantic & Pacific Tea Company, Inc.,* Case No. 15-23007 (Bankr. S.D.N.Y. Aug. 13, 2015) [ECF No. 546] (authorizing a fee equal to 1% of gross sales if such sales exceed the cost value of the merchandise and 10% of proceeds from sales of furniture, fixtures, and equipment); *In re Lack's Stores, Inc.,* Case No. 10-60149 (Bankr. S.D. Tex. Nov. 17, 2010) [ECF No. 34] (approving a $4,500 per store base fee, a fee equal to 20% of net proceeds of sales of merchandise in excess of 64% of the cost value of the merchandise, and 15% of proceeds from sales of FF&E); *In re Bruno's Supermarkets, LLC,* Case No. 09-00634 (Bankr. N.D. Ala. Mar. 2, 2009) [ECF No. 306] (approving a fee equal to 3% of net proceeds of sales of merchandise and 15% of proceeds from sales of FF&E); and *In re Value City Holdings, Inc.,* Case No. 08-14197 (Bankr. S.D.N.Y. Nov. 20, 2008) [ECF No. 158] (approving a $25,000 per store base fee, up to a $25,000 per store success fee based on a 54.6% gross return on merchandise adjusted downward for lower gross return percentages, and a fee equal to 10% of gross proceeds from sales of FF&E).

22

48.     As noted above, the Debtors believe that the expertise of the Liquidation Consultant will greatly assist the Debtors in the disposition of the Stores and maximize the value to be realized in that process. This will inure to the benefit of the Debtors' estates, which will more than offset any expenses incurred through the Liquidation Consultant's retention. Thus, the decision to employ the Liquidation Consultant is a sound exercise of the Debtors' business judgment and assumption of the Liquidation Consulting Agreement should be approved.

## RESERVATION OF RIGHTS

49.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; or (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## BANKRUPTCY RULE 6003(b) IS SATISFIED

50.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition Date. FED. R. BANKR. P. 6003(b). As discussed more fully above and in the Carney Declaration, the Debtors and their estates and creditors will be irreparably harmed if the implementation of the Store Closing Procedures, continuation of the Store Closing Sales, and assumption of the Liquidation Consulting Agreement is delayed. Accordingly, the Debtors submit that the relief

23

requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## BANKRUPTCY RULES 6004(a) AND (h) SHOULD BE WAIVED

51.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

## NOTICE

52.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) counsel to the Prepetition Secured Lender; (d) counsel to any Stalking Horse Bidders; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) all state and local taxing authorities with an interest in the Assets; (h) the Attorney General for the State of Delaware; (i) all other governmental agencies with an interest in the Store Closing Sales and transactions proposed thereunder; (j) all parties known or reasonably believed to have asserted an Interest in the Store Closing Assets; (k) the Landlords; (l) the Debtors' insurance carriers; (m) all parties entitled to notice pursuant to Local Rule 9013-1(m); and (n) any party that has requested notice pursuant to

72044729.8

Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 27, 2020  
Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com

-and-

Liz Boydston (*Pro Hac Vice* Pending)
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Telephone: (214) 661-5557
lboydston@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

25