**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

LUCKY'S MARKET PARENT COMPANY,
LLC, *et al.*,[1]

             Debtors.

Chapter 11

Case No. 20-10166 (JTD)

(Joint Administration Pending)

**DECLARATION OF ANDREW T. PILLARI, CHIEF FINANCIAL OFFICER OF
DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1764, Andrew T. Pillari declares as follows under the penalty of

perjury:

1.     I am the Chief Financial Officer ("**CFO**") of Lucky's Market Parent Company,

LLC ("**LMPC**"), along with its owned direct and indirect subsidiaries (collectively, the "**Debtors**"

or the "**Company**"), as debtors and debtors in possession in the above-captioned chapter 11 cases

(the "**Chapter 11 Cases**"). I am authorized to submit this declaration (the "**First Day**

**Declaration**") on behalf of the Debtors.

2.     I joined the company as CFO in October 2014 and have been in that role

continuously since that time.

3.     Based on my analysis of public and non-public documents, and my discussions

with, and information provided by, other members of the Debtors' management team, employees,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), and Sinoc, Inc. (0723).

agents, investment bankers and advisors, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other members of the Debtors' management team or from the Debtors' employees, agents, attorneys, investment bankers and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

4.      References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

5.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing a case for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors will continue to operate their business and manage their properties as debtors in possession.

6.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief the relief sought

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

72120896.2

therein is essential to uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

7.      This First Day Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings, and sets forth the relevant facts in support of the First Day Pleadings.

## I.      COMPANY AND BUSINESS OVERVIEW

### A.      Overview of Business Operations

8.      The Company focuses on affordable organic and locally-grown fruits and vegetables, top-quality, naturally raised meats and seafood, and fresh, daily prepared foods. The Company's emphasis is on carrying the highest-quality products at the lowest prices, with the mission of providing "Organic for the 99%". The Company's stores offer a broad range of grocery items through the Company's "L" private label at great value that have no artificial colors, flavors or preservatives. Ten percent of profits from the Company's private label are reinvested in the communities it serves.

9.      Jason (known as Bo) and Trish Sharon opened the first Lucky's Market in 2003 and the Company is based in Niwot, Colorado. Both Bo and Trish Sharon are former chefs with restaurant backgrounds. The two cofounders started their first store by acquiring and renovating a grocery store known as the North Boulder Market. After operating their first store for ten years, the Company then opened a second store in Longmont, Colorado.  Bo and Trish Sharon continue to own a membership interest in the Debtors' business.

10.      The first expansion of the Company beyond Colorado was Columbus, Ohio, and by April 2016, the Company was operating 17 stores in 11 states.  In April 2016, The Kroger Co. (**"Kroger"**) acquired a membership interest in the Company.  The Company expanded to twenty

3

stores by the end of 2016, twenty-six stores by the end of 2017, thirty-three stores by the end of 2018, and thirty-nine stores by the end of 2019 and today across ten states (each a "**Store**", collectively, the "**Stores**").  A link to the Company's website where more information about the Company may be located is https://www.luckysmarket.com/.

11.    Each of the Company's Stores averages approximately 31,000 square feet and has full-service departments, which include produce, meat, seafood, culinary, apothecary, beer/wine/spirits and grocery. The Company leases thirty-seven of the Stores. All thirty-seven of the leased Stores have extension options, with thirty-six of the locations having options to extend over twenty years.  The two owned stores are located in Florida, one in Oakland Park and the other in Panama City.

12.    In addition to the Stores, the Company operates a produce warehouse in Orlando, Florida to supply nearly all produce for the Company's Florida and Georgia stores (the "**Distribution Center**").

13.    The Company also has seventeen additional property leases and one owned property for eighteen future stores, seventeen of which are in Florida.

14.    The Company has approximately 3,100 employees, all of which are non-union.

**B.    Corporate Structure of the Company**

15.    A chart reflecting the Company's organizational structure is attached hereto as Exhibit A. The lead Debtor, LMPC, directly or indirectly owns the other Debtors:

- Lucky's Farmers Market Holding Company, LLC
- Lucky's Market Operating Company, LLC
- LFM Stores LLC
- Lucky's Farmers Market, LP
- Lucky's Farmers Market Resource Center, LLC
- Lucky's Market Holding Company 2, LLC
- Lucky's Market GP 2, LLC
- Lucky's Market 2, LP

4

- Lucky's Market of Longmont, LLC
- Lucky's Farmers Market of Billings, LLC
- Lucky's Farmers Markets of Columbus, LLC
- Lucky's Farmers Market of Rock Hill, LLC
- LFM Jackson, LLC
- Lucky's Farmers Market of Ann Arbor, LLC
- Lucky's Market of Gainesville, LLC
- Lucky's Market of Bloomington, LLC
- Lucky's Market of Plantation, LLC
- Lucky's Market of Savanna, GA, LLC
- Lucky's Market of Traverse, City, LLC
- Lucky's Market of Naples, FL, LLC
- Sinoc, Inc.

16.     LMPC is governed by a board of managers (the "**Board**") consisting of seven (7) managers (each, a "**Manager**"). As of the Petition Date, the Managers are J. Michael Schlotman, Christopher Schulte, Andrew Seitz, Patrick Gilliland, Bo Sharon, William Transier, and Nicholas G. Hodge. J. Michael Schlotman serves as the Chairman of the Board. William Transier, an independent director, serves as the sole member of a special committee of the Board charged with, among other things, overseeing sale and financing transactions in these chapter 11 cases, including, but not limited to, cash collateral.

17.     Bo Sharon is the cofounder and serves as Chief Executive Officer of LMPC and Lucky's Market Operating Company, LLC ("**LMOC**"). I serve as Chief Financial Officer of LMPC and LMOC. Chris Darling serves as President of LMPC and LMOC. Mike Phillips serves as Chief Growth Officer of LMPC. Maria Woods serves as General Counsel of LMPC.

18.     For each of the Debtor limited liability companies other than LMOC, Bo Sharon serves as the Manager.

19.     Lucky's Market GP 2, LLC is the General Partner of Lucky's Market 2, LP. LFM Stores, LLC is the General Partner of Lucky's Farmers Market, LP.

C.      **Financial Overview of the Company**

20.      As of the Petition Date, the Debtors had approximately $15 million of cash and cash equivalents and their assets consisted of approximately $425 million on an aggregate basis. The Debtors' aggregate liabilities as of the Petition Date are approximately $600 million.

**Prepetition Credit Facility**

21.      On or about September 15, 2016, LMPC and Kroger, as lender (the "**Prepetition Secured Lende**r"), entered into that certain Promissory Note (as amended prior to the date hereof, the "**A Note**"), pursuant to with the Prepetition Secured Lender agreed to lend LMPC up to $23,328,810 (the "**A Prepetition Secured Loan**").

22.      On or about August 9, 2017, the Prepetition Secured Lender, entered into that certain Secured Loan Agreement (the "**B Prepetition Loan Agreement**"), pursuant to which the Prepetition Secured Lender agreed to lend LMPC up to $25,177,640 (the "**B Prepetition Secured Loan**").

23.      The B Prepetition Secured Loan is evidenced by that certain Promissory Note dated August 9, 2017 made by LMPC in favor of the Prepetition Secured Lender (as amended prior to the date hereof, the "**B Note**").

24.      To secure the obligations under the A Note and B Prepetition Loan Agreement, LMPC and the Prepetition Secured Lender entered into that certain Security Agreement dated as of August 9, 2017 (the "**AB Security Agreement**"). Pursuant to the AB Security Agreement, LMPC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of the personal property with respect to certain identified store locations (the "**AB Security Agreement Collateral**").

6

25.     The obligations of LMPC under the A Note and B Prepetition Loan Agreement are guaranteed by Debtor Lucky's Market Operating Company, LLC ("**LMOC**") pursuant to that certain Guaranty dated as of August 9, 2017 between LMOC and the Prepetition Secured Lender (the "**AB Guaranty**").  To secure the obligations of LMOC under the AB Guaranty, LMOC and the Prepetition Secured Lender entered into that certain Guaranty Security Agreement dated as of August 9, 2017 between LMOC and the Prepetition Secured Lender (the "**AB Guaranty Security Agreement**"). Pursuant to the AB Guaranty Security Agreement, LMOC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMOC's personal property with respect to certain identified store locations (the "**AB Guarantor Collateral**").

