# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| LUCKY'S MARKET PARENT COMPANY, LLC, *et al.*,[1] | Case No. 20-10166 (JTD) |
| Debtors. | (Jointly Administered) |

## MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF CERTAIN OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT, (E) APPROVING BID PROTECTIONS, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF (WINN-DIXIE STORES, INC.)

The above-captioned debtors and debtors in possession (the "**Debtors**") hereby move this Court (this "**Motion**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"); and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of (i) an order, substantially in the form attached hereto as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), and Sinoc, Inc. (0723).

Exhibit B (the "**Bid Procedures Order**"), (a) approving procedures in connection with the potential sale of certain of the Debtors' assets, (b) scheduling the related auction and hearing to consider approval of the Sale (as defined below), (c) approving the form and manner of notice thereof, (d) authorizing the Debtors to enter into the Stalking Horse Agreement (as defined below), (e) approving certain bid protections for Winn-Dixie Stores, Inc., the Stalking Horse Purchaser, (f) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases, and (g) granting related relief; and (ii) an order, substantially in the form attached hereto as Exhibit C (the "**Sale Order**"), (a) approving the Sale of the Assets (as defined below) free and clear of liens, claims, encumbrances, and other interests, (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (c) granting related relief. In support of this Motion, the Debtors rely upon the *Amended Declaration of Andrew T. Pillari, Chief Financial Officer of Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 47] (the "**First Day Declaration**"). In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Under Local Rule 9013-1(f), the Debtors consent to entry of a final order under Article III of the United States Constitution. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2

2.      The statutory predicates for the relief requested in this Motion are Bankruptcy Code sections 105, 363, 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006, 9007, 9014 and Local Rules 2002-1, and 6004-1.

## BACKGROUND

**A.      The Debtors' Chapter 11 Cases**

3.      On January 27, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.[2]

4.      The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

5.      Subject to their right to determine an alternative course of action is preferable, the Debtors intend to wind down their businesses through a combined liquidation and sale of their assets in the Chapter 11 Cases. The Kroger Co., as the Debtors' prepetition secured lender (the "**Prepetition Secured Lender**") has, subject to certain conditions, allowed the Debtors to use the Prepetition Secured Lender's cash collateral to fund the Chapter 11 Cases and the potential sales. The Debtors seek to commence the sale processes as expeditiously as possible to maximize value for the Debtors' stakeholders.

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the First Day Declaration.

## RELIEF REQUESTED

6.      By this Motion, *first* the Debtors seek entry of the Bid Procedures Order in substantially the form attached hereto as Exhibit B:

(a)      authorizing and approving the Bid Procedures attached to the Bid Procedures Order as Exhibit 1 in connection with the sale (the "**Sale**") of certain of the Debtors' assets related to five (5) of the Debtors' stores (the "**Assets**");

(b)      scheduling an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the Sale of the Assets;

(c)      approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as Exhibit 2 (the "**Sale Notice**");

(d)      authorizing the Debtors to enter into (i) that certain Asset Purchase Agreement with Winn-Dixie Stores, Inc. (the "**Stalking Horse Purchaser**"), a copy of which is attached hereto as Exhibit A (the "**Stalking Horse Agreement**"), pursuant to which the Stalking Horse Purchaser seeks to purchase the Assets (as defined in the Stalking Horse Agreement) from the Debtors as set forth therein;

(e)      approving certain bid protections as set forth in the Stalking Horse Agreement, consisting of an expense reimbursement of up to 10% of the Purchase Price (for actual out-of-pocket third party expenses) (the "**Expense Reimbursement**", or the "**Bid Protections**").

(f)      approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "**Assumption Procedures**") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**Contracts**"); and

(g)      granting related relief.

7.      *Second*, the Debtors may seek entry of the Sale Order at the conclusion of the Sale Hearing in substantially the form attached hereto as Exhibit C:

(a)      authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement);

(b)      authorizing the assumption and assignment of the Contracts; and

(c)      granting any related relief.

8.      The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

## PREPETITION MARKETING AND SALE PROCESSES

9.      Prior to the Petition Date, the Debtors engaged PJ Solomon as their investment banker to conduct a prepetition marketing process for substantially all of the Debtors' assets. As a result of the prepetition marketing process, the Debtors have identified a number of potential purchasers for various of the Debtors' assets. The Debtors have already filed four bidding procedures and sale motions seeking to commence four simultaneous sales processes to four different purchasers that indicated interest in non-overlapping packages of assets of the Debtors. The Debtors have identified at least two additional potential purchasers that indicated interest in additional non-overlapping packages of assets. To maximize the value of their assets, Debtors propose to commence at least two more sales processes for these assets, for a total of six simultaneous sales processes, as they continue to negotiate with potential purchasers, develop strategies, and market additional assets for sale. In addition to seeking to establish bid procedures for the six proposed sales, Debtors have also filed a motion to establish store closing procedures and liquidate the assets of the Debtors not subject to one of the proposed stalking horse bids. Finally, the Debtors will market the remaining leases for sale that are not subject to any of the aforementioned sales. The Debtors have retained PJ Solomon to continue and complete the sale processes and to serve, subject to court approval, as their investment bankers in these Chapter 11 Cases. The Debtors expect to retain other consultants to assist with the liquidation of the remainder of the assets and leases.

