**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUCKY'S MARKET PARENT COMPANY, LLC, *et al*., | Case No. 20-10166 (JTD) |
| | (Jointly Administered) |
| Debtors.[1] | **Re: Docket Nos. 63, 71, 72, 73, 97, 98 and 101** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO THE DEBTORS' BIDDING PROCEDURES MOTIONS**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by its proposed co-counsel, Hahn & Hessen LLP and Womble Bond Dickinson (US) LLP, hereby files its omnibus objection (the "Objection") to the Debtors' motions, filed on shortened notice, for the entry of orders approving bid procedures in connection with several potential sales of their assets (each a "Stalking Horse Sale") to (a) Publix Super Markets, Inc. ("Publix") [ECF 63] (the "Publix Bidding Procedures Motion"), (b) ALDI, Inc. ("ALDI") [ECF 71] (the "ALDI Bidding Procedures Motion"), (c) Seabra Foods XIV, Inc. ("Seabra") [ECF 72] (the "Seabra Bidding Procedures Motion"), (d) LM Acquisition Co. LLC ("LMAC")[2] [ECF 73, 101] (the "LMAC Bidding Procedures Motion"), (e) Winn-Dixie Stores, Inc. ("Winn-Dixie") [ECF 97] (the "Winn-Dixie Bidding Procedures") and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), and Sinoc, Inc. (0723).

[2]     The sole member of stalking horse bidder LM Acquisition Co., LLC is Jason B. Sharon, the chief executive officer and one of the co-founders and equity holders of the Debtors.

(f) Carlos Alvarez [ECF 98] (the "Alvarez Bidding Procedures") (collectively, the "Bidding

Procedures Motions"),[3] and in support thereof respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Committee supports the sale of the Debtors' assets[4] through a fair and

reasonable competitive process that maximizes value for the Debtors' estates and their creditors.

However, as presently proposed, the Bidding Procedures and Stalking Horse Sales will not

achieve that goal but in fact may significantly stifle bidding.  Absent modification, the proposed

Bidding Procedures and Stalking Horse Sales contain unwarranted and excessive bid protections

and other overly restrictive provisions that will only serve to discourage bidding rather than

create the even playing field necessary to foster maximum participation and competitive bidding

by interested parties to maximize value for the estates.  As such, the Committee is compelled to

object.

## BACKGROUND

2.      On January 28, 2020 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") with the

United States Bankruptcy Court for the District of Delaware (the "Court").   The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in these cases.

---

[3]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the respective Bidding Procedures Motion.

[4]      By the Bidding Procedures Motions, the Debtors' seek to sell their interests in twenty-three (23) store leases as well as one (1) owned property.  The Committee believes that the Debtors' obligations under some or all of these leases have been guaranteed by The Kroger Co., the Debtors' majority equity holder and prepetition secured lender. *See Amended Declaration of Andrew T. Pillar* [ECF 47] ("Kroger entered into various guaranties of the Debtors' liabilities under approximately 31 leases.")

3.     On February 4, 2020 (the "Formation Date"), the Office of the United States Trustee for the District of Delaware appointed three (3) of the Debtors' largest unsecured creditors to the Committee.  The current members of the Committee are (a) United Natural Foods, Inc., (b) Harvest Meat Company, Inc. and (c) Benderson Development Company LLC.

4.     On the Formation Date, the Committee retained Hahn & Hessen LLP and Womble Bond Dickinson (US) LLP to serve as its co-counsel and Province, Inc. to serve as its financial advisor.

