**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUCKY'S MARKET PARENT COMPANY, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10166 (JTD)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 63, 71, 72, 73, 97, 98, and 186** |

**SECOND AMENDED DECLARATION OF SCOTT MOSES IN SUPPORT OF THE
DEBTORS' BIDDING PROCEDURES MOTIONS**

Pursuant to 28 U.S.C. § 1764, Scott Moses, declares as follows under the penalty of perjury:

1. PJ Solomon Securities, LLC is an investment banking and financial advisory firm located at 1345 Avenue of the Americas, New York City, New York.

2. I am a Managing Director with PJ Solomon, L.P. (together with PJ Solomon Securities, LLC, "**Solomon**"), a leading financial advisory and investment banking firm, and a member of Solomon's Operating Committee. I am also Head of Food Retail & Restaurants Investment Banking (the "**Food Retail Advisory Group**"), specializing in grocery and restaurant sector mergers & acquisitions and strategic advice.

3. Before joining Solomon, I was the Head of Food, Drug and Specialty Retail Investment Banking at Sagent Advisors, prior to which I worked in the retail investment banking

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), and Sinoc, Inc. (0723).

72161591.11

groups at JPMorgan, Citigroup and Dresdner Kleinwort Wasserstein. I received a B.A. from the University of Pennsylvania and both M.B.A. and J.D. degrees from Columbia University.

4. I have substantial knowledge and experience assisting troubled companies with stabilizing their financial condition, analyzing their operations, and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances, including assisting in 363 sale processes in the chapter 11 context.

## SOLOMON QUALIFICATIONS

5. It is my understanding that the Debtors have determined, in the exercise of their business judgment, that the size of their business operations and the complexity of the financial difficulties attendant upon operations of such scope, require them to employ an investment banker and financial advisor with knowledge of the Debtors' industry and businesses and experience with the chapter 11 process, to advise them with respect to the sale of the Debtors' assets.

6. Solomon was first engaged by the Debtors on July 24, 2019 to provide general investment banking and financial advice in connection with the filing of the Debtors' Chapter 11 Cases and the Debtors' attempts to sell their assets. During this process, Solomon's professionals have been working closely with the Debtors' management and other professionals and, as a result, have become acquainted with the Debtors' history, business operations, capital and corporate structure, and related matters. Accordingly, Solomon has developed substantial knowledge regarding the Debtors that will result in effective and efficient services in these Chapter 11 Cases.

7. Founded in 1989, Solomon is a leading independent investment banking advisory firm that provides strategic and financial advisory services, including advisory services in

2

connection with mid- to large-scale corporate restructuring transactions. Solomon's professionals have extensive experience in providing financial advisory and investment banking services to companies across a range of industries as well as to financially distressed companies and creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

8. Solomon's Food Retail Advisory Group provides investment banking advisory services to public and private clients across various food retail sectors, including traditional and specialty grocery stores, drug stores, club stores, convenience stores, wholesalers and restaurants. The members of Solomon's Food Retail Advisory Group have extensive experience in the food retail sector, including working (both at Solomon and at prior firms) with clients such as Fairway Market on its pending sale of stores to Village Super Market; Kroger, on its $800 million acquisition of Roundy's; Lucky's Market, on its sale of a meaningful equity stake to Kroger; Sprouts Farmers Market, on its merger with Henry's Farmers Market (owned at the time by Apollo); Sunflower Farmers Market, on its sale to Sprouts Farmers Market; Mi Pueblo, on its sale to KKR; New Seasons, on its recently announced sale to Good Food Holdings/Emart; Fred's, on its sales of prescription assets to CVS and Walgreens; Martin's, on its sale to SpartanNash; Best Market, on its sale to Lidl; Supervalu, on its sale of Shop & Save to Schnucks; El Rancho, on its sale of growth equity to Albertsons; Central Grocers, on its sales of Strack & Van Til to Indiana Grocery Group and of its distribution of assets to Supervalu; Marsh Supermarkets, on its sales of assets to Kroger and Fresh Encounter; Southeastern Grocers, on its sale of selected prescription assets to CVS Health; Fresh & Easy, on the sale of its produce manufacturing facility to Calavo Growers; United Supermarkets on its sale to Albertson's; Haggen Food & Pharmacy, on the sales of its core business to Albertson's, its non-core stores to