26.     On or about December 4, 2017, LMPC, as borrower, and the Prepetition Secured Lender entered into that certain Secured Loan Agreement (as amended, the "**C Prepetition Loan Agreement**" and together with the B Prepetition Loan Agreement, the "**Prepetition Loan Agreements**"), pursuant to which the Prepetition Secured Lender agreed to make loans to LMPC (the "**C Prepetition Secured Loan**" and together with the A Prepetition Secured Loan and the B Prepetition Secured Loan, the "**Prepetition Secured Loan**").  The Prepetition Secured Lender entered into agreements subsequently to, among other things, lend LMPC additional amounts over time.[3]

---

[3] Loan Modification Agreements were dated February 23, 2018, July 2, 2018, September 21, 2018, November 15, 2018, January 28, 2019, February 6, 2019, February 13, 2019, February 20, 2019, February 27, 2019, March 6, 2019, March 13, 2019, March 20, 2019, March 27, 2019, April 2, 2019, April 10, 2019, April 16, 2019, April 23, 2019, April 30, 2019, May 7, 2019, May 14, 2019, May 21, 2019, May 28, 2019, June 4, 2019, June 11, 2019, June 18, 2019, June 25, 2019, July 2, 2019, July 9, 2019, July 16, 2019, July 23, 2019, July 30, 2019, August 6, 2019, August 13, 2019, August 20, 2019, August 27, 2019, September 3, 2019, September 10, 2019, September 17, 2019, September 24, 2019, October 1, 2019, October 8, 2019, October 15, 2019, October 22, 2019, October 30, 2019, November 5, 2019, November 12, 2019, November 19, 2019, November 26, 2019, December 3, 2019, December 10, 2019, December 17, 2019, December 24, 2019, and December 31, 2019.

7

27.     The C Prepetition Secured Loan is evidenced by that certain Amended and Restated Promissory Note dated December 31, 2019 made by LMPC in favor of the Prepetition Secured Lender (as amended by prior to the date hereof, the "**C Note**" and together with the A Note and B Note, the "**Notes**").

28.     To secure the obligations under the C Prepetition Loan Agreement, LMPC and the Prepetition Secured Lender entered into that certain Security Agreement dated as of December 4, 2017 (the "**C Security Agreement**" and together with the AB Security Agreement, the "**Security Agreements**"). Pursuant to the C Security Agreement, LMPC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMPC's personal property (the "**C Security Agreement Collateral**" and together with the AB Security Agreement Collateral, the "**Collateral**").

29.     The obligations of LMPC under the C Prepetition Loan Agreement are guaranteed by LMOC pursuant to that certain Guaranty dated as of December 4, 2017 between LMOC and the Prepetition Secured Lender (the "**C Guaranty**" and together with the AB Guaranty, the "**Guaranties**").   To secure the obligations of LMOC under the C Guaranty, LMOC and the Prepetition Secured Lender entered into that certain Guaranty Security Agreement dated as of December 4, 2017 between LMOC and the Prepetition Secured Lender (the "**C Guaranty Security Agreement**", and together with the AB Guaranty Security Agreement, the "**Guaranty Security Agreements**"). Pursuant to the C Guaranty Security Agreement, LMOC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMOC's personal property (the "**C Guarantor Collateral**"). The Guaranty Security Agreements together with the Prepetition Loan Agreements, the Notes, the Security Agreements, the Guaranties, and all other documents, instruments, related writings, financing statements,

8

security documents, and guarantees executed in connection therewith, as each has been and may in the future be amended, restated, or replaced, the "**Prepetition Secured Loan Documents**").

30.     As of the Petition Date, the amount of the Prepetition Secured Loan was approximately $301,156,450.

## Prepetition Leasehold Interests

31.     As noted above, the Debtors lease the vast majority of their Store and other real property locations. To facilitate lower rental rates and associated costs, at the Company's requests, Kroger entered into various guaranties of the Debtors' liabilities under approximately 31 leases.

## Prepetition New Markets Tax Credits Loan

32.     To complete certain leasehold improvements and purchase and install certain trade fixtures, equipment and other personal property in two of its leased Stores located in Florida, the Company entered into a new markets tax credit ("**NMTC**") loan agreement for a total original principal amount of $5,940,000.00 as set forth in detail below.

33.     On June 12, 2018, LMOC, as borrower, and BBIF Subsidiary CDE 3, LLC (the "**Prepetition NMTC Lender**" and, together with the Prepetition Secured Lender, the "**Prepetition Lenders**") entered into that certain Loan Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition NMTC Loan Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition NMTC Loan Documents**" and, together with the Prepetition Secured Loan Documents, the "**Prepetition Loan Documents**"), which evidence the original principal amounts of $4,428,000.00 (the "**A Loan**") and $1,512,000.00 (the "**B Loan**", together with the A Loan, the "**Prepetition NMTC Loan**"). The A Loan is evidenced by that certain QLICI Loan A Note dated June 12, 2018 made by LMOC in

favor of the Prepetition NMTC Lender in the original principal amount of the A Loan (the "**A Tax Note**"). The B Loan is evidenced by that certain QLICI Loan B Note dated June 12, 2018 made by LMOC in favor of the Prepetition NMTC Lender in the original principal amount of the B Loan (the "**B Tax Note**", together with the A Tax Note, the "**NMTC Notes**"). The Prepetition NMTC Loan has a final maturity date of the earlier of December 31, 2047 or the date on which the unpaid principal balance of the NMTC Notes becomes due and payable pursuant to the Prepetition NMTC Loan Documents. The Prepetition NMTC Loan is serviced by The Valued Advisor Fund, LLC.

34.     The Prepetition NMTC Loan is guaranteed by Kroger pursuant to that certain Payment and Completion Guaranty dated June 12, 2018 (the "**NMTC Guaranty**"), whereby Kroger agreed to guaranty LMOC's obligations under the Prepetition NMTC Loan Documents.

35.     The current amount outstanding under the NMTC Loan is $5,940,000.00.

**EB-5 Investor Financing**

36.      Beginning in 2013, the Company began offering limited partner interests to a limited number of potential non-U.S. person investors under the Employment Based Immigration Preference program, known as "EB-5". The EB-5 program offers immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job creating initiatives in economically challenged localities in the United States. The Company made two separate EB-5 private offerings, and in connection thereto, the Company received limited partner investments and made certain intercompany loans to primarily fund store expansion.

## II.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

37.     Beginning in 2015, the Company developed and sought to execute on a strategic growth plan, which included accelerated growth in new and existing markets, with a focus on developing stores in Florida.

38.     The Company's strategic growth plan required, among other things, significant upfront investment.  To finance the strategic growth plan, the Company borrowed money and entered into the capital structure described above to pursue the strategic plan using the lowest available costs of capital available to the Company.

39.     The Company expanded in Florida in 2016, and had eleven stores in the state by the end of 2017.  As a result of the expansion, between fiscal year end 2016 and 2017, the Company's sales grew.

40.     However, the Company's expansion in Florida coincided with, among other things, increased competition in the grocery industry, including expansions from competing chains such as Sprouts Farmers Market, Fresh Thyme Farmers Market and Earth Fare. As a result, notwithstanding the growth in sales, the portfolio of Company stores was unable to achieve sustainable four-wall profitability.

41.     Most recently, fiscal year-to-date through January 4, 2020, the Company had approximately $22 million of store operating losses and approximately $100 million net loss. Additionally, fiscal year-to-date through the week ended January 18, 2020, the Company had a 10.6% reduction in comparable store sales versus the prior year-to-date period.

42.     Based on performance of the Company's business, the Company's management determined that it would require approximately $100 million in incremental funding to continue operations until the Company would be cash flow positive.  Management determined that it would be unable to secure new sources of sufficient funding outside of these chapter 11 cases.

72120896.2

43.    The Company retained Alvarez & Marsal ("**A&M**") and Polsinelli PC ("**Polsinelli**") to assist in evaluating all available restructuring options.    The Company subsequently retained Great American Group ("**Great American**") to assist with the liquidation of certain assets in certain of the Company's Stores.

44.    Prior to the Petition Date, the Debtors engaged PJ Solomon as their investment banker to conduct a prepetition marketing process for substantially all of the Debtors' assets. As a result of the prepetition marketing process, the Debtors, in consultation with their advisors, have identified several potential purchasers. Each of the potential purchasers has indicated interest in different assets of the Debtors. Prior to the Petition Date, the Debtors entered into an Asset Purchase Agreement with Aldi to purchase certain store leases. The Debtors are also finalizing the terms of a sale of the 7 operating stores in addition to a separate sale for other store locations.  Each sale will be subject to a separate bidding procedures motion to be filed and subject to approval by this Court. The Debtors will also file a motion to shorten notice related to the bidding procedures motion in order to run an expedited and cost-efficient post-petition sale process given the extensive prepetition marketing efforts.