10.     As part of the proposed post-petition sale process, the Debtors and their other professionals will continue to engage in the robust marketing effort for the Debtors' assets, which started well before the Petition Date, by continuing to contact both financial and strategic investors regarding a potential sale, including all parties contacted prior to the commencement of the Chapter 11 Cases as well as the Debtors' landlords. All interested parties have been or, upon entry of the Bid Procedures Order, will be given an opportunity to execute a confidentiality agreement (a "**Confidentiality Agreement**") and be given access to the data room maintained by PJ Solomon. Those parties that execute a Confidentiality Agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

## STALKING HORSE AGREEMENT

11.     The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached hereto as Exhibit A. The material terms of the Stalking Horse Agreement, including those provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are as follows:

| MATERIAL TERMS OF STALKING HORSE AGREEMENT[3] | |
| --- | --- |
| **Purchase Price** | The purchase price payable under the Stalking Horse Agreement for the Assets shall be Two Million Eight Hundred Thousand and No/100 Dollars ($2,800,000) (collectively, the "**Purchase Price**"), subject to adjustments for prorations as provided in ARTICLE VII, which shall be paid by Buyer to Sellers in accordance with Section 5.1. *See* Stalking Horse Agreement at § 3.1. |

---

[3] All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement. To the extent there are any discrepancies between the Stalking Horse Agreement and this summary, the terms of the Stalking Horse Agreement shall prevail.

| Assets | On the terms and subject to the conditions set forth in the Agreement, on the Closing Date (as defined in Section 2.3) Sellers shall convey, transfer, assign, sell and deliver to Buyer, and Buyer shall acquire, accept and purchase, all of the right, title and interest of Sellers in and to the following assets comprising or relating to the Store Properties whether tangible or intangible and whether or not shown on the books and records of Sellers as the same may exist on the Closing Date, but excluding the Excluded Assets (as defined in Section 2.2) (collectively, the "**Assets**"): |
|---|---|
| | A.      The Store Leases, together with (to the extent of Sellers' interest therein) buildings, fixtures and improvements (collectively, the "**Improvements**") located on or attached to such real property, and all rights arising out of the Store Leases, subject only to the Permitted Exceptions and those liabilities, liens, obligations and encumbrances (if any) which are expressly assumed in writing by Buyer. |
| | B.      To the extent they are assignable, any and all guarantees and warranties (collectively, the "**Warranties**") to the extent they relate to the ownership or operation of the Equipment (as defined in Section 2.1C)). |
| | C.      All furnishings, trade fixtures, machinery and equipment owned by Sellers, without warranty, and located on and used in connection with the operation of the Store Properties, other than any Excluded Equipment (as defined in Section 2.2A)) to be retained by Sellers (collectively, the "**Equipment**"). |
| | D.      All transferable Permits. |
| | E.      All Quota Liquor Licenses applicable to any Store Property, as specified on Exhibit 2.1(E). |
| | F.      To the extent divisible to the Store Property Level and permitted to be assigned, used, or provided by Seller under applicable Laws, all customer data and information related to the Store Properties. |
| | G.      To the extent assignable or transferable by law and without material expense or cost to Sellers, all other assets owned by Sellers located at the Store Properties and which are used primarily in connection with the operation of the businesses at the Store Properties (other than the Excluded Assets). |
| | *See* Stalking Horse Agreement at § 2.1. |
| **Leases Included** | 1. Storeroom, 1459 NW 23rd Avenue, Gainesville, Florida<br>2. Storeroom, 3170 W. New Haven Avenue, West Melbourne, Florida |

7

| | |
|---|---|
| | 3. Storeroom, 13300 S. Cleveland Avenue, Suite 44, Fort Myers, Florida<br>4. Storeroom, 6424 Naples Boulevard, Suite 601, Naples, Florida<br>5. Pad Lease, 211 Wheel House Lane, Lake Mary, Florida |
| **Assumed Liabilities** | Subject to the terms and conditions set forth in the Agreement, effective as of the Closing, Buyer shall assume, pay and discharge the following obligations of Sellers related to the Assets ("**Assumed Liabilities**"): all claims, Liabilities or obligations of any kind, fixed or contingent, known or unknown, relating to or arising in connection with the use, non-use, ownership (whether by leasehold or fee) of the Assets or the operation of the Store Properties (excluding, however, any claims, Liabilities or obligations relating to compliance with any of Sellers' legal or contractual obligations with respect to any of its employees at the Store Properties), including, but not necessarily limited to, obligations under the Store Leases, any leases or subleases of all or any portion of the Store Properties in which Sellers or their Affiliates is a lessor or sublessor, Permits and the Warranties, all to the extent (but only to the extent) such claims, Liabilities and obligations arise during, accrue during, or are attributable to, the period from and after the consummation of the Closing on the Closing Date. The definition of "**Assumed Liabilities**" shall also include any claims, Liabilities and obligations relating to any matters existing prior to the consummation of the Closing on the Closing Date which are of the type covered under the definitions of "**Store Systems Remediation**" or "**Hazardous Materials Remediation**" and which arise from or are attributable to conditions identified by Buyer during the Due Diligence Period. Buyer shall indemnify, defend, and hold harmless, Sellers and any Seller Affiliate that provided a guarantee of the Store Lease from and against any and all Losses and Liabilities sustained or incurred (or alleged to have been sustained or incurred) as a result of Buyer's failure to satisfy on a timely basis the Assumed Liabilities, accruing after the consummation of the Closing.<br><br>*See* Stalking Horse Agreement at § 4.1. |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | Not applicable. |
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | Not applicable. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | The Sale Order provides certain claims against the Debtors and/or the Purchaser are barred or otherwise waived. *See* Sale Order, ¶ 20, 22, 24, and 25. |