## BIDDING PROCEDURES

5.     Between January 30, 2020 and the Formation Date, the Debtors filed, on shortened notice,[5] the Bidding Procedures Motions seeking, *inter alia*, orders (i) approving procedures, including bid protections, to be employed with respect to the Stalking Horse Sales (the "Bidding Procedures"); (ii) scheduling auctions and a sale hearing; (iii) establishing procedures for the assumption and assignment of executory contracts and expired leases; (iv) authorizing the sales to each Stalking Horse Bidder or such other parties that are successful bidders at the auction; and (v) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the sales.   The Debtors seek approval of six (6) separate sales of certain individual or groups of assets, which can be summarized as follows:

---

[5]     The Debtors sought to have the Bidding Procedures Motions heard on an expedited basis so the Court scheduled a hearing for February 10, 2020. *See* ECF 74, 90 and 100.  At the request of the Committee, however, the Debtors have voluntarily sought and obtained an adjournment of the hearing to February 19, 2020.

| Stalking Horse | Purchase Price ("PP") | Bid Protections ("BP") | BP % of PP | Minimum Overbid for Stalking Horse Bidder | Minimum Overbid for Non-Stalking Horse Bidder |
|---|---|---|---|---|---|
| Publix | $11,480,000 | Breakup Fee: $344,500 (3% of PP)<br>Expense Reimbursement ("ER"): $500,000<br>Topping Fee: $750,000 ($250,000, plus ER) at each bid increment | 7.4% | $250,000 | $1,000,000<br>(400% greater than Stalking Horse Bidder) |
| ALDI | $7,800,000<br>Adjusted by Cure Costs in excess of (a) $10,000 per assumed lease, and (b) $10,000 for all assumed contracts | Expense Reimbursement: $250,000<br>Topping Fee: $250,000 at each bid increment (and payable or credited against purchase price at end of auction)<br>Exceeding Bid: YES | [6.4]%[6] | $250,000 | $500,000<br>(200% greater than Stalking Horse Bidder) |
| LMAC | $3,171,000<br>Adjusted by (a) Cure Costs in excess of $50,000 for Assumed Contracts, and (b) amounts greater or less than 5% of a $4,600,000 in Target Inventory Value | Expense Reimbursement: $250,000<br>Topping Fee: $500,000 ($250,000, plus ER) at each bid increment | [7.9]%[7] | $200,000 | $700,000<br>(350% greater than Stalking Horse Bidder) |
| Winn-Dixie | $2,800,000 | Expense Reimbursement: $280,000 (10% of PP)<br>Exceeding Bid: YES | 10% | $250,000 | $250,000 |
| Seabra | $1,250,000 | Expense Reimbursement: $250,000<br>Exceeding Bid: YES | 20% | $250,000 | $250,000 |
| Alvarez | $275,000 | Expense Reimbursement: $8,250 (3% of PP)<br>Exceeding Bid: YES | 3% | $50,000 | $50,000 |

6.    The Bidding Procedures contemplate the following expedited sale timeline:[8]

- 2/10/20: Bidding Procedures Hearing (shortened notice)
- 2/12/20: Service of assumption/assignment and cure notices
- 3/4/20: Objections to assumption/assignment or cure costs
- 3/6/20: Objections to stalking horse bid

[6]    Presently the Committee does not know the amount of the Cure Costs for assumed unexpired leases and contracts in excess of the cap provided for in the ALDI asset purchase agreement. This amount could materially reduce the Purchase Price and increase the percentage of the Purchase Price represented by the proposed bid protections.

[7]    Presently the Committee does not know the amount of the Cure Costs for the Assumed Contracts in excess of the cap provided for in the LMAC asset purchase agreement or the amount below the Target Inventory Value. These amounts could materially reduce the Purchase Price and increase the percentage of the Purchase Price represented by the proposed bid protections.

[8]    Since filing the Bidding Procedures Motions and engaging in discussions with the Committee, the Debtors have suggested some modifications to the proposed timeline including a revised (a) bid deadline of March 19, 2020, (b) auction date of March 24, 2020, and (c) sale hearing date of March 26, 2020. The parties continue to discuss an agreeable timeline that maximizes value for the estates and makes sense under the circumstances of these bankruptcy cases.