various retailers and its previous sale to Comvest Partners; Briar Development, on the sale of its portfolio of various Haggen real estate assets to Merlone Geier; Pro's Ranch Markets, on the sale of its California region stores to Vallarta Supermarkets; Weis Markets, on its sale of SuperPetz to Petco; Jean Coutu, on its sale of Eckerd Drug and Brooks Pharmacy to Rite Aid; Ahold, on its sale of U.S. Foodservice to KKR and CD&R and Cerberus Capital, on its original acquisition of Albertson's non-core stores.

9. In addition, Solomon and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases. Solomon professionals have been retained in numerous large, complex chapter 11 cases, including, among others: *In re iPic-Gold Class Entertainment,* LLC, Case No. 19-11739 (LSS) (Bankr. D. Del. August 5, 2019); *In re Payless Holdings LLC*, Case No. 19-40883 (Bankr. E.D. Mo. Mar. 19, 2019); *In re Marsh Supermarkets Holding, LLC*, Case No. 17-11066 (BLS) (Bankr. D. Del. June 5, 2017); *In re Quicksilver, Inc.*, Case No. 15-11880 (Bankr. D. Del. Oct. 28, 2015); *In re HH Liquidation, LLC (f/k/a In re Haggen Holdings, LLC)*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 8, 2015); *In re The Dolan Company*, Case No. 14-10614 (Bankr. D. Del. Apr. 15, 2014); *In re MES Int'l, Inc.*, Case No. 09-14109 (Bankr. D. Del. Feb. 26, 2010); *In re Building Materials Holding Corp.*, Case No. 09-12074 (Bankr. D. Del. July 16, 2009); *In re Tweeter Home Entm't Grp., Inc.*, Case No. 07-10787 (Bankr. D. Del. July 13, 2007).

10. I submit this declaration (this "**Declaration**") in support of, and to attest to the reasonableness and market fitness of, the Bidding Procedures Motions (defined below) and in support of the Motions to Shorten (defined below) and provide evidence in support of the

compelling circumstances that exist to justify shortening the timeline to conclude the bidding and sale process.

## PREPETITION MARKETING EFFORTS

11.     Prior to the Petition Date, on July 24, 2019, and as set forth in more detail above, the Debtors selected Solomon as their investment banker to assist the Debtors in their sale process, most notably to vigorously market the Debtors' assets and thoroughly solicit and accommodate potential purchasers. Solomon marketed substantially all of the Debtors' assets for sale from its retention through the Petition Date to the date of this Declaration, which is over six (6) months.

12.     In connection with the Debtors' sale process, Solomon has provided, and will continue to provide, the following services to the Debtors:

   a. Solomon familiarized itself with the business, operations, properties, financial condition and prospects of the Debtors and any prospective buyer;

   b. Solomon advised and assisted the Debtors in considering the desirability of effecting a transaction, and, if the Debtors believed any such transaction to be desirable, assisted in developing a general strategy for accomplishing such transaction;

   c. Solomon advised and assisted the Debtors in identifying potential buyers contacted such potential buyers at the Debtors direction;

   d. Solomon advised and assisted the Debtors in the preparation of descriptive data concerning the Debtors, in responding to due diligence requests from prospective buyers, and in establishing and maintaining an electronic or physical data room for use by prospective buyers, in each case, based upon information provided by the Debtors;

   e. Solomon consulted with and advised the Debtors concerning opportunities for any transaction and periodically advised the Debtors as to the status of dealings with any potential Buyer;

   f. Solomon advised and assisted management of the Debtors in making presentations to the Debtors' Board of Managers concerning general strategy and any proposed transaction;

       g. Solomon advised and assisted the Debtors in the course of its negotiations of any transactions; and

       h. Solomon advised and assisted the Debtors in the execution of and closing under a definitive agreement relating to any transactions; and

13. Since its retention, Solomon has conducted a thorough and extensive prepetition marketing process to sell substantially all of the Debtors' assets. Those efforts commenced in July, 2019 and are ongoing at this time.