45.    In addition to seeking to establish bid procedures for the proposed sales, Debtors have also filed a motion to establish store closing procedures and liquidate the assets of the Debtors not subject to a proposed sale. Finally, the Debtors will market the remaining leases for sale that are not subject to any of the aforementioned sales. The Debtors have retained PJ Solomon to continue and complete the sale processes and to serve, subject to court approval, as their investment bankers in these Chapter 11 Cases.

46.    Finally, prior to the Petition Date, the Company engaged in negotiations with the Prepetition Secured Lender to secure the consensual use of cash collateral necessary for the

Debtors to maximize the value of the Debtors' estates, to complete the liquidation of certain of the Stores, to consummate the aforementioned sales, continue to operate the seven open stores, and to fund the administration of these Chapter 11 Cases through confirmation of a liquidating chapter 11 plan that benefits all stakeholders in accordance with the priorities established by the Bankruptcy Code.

## III.   FIRST DAY PLEADINGS

47.     In furtherance of the objective of a value-maximizing sale of the Debtors' assets, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request the Court consider entering the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

48.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits and schedules thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

### A.   *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* **(the "Joint Administration Motion")**

49.     Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their twenty-two (22) Chapter 11 Cases for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe the joint administration of these cases will avoid the unnecessary

13

time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

    **B.**    ***Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Omni Agent Solutions as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* (the "<u>Claims Agent Application</u>")**

    50.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Omni Agent Solutions, Inc. ("**Omni**") as the claims and noticing agent for the Debtors in their Chapter 11 Cases. Omni is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related administrative aspects of chapter 11 cases. Given the complexity of these cases and the number of creditors and other parties in interest involved, I believe appointing Omni as the claims and noticing agent in these Chapter 11 Cases will maximize the value of the Debtors' estates for all their stakeholders.

    **C.**    ***Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices* (the "<u>Cash Management Motion</u>")**

    51.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing Cash Management System, including maintenance of the Debtor Bank Accounts and existing checks and business forms, (ii) granting the Debtors a temporary suspension of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their Cash Management System or other actions described herein, (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices, (iv) authorizing the Debtors to pay ordinary course Service

14

Charges, including prepetition fees, and the accrued and unpaid Armored Car Service Obligations, (v) authorizing the Debtors to pay their pre-petition Corporate Card Obligations and continue using and paying the Corporate Credit Cards in the ordinary course of business, and (vi) authorizing and directing all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

52.     In the ordinary course of their business, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer cash as needed to respond to the cash requirements of the Debtors. The Cash Management System is managed by the Debtors at their headquarters in Niwot, Colorado, where they oversee the administration of the various bank accounts to effectuate the collection, disbursement, and movement of cash. The Debtors' oversight ensures accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

53.     As of the Petition Date, the Debtors maintain seventeen bank accounts, which are described in further detail on the schedule attached to the Cash Management Motion as Schedule 1[4] and below (each a "**Debtor Bank Account**", and collectively, the "**Debtor Bank Accounts**"). Twelve of the Debtor Bank Accounts are held at Chase Bank ("**Chase**"). Two of the Debtor Bank Accounts are held at Stockman Bank ("**Stockman**"). One Debtor Bank Account is held at each of

---

[4] The Debtors believe, and have undertaken reasonable efforts to ensure, that Schedule 1 lists all of the bank accounts that comprise the Debtors' Cash Management System. In the event that any bank account has been inadvertently omitted from Schedule 1, the Debtors request that the relief sought by this Motion be deemed to apply to such account.

the following banks: MetaBank ("**Meta**"), SunTrust Bank ("**SunTrust**"), and Signature Bank ("**Signature**", and together with Chase, Stockman, Meta, and SunTrust, the "**Banks**").   As reflected in Schedule 1, each of the Debtor Bank Accounts is held in the name of one of the Debtors. A demonstrative chart of the Cash Management System is attached to the Cash Management Motion as Schedule 2.

**Overview of Cash Management System**

54.     The Debtors maintain the majority of their operating accounts with Chase and maintain other smaller accounts with Stockman, Meta, SunTrust, and Signature. The Debtors use the Chase Operating LFMH (0015) as their centralized operating and cash concentration account (the "**Primary Operating Account**"). Customer payments and vendor rebate and promotion payments are deposited into the Primary Operating Account. The Disbursement Accounts (defined below), all of which are zero balance accounts, draw funds from the Primary Operating Account when needed to pay vendors, employees, and other third parties. The Primary Operating Account is also used to pay certain vendors directly. The Debtors do not maintain separate accounts by store, but deposits by store can be identified via a unique merchant ID tied to an individual location.

55.     As part of its Cash Management System, the Debtors utilize Positive Pay as a fraud-prevention system. Positive Pay is a service that matches the account number, check number and dollar amount of each check presented for payment against a list of checks previously authorized and issued by the Debtors.

Receipts

56.     Customers make payments at the Debtors' stores via the following forms: physical cash, credit card, debit/EBT card, and check. The vast majority of the Debtors' receipts are credit card related. Credit, debit, and EBT card receipts are deposited between two and four days after

16

the transaction occurs. Each of the Debtors' stores has a check scanner (including the Debtors' Montana stores), and all check deposits are made directly to the Primary Operating Account.

57.     Physical cash is stored in a safe, transferred via armored car, and deposited into the Primary Operating Account. For all stores, cash deposits are marked with a unique merchant ID tied to each individual store location.

58.     Because Chase does not have presence in Montana, each of the Debtors' Montana stores maintains an individual operating account with Stockman (0881 & 5663 for Billings and Missoula, respectively) (collectively, the "**Montana Accounts**"). Funds from customer payments are deposited into the Montana Accounts and then manually transferred to the Primary Operating Account on a regular basis.

Vendor Disbursements

59.     The majority of Debtors' disbursements are made from six of the Debtor Bank Accounts held at Chase, all of which are zero balance accounts ("**ZBA**"). The Debtors pay most vendors by physical check, which are written out of Debtor Bank Account Chase ZBA LFMH (1898) (the "**Check Disbursement Account**"). The Check Disbursement Account is a ZBA. Check runs are typically executed on Fridays. The majority of ACH payments are paid out of Debtor Bank Account Chase Operating PAR (5979) (the "**ACH Disbursement Account**")—this includes the majority of electronic payments to vendors, payments on account of sales & property taxes, and payments on account of payroll taxes and fees. Sales tax payments paid out of the ACH Disbursement Account are paid one month in arrears on the 20th of each month. Some of the Debtors' vendors (*e.g.*, Fintech and Liquor) are paid by ACH directly out of the Primary Operating Account. The ACH Disbursement Account is a ZBA.

60.    Debtor Bank Account Chase Operating BDR (3621) (the "**North Boulder Disbursement Account**") is a ZBA used to pay one specific vendor related to the Debtors' North Boulder store. There are also some *de minimus* ATM deposits made into the North Boulder Disbursement Account.

Employee Disbursements

61.    Ceridian HCM, Inc. ("**Ceridian**"), the Debtors' payroll processor, directly draws payroll disbursements out of the ACH Disbursement Account every other Wednesday to distribute payroll on Friday. The majority of employees are paid via direct deposit, but there are approximately 50 employees who receive physical checks. All payroll checks are backed by Ceridian, not the Debtors. Three Debtor Bank Accounts exist solely due to outstanding payroll checks and have no additional activity: Chase Operating RES (2526), Chase ZBA BDR (5873), and Chase ZBA PAR (5580) (collectively, the "**Outstanding Payroll Disbursement Accounts**", and together with the ACH Disbursement Account, the North Boulder Disbursement Account, and the Check Disbursement Account, the "**Disbursement Accounts**"). Each of the Outstanding Payroll Disbursement Accounts is a ZBA. Ceridian distributes all employee related disbursements with the exception of disbursements under the Debtors' 401(k) Plan, which is processed by MassMutual Retirement Services ("**MassMutual**"). MassMutual draws on the ACH Disbursement Account the Monday following payroll for 401(k) contributions.