| | |
|---|---|
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | Not applicable. |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The closing of the transactions herein contemplated shall, unless another date, time or place is agreed to in writing by the Parties, take place at the Denver offices of Polsinelli PC on that date which is as soon as practicable after the Sale Order becomes the Final Order but not earlier than thirty (30) days after the expiration of the Due Diligence Period as such date may be extended in accordance with Sections 18.2 and 20.2(a), or such other date as is mutually acceptable to both parties (the "**Closing**" or "**Closing Date**"). *See* Stalking Horse Agreement at § 2.3. Within three (3) business days of date the Stalking Horse Agreement is executed, Sellers will file a motion to approve the Bidding Procedures for the Sale and bid protections for the Buyer. *See* Stalking Horse Agreement at § 21.1. |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | Promptly following execution by all necessary parties of the Escrow Agreement, Buyer shall deposit with Escrow Holder the sum of Forty Five Thousand and No/100 Dollars ($45,000) (the "**Earnest Money**"), to be released by Escrow Holder and delivered to either Buyer or Seller, in accordance with the provisions of the Escrow Agreement.  At the Closing, the Earnest Money shall be applied towards the Purchase Price. Notwithstanding anything to the contrary contained in the Agreement, in the event the Agreement is terminated with respect to all Store Properties for any reason, the Earnest Money shall be promptly returned to Buyer. *See* Stalking Horse Agreement at § 3.2. |
| **Interim Arrangements with Proposed Buyer** Local Rule 6004-1(b)(iv)(G) | Not applicable. |
| **Use of Proceeds** Local Rule 6004-1(b)(iv)(H) | Not applicable. |
| **Tax Exemption** | Not applicable. |

| Local Rule 6004-1(b)(iv)(I) | |
|---|---|
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | Following the Closing of the Sale, the Debtors shall have, and the Purchaser shall provide, reasonable access to their books and records, to the extent they are included in the Assets transferred to the Purchaser as part of the Sale as set forth in the Agreement.<br><br>*See* Proposed Sale Order at ¶ 29. |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Not applicable. |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The proposed Sale Order submitted to the Bankruptcy Court shall, among other things, (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of the Agreement, (ii) the sale of the Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than Permitted Exceptions included in the Assumed Liabilities), (iii) the performance by Sellers of their respective obligations under the Agreement, and (iv) the Bid Protections and Bidding Procedures; (b) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller, and grant Buyer the protections of Section 363(m) of the Bankruptcy Code; (c) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Assets other than as expressly set forth in the Agreement (including the Assumed Liabilities), including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; and (d) find that Buyer shall have no Liability for any Excluded Liability.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining bankruptcy court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the bankruptcy court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, (y) including a determination in the Sale Order that Buyer has not engaged in any conduct that would result in avoidance of the sale contemplated by the agreement should be avoided pursuant to Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.<br><br>*See* Stalking Horse Agreement § 21.4. |

| | |
|---|---|
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | Not applicable. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | Unless and until the Stalking Horse Agreement is terminated, no lender to the Debtors will have a right under section 363(k) of the Bankruptcy Code or otherwise to credit bid. *See* Bid Procedures Order at ¶ 20. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), and 7062(g), this Sale Order shall not be stayed and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order. The Debtors and the Purchaser may consummate the Agreement at any time after entry of this Sale Order by waiving any and all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close the Acquired Asset Sale without any notice to the Court, any pre-petition or post-petition creditor of the Debtors and/or any other party in interest. *See* Proposed Sale Order, ¶ 28. |

## THE PROPOSED SALE

12.     The Debtors believe a prompt sale of the Assets represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases. Moreover, it is critical for the Debtors to execute on any sale transaction as expeditiously as possible, to maximize value for the Debtors' estates.

13.     By this Motion, the Debtors request the Court approve the following general timeline, with the assumption the Bankruptcy Court will enter an order granting this motion on shortened notice. These dates are subject to change in the event the Bankruptcy Court does not enter an order at that hearing:

> (a)     ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, or objections to the proposed form of adequate assurance of future performance with respect to any Contract will be filed and served no later

72198709.2

than **March 4, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure or Assignment Objection Deadline**").

(b)     *Bid Deadline*: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **March 9, 2020 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**").

(c)     *Auction*: The Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **March 11, 2020 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(d)     *Stalking Horse Bid Objection Deadline*: Objections to the Sale of Assets to the Stalking Horse Purchaser will be filed and served no later than **4:00 p.m. (prevailing Eastern Time) on March 6, 2020**.