- 3/9/20:  Competing bids
- 3/11/20:  Auction/Notice of successful bidder and    assumption/assignments
- 3/12/20:  Objections to sale (other than stalking horse bid)
- 3/13/20:  Sale hearing

## OBJECTION

### A.    *The Proposed Bidding Procedures and Stalking Horse Sale Agreements Will Discourage Competitive Bidding and Should Not Be Approved Without Modification*

7.      It is axiomatic that the purpose of bidding procedures in bankruptcy is to facilitate the fair sale of a debtor's assets through a process that maximizes the value of those assets for the benefit of the debtor's estate and its creditors. *See, e.g., In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.") (*quoting Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558 (8th Cir. 1997).   Indeed, courts routinely disapprove mechanisms that do not promote competitive bidding. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("a break-up fee and reimbursement of expenses" should "not give an advantage to a favored purchaser over other bidders"); *In re O'Brien Envtl. Energy*, 181 F.3d 527, 537 (3d Cir. 1999) (rejecting break-up fee and expense reimbursement as they did not "promote more competitive bidding"); *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (rejecting "topping fee" because such fee would not "enhance the bidding or result in any substantial benefit to the estate").

8.      As bid protections are governed by section 503(b) of the Bankruptcy Code, the proponent bears a heavy burden of proof for approval under the heightened "benefit to the estate" standard.  *See, e.g., In re O'Brien Envtl. Energy*, 181 F.3d at 535 ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").

9.      As currently proposed, the Bidding Procedures and the Stalking Horse Sales will not facilitate a fair sale of the Debtors' assets or encourage competitive bidding to maximize value for the estate.   To do so, the Bidding Procedures must be modified to (a) reduce, and in some cases eliminate, certain proposed bid protections, (b) eliminate other overly restrictive provisions, including an inability to consider bids for individual assets, and (c) extend the time period available for prospective bidders to submit their bids, all as set forth more fully below.

### (a)      *The Exceeding Bid Provisions Should Be Eliminated*

10.      The ALDI, Alvarez, Seabra and Winn-Dixie Bidding Procedures provide that "[i]f the Stalking Horse Purchaser is overbid for the Assets <u>at the conclusion of the Auction</u>, the Stalking Horse Purchaser may, in its sole discretion, <u>submit a higher bid for the respective Assets</u> which exceeds that of the Successful Bidder (the "<u>Exceeding Bid</u>") at the Action." ALDI, Alvarez, Seabra and Winn-Dixie Bidding Procedures Motions, Stalking Horse Bid Protections, ¶(4) (emphasis added).

11.      By granting the ALDI, Alvarez, Seabra and Winn-Dixie stalking horse bidders the right to submit a topping bid at the conclusion of the auction, the Exceeding Bid provisions stifle competitive bidding.  This is particularly true in the case of an auction with only two (2) bidders. In that scenario, a stalking horse bidder is completely disincentivized from engaging in any bidding at all (which is antithetical to maximizing the value of the assets for the Debtors' estates) since the stalking horse bidder can simply "lay in the weeds" and acquire the assets after the auction has ended with just the minimum overbid over the competing bidder's initial overbid. Prospective bidders will be reluctant to undertake the time and expense of conducting due diligence and engaging in the auction process when they know that after the auction has

concluded, the stalking horse bidder can simply top their successful bid thereby snatching the assets from their grasp as the successful bidder with no ability to submit another bid.

12.     Moreover, any assertion that the Exceeding Bid provisions are necessary to promote active bidding or otherwise encourage meaningful participation from financially capable prospective bidders is belied by the fact that those provisions are not universally included in the Bidding Procedures, as they are absent from both the Publix and LMAC Bidding Procedures. *See* LMAC and Publix Bidding Procedures Motion, Stalking Horse Bid Protections, ¶(1)-(3).

13.     Since the Exceeding Bid provisions "give an advantage to a favored purchaser over other bidders" and operate to stifle, rather than encourage, competitive bidding, they should be eliminated from the Bidding Procedures. *In re Reliant Energy*, 594 F.3d at 206.

### (b)     *The Perpetual Topping Fee Provisions Should Be Eliminated*

14.     The ALDI, LMAC and Publix Bidding Procedures provide for additional protection to the stalking horse bidders in the form of a "perpetual topping fee requirement … at each bid increment."  ALDI, LMAC and Publix Motions, Stalking Horse Bid Protections, ¶(1). In the case of Publix, the Topping Fee requirement is $750,000, for LMAC, it is $500,000 and for ALDI, it is $250,000. *See id*.