14. As part of its marketing efforts, Solomon:

       a. Contacted 60 parties

       b. Entered into non-disclosure agreements with 25 parties

       c. Granted access to the data room to 8 parties

       d. Received 10 indications of interest

15. As a result of these efforts, and as set forth in more detail below, Solomon has assisted the Debtors in finalizing asset purchase agreements with 6 parties. Solomon continues to work with several other interested parties on letters of intent and asset purchase agreements to sell other, but separate, store locations of the Debtors.

## THE CHAPTER 11 CASES

16. On January 27, 2020 (the "**Petition Date**"), the above-captioned debtors and debtors in possession (the "**Debtors**") each filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

17. On January 30, 2020, the Debtors filed the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and*

6

*Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (Publix Super Markets, Inc.)* [Docket No. 63] (the "**Publix Bidding Procedures Motion**").

18. On January 31, 2020, the Debtors filed the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (ALDI, INC.)* [Docket No. 71] (the "**Aldi Bidding Procedures Motion**"); the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (LM Acquisition Co. LLC)* [Docket No. 73] (the "**LM Bidding Procedures Motion**"); and the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid*

*Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (Seabra Foods XIV, Inc.)* [Docket No. 72] (the "**Seabra Bidding Procedures Motion**").

19. On January 31, the Debtors filed the *Motion of Debtors to Shorten Notice for the Hearing on the Motions of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially all the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially all the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 74] (the "**First Motion to Shorten**").

20. On February 3, 2020, the Bankruptcy Court entered the *Order Granting Motion of Debtors to Shorten Notice for the Hearing on the Motions of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (E)*

8

72161591.11

*Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 90] (the "**Order Shortening Notice**"), granting the First Motion to Shorten.

21.   On February 4, 2020, the Debtors filed the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (Winn-Dixie Stores, Inc.)* [Docket No. 97] (the "**Winn-Dixie Bidding Procedures Motion**"); and the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (Carlos Alvarez)* [Docket No. 98] (the

"**Alvarez Bidding Procedures Motion**", together with the Publix Bidding Procedures Motion, the Aldi Bidding Procedures Motion, the LM Bidding Procedures Motion, the Seabra Bidding Procedures Motion, and the Winn-Dixie Bidding Procedures Motion, the "**Stalking Horse Bid Procedures Motions**")[2].

22. On February 4, 2020, the Debtors filed the *Second Motion of Debtors to Shorten Notice for the Hearing on the Motions of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially all of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially all the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 100] (the "**Second Motion to Shorten**").

23. On February 13, 2020, the Debtors filed the *Motion of Debtors for Entry of (I) an Order (A) Approving Global Bid Procedures in Connection with the Sale of the Remainder of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief; and (II) an Order (A) Approving the Sale of the Remainder of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 186] (the "**Global Bidding Procedures**

---

[2] All capitalized terms herein undefined shall have the meaning ascribed to them in the Bidding Procedures Motions.

10

72161591.11

**Motion**", together with the Stalking Horse Bid Procedures Motions, the "**Bidding Procedures Motions**").

24. On February 13, 2020, the Debtors filed the *Third Motion of Debtors to Shorten Notice for the Hearing on the Motions of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of the Remainder of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief; and (II) an Order (A) Approving the Sale of the Remainder of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 187] (the "**Third Motion to Shorten**", together with the First Motion to Shorten and the Second Motion to Shorten, the "**Motions to Shorten**").