62.    Certain of the Debtors' employees are paid via reloadable cash cards which are held with Meta Bank (the Meta Bank "**Global Cash Cards**"). During typical payroll cycles, the Global Cash Cards are funded through Ceridian. In certain instances, the Debtors may fund the Global Cash Cards directly. Meta Bank currently holds approximately $5,000 of the Debtors' funds,

18

which it will draw upon in order to fund certain employee's Global Cash Cards during off-cycle payrolls.

Other Debtor Bank Accounts

63.    The Debtors maintain eight additional accounts, which the Debtors have set up for various purposes.

64.    Debtor Bank Account Chase Operating LMOC (6765) is a liquor license proof of entity holding account. This account has no activity and a minimal balance.

65.    Debtor Bank Accounts Chase Admin LFM LP (2517) and Chase Operating LFM LP (3515) are proof of entity accounts established in connection with the Phase 1 EB-5 financing. These accounts have no activity and minimal balances.

66.    Debtor Bank Accounts Chase admin LM2 LP (9653) and Chase Operating LM2 LP (9905) are proof of entity accounts established in connection with the Phase 2 EB-5 financing. These accounts have no activity and minimal balances.

67.    Debtor Bank Account Meta Bank Global Cash Card (9899) is a reserve account used exclusively for employee cash card transactions.

68.    Debtor Bank Account RC SunTrust LFM LP (9995) is a dormant restricted cash account held at SunTrust related to EB-5 financing deposits. As of the Petition Date, this account had a balance of $22,956. The Debtors require a release from a former EB-5 limited partner to transfer funds from this account.

69.    Debtor Bank Account RC Signature LM GP2 LLC (6233) is a dormant restricted cash account held at Signature related to EB-5 financing deposits. As of the Petition Date, this account had a balance of $96. Debtors require a release from a former EB-5 limited partner to transfer funds from this account.

72120896.2

Intercompany Transactions

70.     In the ordinary course of business, the Debtors maintain business relationships with each other. Intercompany transactions (the "**Intercompany Transactions**") among the Debtors result in intercompany receivables and payables (the "**Intercompany Claims**"). The Intercompany Claims primarily are driven by cash and transfers, given the nature of Debtors' business and their centralized Cash Management System. The main Intercompany Transactions giving rise to Intercompany Claims are:

a.     Cash Receipts Activities. As described above, in accordance with the Cash Management System, the Debtors concentrate their revenue into the Primary Operating Account, which is owned by Debtor Lucky's Market Parent Company, LLC ("**LMPC**"). As a result, to the extent the revenue in the Operating Account is contributed from another Debtor, an Intercompany Transaction is generated between LMPC with the particular Debtor that contributed the funds to the Primary Operating Account.

b.     Disbursement Activities. Likewise, in accordance with the Cash Management System, disbursements made from the Check Disbursement Account or the ACH Disbursement Account on behalf of another Debtor gives rise to an Intercompany Transaction. The Check Disbursement Account and ACH Disbursement Account are owned by Debtor Lucky's Farmers Market Holdings, LLC ("**LFMH**") and LMPC, respectively.

71.     Intercompany Claims are not settled by actual transfers of cash among the Debtors. The Debtors document the Intercompany Transactions electronically in its accounting system as transactions are incurred on a monthly and quarterly basis.

Service Charges and Armored Car Service Obligations

72.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "**Bank Fees**"), which average approximately $12,000 per month. The Debtors estimate that they owe approximately $16,000 in Bank Fees as of the Petition Date. The Debtors seek authorization to pay such Bank Fees.

73.     Similarly, the Debtors' credit and debit card processors deduct service charges before transferring the Debtors' credit and debit card receivables. Such fees generally are between 1.0 and 2.0 percent (collectively, the "**Credit Card Fees**," and, together, with the Bank Fees, the "**Service Charges**"). The Debtors estimate that they owe approximately $500,000 in Credit Card Fees as of the Petition Date.  The Debtors seek authorization to pay such Service Charges.

74.     GardaWorld Corporation ("**Garda**") and Brink's Company ("**Brink's**") provide armored car services to the Debtors ("**Armored Car Services**"). On average, the Debtors pay Garda and Brink's approximately $22,000 and $2,500, respectively, per month. The Debtors estimate that, as of the Petition Date, they owe approximately $22,000 to Garda and $2,500 to Brink's on account of accrued and unpaid Armored Car Services (collectively, the "**Armored Car Service Obligations**"). The Debtors seek authorization to pay any unpaid prepetition Service Charges and Armored Car Service Obligations.

Corporate Cards

75.     Additionally, the Debtors provide certain employees with the following types of corporate cards: Chase P-Cards (the "**Chase P-Cards**"), Amex – Travel Cards (the "**Amex Travel Cards**"), and Amex – Expense Cards (the "**Amex Expense Cards**", together with the Chase P-Cards and the Amex Travel Cards, the "**Corporate Cards**") to be used by Debtors' employees to pay business expenses of the Debtors.

76.     The Chase Cards are used by Employees at the Director level and above for general expenses. The Chase Cards are held in the applicable Employee's name but are paid by Debtors directly to Chase. As of the Petition Date, Debtors estimate that approximately $2,000 is owed on account of the Chase P-Cards.

77.     The Amex Travel Cards are held in one account on behalf of seven Employees. The Amex Travel Cards are held in the applicable Employee's name but are paid by Debtors directly to Amex. As of the Petition Date, Debtors estimate that approximately $3,000 is owed on account of the Amex Travel Cards.

78.     The Amex Expense Cards are held in the name of Andrew Pillari, Chief Financial Officer of Debtor Lucky's Market Parent Company, LLC, and used for expense accounts. The Amex Expense Cards are paid directly by Debtors to Amex. As of the Petition Date, Debtors estimate that approximately $10,000 is owed on account of the Amex Expense Cards. Accordingly, Debtors estimate that approximately $15,000 is owed on account of the Corporate Cards as of the Petition Date (the "**Corporate Card Obligations**").

79.     As the foregoing overview reflects, the Cash Management System is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. The Debtors, therefore, request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the ordinary transfer methods in accordance with the agreements governing the Debtor Bank Accounts, including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements (collectively, the "**Bank Account Agreements**").

80.     The Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical

72120896.2

stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**").

81.     For the aforementioned reasons, I believe maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

D.     *Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, and (V) Prepetition Claims Owing to Administrators and Third-Party Providers* (the "Employees and Wages Motion")*

82.     Pursuant to the Employees and Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, to (i) pay accrued prepetition wages, salaries, and other compensation to their Employees (as defined below); (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), the Debtors' paid time off policy, severance policy, and employee benefit plans and programs, as described below; (iii) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions; (v) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the

23

foregoing programs are administered, insured, or paid through a third-party administrator or provider; (vii) continue to honor and maintain Employee programs; and (viii) pay anticipated postpetition severance and WARN obligations that arise in the Interim period.

83.     In connection with the operation of their business, the Debtors currently employ approximately 3,015 employees (collectively, the "**Employees**"), of which approximately 1,675 are full-time employees and 1,340 are part-time employees. Approximately 2,945 of the Employees are employed in the Debtors' store locations (the "**Store Employees**") across ten different states (each, a "**Store**") and approximately 70 Employees are employed at the Company's corporate headquarters in Niwot, Colorado (the "**Support Employees**"). Prior to the Petition Date, Debtors began the wind down and liquidation of 32 of its 39 Stores and certain employees were terminated in connection with such wind-down and liquidation efforts.

84.     The Debtors' weekly gross payroll on account of the Employees averages approximately $530,000. The next scheduled payroll date for Employees is April 5, 2019 and will include salaries and wages earned prepetition. The Debtors estimate that, as of the Petition Date, they owe approximately $320,000 on account of accrued and unpaid prepetition salaries and wages (the **"Employee Compensation Obligations"**). To the best of my understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.

85.     The Employees are critical to the Debtors' business, and their value cannot be overstated. To a significant extent, the Debtors' success depends on the Debtors' ability to retain qualified personnel. The Store Employees hold a variety of positions at the Stores that ensure the Debtors' ability to operate, including: Store Directors, Meat Managers, Apothecary Managers, Produce Managers, Culinary Supervisors, Grocery Managers, Cashiers, Beer Wine Spirits

72120896.2

Department Managers, Cooks, Officer Managers, and Warehouse Specialists. The Support Employees also perform a variety of functions that ensure the Debtors' ability to operate, including: coordinating payroll and benefits, IT, Human Resources, Legal, Marketing, Accounts Payable, and managing operations at the regional and national level. The loss of certain Employees will impede the Debtors' sales operations and seriously harm the ability to successfully implement their bankruptcy strategy.