(e)     *Sale Objection Deadline*: Objections to the Sale of Assets to the Successful Bidder or Backup Bidder, other than the Stalking Horse Purchaser, will be filed and served no later than **12:00 p.m. (prevailing Eastern Time) on March 12, 2020**.

(f)     *Sale Hearing*: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **March 13, 2020**.

14.     The Debtors believe this timeline maximizes the prospect of receiving the highest and best offer without unduly prejudicing their estates. Given the Debtors' extensive prepetition marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. To further ensure the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

15.     As part of its bid, the Stalking Horse Purchaser negotiated for the timeline requested herein. The Debtors believe an expedited sale process will minimize any further deterioration of the Assets and increase in costs of administering the Debtors' estates and is in the best interests of all stakeholders. Thus, the Debtors have determined that pursuing the potential Sale in the manner and within the time periods prescribed in the Bid Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## THE BID PROCEDURES ORDER

### A.     The Bid Procedures

16.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order. The Bid Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure the Debtors receive the highest or otherwise best offer for the Assets. As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

17.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

18.     The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1(c)(i):[4]

---

[4] This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

| | |
|---|---|
| **Provisions Governing Qualifications of Bidders (Local Bankr. R. 6004-1(c)(i)(A))** | To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "**Bid**"), and each party submitting such a Bid (each, a "**Bidder**"), must be determined by the Debtors, in consultation with the Prepetition Secured Lender and the Creditors' Committee (together, the "**Consultation Parties**"), to satisfy each of the following conditions:<br><br>(i) **Corporate Authority.** Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed transaction; provided, however, if the Bidder is an entity specially formed for the purpose of effectuating the transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the transaction by the equity holder(s) of such Bidder. *See* Bid Procedures § (B)(3)(8).<br><br>(ii) **Proof of Financial Ability to Perform.** Written evidence that the Debtors reasonably conclude demonstrates the Bidder has the necessary financial ability to close the Sale and provide adequate assurance of future performance under all contracts to be assumed and assigned in such transaction. Such information should include, *inter alia*, the following:<br><br>• contact names and telephone numbers for verification of financing sources;<br><br>• written evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction;<br><br>• the Bidder's current financial statements (audited if they exist);<br><br>• a description of the Bidder's pro forma capital structure; and<br><br>• any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating such Bidder has the ability to close the transaction; *provided, however*, the Debtors shall determine in their reasonable discretion, in consultation with the Consultation Parties, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.<br><br>*See* Bid Procedures § (B)(3)(10).<br><br>To participate in the bidding process and to receive access to any materials relating to the Assets (the "**Diligence Materials**"), a party |

| | |
|---|---|
| | must submit to the Debtors an executed Confidentiality Agreement. The executed Confidentiality Agreement must be signed and transmitted by the person or entity wishing to have access to the Debtors' data room (the "**Data Room**") and any other Diligence Materials. *See* Bid Procedures § (B)(2).<br><br>Unless and until the Stalking Horse Agreement is terminated, no lender to the Debtors will have a right under section 363(k) of the Bankruptcy Code or otherwise to credit bid.<br><br>*See* Bid Procedures § (B)(2). |
| **Provisions Governing Qualified Bids (Local Bankr. R. 6004-1(c)(i)(B))** | Each Bid must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:<br><br>(i) **Good Faith Deposit.** Each Bid (other than the Stalking Horse Bid) must be accompanied by a deposit in the amount of ten percent (10%) of the Bid's proposed cash purchase price to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). *See* Bid Procedures § (B)(3)(2).<br><br>(ii) **Terms.** A Bid must be on terms that are substantially the same or better than the terms of the Stalking Horse Agreement, as determined by the Debtors in consultation with the Consultation Parties, and the Bid must identify which Assets the Bidder intends to purchase and include executed transaction documents (the "**Transaction Documents**"). A Bid shall include (i) an executed asset purchase agreement and (ii) a copy of such asset purchase agreement marked to show all changes requested by the Bidder as compared to the Stalking Horse Agreement. A Bid will not be considered qualified for the Auction if (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Stalking Horse Agreement (it being agreed and understood such Bid shall modify the Stalking Horse Agreement as needed to comply in all respects with the Bid Procedures Order and will remove provisions that apply only to the Stalking Horse Purchaser such as the provisions relating to the Bid Protections); (ii) such Bid is not received by the Debtors in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof the Good Faith Deposit has been made. The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors the Bidder wishes to have |

assumed and assigned to it pursuant to the Sale (collectively, the "**Assigned Contracts**"). *See* Bid Procedures § (B)(3)(3), (4).

(iii)**Contingencies.** Except as provided in the Stalking Horse Agreement, a Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties in the manner set forth in the Stalking Horse Agreement. *See* Bid Procedures § (B)(3)(13).

(iv)**Irrevocable.** A Bid (other than the Bid of the Stalking Horse Purchaser) must be irrevocable until two (2) business days after the closing of the Sale. Each Bidder (other than the Stalking Horse Purchaser) further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below) as may be designated by the Debtors at the Sale Hearing, in the event the Successful Bidder fails to close as provided in the Successful Bidder's purchase agreement, as modified, if at all, and the Sale Order. The Stalking Horse Purchaser shall have the right, but not the obligation, to serve as a Backup Bidder if the Stalking Horse Purchaser is not the Successful Bidder. *See* Bid Procedures § (B)(3)(14).