15.     The proposed Topping Fees are substantial and, as evidenced by the minimum overbid disparity that they create between a stalking horse bidder and each non-stalking horse bidder, impose an unreasonable obstacle for non-stalking horse bidders at every bid increment of the auction.  Indeed, compared to the minimum overbid required for a stalking horse bidder (as set forth in paragraph 5 *supra*), a non-stalking horse bidder is required to bid 400% of the minimum overbid against a Publix bid, 350% of the minimum overbid against an LMAC bid and 200% of the minimum overbid against an ALDI bid.  These Topping Fees create unwarranted

barriers both to entry and participation in the ALDI, LMAC and Publix auctions that will undeniably further chill bidding for the Debtors' assets.

16.     Moreover, there is no rational basis for providing the Topping Fee at each successful bid interval because, once the initial overbid has been made, the value of the bid protections have been fully recovered by the Debtors' estates.  Moreover, at the initial overbid, the stalking horse bidder is already assured of receiving the full benefit of its bid protection whether it decides to voluntarily engage in the auction process by submitting another bid or not. As such, there is simply no justification for requiring the addition of a Topping Fee after the initial bid.  Requiring a Topping Fee at each bid increment does nothing more than give the kind of competitive "advantage to a favored purchaser over other bidders by increasing the cost of acquisition" that the Third Circuit has warned against. *In re Reliant Energy*, 594 F.3d at 206.

17.     As with the Exceeding Bid, any assertion that the Topping Fee is necessary to promote active bidding or otherwise encourage meaningful participation from prospective bidders is belied by the fact that the Topping Fee provisions are not universally included in the Bidding Procedures, as they are absent from the Alvarez, Seabra and Winn-Dixie Bidding Procedures. *See* Alvarez, Seabra and Winn-Dixie Bidding Procedures Motion, Stalking Horse Bid Protections, ¶(1).

18.     Since the Topping Fee provisions operate to stifle, rather than encourage, competitive bidding, they should be eliminated from the Bidding Procedures.

### (c)     *Stalking Horse Bidders Should Not Be Permitted to Credit Their Bid Protections Against the Purchase Price if They Are the Successful Bidder*

19.     Even if the Court believes that certain Topping Fee protections should be maintained, a stalking horse bidder should not be allowed to credit their bid protections against the purchase price if they are the successful bidder.  At least with respect to the ALDI Stalking

Horse Sale, the proposed Bidding Procedures provide for such a purchase price credit. *See* ALDI Bidding Procedures Motion, Ex. B, ¶10 ("If a Sale occurs to the Stalking Horse Purchaser pursuant to an Overbid or an Exceeding Bid following the Auction, then the Expense Reimbursement and Topping Fee may be paid by way of a credit against the purchase price."); Ex. 1, ¶C.8.

20.    This is yet another provision that is overly favorable to the stalking horse bidder and one that will chill bidding, stifle a robust auction and result in the estates receiving less than the maximum value for the Debtors' assets.  As proposed, it permits the stalking horse bidder to increase its bid without dedicating any real additional funds to the actual overbid, secure in the knowledge that whether successful or not in the auction, it is going to get the benefit of its bid protections anyway.  This proposed provision is particularly egregious in the context of the Exceeding Bid, insofar as it incentivizes the stalking horse bidder to avoid bidding all together and simply submit a topping bid after the auction is over, comfortable in the knowledge that its overbid will be entirely or substantially off-set by its bid protections.

21.    For example, if ALDI refrains from bidding, it is only required to submit a $250,000 overbid after the auction ends to be the successful bidder for the assets.  However, if ALDI is permitted to credit its $500,000 in bid protections (a $250,000 expense reimbursement and a $250,000 Topping Fee) against the purchase price, ALDI would actually pay $250,000 less than the prior competing successful bid.  ALDI would receive a windfall at the expense of the Debtors' estates.