25. **Publix Bidding Procedures Motion**. Pursuant to the Publix Bidding Procedures Motion, Publix Super Markets, Inc. ("**Publix**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**Publix Stalking Horse Agreement**"), dated as of January 27, 2020. Pursuant to the Publix Stalking Horse Agreement, Publix is entitled to:

   (a) a break-up fee equal to three percent (3%) of the Purchase Price (as defined in the Publix Stalking Horse Agreement) (the "**Publix Break-Up Fee**");

   (b) reimbursement of Publix's out of pocket costs, expenses, and fees incurred in connection with evaluating, negotiating, documenting and performing the transactions contemplated by the Publix Stalking Horse Agreement in an amount up to $500,000 (the "**Publix Expense Reimbursement**"); and

   (c) a perpetual topping fee requirement of $250,000 plus expense reimbursement at each bid increment (the "**Publix Topping Fee**", together with the Publix Expense Reimbursement and the Publix Break-Up Fee, the "**Publix Bid Protections**").

26.     The Publix Stalking Horse Agreement is for the purchase of certain of the Debtors' assets related to five (5) of the Debtors' stores located in Florida (the "**Publix Assets**"). Pursuant to the Publix Stalking Horse Agreement, the purchase price for the Publix Assets is $11,483,333.30, subject to adjustments for prorations and other matters as provided in the Publix Stalking Horse Agreement.

27.     **Aldi Bidding Procedures Motion**. Pursuant to the Aldi Bidding Procedures Motion, Aldi, Inc. ("**Aldi**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**Aldi Stalking Horse Agreement**"), dated as of January 26, 2020. Pursuant to the Aldi Stalking Horse Agreement, Aldi is entitled to:

(a)     reimbursement of Aldi's out of pocket costs, expenses, and fees incurred in connection with evaluating, negotiating, documenting and performing the transactions contemplated by the Aldi Stalking Horse Agreement in an amount up to $250,000 (the "**Aldi Expense Reimbursement**"); and

(b)     a perpetual topping fee requirement of $250,000 plus expense reimbursement at each bid increment (the "**Aldi Topping Fee**", together with the Aldi Expense Reimbursement, the "**Aldi Bid Protections**").

28.     The Aldi Stalking Horse Agreement is for the purchase of certain of the Debtors' assets related to five (5) of the Debtors' stores located in Florida (the "**Aldi Assets**"). Pursuant to the Aldi Stalking Horse Agreement, the purchase price for the Aldi Assets is $7,800,000, subject to adjustments for prorations and other matters as provided in the Aldi Stalking Horse Agreement.

29.     **LM Bidding Procedures Motion**. Pursuant to the LM Bidding Procedures Motion, LM Acquisition Co. LLC ("**LM**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**LM Stalking Horse Agreement**"), dated as of January 29, 2020. Pursuant to the LM Stalking Horse Agreement, LM is entitled to:

(a)     reimbursement of LM's out of pocket costs, expenses, and fees incurred in connection with evaluating, negotiating, documenting and performing the

transactions contemplated by the LM Stalking Horse Agreement in an amount up to $250,000 (the "**LM Expense Reimbursement**"); and

(b) a perpetual topping fee requirement of $250,000 plus $250,000 reimbursement at each bid increment (the "**LM Topping Fee**", together with the LM Expense Reimbursement, the "**LM Bid Protections**").

30. The LM Stalking Horse Agreement is for the purchase of the Debtors' assets related to six (6) of Debtors' operating stores as a package deal (the "**LM Assets**"). Pursuant to the LM Stalking Horse Agreement, the purchase price for the LM Assets is $3,171,000, subject to adjustments for prorations and other matters as provided in the LM Stalking Horse Agreement.