86.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Compensation Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

87.     In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. Approximately 192 Employees are paid a fixed salary and approximately 2,823 Employees are paid on an hourly basis. The Debtors pay Employees on a bi-weekly basis. Payroll is funded every other Wednesday and paid to Employees on the Friday that follows (or, if such date is a holiday, on the immediately preceding business day). The Debtors' bi-weekly gross payroll on account of the Employees averages approximately $3,250,000. The next scheduled payroll date for Employees is January 31, 2020 and will include salaries and wages earned prepetition from January 12, 2020 through January 26, 2020. The Debtors estimate that, as of the Petition Date, they owe approximately $3,000,000 on account of accrued and unpaid prepetition salaries and wages (the **"Employee Compensation Obligations"**).

To the best of the Debtors' understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.[5]

88.     As of the Petition Date, the majority of the Debtors' Employees have elected to have their payroll administered via direct deposit. Approximately 50 Employees receive payment via check. Approximately 425 Employees receive payment via the Global Cash Card,[6] which load employee payment directly to a debit card.  The Debtors use Ceridian HCM, Inc. ("**Ceridian**") to process their payroll and coordinate the payment of Withholding Obligations (as defined below).

89.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

90.     To the best of the Debtors' understanding, the aggregate of payment of these pre-petition Employee Compensation Obligations and accrued and unpaid general prepetition wages, and salaries is less than $13,650 per Employee.

91.     The Debtors pay certain administrative fees in connection with payroll processing, including amounts owed to Ceridian. In addition to processing the Debtors' payroll and coordinating the payment of Withholding Obligations, Ceridian provides the timekeeping system for the Debtors' corporate office. The Debtors pay Ceridian approximately $42,000 per month in connection with the services it provides. As of the Petition Date, the Debtors estimate that they

---

[5]  To the extent that any Employee is owed more than $13,650, the Debtors will seek authority to pay such amounts by separate motion pursuant to Bankruptcy Code section 502.

[6] A detailed description of the Global Cash Cards is set forth in the Debtors' motion to continue use of their cash management system filed contemporaneously herewith.

owe approximately $0 on account of services provided by Ceridian (the "**Payroll Processing Obligations**"). The Debtors also incur certain tax filing service fees in addition to the monthly fees paid to Ceridian. As of the Petition Date, the Debtors estimate that they owe approximately $500 on account of tax filing services provided by Ceridian (the "**Tax Service Fees**", together with the Payroll Processing Obligations, the "**Ceridian Obligations**").

92.     Kronos Incorporated ("**Kronos**") also provides crucial services to the Debtors by providing the timekeeping system for Debtors' Stores. On average, the Debtors pay Kronos $14,658 per month in connection with the services it provides. As of the Petition Date, the Debtors estimate that they owe approximately $19,500 on account of prepetition services provided by Kronos (the "**Kronos Obligations**"). The ongoing services of Ceridian and Kronos are imperative to the smooth functioning of the Debtors' operations and payroll system.

93.     As of the Petition Date, the Debtors believe that they owe approximately $20,000 on account of prepetition Administrative Fee Obligations (the Ceridian Obligations and the Kronos Obligations are collectively, the "**Administrative Fee Obligations**").

94.     The Debtors seek authorization, but not direction, to pay outstanding prepetition Administrative Fee Obligations and continue paying the Administrative Fee Obligations post-petition in the ordinary course of business. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

95.     For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein, including an

27

Employee's share of health care benefits, insurance premiums, 401(k) contributions, legally-ordered deductions, and other miscellaneous deductions (collectively, the "**Deductions**"). The Debtors withhold approximately $491,000 per month in the aggregate from Employees' wages on account of Deductions, which the Debtors remit to the appropriate third-party recipients. As of the Petition Date, the Debtors estimate that they owe approximately $245,000 on account of accrued and unpaid Deductions.

96.     In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes from Employees' wages (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and Ceridian remits the same to the applicable taxing authorities. On average, the Debtors withhold Employee Withholding Taxes of approximately $1,200,000 per month, and the Debtors' pay Employer Payroll Tax Obligations of approximately $615,000 per month. Ceridian draws the necessary amounts in to satisfy the Payroll Tax Obligations in advance of the relevant payroll processing day. As of the Petition Date, the Debtors estimate that they owe approximately $590,000 on account of accrued and unpaid Employee Withholding Taxes and $310,000 on account of accrued and unpaid Employer Payroll Tax Obligations.

28

97.     The Debtors seek authorization to continue to make the Deductions and satisfy the Payroll Tax Obligations (collectively, the "**Withholding Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

98.     Debtors maintain a discount program, pursuant to which the Debtors offer team member Employees, their family members, and spouses a 20% discount on store purchases, meals, and beverages (the "**Employee Discount Program**"). The Debtors seek authorization to continue the Employee Discount Program.

99.     The Debtors maintain a Severance Policy for their Store Employees based on an Employee's position and the number of years of service with the Debtors. Payment under the Severance Policy is based on the average number of hours worked during the three months preceding termination. Under the Severance Policy, Store Employees receive the greater of the following: (i) number of weeks earned based on position and (ii) number of weeks earned based on the number of years of service with the Debtors. The number of weeks earned under the Severance Policy is set forth in the chart below:

| Years of Service | Weeks of Severance Pay | Position | Weeks of Severance Pay |
|---|---|---|---|
| .74 – 1.00 | 1 | Team Member | 1 |
| 1.01 – 1.50 | 2 | Supervisor | 2 |
| 1.51 – 2.00 | 2 | Hourly Store Support | 3 |
| 2.01 – 2.50 | 4 | Assistant Department Manager | 3 |
| 2.51 – 3.00 | 5 | Department Manager | 4 |
| 3.01 – 3.50 | 6 | Store Director/ Assistant Store Director | 5 |
| 3.51 – 4.00 | 7 | | |
| 4.01 + | 8 | | |

72120896.2

100.    As of the Petition Date, the Debtors do not believe that there are any accrued or unpaid amounts under the Severance Policy.[7] Pursuant to the *Motion of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement* (the "**Store Closing Motion**"), the Debtors anticipate closing 32 stores within approximately three weeks of the Petition Date. The Debtors thus anticipate terminating the majority of the employees who work at those stores and/or support those stores at that time. The Debtors' estimate that the amount of severance payments due at that time will be $3.2 million. The Debtors request that they be authorized to continue to honor the Severance Policy in the ordinary course and pay the estimated severance obligations that will occur before the Final Hearing.

101.    In addition to the Severance Policy, the Debtors are required to make payments to certain Employees under the Worker Adjustment and Retraining Notification Act (the "**WARN Act**") at those facilities at which there are more than 50 full time employees. On January 24, 2020, Debtors issued WARN Act notices to the Employees. The Debtors do not have any outstanding WARN Act obligations for employees terminated prior to the Petition Date.

102.    The Debtors' estimate that the amount of WARN payments due when additional stores close will be $950,000. The Debtors request that they be authorized to pay the estimated WARN obligations that the Debtors incur before the Final Hearing.

103.    Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Employees for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**").

---

[7] One former executive of the Debtors signed a separate severance agreement that did not fall under the Severance Policy. The Debtors do not intend to make the postpetition payments under that severance agreement and do not seek authority to pay any prepetition amount owed.

Reimbursable Expense Obligations typically include expenses for, among other things, travel, meals, parking, mileage, and certain other business and travel related expenses. All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below. In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

104.     The Debtors also have policies whereby Employees can seek reimbursement, by filing expense reports through Concur for the Debtors' payment of business related expenses. Upon approval, expenses are then remitted to Employees as part of payroll. As such, it is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement. On average the Debtors pay approximately $37,000 per pay period on account of Reimbursable Expense Obligations. As of the Petition Date, the Debtors estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations is $35,000.

105.     The Reimbursable Expense Obligations are ordinary course expenses that the Debtors' Employees incur in performing their job functions. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses.

106.     Employees incurred the Reimbursable Expense Obligations as business expenses on the Debtor's behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred the Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the

31

extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses. The Debtors also seek authority to continue their reimbursement policy in the ordinary course of business during the administration of these Chapter 11 Cases.