(v) **Disclaimer of Fees.** Each Bid (other than the Stalking Horse Agreement) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Purchaser) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. By submitting its Bid, each Bidder (other than the Stalking Horse Purchaser) is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including pursuant to section 503(b) of the Bankruptcy Code. *See* Bid Procedures § (B)(3)(17).

(vi)**Bid Deadline.** The Debtors and the Consultation Parties must receive a Bid in writing, on or before the Bid Deadline, **March 9, 2020 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**"). *See* Bid Procedures § (B)(3)(18).

(vii) **Cancellation of Auction.** If no Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, then the Auction will not occur, the Stalking Horse Agreement will be deemed the Successful Bid, and, subject to the termination rights

| | |
|---|---|
| | under the Stalking Horse Agreement, the Debtors will pursue entry of an order by the Bankruptcy Court authorizing the Sale to the Stalking Horse Purchaser as soon as practicable. *See* Bid Procedures § (C). |
| **Stalking Horse Bid Protections** Local Rule 6004-1(c)(i)(C) | (1) **Expense Reimbursement.** The Stalking Horse Purchaser is entitled to an expense reimbursement of up to 10% of the Purchase Price (for actual out-of-pocket third party expenses) (the "**Expense Reimbursement**", or the "**Bid Protections**"). |
| | *See* Stalking Horse Agreement, at § 21.1. |
| | (2) **Bidding Increments.** Each Bid or combination of Bids must be for all of the Assets and shall clearly show the amount of the purchase price. In addition, a Bid or combination of Bids must propose a purchase price equal to or greater than the sum of (i) the value of the Stalking Horse Agreement, as determined by the Debtors in consultation with the Consultation Parties; and (ii) an initial overbid of up to $280,000 (the "**Initial Overbid**"), consisting of the Expense Reimbursement. *See* Bid Procedures § (B)(3)(7). |
| | Any Overbid after the Starting Bid (as defined in the Bid Procedures) shall be made in increments of at least $250,000 (the "**Minimum Overbid Increment**"). Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided, however* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties. *See* Bid Procedures § (C)(2)(1). |
| | (3) **Treatment Expense Reimbursement at Auction.** To the extent payable in accordance with the Stalking Horse Agreement, the Expense Reimbursement shall be paid as provided in the Stalking Horse Agreement and shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 363, 503(b), and 507(a)(2). *See* Bid Procedures § (C)(9). |
| | (4) **Exceeding Bid**. If the Stalking Horse Purchaser is overbid for the Assets at the conclusion of the Auction the Stalking Horse Purchaser may, in its sole discretion, submit a higher bid for the respective Assets which exceeds that of the Successful Bidder (the "**Exceeding Bid**") at the Auction. If no Exceeding Bid is set forth by Buyer, the Agreement will be terminated. The ultimate Successful Bidder will be decided at the conclusion of the Auction. *See* Bid Procedures § (C)(7). |

| | |
|---|---|
| **Modifications of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors, in consultation with the Consultation Parties, reserve their rights to modify these Bid Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (b) reopening the Auction to consider further Bids or Overbids; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids, in all cases, subject to the Stalking Horse Agreement, the Bid Procedures, and the Bid Procedures Order. *See* Bid Procedures § (G). |
| **Closing with Alternative Backup Bidders** Local Rule 6004-1(c)(i)(E) | Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party(ies) with the next highest or otherwise best Qualified Bid (or combination of Qualified Bids) at the Auction, as determined by the Debtors in consultation with the Consultation Parties, in the exercise of their business judgment, shall be required to serve as backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be required to keep its initial Bid(s) (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "**Backup Bid**") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is twenty five (25) days after the date of the Sale Hearing (the "**Outside Backup Date**") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than the later of twenty five (25) days after the date the Debtors provide notice to the Backup Bidder that the Successful Bidder failed to consummate a sale and the Debtors desire to consummate the transaction with the Backup Bidder or five (5) days after necessary regulatory approvals are completed by the Backup Bidder and/or the Debtors. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (a) the closing of the Sale with the Successful Bidder and (b) the Outside Backup Date; *provided*, *however*, in the event the Successful Bidder does not consummate the transaction as described above and the Debtors provide notice to the Backup Bidder, the Backup Bidder's deposit |

18

|  | shall be held until the closing of the transaction with the Backup Bidder. In the event the Debtors fail to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Backup Bidder. Notwithstanding anything to the contrary herein, the Stalking Horse Purchaser shall have the right, but not the obligation, to serve as a Backup Bidder in the event that the Stalking Horse Purchaser is not selected as the Successful Bidder. *See* Bid Procedures § (C)(4). |
|---|---|

19.     Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to maximize the value of their assets and, as such, do not impair the Debtors' ability to consider all qualified bid proposals. Additionally, as noted above, the Bid Procedures preserve the Debtors' rights to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtors' estates.