22.    Such a result underscores just how extremely unreasonable this provision is.  Bid protections are designed to be used as a shield to protect the stalking horse for setting a bidding floor to create a market, not to be used as a sword by providing a stalking horse with a

competitive advantage through an auction process that they, of their own volition, can actively choose whether to participate in or not.

23.     No stalking horse bidder should be permitted to credit bid its bid protections against the purchase price if it ultimately becomes a successful bidder.  Any such provisions should be eliminated.

> ### (d)     *The Stalking Horse Bid Protections Afforded LMAC Are Not Necessary and Should Be Eliminated*

24.     The sole member of LMAC is Jason (Bo) Sharon, the chief executive officer and co-founder and equity holder of the Debtors.  LMAC is an acquisition entity created by Mr. Sharon so he can purchase the Debtors' interests in its operating store leases.  As such, the LMAC Stalking Horse Sale is an "insider" transaction that is subject to heightened scrutiny. *See* 11 U.S.C. 101(31)(B)(ii) ("insider includes [an] officer of the debtor"); *Crown Vill. Farm, LLC v. ARL, LLC (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) ("[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. V. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein").

25.     Here, the LMAC bid protections are unnecessary and do not meet the standard required by the Third Circuit for approval because, among other things, they were not needed to induce Mr. Sharon's bid or preserve that bid after the Court orders an auction, nor is there a credible argument otherwise. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010).

26.     The rationale for the LMAC bid protections is that Mr. Sharon expended considerable time and expense in connection with "the identification and quantification of" the assets subject to the LMAC Stalking Horse Sale. LMAC APA, ¶21.2(A); LMAC Motion, ¶42 ("performing due diligence activities").    However, Mr. Sharon is not engaging in a new investment opportunity or conducting novel diligence in a new investment.  He is a co-founder, equity holder and chief executive officer of the Debtors.  As such, Mr. Sharon is intimately familiar with all aspects of the Debtors' operations and finances, including the assets subject to the LMAC Stalking Horse Sale.  The reality is that Mr. Sharon is preserving his legacy and equity investment in the Debtors by acquiring their operating stores through the LMAC Stalking Horse Sale and, therefore, the LMAC bid protections are not necessary to either induce or preserve his bid through LMAC.

27.     Accordingly, the LMAC bid protections do not meet the standard required by the Third Circuit and should be eliminated.

> **(e)     The Bid Protections Are Excessive in Relation to the Transaction Value of the Stalking Horse Sales and Should Be Reduced**

28.     Even if the Court finds that any of the bid protections are necessary to induce an initial bid, the bid protections (with the exception of those afforded to Alvarez) are excessive relative to the transaction value.   To be approved, bid protections must encourage, not discourage, bidding. *See, e.g.*, *In re Reliant Energy* 594 F.3d 200 at 206; *Off. Comm. Of Subordinated Bond Holders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) (if bid protection "encourage bidding, it will be approved; if it stifles bidding, it will not be approved."). The vast majority of courts generally approve bid protections that do not exceed three (3%) to four percent (4%) of the purchase price and, with respect to the Alvarez Stalking Horse Sale, the parties have adhered to that well-accepted

standard. *See* Alvarez Bidding Procedures Motion, Stalking Horse Bid Protections ¶(1) (no break-up fee and limiting expense reimbursement to 3% of purchase price).

29.     However, with respect to the other Stalking Horse Sales (as set forth in paragraph 5 *supra*), the aggregate percentage of the proposed bid protections deviate from that well-accepted standard and are excessive in relation to the transaction value of the proposed Stalking Horse Sales, i.e., Seabra (20% of $1.25 million purchase price), Winn-Dixie (10% of $2.8 million purchase price), LMAC (at least 7.9% of $3.171 million purchase price),[9] Publix (7.4% of $11.48 million purchase price) and ALDI (at least 6.4%[10] of a $7.8 million purchase price).