31. **Seabra Bidding Procedures Motion**. Pursuant to the Seabra Bidding Procedures Motion, Seabra Foods XIV, Inc. ("**Seabra**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**Seabra Stalking Horse Agreement**"), dated as of January 31, 2020. Pursuant to the Seabra Stalking Horse Agreement, Seabra is entitled to up to $250,000 of expense reimbursement (for actual out-of-pocket third party expenses), plus $250,000 reimbursement at each bid increment (the "**Seabra Bid Protections**").

32. The Seabra Stalking Horse Agreement is for the purchase of the Debtors' assets related to one (1) of Debtors' stores (the "**Seabra Assets**"). Pursuant to the Seabra Stalking Horse Agreement, the purchase price for the Seabra Assets is $1,250,000, subject to adjustments for prorations and other matters as provided in the Seabra Stalking Horse Agreement.

33. **<u>Winn-Dixie Bidding Procedures Motion</u>**. Pursuant to the Winn-Dixie Bidding Procedures Motion, Winn-Dixie Stores, Inc. ("**Winn-Dixie**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**Winn-Dixie Stalking Horse Agreement**"), dated as of February 4, 2020. Pursuant to the Winn-Dixie Stalking Horse Agreement, Winn-Dixie is entitled to reimbursement of Winn-Dixie's out of pocket costs,

expenses, and fees incurred in connection with evaluating, negotiating, documenting and performing the transactions contemplated by the Winn-Dixie Stalking Horse Agreement in an amount up to 10% of the purchase price (the "**Winn-Dixie Expense Reimbursement**", or the "**Winn-Dixie Bid Protections**").

34. The Winn-Dixie Stalking Horse Agreement is for the purchase of certain of the Debtors' assets related to five (5) of the Debtors' stores (the "**Winn-Dixie Assets**"). Pursuant to the Winn-Dixie Stalking Horse Agreement, the purchase price for the Winn-Dixie Assets is $2,800,000, subject to adjustments for prorations and other matters as provided in the Winn-Dixie Stalking Horse Agreement.

35. **Alvarez Bidding Procedures Motion**. Pursuant to the Alvarez Bidding Procedures Motion, Carlos Alvarez and/or an Affiliate ("**Alvarez**") will serve as the stalking horse purchaser pursuant to an Asset Purchase Agreement (the "**Alvarez Stalking Horse Agreement**"), dated as of February 4, 2020. Pursuant to the Alvarez Stalking Horse Agreement, Alvarez is entitled to reimbursement of Alvarez's out of pocket costs, expenses, and fees incurred in connection with evaluating, negotiating, documenting and performing the transactions contemplated by the Alvarez Stalking Horse Agreement in an amount up to 3% of the purchase price (the "**Alvarez Expense Reimbursement**", or the "**Alvarez Bid Protections**"). The Publix Bid Protections, the Aldi Bid Protections, the LM Bid Protections, the Seabra Bid Protections, the Winn-Dixie Bid Protections, and the Alvarez Bid Protections shall be collectively referred to herein as, the "**Bid Protections**".

36. The Alvarez Stalking Horse Agreement is for the purchase of certain of the Debtors' assets related to one (1) of the Debtors' stores (the "**Alvarez Assets**"). Pursuant to the Alvarez Stalking Horse Agreement, the purchase price for the Alvarez Assets is $275,000,

subject to adjustments for prorations and other matters as provided in the Alvarez Stalking Horse Agreement.

37. **Global Bidding Procedures Motion**. To maximize the value of their remaining assets, Debtors propose to establish the Global Bid Procedures in connection with the sale of their remaining assets, including liquor licenses, not already the subject of a Stalking Horse Bid Procedures Motion (the "**Global Assets**"). The Global Bidding Procedures Motion does not contemplate the designation of any additional stalking horse purchasers or granting of bid protections with respect to the Global Assets.