107.    Additionally In the ordinary course of business, the Debtors implement various benefit plans and policies for their Employees that can be divided into the following categories: (a) medical benefits (the "**Medical Plan**"), dental benefits (the "**Dental Plan**"), and vision care (the "**Vision Plan,**" and collectively, with the Medical Plan and the Dental Plan, the "**Health Plans**"); (b) basic life and accidental death and dismemberment insurance, short- and long-term disability insurance, supplemental life and AD&D, whole life, and other voluntary insurance plans (collectively, the "**Income Protection Plans**"); (c) a retirement savings 401(k) plan (the "**401(k) Plan**"); (d) flexible spending plans (the "**FSA Plan**"); (e) an employee assistance program (the "**EAP**"); (f) voluntary accident insurance plans (the "**Voluntary Accident Insurance Plan**"); (g) the advantage card program (the "**Advantage Card Program**", and collectively, with the Health Plans, the Income Protection Plans, the 401(k) Plan, the FSA Plan, the EAP, and the Voluntary Accident Insurance Plan, the "**Employee Benefits Plans**"). In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans. All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "**Employee Benefits Obligations**."

108.    As further provided in the Employees and Wages Motion, obligations relating to certain Employee Benefits Plans remain unpaid as of the Petition Date. The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits Obligations that have already accrued.

32

109.    The Debtors' ability to successfully operate is contingent on a reliable and loyal workforce. As stated above, competition for qualified employees is intense in the Debtors' industry. Thus, it is essential to assure the Employees that the Debtors will honor their obligations and continue and maintain the employment and pay and programs in the ordinary course of business throughout these Chapter 11 Cases. I believe that a failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or the decision to not complete work for the Debtors or accept future hiring proposals. I believe that the loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

E.    ***Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment*** (the "<u>Utilities Motion</u>")

110.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) prohibiting Utility Providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

111.    Historically, in conjunction with its day-to-day operations, the Debtors used to receive traditional utility services from 65 unique utility providers for, among other things, telecommunications, gas, water, electricity, waste disposal, and similar utility products and services. In the past, the Debtors paid an average of approximately $775,000 per month on account

33

of utility services during 2019. The Debtors anticipate needing the services (collectively, the "**Utility Services**") of all utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") which, without limitation, are set forth on the list annexed to the Utilities Motion as Exhibit C (the "**Utility Providers List**") going forward.

112.    As "adequate assurance," the Debtors propose to segregate on their books and records, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks (net of deposits and surety bonds) of ongoing Utility Services (*i.e.,* approximately $204,000, net of deposits and surety bonds), calculated based on 50% of the Debtors' average monthly consumption over the last 12 months of Utility Services (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

113.    I believe uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to consummate a sale through chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**F.**     ***Motion of Debtors for an Order Authorizing Payment of Prepetition Taxes and Fees* (the "Taxes Motion")**

114.     Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing them to pay any prepetition tax and fee obligations including, without limitation, income and franchise taxes, property taxes, sales and use taxes, business license fees, annual report taxes, and other taxes and fees (collectively, the "**Taxes and Fees**")[8] owing to those federal, state, and local governmental entities in the United States, including as listed on Exhibit B attached to the Taxes Motion (the "**Taxing Authorities**"). The Debtors propose to pay approximately $1.43 million on account of prepetition Taxes and Fees under this Motion, broken down as $250,000 in prepetition property taxes, sales and use taxes of approximately $1.15 million, and $30,000 in income/business taxes. The Debtors anticipate approximately $1.15 million in Taxes and Fees will be due within the next 30 days.

115.     Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial, and local governments in the United States. Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due. Certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year. In 2019, the Debtors paid approximately $13.5 million on account of all Taxes and Fees.

---

[8]  Payroll, withholding, and other employee-related tax obligations are separately addressed in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers*, which is contemporaneously filed herewith.

116.    I believe the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (i) the obligations are priority, secured, or unsecured in nature, (ii) the obligations are proratable or fully prepetition or postpetition, and (iii) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

117.    Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

118.    I believe failure to pay the Taxes and Fees to the Taxing Authorities in full and on time, thereby risking the cessation of normal relations between the Taxing Authorities and the Debtors, will make these estates worse off than they will be having paid the Taxes and Fees. I believe it is in the best interests of the Debtors' estates that the Taxes and Fees be paid on time so as to avoid administrative difficulties. Failure to timely pay, or a precautionary withholding by the Debtors of payment of, the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including an increase in audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.

119.     The Chapter 11 Cases are complicated due to the nature of the Debtors' business, and the Debtors' focus should be on addressing their operational and financial issues in a manner that will maximize recoveries. In this context, the payment of the Taxes and Fees is insignificant and will have no meaningful effect on the recoveries of creditors in the Chapter 11 Cases, particularly in view of the priority or secured status of a significant portion of such obligations. Moreover, the payment amount will likely be offset in no small part by the amount of postpetition resources that the Debtors will conserve by obviating the need to spend time and money to address disputes with the Taxing Authorities that are unnecessary and wasteful of the resources of the Debtors and this Court.

G.      ***Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (III) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay*** (the "**Insurance Motion**")

120.     Pursuant to the Insurance Motion, the Debtors seek entry of an authorizing the Debtors to (i) continue and renew their Insurance Policies, or obtain new insurance policies, as needed in the ordinary course of business, and (ii) honor all of their prepetition and postpetition obligations, including payment of all outstanding prepetition Insurance Obligations, under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, including premiums arising under the Insurance Policies and the Broker Fees.[9]

---

[9] Nothing in the Insurance Motion should be construed as an assumption of any executory contract or unexpired lease between the Debtors and any other party, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor. The Debtors reserve the right to contest the amount claimed to be due by any person or entity.

121.    In the ordinary course of their business, the Debtors maintain: (a) approximately 11 insurance policies solely with Lucky's Market with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general and liquor liability, excess liability, automobile and workers compensation; and (b) insurance policies providing coverage for, among other things, directors and officers liability, employment practices liability, fiduciary liability, cyber liability, property losses and environmental losses purchased by the Kroger Co. to cover several entities including Lucky's Market, the premiums of which the Debtors partially reimburse to the Kroger Co. (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in Exhibit B annexed to the Insurance Motion.

122.    The Debtors incur approximately $2,750,000 in the aggregate in premiums under the terms of their existing Insurance Policies as well as other obligations, including other related fees and costs (collectively, the "**Insurance Obligations**") annually. One such Insurance Obligation relates to Workers' Compensation. There are no Workers' Compensation claim payments that are currently unpaid and due; however, there are open Workers' Compensation claims incurred prepetition that may require payments post-petition. In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable, and anticipate more than $135k in premium adjustments for the 2018-2019 policies.

123.    The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily (i) paid in full at the time or renewal or (ii) paid in installments over the term of the policy.

124.     The Debtors may elect to fund premiums for certain policies by making installment payments directly to the insurer throughout the term of the policies. Accordingly, in the ordinary course of business, the Debtors make monthly installment payments pursuant to premium installment plans with Argonaut Great Central Insurance Company for general liability and automotive insurance, Pinnacle Assurance for workers compensation insurance in Colorado, and American Zurich Insurance Company for workers compensation insurance in all states except Colorado, Ohio, and Wyoming (collectively, the "**Installment Plans**"), summarized on Exhibit C annexed to the Insurance Motion. The Debtors entered into the Installment Plan in order to pay the insurance premiums for the various policies. Under the Installment Plan, the Debtors are obligated to make, in addition to a predetermined down payment, interval installment payments. The Debtors have paid the down payments and have continued to pay the installments as they have come due prior to the Petition Date. The next payments for the Installment Plans will likely be due in the first weeks of February, March, and April, and will total approximately $245,000 each.

125.     In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by paying premiums in installment, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the Installment Plan and, as necessary, renew or enter into new such agreements.

126.     With respect to certain Insurance Policies, the Debtors retain the services of Marsh USA, Inc. ("**Marsh**") as the broker to assist them with the procurement and negotiation of certain Insurance Policies. Marsh assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. Marsh also provides ongoing support through the policy periods. The Debtors pay Marsh $150,000 annually, paid in four equal quarterly installments of $37,500. Two

72120896.2

of the installment payments due to Marsh for this year, totaling $75,000, have not yet come due and remain unpaid. The Debtors are also eligible for a retainage of fees from Marsh if total fees and commissions paid exceed the $150,000 annual amount. The Debtors may apply this retainage of paid fees exceeding the $150,000 annual amount to future services provided by Marsh.

127.   Based on the foregoing, I believe that continuation of the Insurance Policies is essential to preserve the value of the Debtors' assets and minimize exposure to risk.