## B.     The Auction and Sale

20.     If one or more Qualified Bids are received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtors will conduct an Auction to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, without limitation, the following: (i) the amount and nature of the consideration, (ii) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any, and the excluded assets and/or executory contracts or unexpired leases, if any, (iii) the ability of the Qualified Bidder to close the proposed transaction and the conditions related thereto, and the timing thereof, (iv) whether the bid is a bulk bid or a partial bid for only some of the Debtors' assets, (v) the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including delays owing to regulatory uncertainty, (vi) any purchase price adjustments, (vii) the impact of the transaction on any actual or potential litigation, (viii) the net after-tax consideration to be received by the Debtors' estates, and (ix) the tax consequences of such bid (collectively, the "**Bid Assessment Criteria**").

If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction and deem the Stalking Horse Agreement to be the Successful Bid without conducting the Auction. The Debtors seek authority from the Court to schedule the Auction on a date as further described in the Bid Procedures.

### C.    Form and Manner of Sale Notice

21.    On or within two (2) business days after entry of the Bid Procedures Order, the Debtors will cause the Sale Notice to be served on (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) counsel to the Prepetition Secured Lender; (d) counsel to the Stalking Horse Purchaser; (e) all other parties who have expressed a written interest in the Assets; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) all state and local taxing authorities with an interest in the Assets; (i) the Attorney General for the State of Delaware; (j) the Securities and Exchange Commission; (k) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (l) all parties known or reasonably believed to have asserted an Interest in the Assets; (m) the counterparties to the Contracts (the "**Contract Counterparties**"); (n) the Debtors' insurance carriers; and (o) all parties entitled to notice pursuant to Bankruptcy Rule 2002.

22.    In addition, the Debtors propose to publish the notice attached hereto as Exhibit D (the "**Bid Procedures Notice**") once in *USA Today* as soon as practicable after entry of the Bid Procedures Order. Finally, the Debtors will post a copy of the Sale Notice at the website of their claims and noticing agent, Omni Agent Solutions, located at http://www.omniagentsolutions.com/LuckysMarket.

20

**D.      Summary of the Assumption Procedures**

23.      The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**"). Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "**Cure and Possible Assumption and Assignment Notice**") and <u>Exhibit 4</u> (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties. Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## BASIS FOR RELIEF

**A.      The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**

**1.      The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

24.      The Debtors seek authority to sell the Assets through an Auction and related sale process, subject to the Debtors' right to seek an alternative course of action to maximize the value of their estates. The Debtors and their advisors have conducted and will conduct an extensive marketing process. The Debtors have developed a list of "Contact Parties" who will receive a copy of the "Information Package" (both as defined in the Bid Procedures). The list of Contact Parties

will encompass those parties whom the Debtors believe may be potentially interested in pursuing a Sale and whom the Debtors reasonably believe may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

25.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

26.     The Debtors respectfully submit the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

27.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, and publication of the Bid Procedures Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable

requirements of Bankruptcy Rule 2002. The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### 2. The Bid Procedures Are Appropriate and Will Maximize Value

28.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

29.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in

bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

30.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

31.     The Debtors believe the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bid Procedures will increase the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

32.     The Debtors believe the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

24

33.     Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

34.     At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. As such, creditors of the Debtors' estates can be assured the consideration obtained will be fair and reasonable and at or above the market.

35.     The Debtors submit the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this District. *See, e.g., In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bank. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Hldgs, LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009); *see also In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).[5]

---

[5] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

36.     Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### 3.     The Minimum Overbid Increment Is Appropriate

37.     One important component of the proposed Bid Procedures is the "Overbid" provision. Once the Debtors determine the Starting Bid, which shall equal or exceed the value of the Stalking Horse Agreement, as determined by the Debtors in consultation with the Consultation Parties, plus the Initial Overbid, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least $250,000.

38.     The Debtors believe such Minimum Overbid Increment is reasonable under the circumstances, and will enable the Debtors to maximize the value received for the Assets while limiting any chilling effect in the marketing process. The Minimum Overbid Increment is also well within the increment level previously approved by courts in this District. *See In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016) (approving $500,000 bid increment); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

### 4.     Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved

39.     Pursuant to the Motion, the Debtors are seeking the approval of this Court of the Stalking Horse Purchaser and to offer the Bid Protections. The Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid. The ability of the Debtors to offer the Stalking Horse Purchaser the Bid

Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.

40.     Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotation omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

41.     As a result, courts routinely approve bid protections similar to the Bid Protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as these protections will only be employed where a stalking horse bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

42.     The Stalking Horse Purchaser has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, and its bid will be subject not only to Court approval, but also to overbidding by third parties. The Bid Protections granted to the Stalking Horse Purchaser were negotiated in good faith and at arm's length, with significant give-and-take with respect to those Bid Protections. The

27

Debtors agreed to the Bid Protections in the Stalking Horse Agreement because they ensure the Debtors will have the benefit of the option to accept the transaction with the Stalking Horse Purchaser offered through the Stalking Horse Agreement, without sacrificing the potential for interested parties to submit overbids at the Auction.