30.     The cases cited in the Bidding Procedures Motions in support of these bid protections either support an aggregate bid protection of approximately three (3%) of the purchase price or are distinguishable as, *inter alia*, (a) the subject transactions were significantly more complex (than merely purchasing the Debtors' interests in one (1) to six (6) store leases) and/or (b) the transactional values in the cited cases far exceed that of the Stalking Horse Sales (which only average $4 million). *See* LMAC Bidding Procedures Motion, ¶43 (*FoxMeyer Corp*. ($87 million); *Global Home Products* ($21 million); *Global MotorSport Group, Inc*. (entire business platform ($16 million)); *deCode Genetics* (entire business platform ($16 million))); Seabra Bidding Procedures Motion, ¶43 (*Filene's Basement, Inc.* ($22 million); *Point Blank Solutions* ($20 million); *Champion Enterprises* ($80 million)); ALDI Bidding Procedures

---

[9]     Both the LMAC and ALDI asset purchase agreements provide for purchase price adjustments which could materially reduce their respective purchase prices and, therefore, materially increase the percentage of the bid protections that are presently listed.

[10]    The ALDI Bidding Procedures seek payment of the Topping Fee in the event that the stalking horse bidder is ultimately outbid at auction. *See* ALDI Bidding Procedures Motion, Ex. B, ¶10 ("Topping Fee shall be payable contemporaneous with the closing of a Sale to a Qualified Bidder who submitted an Overbid"); Ex. 1, ¶ C.8. Thus, while styled as a Topping Fee, that fee functions as a *de facto* break-up fee. Requiring the payment of a Topping Fee in addition to the expense reimbursement is excessive in comparison to the transaction value, overly favorable to the stalking horse bidder and likely to chill bidding to the detriment of the Debtors' estates. Any provision requiring the payment of a Topping Fee should be rejected because it will not "enhance the bidding or result in any substantial benefit to the estate." *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998).

Motion, ¶43 (*Ameriserve* ($110 million); *Montgomery Ward Holding Corp.* ($110 million));

Winn-Dixie Bidding Procedures Motion, ¶43 (*Edison Bros. Stores. Inc.* (entire business platform

($17 million)); Publix Bidding Procedures Motion, ¶43 (same).

31.     Here, in the context of these cases and the scope of the Stalking Horse Sales, the

aggregate bid protections that are over three percent (3%) are excessive and create an

unwarranted barrier for prospective bidders that will chill bidding.  The aggregate amount of the

bid protections must be modified in order to facilitate a robust sale process that will generate

maximum value for the estate.

> **(f)     The LMAC Qualification Process Unnecessarily Restricts the Debtors' Ability to Maximize Value for Their Estates**

32.     The LMAC Stalking Horse Sale, like the ALDI, Publix and Winn-Dixie Stalking

Horse Sales, contemplates the sale of the Debtors' interests in multiple store leases.  However,

unlike the ALDI, Publix and Winn-Dixie Stalking Horse Bidding Procedures, the proposed

LMAC Bidding Procedures require a prospective bidder to submit a bid for "all of the Purchased

Assets" in order to be eligible to participate in an auction in connection with the LMAC Stalking

Horse Sale. *Compare* LMAC Bidding Procedures, ¶B.3(8) *with* ALDI, Publix and Winn-Dixie

Bidding Procedures, ¶B.3(7).

33.     This requirement is overly restrictive, operates to discourage bidding in favor of

LMAC and contrary to the fundamental principal of maximizing value for the estate.  The "all

asset" LMAC bid requirement creates an unjustifiable barrier to entry for prospective bidders

that may be interested in either an individual or a subset of the store leases subject to the LMAC

Stalking Horse Sale.[11]   Rather than set a floor to create a market, this aspect of the LMAC

Bidding Procedures severely limits, and may completely foreclose, the market.  This restriction

---

[11]     At least one (1) prospective bidder, Dave's Supermarket, Inc., has already raised this very concern. *See Limited Objection to Debtors' Bid Procedures* [ECF 170].

robs the Debtors of one of the most basic principles used to maximize value in stalking horse sales – the ability to consider combinations of offers that would aggregate to the same group of assets subject to a stalking horse sale but provide greater value to the estates. The damaging effect that this unwarranted restriction would have on the sale process and the estates is patent.