38. For the avoidance of doubt, the Stalking Horse Bid Procedures Motions are subject to the terms and conditions of their respective Stalking Horse Bid Procedures Motions; however, the schedule of dates and deadlines contained in the Global Bidding Procedures Motion will govern both the Stalking Horse Bid Procedures Motions and any other transaction that may result as a result of the Global Bidding Procedures Motion.[3] The Global Bidding Procedures Motion seeks to establish the following dates and milestones:

(a) *Contract Cure Objection Deadline*: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, or objections to the proposed form of adequate assurance of future performance with respect to any Contract will be filed and served no later than **March 14, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure or Assignment Objection Deadline**").

(b) *Bid Deadline*: Bids for any portion of the Assets as well as the deposit and the other requirements for a bid to be considered a Qualified Bid must be received by no later than **March 19, 2020 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**").

(c) *Sale Objection Deadline*: Objections to the relief requested at the Sale Hearing will be filed and served no later than **March 19, 2020 at 4:00**

---

[3] As of the date of filing of this Declaration, LM Acquisition Co. LLC has not agreed to the timeline set forth herein. LM Acquisition Co. LLC, the Debtors, and the Creditors' Committee continue to negotiate this and other terms of LM Acquisition Co. LLC's stalking horse agreement and related bid procedures.

      **p.m. (prevailing Eastern Time)** (except for any objection that arises at an Auction).

(d)  *Auction*: An Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **March 24, 2020 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(e)  *Auction and Sale Objection Deadline*: Objections to the Sale of any Asset Package to a Successful Bidder or Backup Bidder will be filed and served no later than **12:00 p.m. (prevailing Eastern Time) on March 25, 2020**.

(f)  *Sale Hearing*: Consistent with the Court's availability and schedule, the Sale Hearing(s) will commence on or before **March 26, 2020**.

39.  Based on this interest to date, I expect there to be additional letters of intent and asset purchase agreements negotiated during the Chapter 11 Cases. I also fully expect several bids to be submitted prior to the Bid Deadline and I am hopeful that there will be a competitive and robust Auction on March 24, 2020.

40.  I believe that the proposed sale timeline is reasonable and well within the range of market comparable sales timelines given the extensive prepetition marketing efforts. I believe that this timeline will allow a thorough marketing process and give potential bidders more than a sufficient opportunity to conduct their due diligence.

41.  Given that the Debtors are operating solely on the use of cash collateral, it is imperative that the Debtors accomplish their sales process as expeditiously as possible. The Debtors seek to avoid any delay in the sale and marketing process, which is already underway and has garnered significant interest from both financial and strategic parties. Given the robust prepetition marketing process, I do not believe that additional time for a post-petition marketing process will further enhance the value of the assets. Furthermore, I believe expeditiously conducting a sale of the Debtors' assets will preserve value for the Debtors' estates and maximize value for the Debtors' creditors. Accordingly, I believe it prudent to obtain approval of

the Bidding Procedures for each of the proposed sales as soon as possible in order to formalize the sale processes that have already been started and provide court supervision of the processes.

42.     Lastly, I believe that the Bid Protections for each of the stalking horse purchasers are reasonable and within the range of those offered in market comparable sales and that the stalking horse purchasers would not have undertaken the sales without such Bid Protections.

43.     **Publix**. The Publix Breakup Fee, Publix Expense Reimbursement, and Publix Topping Fee were crucial and necessary to induce Publix to serve as the stalking horse bidder, as Publix would not have agreed to enter into the Publix Stalking Horse Agreement without these Publix Bid Protections. I do not believe that the Publix Breakup Fee, Publix Expense Reimbursement, or Publix Topping Fee will have any chilling effect on bidding whatsoever. I am not aware of any pre-existing relationships between the Debtors and Publix, nor do the Debtors have any ownership or other financial stake in Publix.