## H.   *Motion of Debtors for Interim and Final Authority to (i) Maintain and Administer Customer Programs, Promotions and Practices, and (ii) Pay and Honor Related Prepetition Obligations (the "Customer Programs Motion").*

128.   Pursuant to the Customer Programs Motion, the Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer customer programs, promotions, and practices and (ii) pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business judgment.

129.   Traditionally, the Debtors' businesses have been dependent upon the loyalty of their customers. To maximize customer loyalty, the Debtors maintained and followed, in the ordinary course of business, the practices and programs described herein and others (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' stores. Customer programs are standard in the retail food business. Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk disrupting the store closing sales and eroding estate value and losing customers at continuing Lucky's Market stores.

Return and Exchange Policies

130.   Consistent with industry practice and to accommodate customers' needs, the Debtors maintain return, refund, exchange, price-guarantee, and rain-check policies with respect

40

72120896.2

to both cash and credit purchases (collectively, the "**Return and Exchange Policies**"). These policies assure the Debtors' customers that they will be "made whole" if merchandise is inadequate, damaged or defective, incorrectly processed, or unavailable. The Debtors seek authorization to honor the Return and Exchange Policies with respect to merchandise purchased prior to the Petition Date.

Sales Promotions

131.    From time to time, the Debtors conduct sales promotions at selected stores or banners (the "**Sales Promotions**"). The Sales Promotions include "buy one get one free" programs and percent off sales. These Sales Promotions allow the Debtors to increase their vendors' exposure to the Debtors' customer base and generate additional income by driving foot traffic at the stores. The Debtors seek authorization to honor these Sales Promotions.

Coupon Program

132.    The Debtors maintain a coupon redemption program pursuant to which they honor (a) certain third-party coupons distributed to the Debtors' customers and (b) the Debtors' own coupons that are included in advertising circulars, electronic mail, or distributed in the Debtors' stores (collectively, the "**Coupons**"). When a customer redeems a valid third-party Coupon in one of the Debtors' stores, the Debtors deduct the amount of the Coupon (or such other deduction as may be advertised) from the relevant item's purchase price. Third-party Coupons are then processed and remitted to third-party intermediaries, who in turn collect the amounts from the various vendors and pay the Debtors the value of the Coupons collected. To not disrupt the store closing sales, which may erode value to the Debtors and to preserve the goodwill of their existing customer base, the Debtors seek authorization to honor the Coupons issued prior to the Petition Date in a manner consistent with their ordinary business practices.

72120896.2

Gift Card Programs

133.    Pre-petition, the Debtors maintained a program by which their customers could purchase gift cards that would be redeemed for merchandise at a later date (collectively, the "**Gift Card Programs**"). As of the Petition Date, approximately $775,000 in issued gift cards are outstanding, of which $475,000 has had no activity since June 1, 2019.  To not disrupt the store closing sales, which may erode value to the Debtors and to preserve the goodwill of their existing customer base, the Debtors seek authorization to honor all gift cards purchased by customers prior to the Petition Date in a manner consistent with their ordinary business practices.

Script Programs

134.    The Debtors maintain two script programs, pursuant to which non-profit organizations and schools can purchase gift cards ($500 minimum purchase) and receive a 7% discount on the purchase (the "**Script Programs**"). The first program is an "upfront only" sale where the non-profit organization or school resells the gift cards at face value at various fundraising functions. At that point, the gift cards are treated like any other gift card purchased for full value. The second program is a "reloadable" gift card. In this program, the purchasing organization and card numbers in the initial purchase are recorded when the sale occurs. The non-profit organization or school resells the gift cards at face value at various fundraising functions. The card holder has the option of reloading funds onto these cards once the initial balance has been used or significantly depleted. Reload dollars are manually tracked and 7% of the total reload amount is remitted to the non-profit organization or school quarterly. The Reloadable program has only been implemented in Colorado. The Debtors seek authorization to maintain the Script Programs and to honor all gift cards purchased as part of the Script Programs prior to the Petition Date.

135.    The ability to continue administering the Customer Programs without interruption is absolutely critical to the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders. If the Debtors are unable to continue the Customer Programs postpetition or honor obligations thereunder, the Debtors risk alienating certain customer constituencies (who then could form relationships with the Debtors' competitors) and could suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for maximizing recoveries to their creditors.

136.    The Debtors' Customer Programs also are essential marketing strategies for attracting new customers. Failure to continue the Customer Programs and offer even basic programs such as the Return and Exchange Policy will place the Debtors at a significant—and potentially insurmountable—competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from these chapter 11 filings. Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their ability to successfully administer their chapter 11 cases and maximize recoveries to stakeholders. The relief requested herein will pay dividends with respect to their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of these chapter 11 cases.

137.    Under these circumstances, I believe the benefits of continuing to honor the Customer Programs far outweigh the relatively minimal costs associated therewith. Thus, I believe sufficient cause exists to warrant the authority to continue administering the Customer Programs and to honor any customer obligations relating thereto.

43

I.     ***Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, and 541 of the Bankruptcy Code, Authorizing the Payment of Prepetition Claims Arising under (A) the Perishable Agricultural Commodities Act, and (B) the Packers and Stockyards Act (the "PACA/PASA Motion")***

138.   Pursuant to the PACA/PASA Motion, the Debtors seek authority, but not direction, after consultation with any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "**Committee**") and The Kroger Co. (the "**Prepetition Secured Lender**"), to pay valid, pre-petition PACA/PASA Claims ("**Allowed PACA/PASA Claims**") in connection with any of their Stores, in the Debtors' discretion prior to the effective date of any plan filed in these Chapter 11 Cases. For clarity, not every claim held by a creditor that supplied perishable agricultural commodities may be entitled to the protection of PACA and PASA. In addition, any supplier asserting a PACA/PASA Claim must comply strictly with the notice requirements set forth in PACA/PASA. As such, the Debtors seek only the authority to pay Allowed PACA/PASA Claims in connection with any of their Stores, in their discretion and after consultation with the Committee and the Prepetition Secured Lender, without prejudice to their right to challenge any claim asserted to be entitled to protection and/or treatment under PACA or PASA.

139.   Before the commencement of these Chapter 11 Cases, the Debtors and their advisors identified and commenced the wind down and liquidation of 32 of their 39 stores (the "**Stores**"). Debtors continue to operate the remaining 7 stores (the "**Remaining Stores**"). In operating the Stores, the Debtors ensured that the Stores were continuously replenished with a supply of goods including, but not limited to, fresh produce, canned goods, baked goods, dairy products, eggs, meats, seafood, floral products, alcoholic beverages and various non-food products (the "**Merchandise**") for sale directly to the Debtors' customers. To maintain the goodwill of their vendors and the Debtors' customer base, which relies on the Debtors as a primary source of fresh

fruits, produce, meats, and poultry, it is critical that the Debtors preserve the ability to source such Merchandise.

140.     The Debtors believe that a certain portion of the Merchandise sold in the Stores may qualify under PACA or PASA. Payment of PACA/PASA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and certain of the vendors of fresh produce, meat and poultry products. Without the relief requested herein, the Debtors could be subject to numerous claims, adversary proceedings, and motions, including motions by PACA/PASA Claimants for relief from the automatic stay and/or complaints for injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors. Payment made to PACA/PASA Claimants will inure to the benefit of the Debtors' Remaining Stores and parties in interest by (a) facilitating the continued purchase and receipt of fresh produce and other products and (b) avoiding potential disruption to the Debtors' business operations at the Remaining Stores.

141.     I believe paying the PACA/PASA Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Accordingly, I believe that the proposed relief with respect to the PACA/PASA Caims is warranted in these Chapter 11 Cases.

J.       **Motion of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement (the "Store Closing Sales Motion").**

142.     Pursuant to the Store Closing Sales Motion, pursuant to sections 105(a), 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 6003, 6004, 6006, and 9014, and Local Rule 9013-1, the Debtors request interim authority, but not direction, to (i) implement the Store Closing Procedures attached as Exhibit 1 to the Proposed Order of the Store Closing Sales Motion granting the relief requested in the Store Closing Sales Motion on an interim basis and conduct or continue

45

conducting the Store Closing Sales at the Stores, as applicable; and (ii) assume the Liquidation Consulting Agreement attached to the Proposed Order of the Store Closing Sales Motion as Exhibit 2.