43.     Furthermore, the proposed Expense Reimbursement capped at 10% of the Purchase Price for all reasonable and documented out of pocket costs, expenses, and fees incurred by the Stalking Horse Purchaser pursuant to the transactions contemplated by the Stalking Horse Agreement is well within the range of similar fees approved by courts in this District. *See, e.g., In re Global Motorsport Group, Inc., et al.,* (Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (approving a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products,* Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (approving a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve,* Case No. 00-0358 (PJW) (Bankr. D. Del., Sept. 27, 2000) (approving a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.,* Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (approving termination fee of 2.10%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.,* Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (approving termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (approving termination fee of 7.410%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc., et al.,* Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (approving termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11,

2008) (approving break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.,* Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (approving break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.,* Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (approving break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.,* Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (approving break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000); and *In re Point Blank Solutions, Inc., et al.,* Case No. 10-11255 (PJW) (Bankr. D. Del. Oct. 5, 2011) (approving break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).[6]

### 5. The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate

44.    As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Contract Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code sections 105(a) and 365, and (ii) such counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

---

[6] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

45.     The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

46.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(b), by (i) payment of the undisputed cure amount (the "**Cure Amount**") and/or (ii) reserving amounts with respect to any disputed cure amounts. Should the Stalking Horse be the Successful Bidder, the Debtors shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(d), by (i) payment of the Cure Amount and/or (ii) reserving the full disputed amount with respect to any disputed cure amounts.

47.     As set forth in the Bid Procedures Order, the Debtors also request any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to Bankruptcy Code section 365 on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

48.     The Debtors believe the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.      Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

      **1.      The Sale of the Assets Should Be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtors' Business Judgment**

49.      Bankruptcy Code section 363(b)(1) provides a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

50.      Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

51.      A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

52.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

53.     As set forth above, and in the First Day Declaration, the Debtors have a sound business justification for selling the Assets. ***First***, the Debtors believe the Sale will maximize the Assets' value by allowing a party to bid on business assets that would have substantially less value

on a stand-alone or liquidation basis. Moreover, to the extent the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtors' creditors.

54.     ***Second***, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtors in the exercise of their reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and at this time the Debtors believe will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at \*4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

55.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Purchaser) will be a valid and sound exercise of the Debtors' business

judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request the Court make a finding the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2. Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv)[7]

56.     Pursuant to Local Rule 6004(b)(iv)(C), a sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied. The Sale Order provides certain claims against the Debtors and/or the Purchaser are barred or otherwise waived. *See* Sale Order, ¶ 20, 22, 24, and 25.

57.     Pursuant to Local Rule 6004(b)(iv)(E), a sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction. As set forth above, the Debtors are subject to certain deadlines, including (a) within three (3) business days of the date the Stalking Horse Agreement is executed, Sellers will file a motion to approve the Bidding Procedures for the Sale and bid protections for the Buyer; and (b) the closing of the transactions contemplated in the Stalking Horse Agreement shall, unless another date, time or place is agreed to in writing by the Parties, take place at the Denver offices of Polsinelli PC on that date which is as soon as practicable after the Sale Order becomes the Final Order but not earlier than thirty (30) days after the expiration of the Due Diligence Period as such date may be extended in accordance with Sections 18.2 and 20.2(a), or such other date as is mutually acceptable to both parties.

58.     Pursuant to Local Rule 6004(1)(b)(iv)(J), a sale motion must highlight whether, if the debtor proposes to sell substantially all of its assets, the debtor will retain or have reasonable

---

[7] If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Assets do not contain a provision that triggers disclosure under that rule.

access to its books and records to enable it to administer its bankruptcy case. The proposed Sale Order provides the Debtors shall have reasonable access to their books and records. *See* Sale Order, ¶ 29.

59.     Pursuant to Local Rule 6004-1(b)(iv)(L), a sale motion should highlight any provision limiting the proposed purchaser's successor liability. The proposed Sale Order provides the Purchaser shall not have any successor liability related to the Debtors or the Assets. *See* Sale Order ¶¶ EE, KK, 24, 25, and 26.

60.     Pursuant to Local Rule 6004-1(b)(iv)(N), a sale motion must highlight any provision by which the debtor seeks to allow, disallow or affect in any manner, credit bidding pursuant to Bankruptcy Code section 363(k). The Bid Procedures Order provides that unless and until the Stalking Horse Agreement is terminated, no lender to the Debtors will have a right under section 363(k) of the Bankruptcy Code or otherwise to credit bid. *See* Bid Procedures Order at ¶ 20.

61.     Pursuant to Local Rule 6004-1(b)(iv)(O), a sale motion must highlight any provision whereby the debtor seeks relief from the 14-day stay imposed by Bankruptcy Rule 6004(h). As explained in further detail below, to maximize the value received for the Assets, the Debtors seek to close the transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors have requested the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d). *See* Bid Procedures Order at ¶ 38; Sale Order at ¶ 28.

### 3.     Adequate and Reasonable Notice of the Sale Will Be Provided

62.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale.

35

Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 4.    The Sale and Purchase Price Will Reflect a Fair-Value Transaction

63.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures, including, without limitation, by providing acceptable Bidders with access to the Data Room and requested information. In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if the Debtors enter into the Stalking Horse Agreement and no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

### 5.    The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f)

64.    The Debtors further submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Interests**") other than Permitted Encumbrances and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement) pursuant to section Bankruptcy Code 363(f), with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

65.    Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the

property exceeds the value of all liens on the property, (iv) the interest is the subject of a *bona fide* dispute, (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

66.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at \*12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating section 363(f) of the Bankruptcy Code is written in the disjunctive; holding the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) has been satisfied).