34.    Tellingly, there is no such restriction in the Bidding Procedures for the other Stalking Horse Sales that involve multiple store leases and its absence speaks volumes. *See* ALDI, Publix and Winn-Dixie Bidding Procedures, ¶B.3(7) ("Each Bid or combinations of Bids must be for all for all of the Assets"). Even without the consideration of the heightened scrutiny that the LMAC "insider" Stalking Horse Sale is subject to, this restriction simply does not pass muster.

35.    As this restriction prevents the Debtors from considering combinations of offers which, when aggregated, may exceed the value of the LMAC Stalking Horse Sale and maximize value for the estates, this restriction should be eliminated.

### (g)    *The Proposed Timeline is Unduly Accelerated and Will Stifle Bidding*

36.    The proposed timeline in the Bidding Procedures is insufficient to afford prospective bidders a fair opportunity to participate in the sale process. As originally proposed, the Bidding Procedures provide for a thirty-three (33) day sale process that contemplates (a) a bid deadline of March 6, 2020 (just twenty-eight (28) days following the Court's requested entry of the Bidding Procedures Order), (b) auctions on March 11, 2020 (five (5) days after the bid deadline), and (c) a sale hearing on March 13, 2020. *See* Bidding Procedures Motion, ¶13.

37.    When compared to the milestones governing the Debtors' use of cash collateral, which contemplate a sale hearing/order by no later than April 11, 2020, the proposed timeline is unduly and unnecessarily accelerated. *See* Interim Cash Collateral Order [ECF 50], ¶14(xii) (sale order 75 days after Petition Date).

38.     As such, the Committee submits that the proposed timeline can and should be extended for an additional thirty (30) days.  Doing so is necessary to provide prospective bidders with sufficient time to conduct reasonable diligence, formulate competing offers and obtain any necessary financing to participate in the sale process to maximize the value of the assets for the Debtors' estates.

### (h)     *Modifications to Stalking Horse APAs*

39.     The Committee has identified a number of issues with the proposed form of Stalking Horse Sale agreements that need to be addressed prior to any sale hearing in order to avoid the Committee's objection to the subject sales.  The more significant issues include:

    a.    disparate deposit requirements between stalking horse bidders themselves as well as between stalking horse bidders and prospective bidders.  The Committee suggests that all parties should be required to submit a ten percent (10%) good faith deposit;

    b.    representations and warranties that survive closing;

    c.    indemnities that survive closing indefinitely and without any cap on liabilities;

    d.    unreasonable conditions to closing (such as requiring the buyer to obtain landlord estoppel certificates and similar documents or lease amendments) and/or unreasonable termination rights;

    e.    prevailing party provisions with respect to litigation expenses; and

    f.    failure to reimburse prepaid expenses to the Debtors.

### RESERVATION OF RIGHTS

40.     The Committee and its professionals are continuing to gather information, to communicate with the Debtors and other parties in interest, and to analyze the proposed Stalking Horse Sales and alternative proposals for the Debtors' assets.  Accordingly, the Committee

expressly reserves the right to file any appropriate objection to the Bidding Procedures, including any bid protections, and the Stalking Horse Sales prior to, or raise such objections at, their respective hearings.

**WHEREFORE**, the Committee respectfully requests that this Court (a) limit the relief sought by the Debtors in the Bidding Procedures Motions to the extent provided for herein and (b) grant such other and further relief as may be just and proper.

Dated:  February 12, 2020

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Morgan L. Patterson*
Matthew P. Ward, Esq. (DE No. 4471)
Morgan L. Patterson, Esq. (DE No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 661-7711

- and -

**HAHN & HESSEN LLP**
Mark S. Indelicato, Esq.
Mark T. Power, Esq.
Jeffrey Zawadzki, Esq.
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors of Lucky's Market Parent Company, LLC, et al.*