44.     **Aldi**. The Aldi Expense Reimbursement and Aldi Topping Fee were crucial and necessary to induce Aldi to serve as the stalking horse bidder, as Aldi would not have agreed to enter into the Aldi Stalking Horse Agreement without these Aldi Bid Protections. I do not believe that the Aldi Expense Reimbursement and the Aldi Topping Fee will have any chilling effect on bidding whatsoever. I am not aware of any pre-existing relationships between the Debtors and Aldi, nor do the Debtors have any ownership or other financial stake in Aldi.

45.     **LM**. The LM Bid Protections were crucial and necessary to induce LM to serve as the Stalking Horse Bidder, as LM would not have agreed to enter into the LM Stalking Horse Agreement without the LM Bid Protections. I do not believe that the LM Expense Reimbursement or the LM Topping Fee will have any chilling effect on bidding whatsoever. In addition, the purchase of the LM Assets as a package deal was crucial and necessary to induce

LM to serve as the Stalking Horse Bidder, as LM would not have agreed to enter into the LM Stalking Horse Agreement without the LM Assets being a package deal. LM is an "insider" or "affiliate" of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code. However, LM and the Debtors do not have the same directors, stockholders, members, or other equity holders. The Debtors have appointed an independent director to oversee all matters related to the sale, and such independent director has and will continue to exercise its fiduciary duties in evaluating the sale and determining whether the sale is in the best interests of the Debtors, their creditors, and their estates. Neither LM, nor LM's principals, took part in the decision making process through which the Debtors (i) decided to enter into the LM Stalking Horse Agreement or (ii) made the determination that LM's offer to purchase the LM Assets, subject to the terms and conditions of the LM Stalking Horse Agreement, including the LM Bid Protections, constituted the highest price or otherwise best purchase price to date for the LM Assets.

46.     **Seabra.** The Seabra Bid Protections were crucial and necessary to induce Seabra to serve as the stalking horse bidder, as Seabra would not have agreed to enter into the Seabra Stalking Horse Agreement without these Seabra Bid Protections. I do not believe that the Seabra Bid Protections will have any chilling effect on bidding whatsoever. I am not aware of any pre-existing relationships between the Debtors and Seabra, nor do the Debtors have any ownership or other financial stake in Seabra.

47.     **Winn-Dixie**. The Winn-Dixie Expense Reimbursement was crucial and necessary to induce Winn-Dixie to serve as the stalking horse bidder, as Winn-Dixie would not have agreed to enter into the Winn-Dixie Stalking Horse Agreement without these Winn-Dixie Expense Reimbursement. I do not believe that the Winn-Dixie Expense Reimbursement will have any chilling effect on bidding whatsoever. I am not aware of any pre-existing relationships between

the Debtors and Winn-Dixie, nor do the Debtors have any ownership or other financial stake in Winn-Dixie.

48. **Alvarez**. The Alvarez Expense Reimbursement was crucial and necessary to induce Alvarez to serve as the stalking horse bidder, as Alvarez would not have agreed to enter into the Alvarez Stalking Horse Agreement without the Alvarez Expense Reimbursement. I do not believe that the Alvarez Expense Reimbursement will have any chilling effect on bidding whatsoever. I am not aware of any pre-existing relationships between the Debtors and Alvarez, nor do the Debtors have any ownership or other financial stake in Alvarez.

49. All negotiations with the stalking horse purchasers and any other potential bidders have been in good faith and at arm's length, and I know of no collusion among potential bidders with respect to the Debtors' assets.

50. It is my professional opinion, that the Debtors, with the assistance of Solomon and their other advisors, have canvassed the market to the best extent possible and been in contact with as many strategic, and financial, potential buyers as possible. I believe that the current time line contemplated by the Bid Procedures, as set forth in detail herein, is reasonable under the circumstances and will allow the Debtors to maximize the value of their assets and provide the most reliable course of action to sell or liquidate as many store locations as possible for the highest value as possible during these Chapter 11 Cases.

51. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the Bidding Procedures Motions be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of February, 2020.

/s/ Scott Moses
Scott Moses
PJ SOLOMON
*Proposed Investment Banker to the Debtors*