143.    The Debtors propose implementing the Store Closing Procedures, substantially in the form attached to the Proposed Order of the Store Closing Sales Motion, to facilitate seamless Store Closing Sales. The Debtors have determined that, in the exercise of their business judgment and in consultation with their advisors and their prepetition secured lender, implementing the Store Closing Procedures will provide the most timely and efficient means for maximizing the value of the Store Closing Assets.

144.    Before the commencement of these Chapter 11 Cases, the Debtors notified parties affected by the closure of the Closing Stores, including employees.

145.    Certain states and localities in which the Debtors operate stores have or may have laws, rules, regulations, or ordinances regarding licensing or other requirements governing the conduct of store closings, liquidations, or other inventory clearance sales (collectively, the "**Liquidation Sale Laws**"). Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closing Sales. The Debtors believe that in most cases, the Store Closing Procedures are consistent with Liquidation Sale Laws and with the leases affected by the Store Closing Sales. Certain requirements, however, may hamper the Debtors' efforts to maximize the value of their Store Closing Assets, a significant portion of which consists of perishable inventory. Thus, the Debtors seek authority from the Court to conduct the Store Closing Sales in accordance with the Store Closing Procedures without complying with the Liquidation Sale Laws, when the two are inconsistent.

146.     Similarly, the Debtors respectfully request a finding that any contractual restrictions that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the Store Closing Sales are unenforceable. In certain cases, the Store Closing Sales may be inconsistent with certain provisions of leases, subleases, vendor contracts, or other documents associated with the Stores, including reciprocal easement agreements, agreements containing covenants, conditions, and restrictions, including "go dark" provisions and landlord recapture rights, or other similar documents or provisions.

147.     Debtors commenced these Chapter 11 Cases for the purpose of liquidating all of their stores not included in the proposed sale process discussed below. Prior to the Petition Date, the Debtors and their advisors engaged in a systematic review of each of their 39 open stores and 19 unopened stores, analyzing their performance, profitability, liquidity, and market impact. Historically, the Debtors' underperforming stores are, among other things, in regions over-saturated with competition (new and historical) and/or are too costly for the Debtors to operate. Accordingly, continued operation of such underperforming stores no longer remains viable. Indeed, before the commencement of these Chapter 11 Cases, the Debtors and their advisors identified and commenced the wind down and liquidation of 32 stores (the "**Closing Stores**").

148.     In formulating the list of Closing Stores, the Debtors considered, among other factors, current occupancy costs, historical store profitability, recent and projected sales trends, specific circumstances related to a store's performance, current liquidity, and whether any firm offer for such store was obtained or likely available from third parties. The Debtors estimate that, absent closure, the Closing Stores will collectively generate approximately $30 million in operating losses for the fiscal year 2020.

149.    Leading up to the Petition Date, the Debtors, in consultation with their advisors, developed procedures to sell or otherwise dispose of the inventory and furniture, fixtures, and equipment ("**FF&E**" and, together with applicable inventory, the "**Store Closing Assets**") at the Closing Stores, in each case, free and clear of all liens, claims, interests, and other encumbrances (the "**Store Closing Procedures**," and the liquidation sale, the "**Store Closing Sales**").

150.    The Debtors also conducted an extensive prepetition sales process to sell as many of the Debtors' stores as possible. As a result of these efforts, the Debtors have received indications of interest for the sale of FF&E and transfer of leases for approximately 26 stores to third-party purchasers. The Debtors have executed an Asset Purchase Agreement with Aldi and are negotiating the terms of other Assets Purchase Agreements pursuant to letters of intent that have been received (the "**APAs**") for certain other stores (the "**Sold Stores**"). The Debtors will file separate motions to establish bid procedures for each of the APAs for the sale of certain of the Debtors' assets in connection with the Sold Stores. The Debtors will also file a motion to shorten notice of the bidding procedures in order to run an expedited and cost-efficient post-petition sale process given the extensive prepetition process. As the sale transactions only contemplate the sale of unexpired leases and FF&E, the Store Closing Procedures will also apply to the Sold Stores to the extent applicable.

151.    The Debtors continue to operate 7 stores (the "**Operating Stores**", together with the Closing Stores and the Sold Stores, the "**Stores**"). The Debtors are finalizing the terms of a sale of the Operating Stores, which will be subject to a bidding procedures motion and approval by the Court as well. The Debtors, in their business judgement, believe that sale of the Operating Stores provides value to the Debtors in excess of what would otherwise be realized in a liquidation.

152.    Before commencing any store liquidations, the Debtors and their advisors, formulated a comprehensive store closing schedule. Store Closing Sales at the Closing Stores began on or around January 22, 2020, and are expected to be completed by February 29, 2020, at which time the Debtors will exit the store facility.

153.    To maximize the value of the Store Closing Assets and effectuate an orderly liquidation process, the Debtors also seek authority to assume a liquidation consulting agreement dated January 26, 2020 (the "**Liquidation Consulting Agreement**") between Lucky's Market Parent Company, LLC and Great American Global Partners, LLC (referred to hereout as "**Great American**" or the "**Liquidation Consultant**"). The Liquidation Consultant will assist with the sale of FF&E for certain Stores. With the help of the Liquidation Consultant, the Debtors estimate that the sale of the Store Closing Assets in the Stores will yield approximately $1.5 million in gross proceeds.

154.    Thus, I believe the relief requested in the Store Closing Sales Motion is integral to maximizing value for the Debtors' estates and their economic stakeholders. It will permit the Debtors to continue implementing the Store Closing Sales at the Stores, and it will establish fair and uniform Store Closing Procedures to assist the Debtors and their creditors through the Debtors' liquidation and sale processes. I also believe that the terms of the Liquidation Consulting Agreement are market, reasonable, and that assumption of the Liquidation Consulting Agreement is an exercise of the Debtors' sound business judgment.

**K.**    ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief* (the "<u>Cash Collateral Motion</u>")**

155.    Pursuant to the Cash Collateral Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to use the Cash Collateral, (ii) granting the Prepetition Secured

Lender adequate protection upon the terms set forth in the Interim Order and in any final orders, (iii) modifying the automatic stay, and (iv) scheduling a final hearing on the Motion.

156.    Based on performance of the Debtors' business, the Debtors' management determined that it would require approximately $100 million in incremental funding to continue operations until the Debtors would be cash flow positive. Management determined that it would be unable to secure new sources of sufficient funding outside of these chapter 11 cases. The Debtors have an immediate and critical need for the use of Cash Collateral. Access to the use of Cash Collateral will allow the Debtors to retain employees to continue the liquidation of certain of their Stores and pursue sales processes, which the Debtors believe will preserve and maximize the value of the estates. The Debtors have determined that absent the use of Cash Collateral, the Debtors will be unable to continue (i) operations of their businesses, (ii) the ongoing liquidation of certain of their assets, and (iii) the sales processes during the Chapter 11 Cases, which will irreparably harm the Debtors' estates and creditors. The Debtors' ongoing obligations include obligations to pay wages to employees and amounts due and owing to vendors.

157.    In exchange for the consensual use of Cash Collateral, the Debtors have agreed, and the Interim Order provides, adequate protection in the form of, among other things, adequate protection liens, and superpriority claims to protect the Prepetition Secured Lender against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, the subordination of the Prepetition Secured Lender's liens to the Carve-Out (as defined in the Interim Order), and the imposition of the automatic stay.

158.    At this time, the Debtors do not contemplate the need for postpetition financing. Instead, the Debtors intend to operate their businesses solely on the use of the existing Cash Collateral generated from the liquidation of their stores. I believe that access to existing Cash

72120896.2

Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to continue operating and continue the liquidation and sales processes. Without access to Cash Collateral, I believe the Debtors will face irreparable harm.

159.   Based on the foregoing, I believe that entry of the Interim Order authorizing the interim use of Cash Collateral and scheduling a Final Hearing to approve the use of Cash Collateral on a final basis is necessary and appropriate.

## IV.   CONCLUSION

160.   The Debtors' goal in these Chapter 11 Cases is the maximization of estate value through a sale of the business as a going concern, preserving value for the Debtors' creditors, employees and other parties-in-interest. In the near term, however, the Debtors' immediate objective is to continue operating their business during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of substantially all of the Debtors' assets will be substantially enhanced.

161.    I hereby certify the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of January, 2020.

**Lucky's Market Parent Company, LLC,** *et al.*

Debtors and Debtors in Possession

*/s/ Andrew T. Pillari*

_____

Andrew T. Pillari
Chief Financial Officer

72120896.2

**Exhibit A**

**Organization Structure**

*Lucky's Organization and Ownership Chart*                                         *05/01/2019*