67.    The Debtors submit, excluding assumed agreements, if any, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of Bankruptcy Code section 363(f). Consistent with Bankruptcy Code section 363(f)(2), each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets. Furthermore, any party holding a valid lien against the Assets will be adequately protected by

37

having its liens, if any, attach to the sale proceeds received by the Debtors from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, Bankruptcy Code section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Interests.

### 6.   The Assets and the Assigned Contracts Should Be Sold Free and Clear of Successor Liability.

68.     The Sale Order provides the Purchaser shall not have any successor liability related to Seller or the Assets to the maximum extent permitted by law. *See* Sale Order, ¶ 24. Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

69.     Although Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets

38

under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

70.     Courts have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

71.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Purchaser. Under Bankruptcy Code section 363(f), the Purchaser is entitled to know the Assets are not tainted by latent claims that could be asserted against the Purchaser after the proposed

transaction is completed. Absent that ruling, the value of the Assets could be severely compromised.

72.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state the Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**7.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n)**

73.     The Debtors request the Court find the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of the Assets.

74.     Bankruptcy Code section 363(m) provides, in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

75.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the

[proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

76.    The Debtors submit the Stalking Horse Purchaser, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m), and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code section 363(m).[8] *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale will be subject to a market process by virtue of Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable. *Second*, the asset purchase agreement entered into by the Debtors and the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Purchaser) will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to Bankruptcy Code section 363(n). Moreover, with respect to potential bidders, the Bid Procedures are designed to

---

[8] The Debtors believe a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under Bankruptcy Code section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

ensure no party is able to exert undue influence over the process. ***Finally***, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the Debtors believe the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Bankruptcy Code section 363(m).

77.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n), and, as a result, the Purchaser should receive the protections afforded good faith purchasers by Bankruptcy Code section 363(m). Accordingly, the Debtors request the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Bankruptcy Code section 363(m). The Debtors will submit evidence at the Sale Hearing to support these conclusions.

**C.     The Assumption and Assignment of the Contracts Should Be Approved**

**1.     The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment**

78.     To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

79.     Bankruptcy Code section 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

80.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See*

42

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

81.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

82.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. ***First***,

43

the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. **Second**, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases. Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

83.     A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with Bankruptcy Code section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

84.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

85.     Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

86.     To assist in the assumption, assignment, and sale of the Assigned Contracts, the Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

87.     Bankruptcy Code section 365(f)(1) permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

88.     Bankruptcy Code section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998). Bankruptcy Code section 365(f)(3) goes beyond the scope of Bankruptcy Code section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (Bankruptcy Code section 365(f)(3) prohibits enforcement of any lease clause

45

creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

89.     Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

90.     Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor. *See, e.g., In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to....declare a breach or default as a result of a change in control in respect of the Debtor…shall have any force and

effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e)."); *see also In re McPhillips Motors, Inc.*, No. 6:09-BK-37488-RN, 2010 WL 3157062, at *7 (Bankr. C.D. Cal. Feb. 9, 2010) ("any breach related to or arising out of change-in-control or other assignment in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts" was unenforceable); *In re Bethel Healthcare, Inc.*, No. 1:13-BK-12220-GM, 2014 WL 12758523, at *4 (Bankr. C.D. Cal. May 1, 2014) ("[a]ny provision in the Lease that purports to declare a breach or default as a result of a change in control of the Debtor's business or requires the consent of a non-seller party is hereby determined unenforceable under section 365(f) of the Bankruptcy Code…").

### D.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

91.    Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

92.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay

47

periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

93.     To maximize the value received from the Assets, and to ensure they are in compliance with the requirements of the Cash Collateral Order, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## CONSENT TO JURISDICTION

94.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

95.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) counsel to the Prepetition Secured Lender; (d) counsel to the Stalking Horse Purchaser; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) all state and local taxing authorities with an interest in the Assets; (h) the Attorney General for the State of Delaware; (i) the Securities and Exchange Commission; (j) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (k) all parties known or reasonably believed to have asserted an Interest in the Assets; (l) the Contract Counterparties; (m) the Debtors' insurance carriers; and (n)

any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

96.     In addition, copies of the Sale Notice, the Bid Procedures, and the Bid Procedures Order will be served on the applicable parties no later than two (2) business days after entry of the Bid Procedures Order by this Court. In light of the nature of the relief requested herein, the Debtors submit no other or further notice is required. A copy of the Motion also is available on the website of    the    Debtors'    notice    and    claims    agent,    Omni    Agent    Solutions, http://www.omniagentsolutions.com/LuckysMarket.

## **NO PRIOR REQUEST**

97.     No previous request for the relief sought herein has been made to this Court or any other court.

49

**WHEREFORE**, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, the form of which is attached as Exhibit B hereto, (ii) enter the Sale Order, the form of which is attached as Exhibit C hereto, and (iii) grant such other and further relief as is just and proper.

Dated: February 4, 2020
      Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com

-and-

Liz Boydston (Admitted *Pro Hac Vice*)
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Telephone: (214) 661-5557
lboydston@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

72198709.2