## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

LUCKY'S MARKET PARENT COMPANY, LLC, *et al.*,[1]

Debtors.

Chapter 11

Case No. 20-10166 (JTD)

(Jointly Administered)

---

### JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
### LUCKY'S MARKET PARENT COMPANY, LLC AND ITS DEBTOR AFFILIATES

---

Dated: October 29, 2020
      Wilmington, Delaware

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com

-and-

Liz Boydston (Admitted *Pro Hac Vice*)
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 661-5557
lboydston@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), Sinoc, Inc. (0723), Lucky's Farmers Market of Ellisville, LLC (2875), and Lucky's Farmers Market of Lexington, KY, LLC (3446).

## TABLE OF CONTENTS

I.      Introduction ....................................................................................................1

II.     Definitions and Construction of Terms...............................................................1

        A.      Definitions.............................................................................................1

        B.      Interpretation; Application of Definitions and Rules of Construction...................18

III.    Unclassified Claims .........................................................................................18

        A.      PACA Claims and PASA Claims ...........................................................18

        B.      Administrative Expense Claims...............................................................19

        C.      Professional Fee Claims.......................................................................19

        D.      Priority Tax Claims..............................................................................20

        E.      Class Action Claims.............................................................................21

        F.      Statutory Fees.....................................................................................21

IV.     Classification and Treatment of Claims and Interests .....................................22

        A.      Summary of Treatment of Claims and Interests Under the Plan ...........................22

        B.      Classification of Claims and Interests....................................................22

        C.      Treatment of Claims and Interests .........................................................22

                1.      Class 1 – Prepetition Secured Claims ......................................22

                2.      Class 2 – Other Secured Claims...............................................23

                3.      Class 3 – Priority Claims .........................................................23

                4.      Class 4 – General Unsecured Claims Class A Recovery Pool...................23

                5.      Class 5 – General Unsecured Claims Class B Recovery Pool...................24

                6.      Class 6 – General Unsecured Claims Class C Recovery Pool...................24

                7.      Class 7 – Intercompany Claims ...............................................25

                8.      Class 8 – Equity Interests.......................................................25

                9.      Class 9 – EB-5 Investors........................................................25

|      | D.   | Impaired Claims and Equity Interests .................................................. 25 |
|      | E.   | Cramdown and No Unfair Discrimination .......................................... 26 |
|      | F.   | Special Provision Regarding Settled Claims ..................................... 26 |
| V.   |      | Implementation and Execution of the Plan ............................................ 26 |
|      | A.   | Effective Date ................................................................................... 26 |
|      | B.   | Implementation of the Plan ............................................................... 26 |
|      |      | 1.   General ..................................................................................... 26 |
|      |      | 2.   Corporate Action; Officers and Directors; Effectuating Documents ......... 26 |
|      | C.   | Records ............................................................................................. 27 |
|      | D.   | Provisions Governing Distributions Under the Plan ........................... 27 |
|      |      | 1.   Distribution Record Date ......................................................... 27 |
|      |      | 2.   Method of Payment .................................................................. 27 |
|      |      | 3.   Surrender of Instruments ......................................................... 28 |
|      |      | 4.   Delivery of Distributions ........................................................ 28 |
|      |      | 5.   Objection to and Resolution of Claims ................................... 29 |
|      |      | 6.   The Settlement of Claims ......................................................... 29 |
|      |      | 7.   Miscellaneous Distribution Provisions ................................... 29 |
| VI.  |      | Executory Contracts and Unexpired Leases ........................................... 30 |
|      | A.   | Executory Contracts and Unexpired Leases ....................................... 30 |
|      | B.   | Rejection Claims ............................................................................... 30 |
| VII. |      | Conditions Precedent to Confirmation and the Effective Date .............. 31 |
|      | A.   | Conditions Precedent to Confirmation ............................................... 31 |
|      | B.   | Conditions Precedent to the Effective Date ....................................... 31 |
|      | C.   | Waiver of Conditions ........................................................................ 31 |
|      | D.   | Effect of Nonoccurrence of Conditions ............................................. 31 |

72709057.12

VIII.  Settlement, Injunction, Exulpation, Release, and Related Provisions .............................32

    A.    Settlement Released Claims..................................................................................32

    B.    Injunction ...........................................................................................................34

    C.    Exculpation ........................................................................................................35

    D.    Releases by the Debtors.....................................................................................35

    E.    Third Party Releases ..........................................................................................36

    F.    Substantive Consolidation .................................................................................37

IX.  Liquidating Trust .........................................................................................................40

    A.    Establishment of the Liquidating Trust.............................................................40

    B.    Purpose of the Liquidating Trust. ......................................................................40

    C.    Liquidating Trust Assets. ...................................................................................40

    D.    Administration of the Liquidating Trust. ...........................................................40

    E.    Liquidating Trustee's Tax Power for Debtors. ..................................................41

    F.    Cash Investments. ..............................................................................................41

    G.    Distribution of Liquidating Trust Interests. ......................................................41

    H.    Federal Income Tax Treatment of Liquidating Trust. .......................................41

    I.    Dissolution. .......................................................................................................42

X.  Rights and authority of the creditor representative.......................................................43

XI.  Retention of Jurisdiction ...............................................................................................44

XII.  Miscellaneous Provisions...............................................................................................45

    A.    Amendment or Modification of the Plan ...........................................................45

    B.    Exhibits/Schedules.............................................................................................46

    C.    Plan Supplement ................................................................................................46

    D.    Filing of Additional Documents ........................................................................46

    E.    Binding Effect of Plan .......................................................................................46

F.     Governing Law ..................................................................................................46

G.     Time ...................................................................................................................46

H.     Severability .......................................................................................................46

I.      Revocation .........................................................................................................46

J.      Dissolution of the Committee ...........................................................................47

K.     Claims Agent .....................................................................................................47

L.      Inconsistency.....................................................................................................47

M.    No Admissions..................................................................................................47

N.     Reservation of Rights........................................................................................47

O.     Compromise of Controversies ..........................................................................47

P.      No Discharge .....................................................................................................48

72709057.12

## I.    INTRODUCTION

The Debtors propose this joint plan of liquidation (the "**Plan**") pursuant to Bankruptcy Code sections 1125 and 1129 for the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article II.A of this Plan.

Except for Debtors Lucky's Farmers Market, LP and Lucky's Market 2, LP, which are treated separately under this Plan, the Plan also constitutes a substantively consolidated Plan for all other Debtors for the pooling of assets and resolution of and distribution on outstanding Allowed Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

The Plan reflects substantial arms' length settlement negotiations among the Debtors, the Prepetition Secured Lender, the Committee, the EB-5 Investors, and the Special Committee, which culminated in the Global Settlement.

Copies of the Plan and Disclosure Statement and all other documents related to the Chapter 11 Cases are available for review without charge on the bankruptcy case website at: https://cases.omniagentsolutions.com/luckysmarket.

The Plan is a liquidating chapter 11 plan. Most of the Debtors' assets have been sold to third party buyers through Bankruptcy Court approved lease and asset sales. There are, however, a few Identified Assets, which are in the process of being sold or liquidated. Those Identified Assets are listed on Schedule A to this Plan. With respect to any Remaining Assets, those are being treated as set forth herein.

Each Holder of an Impaired Claim against the Debtors entitled to vote to accept or reject the Plan is encouraged to read the Plan in its entirety before voting. Reference is made to the Disclosure Statement, filed contemporaneously herewith, for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan.

Subject to the restrictions on modifications as set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, in the Plan, and in the Disclosure Statement, the Debtors expressly reserve the right to alter, amend or modify the Plan and the Disclosure Statement one or more times before its substantial consummation.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

"**503(b)(9) Claim**" means any Claim against any of the Debtors for the value of goods sold to the Debtors in the ordinary course of business and received by the Debtors within twenty (20) days before the Petition Date, which qualifies as an administrative expense pursuant to 11 U.S.C. § 503(b)(9).

"**Administrative Expense Bar Date**" means the first business day that is thirty (30) calendar days after the Effective Date.

"**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs and expenses of preserving the Estates under Bankruptcy Code sections 503(b) and 507(a)(2) including, without limitation: (a) Professional Fee Claims, (b) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (c) all 503(b)(9) Claims; and (d) any actual and necessary costs and expenses of preserving the Estates.

"**Affiliate**" means an "affiliate" as defined in Bankruptcy Code section 101(2).

"**Allowed**" means any Claim that is not a Disputed Claim or a Disallowed Claim; provided, however, that a Disputed Claim shall be an Allowed Claim to the extent that (a) no objection to allowance has been interposed within the applicable period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed, but withdrawn with prejudice or overruled, in whole or in part, by a Final Order; or (c) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

"**Assets**" means any asset of the Estates that is not Cash on Hand, an Identified Asset, and the Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC. Assets shall include without limitation all other Equity Interests.

"**Avoidance Actions**" means all claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under sections 544, 545, 546, 547, 548, 549, and 550 of the Bankruptcy Code, and applicable non-bankruptcy law.

"**Ballot**" means the voting form accompanying the Disclosure Statement distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which the Holder is to indicate acceptance or rejection of the Plan in accordance with the voting instructions, make any other elections or representations required pursuant to the Plan and procedures governing the solicitation process.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date Order**" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Section 503(b)(9) Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 507].

2

"**Bar Date**" means the applicable bar date by which proofs of Claim or requests for allowance and payment of administrative expenses must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and Confirmation Order.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Case Website**" means the website maintained by Omni where parties are able to view the Plan, Disclosure Statement and other documents related to the Chapter 11 Cases at https://cases.omniagentsolutions.com/luckysmarket.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Cash on Hand**" means (i) all Cash in the Debtors' possession or control as of the Effective Date, including the Debtors' interest in any Cash held in reserves, security deposits and/or retainers, (ii) any unused Cash remaining in the budget attached to the Final Cash Collateral Order, and (iii) the Kroger Rent Reimbursement Obligation, *less* Cash in an amount sufficient to fund the Wind-Down Reserve.

"**Causes of Action**" means any Claim, cause of action (including Avoidance Actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" means the chapter 11 cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code as well as the chapter 11 cases initiated by Lucky's Farmers Market of Ellisville, LLC and Lucky's Farmers Market of Lexington, KY, LLC on March 3, 2020. The Chapter 11 Cases are jointly administered by the Bankruptcy Court under Case No. 20-10166-JTD.

"**Claim**" means a "claim" as defined in Bankruptcy Code section 101(5).

"**Claims and Noticing Agent**" means Omni in its capacity as claims and noticing agent and in its capacity as solicitation and tabulation agent, to the Debtors pursuant to the *Order (I) Approving Retention of Omni as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* [Docket No. 39] entered by the Court on January 28, 2020, and the *Order (I) Authorizing the Employment and Retention of Omni as Administrative Advisor Nunc Pro Tunc to the Petition Date* [Docket No. 616] entered by the Court on April 15, 2020.

"**Claims Register**" means the official register of Claims maintained by Omni.

"**Claims Reserve**" means, collectively, one or more reserves and/or escrows to be established not later than the Effective Date that will provide for the payment in full of Allowed Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Claims, Allowed PACA Claims, Allowed PASA Claims, Allowed Class Action Claims, and Allowed Professional Fee Claims in an amount to be disclosed in the Plan Supplement. All such amounts and reserves and/or escrows shall be subject to the consent of the Prepetition Secured Lender and the Committee.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Class Action Adversary Proceeding**" means that certain adversary proceeding commenced on February 3, 2020 (Adv. No. 20-50449 (JTD)) and captioned *Laura Forsyth, on behalf of herself and on behalf of all others similarly situated v. Lucky's Market Parent Company, LLC; Lucky's Farmers Market Holding Company, LLC; Lucky's Market Operating Company, LLC; LFM Stores LLC; Lucky's Farmers Market, LP; Lucky's Farmers Market Resource Center, LLC; Lucky's Market Holding Company 2, LLC; Lucky's Market GP 2, LLC; Lucky's Market 2, LP; Lucky's Market of Longmont, LLC; Lucky's Farmers Market of Billings, LLC; Lucky's Farmers Markets of Columbus, LLC; Lucky's Farmers Market of Rock Hill, LLC; LFM Jackson, LLC; Lucky's Farmers Market of Ann Arbor, LLC; Lucky's Market of Gainesville, LLC; Lucky's Market of Bloomington, LLC; Lucky's Market of Plantation, LLC; Lucky's Market of Savannah, GA, LLC; Lucky's Market of Traverse, City, LLC; Lucky's Market of Naples, FL, LLC; and Sinoc, Inc.*

"**Class Action Claims**" means the allegations and causes of action referenced in the purported Class Action Adversary Proceeding.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee on February 4, 2020 [Docket No. 94].

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider the confirmation of the Plan pursuant to Bankruptcy Code section 1129, and as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

"**Confirmation**" means confirmation of the Plan pursuant to Bankruptcy Code section 1129.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtors.

"**Creditor Representative**" means the person the Committee selects by the Effective Date to oversee, in consultation with the Debtors, Liquidating Debtor, and/or Liquidating Trustee, the reconciliation and distribution on account of General Unsecured Class A Claims. The Creditor Representative shall have the authority and duties set forth in Article X below.

"**Debtors**" means the debtors in the Chapter 11 Cases: Lucky's Market Parent Company, LLC; Lucky's Farmers Market Holding Company, LLC; Lucky's Market Operating Company, LLC; LFM Stores LLC; Lucky's Farmers Market, LP; Lucky's Farmers Market Resource Center, LLC; Lucky's Market Holding Company 2, LLC; Lucky's Market GP 2, LLC; Lucky's Market 2, LP; Lucky's Market of Longmont, LLC; Lucky's Farmers Market of Billings, LLC; Lucky's Farmers Markets of Columbus, LLC; Lucky's Farmers Market of Rock Hill, LLC; LFM Jackson, LLC; Lucky's Farmers Market of Ann Arbor, LLC; Lucky's Market of Gainesville, LLC; Lucky's Market of Bloomington, LLC; Lucky's Market of Plantation, LLC; Lucky's Market of Savannah, GA, LLC; Lucky's Market of Traverse, City, LLC; Lucky's Market of Naples, FL, LLC; Sinoc, Inc.; Lucky's Farmers Market of Ellisville, LLC; and Lucky's Farmers Market of Lexington, KY, LLC.

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that (a) has been disallowed under the Plan, the Disclosure Statement, the Bankruptcy Code, applicable law, or by Final Order; (b) is listed in the Schedules and Statements as zero or as contingent, disputed, or unliquidated as to which no proof of Claim or administrative expense request has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed Filed under applicable law or the Plan; (c) is not listed in the Schedules and Statements and as to which no proof of Claim or administrative expense request has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the Debtors and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

"**Disbursing Agent**" means the Liquidating Debtor and/or Liquidating Trustee, or the Debtors' named successor or assign.

"**Disclosure Statement**" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

"**Disclosure Statement Hearing**" means the hearing held by the Bankruptcy Court to consider the approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and as such hearing may be adjourned or continued from time to time.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, including, without limitation, Claims that (a) have not

been listed on the Schedules and Statements or have been listed on the Schedules and Statements as unliquidated, disputed, contingent, and/or at zero dollars, whether or not such Claim is the subject of a Proof of Claim; (b) are the subject of a proof of Claim that differs in nature, amount, or priority from the Schedules and Statements; or (c) are the subject of an objection or request for estimation Filed by the Debtors or the Liquidating Debtor or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order.

"**Distribution**" means, except as otherwise provided in the Plan, the property required by the Plan to be distributed to the Holders of Allowed Claims.

"**Distribution Record Date**" means the date(s) the Liquidating Debtor sets for the various transfer registers for each Class of Claims or Interests as maintained by the Debtors, or their respective agents, to be deemed closed in order to make Distributions to the record Holders of such Claims or Interests.

"**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

"**EB-5 Consideration**" means (a) $1.00 provided by the EB-5 Purchasers to the Debtors and (b) a waiver of Claims and agreement and consent to the Releases by the EB-5 Investors set forth in the Plan in exchange for the transfer of the EB-5 Limited Partnership Interests.

"**EB-5 Designated Entity**" means the entity designated on or before the Effective Date by a majority of the Holders of Class 9 Interests to receive and hold the Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC.

"**EB-5 Guarantees**" means those guarantees provided by the EB-5 Guarantors as part of EB-5 Investor Financing.

"**EB-5 Guarantors**" means LMPC, Lucky's Farmers Market Holding Company, LLC, and Mike Gilliland.

"**EB-5 Investor Financing**" means $16.5 million in investments received from the two separate private offerings of limited partner investments and certain intercompany loans received to fund store expansion primarily, which Lucky's Farmers Market, LP and Lucky's Market 2, LP offered to a limited number of potential non-American investors under the Employment Based Immigration Preference Program beginning in 2013 and ending in June 2014.

"**EB-5 Investors**" means those Persons and/or Entities who contributed $16.5 million in investments to Lucky's Farmers Market, LP and Lucky's Market 2, LP to a limited number of potential non-American investors under the Employment Based Immigration Preference Program beginning in 2013 and ending in June 2014.

"**EB-5 Limited Partnership Interests**" means the limited partner interests received in Lucky's Farmers Market, LP and in Lucky's Market 2, LP in exchange for the provision of EB-5 Investor Financing.

"**EB-5 Purchasers**" means those EB-5 Investors who provide the EB-5 Consideration in consideration for the transfer of the ownership interest of the EB-5 Limited Partnership Interests.

"**Effective Date**" means the date on which the conditions specified in Article VII.B of the Plan have been met, satisfied, or waived.

"**Effective Date Distributions**" means all Distributions required to be made on the Effective Date of the Plan to the Holders of Claims that are Allowed as of the Effective Date.

"**Effective Date Transactions**" means the transactions listed in Article V.E.

"**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

"**Equity Interests**" means all equity interests in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares, membership, or partnership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time, but does not include the EB-5 Investor Financing.

"**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541, and any successor Liquidating Trust.

"**Exculpated Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors; (b) the Committee and members of the Committee in their capacity as members of the Committee; (c) the Prepetition Secured Lender; and (d) the Related Parties of the foregoing.

"**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtors and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to the Plan.

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

"**Final Cash Collateral Order**" means the *Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, and 507, Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral of the Prepetition Secured Lender, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Prescribing Form and Manner of Notice of and Scheduling Final Hearing, and (IV) Granting Related Relief* that the Debtors, the Prepetition Secured Lender, and the Committee will seek to have entered at the Confirmation Hearing.

"**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

"**Final Fee Hearing**" means the hearing before the Bankruptcy Court to consider the Professional Final Fee Applications.

"**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

"**First Day Declaration**" means the *Amended Declaration of Andrew T. Pillari, Chief Financial Officer of Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 47].

"**First Day Motions**" means the *Motion for Joint Administration* [Docket No. 3], *Application to Appoint Omni Agent Solutions as Claims and Noticing Agent* [Docket No. 4], *Motion to Maintain Bank Accounts* [Docket No. 5], *Motion to Pay Employee Wages* [Docket No. 6], *Motion to Authorize Debtors to Maintain and Administer Customer Programs* [Docket No. 7], *Motion to Authorize Debtors to Continue Paying Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies* [Docket No. 8], *Motion to Pay Sales and Use Taxes* [Docket No. 10], *Motion Prohibiting Utilities from Discontinuing Service* [Docket No. 11], *Motion to Approve Use of Cash Collateral* [Docket No. 12], *Motion to Approve Procedures for Store Closing Sales and Assumption of Liquidation Consulting Agreement* [Docket No. 13], and *Motion to Authorize Debtors to Pay Prepetition Claims Arising under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act* [Docket No. 14].

"**First Day Order**" the Final Orders entered by the Bankruptcy Court approving the First Day Motions and granting the relief set forth in each First Day Motion.

"**First Interim Cash Collateral Order**" means the *Interim Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, and 507, Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral of the Prepetition Secured Lender, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Prescribing Form and Manner of Notice of and Scheduling Final Hearing, and (IV) Granting Related Relief* [Docket No. 50].

"**Fourth Interim Cash Collateral Order**" means the *Fourth Interim Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, and 507, Fed. R. Bankr. P. 2002, 4001, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral of the Prepetition Secured Lender, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Prescribing Form and Manner of Notice of and Scheduling Final Hearing, and (IV) Granting Related Relief* to be agreed upon between the Debtors, Prepetition Secured Lender, and Committee.

"**General Bar Date**" means April 24, 2020 at 4:00 p.m. prevailing Eastern Time, as established by the Bar Date Order.

"**General Partner of Lucky's Market 2, LP**" means Lucky's Market GP 2, LLC.

"**General Partner of Lucky's Farmers Market, LP**" means LFM Stores, LLC.

"**General Unsecured Claims**" means any Claim against the Debtors that is not (a) a Priority Claim, (b) an Administrative Expense Claim, (c) a Professional Fee Claim, (d) a Priority Tax Claim, (d) a Secured Tax Claim, (e) a Secured Claim, (f) an Other Secured Claim, (g) any Claim that constitutes an Interest, or (h) entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court. For the avoidance of doubt, General Unsecured Claims shall include the Prepetition Secured Lender Deficiency Claim.

"**General Unsecured Claims Class A Recovery Pool**" means Allowed General Unsecured Claims, including, but not limited to, any Mechanics Lien Claims that are timely filed, properly asserted, and Allowed with respect to a non-Kroger Guaranteed Lease(s), but excluding (i) any General Unsecured Claim guaranteed by Kroger, (ii) any Claims arising out of or relating to any Kroger Guaranteed Lease(s), (iii) any Kroger General Unsecured Claim, (iv) Prepetition Secured Lender Deficiency Claim, (v) Prepetition Secured Lender Subrogation Claim, (vi) any Claim asserted by any EB-5 Investors, (vii) any Intercompany Claim; and (viii) any Claim or Subrogation Claim asserted by any EB-5 Guarantors or Insiders of the Debtors.

"**General Unsecured Claims Class A Recovery Pool Allocation**" means 75% of (i) Cash on Hand and (ii) the proceeds from any Identified Assets to be allocated to the General Unsecured Claims Class A Recovery Pool for Pro Rata distribution to Holders of Allowed General Unsecured Class A Claims.

"**General Unsecured Claims Class B Recovery Pool**" means any Allowed General Unsecured Claim not included in the General Unsecured Claims Class A Recovery Pool or the General Unsecured Claims Class C Recovery Pool, including without limitation any (i) Allowed General Unsecured Claim of any kind arising under or relating to any Kroger Guaranteed Leases, including, but not limited to, any cure amounts or rejection damages claims and related Mechanics Lien Claims to the extent they are timely filed, properly asserted, and Allowed on a Kroger Guaranteed Lease(s), (ii) any other General Unsecured Claim guaranteed by Kroger, (iii) any Claims held by BBIF Subsidiary CDE 3, LLC arising from the Prepetition NMTC Loan, but only to the extent they are subject to the June 12, 2012 Payment and Completion Guaranty issued by Kroger, and (iv) any Claim or Subrogation Claim asserted by any EB-5 Guarantors.

"**General Unsecured Claims Class B Recovery Pool Allocation**" means 25% of (i) Cash on Hand and (ii) the proceeds from any Identified Assets to be allocated to the General Unsecured Claims Class B Recovery Pool for Pro Rata distribution to Holders of Allowed General Unsecured Class B Claims, subject to Kroger's consent right to the settlement of claims or settlement of cure disputes of Class members and to Kroger's oversight regarding objecting to claims of Class members.

"**General Unsecured Claims Class C Recovery Pool**" means the Kroger General Unsecured Claims, Prepetition Secured Lender Deficiency Claim, and Prepetition Secured Lender Subrogation Claim.

"**General Unsecured Claims Class C Recovery Pool Allocation**" means the amount remaining in the General Unsecured Claims Class B Recovery Pool Allocation, if any, after payment or reserve in full of all General Unsecured Claims Class B Recovery Pool, and all Remaining Assets of the Debtors' Estates other than Cash on Hand and the Wind Down Reserve (*e.g.* Causes of Action (including against the EB-5 Guarantees), claims related to guarantees, future accounts receivable, rebates, refunds, etc.), which shall be distributed or assigned to Kroger.

"**Global Settlement**" means the mutually agreeable resolution reached between the Debtors, Prepetition Secured Lender, and Committee, which is embodied herein within the Plan and discussed in detail within Article VIII.A. hereof.

"**Governmental Bar Date**" means July 27, 2020 at 4:00 p.m. prevailing Eastern Time, as established in the Bar Date Order.

"**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Identified Assets**" means those assets of the Debtors' estates identified on Schedule A hereto and any proceeds thereof.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Independent Director**" means William Transier who serves as the sole member of Special Committee of the LMPC Board.

"**Intercompany Claims**" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor, any Claim held by an Affiliate of a Debtor against a Debtor, any Claim held by a non-Debtor Affiliate against a Debtor, or any Claim held by a Debtor against a non-Debtor Affiliate, including any loans from one Debtor to another Debtor.

"**Interest**" means any "equity security" in a Debtor as defined in Bankruptcy Code section 101(16), including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Kroger**" means The Kroger Co.

"**Kroger Assumption Motion**" means the *Motion of Debtors for Authority (I) to Assume and Assign Certain Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 977].

"**Kroger General Unsecured Claims**" means any general unsecured non-Priority Claim held by Kroger, which includes any general unsecured vendor claims and any subrogation claims, but excluding the Prepetition Secured Lender Deficiency Claim, the Prepetition Secured Lender Subrogation Claim, the Prepetition Secured Claims, any 503(b)(9) Claim, any PACA Claim or PASA Claim.

"**Kroger Guaranteed Leases**" means the various written guaranties Kroger entered into pursuant to which Kroger guaranteed the Company's liabilities under approximately thirty-one (31) non-residential lease agreements.

"**Kroger Rent Reimbursement Obligation**" means all Post-Deadline Rents, which amount shall reduce on a dollar-for-dollar basis any distribution to or for the benefit of the Prepetition Secured Lender (in any capacity) or the holders of Allowed General Unsecured Claims in Class 5, as applicable, as follows: first, by reducing the General Unsecured Claims Class B Recovery Pool Allocation; second, by reducing any distribution to the Prepetition Secured Lender on its allowed PACA Claim and PASA Claim; third, by reducing any distribution to the Prepetition Secured Lender on its Allowed Section 503(b)(9) Claim; fourth, by reducing any distribution to the Prepetition Secured Lender on its Allowed Secured Claim; fifth, by reducing any distribution to the Prepetition Secured Lender on its Kroger General Unsecured Claims; sixth, by reducing any distribution to the Prepetition Secured Lender related to attorneys' fees under the Final Cash Collateral Order; and in the event that the amount of reductions from distributions set forth above is insufficient to reimburse the Debtors for the entire amount of the Post-Deadline Rents, the Prepetition Secured Lender shall pay or reimburse any such difference to the Liquidating Debtor within five (5) business days of the Liquidating Debtor's request thereof.

"**Licenses**" means required certificates of need, certificates of exemption, franchises, accreditations, registrations, licenses, permits, and other consents or approvals issued by any Governmental Entity or accreditation organizations necessary to operate the Debtors' business.

"**Liquidating Debtor**" means the Debtors and debtors in possession, or any successors thereto (including, from and after the establishment of a Liquidating Trust and the transfer of Liquidating Assets thereto, such Liquidating Trust), by merger, consolidation, or otherwise, on and after the Effective Date.

"**Liquidating Trust**" means a trust to be established on or after the Effective Date with respect to the Liquidating Debtor but no later than January 15, 2022 (unless the Liquidating Debtor has previously dissolved), in accordance with the provisions of Article IX of the Plan and a Liquidating Trust Agreement for the benefit of holders of Allowed Claims and as determined by the Liquidating Debtor consistent with the purposes of the Liquidating Trust pursuant to Article IX.B of the Plan.

"**Liquidating Trust Agreement**" means an agreement evidencing the terms and provisions governing the Liquidating Trust that shall be entered into prior to the establishment of the Liquidating Trust and pursuant to which the Liquidating Trustee shall manage and administer Liquidating Trust Assets.

"**Liquidating Trust Assets**" means all of the Assets of the Liquidating Debtor as of the time of transfer of the Assets to the Liquidating Trust.

"**Liquidating Trust Beneficiaries**" means those holders of Allowed Claims against the Liquidating Debtor to the extent such holders receive Liquidating Trust Interests.

"**Liquidating Trust Interests**" means the non-certificated beneficial interests of the Liquidating Trust allocable to holders of Allowed Claims in accordance with the terms and conditions of the Liquidating Trust Agreement, which may or may not be transferable.

"**Liquidating Trustee**" means the person or entity appointed by the Liquidating Debtor prior to the creation of the Liquidating Trust to administer the Liquidating Trust in accordance with the provisions of Article IX of the Plan and the Liquidating Trust Agreement and any successor or replacement duly appointed under the terms of the Liquidating Trust Agreement and the Plan; provided, however, that under no circumstance shall the Liquidating Trustee be a director or officer with respect to any entity over which the Liquidating Trust has control.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**LMOC**" means Debtor Lucky's Market Operating Company, LLC.

"**LMOC Officers**" means the Chief Executive Officer, Chief Financial Officer, and President of LMOC.

"**LMPC**" means Debtor Lucky's Market Parent Company, LLC.

"**LMPC Board**" means the managers who comprise the current and former Board of Managers of LMPC, including these seven managers, J. Michael Schlotman, Christopher Schulte, Andrew Seitz, Patrick Gilliland, Bo Sharon, William Transier, and Nicholas G. Hodge, who were serving on the LMPC Board on the Petition Date.

"**LMPC Officers**" means the Chief Executive Officer, Chief Financial Officer, President, Chief Growth Officer, and General Counsel of LMPC.

"**Mechanic's Lien Claims**" means a statutory lien that, in accordance with the applicable non-bankruptcy law giving rise to the lien: (a) secures payment for services, including labor, or materials and supplies provided to the Debtors in improving, repairing, or maintaining real or personal property; and (b) is properly asserted by the appropriate party to, among other things, assure no double recovery between lien claimants, including general contractors of the Debtors and sub-contractors of general contractors.

"**Manager**" means Bo Sharon for each limited liability Debtor company, with the exception of LMOC.

"**Omni**" means Omni Agent Solutions, Inc.

"**Opt Out Deadline**" means _____ __, 2020 at 4:00 p.m., prevailing Eastern Time, the deadline by which Holders of Claims or Equity Interests must opt out of the Third Party Release.

"**Other Secured Claims**" means any Secured Claim other than the Prepetition Secured Claims and Secured Tax Claims.

"**PACA and PASA Final Order**" means the *Final Order Pursuant to Sections 105(a), 363, and 541 of the Bankruptcy Code, Directing the Payment of Prepetition Claims arising under (A) Perishable Agricultural Commodities Act, and (B) the Packers and Stockyards Act* [Docket No. 273], which the Bankruptcy Court entered on February 25, 2020.

"**PACA Claims**" means any Claims under the Perishable Agricultural Commodities Act of 1930, as amended 7 U.S.C. §§ 499a *et seq.* ("**PACA**").

"**PASA Claims**" means any Claims under the Packers and Stockyards Act of 1921 as amended 7 U.S.C. § 181 *et seq.* ("**PASA**").

"**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

"**Petition Date**" means January 27, 2020, the date on which the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code; however, shall mean with respect only to Lucky's Farmers Market of Ellisville, LLC and Lucky's Farmers Market of Lexington, KY, March 3, 2020, the date on which each filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"**Plan**" means this chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Plan Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court at least seven (7) days before the Voting Deadline.

"**Post-Deadline Rents**" means all rents, taxes, utilities, CAM charges or other rental obligations attributable to the period following two hundred ten (210) days after the Petition Date (i.e., August 24, 2020) paid by the Debtors arising under any Kroger Guaranteed Lease.

"**Prepetition NMTC Loan**" means the new market tax credit loan agreement with a total original principal amount of $5,940,000.00, between LMOC, as borrower, and BBIF Subsidiary CDE 3, LLC, as lender, which is guaranteed by Kroger, dated on or about June 12, 2018.

"**Prepetition Secured Claims**" means any and all Secured Claims held by Kroger arising under or related to the Prepetition Secured Loan in its capacity as Prepetition Secured Lender.

"**Prepetition Secured Lender**" means Kroger.

"**Prepetition Secured Lender Deficiency Claim**" means, collectively, any and all Claims arising under the Prepetition Secured Loan held by the Prepetition Secured Lender that are not Prepetition Secured Claims.

"**Prepetition Secured Lender Subrogation Claim**" means any Subrogation Claim asserted by the Prepetition Secured Lender.

"**Prepetition Secured Loan**" means the loan dated September 15, 2016, with a total original principal amount of $23,328,810.00, between LMPC, as borrower, and the Prepetition Secured Lender, the loan dated August 9, 2017, with a total original principal amount of $25,177,640.00, between LMPC as borrower, and the Prepetition Secured Lender, and the loan agreement, dated December 31, 2019, between LMPC, as borrower, and the Prepetition Secured Lender, pursuant to which the Prepetition Secured Lender agreed to make loans to LMPC over time. The amount of the Prepetition Secured Loan was approximately $301,156,450.00 as of the Petition Date.

"**Prior Owners**" means, collectively, Patrick Gilliland, Michael Gilliland, Insook Gilliland, Jason B. Sharon, and PG Holdings, LLC.

"**Priority Claims**" means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than Administrative Expense Claims and Priority Tax Claims.

"**Priority Tax Claims**" means Claims of a Governmental Unit against any Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified section of Bankruptcy Code section 502(i).

"**Pro Rata Share**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, or 1103 pursuant to an Order of the Bankruptcy Court and who is to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, or 331. The term "Professional" does not include any ordinary course professionals that were retained and compensated pursuant to the Order Authorizing Retention and Payment of Professionals Utilized by Debtors in Ordinary Course of Business [Docket No. 265].

"**Professional Fee Claims**" means all Claims under section 330, 331, 503, or 1103 of the Bankruptcy Code for compensation and reimbursement of expenses incurred by Professionals through the Confirmation Date to the extent Allowed by the Bankruptcy Court.

"**Professional Final Fee Applications**" means the fee applications filed by Professionals, for final allowance of compensation and reimbursement of all Professional Fee Claims incurred up to and including the Effective Date, and no fee application shall be filed by any Professional related to any Professional Fee Claim arising after the Effective Date; provided, however, that Professionals may include in their Professional Final Fee Applications an estimated amount for fees and expenses incurred after the Effective Date for the preparation, Filing and prosecution (but not defense of) their Professional Final Fee Applications and for attending the Final Fee Hearing.

"**Professional Final Fee Application Claims Bar Date**" means the first business day that is thirty (30) calendar days after the Effective Date.

"**Proof of Claim**" means a proof of Claim Filed against any Debtor in accordance with the Bar Date Order or any other order by the Bankruptcy Court setting a date for the fixing of Claims.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(a) by any of the Debtors, as limited, in the case of a rejected unexpired lease, by Bankruptcy Code section 502(b)(6).

"**Related Parties**" means, with respect to any Person or Entity, such Person's or Entity's direct and indirect current and former affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, financial advisors, real estate advisors, investment bankers, Professionals, advisors, and representatives, each in their capacity as such.

"**Release by Debtors**" means the release given by the Debtors to the Released Parties as set forth in Article VIII.D herein.

"**Released Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors; (b) Kroger; (c) the Committee; (d) each member of the Committee; and (e) the Related Parties of the foregoing; provided, however, that claims arising under any lease guaranties, personal guaranties, or other such guaranties related to the LMPC Board or Insiders (as defined in section 101(31) of the Bankruptcy Code) of the Debtors shall be released.

"**Releasing Parties**"  means, individually and collectively, (a) each Holder of a Claim or Equity Interest that (i) votes to accept the Plan, (ii) is deemed to have accepted the Plan or is otherwise unimpaired, (iii) is entitled to vote to accept or reject the Plan but either (x) abstains from voting on the Plan, or (y) votes to reject the Plan and, in the case of (x) or (y) does not opt out of the voluntary releases contained in the Plan by checking the opt out box on the ballot and timely returning it in accordance with the instructions set forth therein, or (iv) is deemed to have rejected the Plan and does not opt out of the releases contained in the Plan by timely Filing an objection to such releases; (b) the Debtors; (c) Kroger, provided that Kroger shall not be deemed a Releasing Party with respect to the Prior Owners; (d) any lender to the Prepetition NMTC Loan; and (e) the Related Parties of the foregoing.

"**Remaining Assets**" means any Asset of the Estates that is not (i) Cash on Hand, (ii) an Identified Asset, nor (iii) the Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC.

"**Rule 3018 Motion**" means a motion for temporary allowance of a claim for the purpose of voting on the Plan.

"**Schedules and Statements**" means the Schedules of Assets and Liabilities and Statements of Financial Affairs Filed by the Debtors under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Second Interim Cash Collateral Order**" means the *Second Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral of the Prepetition Secured Lender, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Prescribing Form and Manner of Notice of and Scheduling Final Hearing, and (IV) Granting Related Relief* [Docket No. 297].

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law (i) as set forth in the Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order; or (b) subject to a valid right of setoff under Bankruptcy Code section 553, in each case, as determined pursuant to Bankruptcy Code section 506(a).

"**Secured Tax Claims**" means any Secured Claims of a Governmental Unit which, absent their secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8), including any related Secured Claim for penalties.

"**Settled Causes of Action**" means all Claims and Causes of Action made, or which could have been made, on behalf of the Debtors against, or related to Kroger in any capacity and for whatever reason that may exist, as further described in connection with the Global Settlement.

"**Settlement**" means the settlement of the Settled Causes of Action on the terms set forth herein.

"**Settlement Released Claims**" means all Claims and Causes of Action made, or which could have been made, or could be made, on behalf of the Debtors, against, or related to Kroger, for any reason whatsoever provided that, for the avoidance of doubt, the Settlement Released Claim shall include all Avoidance Actions against Kroger.

"**Settlement Proceeds**" means the consideration being provided by the Prepetition Secured Lender in full and complete satisfaction of the Settled Causes of Action.

"**Solicitation Package**" means the packages to be distributed to creditors for solicitation of votes on the Plan.

"**Special Committee**" means that certain Special Committee of the LMPC Board, formed by the LMPC Board prior to the Petition Date.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930 and any interest thereupon.

"**Subrogation Claim**" means any Claim that any non-Debtor may assert against the Estates based on such party's payment of any guaranty claims that would otherwise have been an obligation of the Estates and which were not paid by the Debtors.

"**Tax Claims**" means any claim under the Tax Code and includes claims asserted under applicable non-federal tax laws.

"**Tax Code**" means the Internal Revenue Code, as amended.

"**Third Interim Cash Collateral Order**" means the *Third Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral of the Prepetition Secured Lender, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Prescribing Form and Manner of Notice of and Scheduling Final Hearing, and (IV) Granting Related Relief* [Docket No. 622].

"**Third Party Release**" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.F of the Plan.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unclaimed Distribution**" means any distribution of Cash or any other property made to the Holder of an Allowed Claim pursuant to this Plan that (a) is returned to the Liquidating Debtor as undeliverable and no appropriate forwarding address is received within the later of (i) 90 days after the Effective Date and (ii) 90 days after such attempted Distribution by the Liquidating Debtor is made to such Holder or (b) in the case of a distribution made in the form of a check, is not negotiated within 90 days and no request for re-issuance is made.  Upon a distribution to the Holder of an Allowed Claim becoming an Unclaimed Distribution, such Allowed Claim will automatically become null and void and shall be expunged from the Claims Register.

"**Voting Classes**" means Class 1, Class 4, Class 5, Class 6, and Class 9.

"**Voting Deadline**" means _____ __, 2020, 4:00 p.m. prevailing Eastern Time.

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the *Order (I) Approving Disclosure Statement, (II) Establishing Voting Record Date, Voting Deadline, and Other Dates, (III) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on Plan and for Filing Objections to Plan, (IV) Approving Manner and Forms of Notice and Other Documents, and (V) Granting Related Relief* [Docket No. #] entered by the Court on _____ __, 2020.

"**Wind-Down Budget**" means the cash collateral budget in an amount equal to $1,000,000.00 for the post-Effective Date administration and wind-down of Estates, as agreed to by the Debtors, the Committee, and the Prepetition Secured Lender, with any amount incurred after depletion of the Wind-Down Reserve to be paid from Cash, if any, remaining available in (i) the General Unsecured Claims Class A Recovery Pool Allocation solely to pay for fees and expenses incurred in the administration of and distribution to the General Unsecured Claims Class A Recovery Pool, and (ii) the General Unsecured Claims Class B Recovery Pool Allocation, if any, solely to pay for fees and expenses incurred in the administration of and distribution to the General Unsecured Claims Class B Recovery Pool.

"**Wind-Down Reserve**" means the escrow or reserve to be established and funded, not later than the Effective Date, in an amount equal to the Wind-Down Budget plus the Claims Reserve pursuant to the Global Settlement and utilized for post-Confirmation Estate wind-down costs.

B.    **Interpretation; Application of Definitions and Rules of Construction**

The following rules of construction, interpretation, and application shall apply:

(1)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2)    Unless otherwise specified, each section, article, schedule, or exhibit reference in the Plan and Disclosure Statement is to the respective section in, article of, schedule to, or exhibit to the Plan and Disclosure Statement.

(3)    The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

(4)    The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Plan.

(5)    A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6)    The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

(7)    Unless otherwise provided, any reference in the Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8)    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## III.    UNCLASSIFIED CLAIMS

A.    **PACA Claims and PASA Claims**

The Liquidating Debtor shall pay the PACA Claims and PASA Claims consistent with the resolution procedures outlined in the PACA and PASA Final Order. To the extent not previously paid in full, the Allowed PACA Claims and PASA Claims will be paid in full from the Wind-Down Reserve when such PACA and PASA Claims are Allowed to the extent that such PACA Claim or PASA Claim is asserted prior to the Effective Date. Any distributions on PACA Claims or PASA Claims held by Kroger (or any affiliate thereof) may be used to satisfy the Kroger Rent

Reimbursement Obligation in accordance with the terms of the Plan. For the avoidance of doubt, Kroger (or any affiliate thereof) shall not be required to File a Proof of Claim or other request for allowance and/or payment of any PACA Claims or PASA Claims by the Bar Date or any other claims bar date.

B.     **Administrative Expense Claims**

Requests for payment of Administrative Expense Claims must be Filed no later than the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the applicable Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or the Estates. Kroger (or any affiliate thereof) shall not be required to File a Proof of Claim or other request for allowance and/or payment of any Administrative Expense Claim by the Administrative Expense Bar Date or any other claims bar date.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by any applicable Liquidating Debtor or Purchaser prior to the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for release of each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash (or other available funds in the Estate) from the Wind-Down Reserve: (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due; or (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Expense Claims that have been assumed by purchasers pursuant to purchase agreements approved by the Bankruptcy Court shall not be an obligation of the Liquidating Debtor.

Any distributions on any Administrative Expense Claims, including Section 503(b)(9) Claims, held by Kroger (or any affiliate thereof) may be used to satisfy the Kroger Rent Reimbursement Obligation in accordance with the terms of the Plan.

C.     **Professional Fee Claims**

All Professionals requesting compensation or reimbursement of Professional Fee Claims for services rendered before or on the Effective Date shall File a Professional Final Fee Application for final allowance of compensation and reimbursement of expenses no later than the Professional Final Fee Application Claims Bar Date.

The Final Fee Hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Final Fee Application Claims Bar Date. The Liquidating Debtor's counsel shall File a notice of the Final Fee Hearing. Such notice shall be posted on the Case Website, and served upon counsel for the Committee, all Professionals, the U.S. Trustee and all parties on the Liquidating Debtor's Bankruptcy Rule 2002 service list.

Allowed Professional Fee Claims of the Professionals shall be paid in full from Cash in the Wind-Down Reserve: (a) as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court; or (b) upon such other terms as agreed by the Holder of such an Allowed Professional Fee Application Claims. After the Effective Date and the resolution of Professional Final Fee Applications filed before the expiration of the Professional Final Fee Application Claims Bar Date, no Professional shall file any additional fee application.

Pursuant to the Fourth Interim Cash Collateral Order, the Liquidating Debtor shall pay in cash, without the need for the filing of formal fee applications, the reasonable and documented out-of-pocket professional fees, expenses and disbursements for one primary law firm and one local counsel incurred by the Prepetition Secured Lender arising after the Petition Date and prior to the Effective Date. After delivery of a monthly summary statement of any such requested fees (which shall include the total number of hours billed by attorney and a summary description of services) to counsel for the Liquidating Debtor, the U.S. Trustee and counsel to the Committee, the Liquidating Debtor shall pay such fees, costs and expenses within ten (10) days from delivery thereof. Any and all amounts paid by the Liquidating Debtor as such fees are deemed permitted uses of cash collateral, not subject to the Wind-Down Budget or any variance report and shall reduce any Adequate Protection Superpriority Claim (as defined in the Fourth Interim Cash Collateral Order) on account of such fees to the extent of such fees paid.

D.   **Priority Tax Claims**

Except to the extent the Debtors and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, the Liquidating Debtor, or the purchaser of any asset of the Estates pursuant to the applicable sale order and asset purchase agreement [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, Cash from the Wind-Down Reserve (solely in the event the Liquidating Debtor, and not the Purchasers, must pay such claims), in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due from the Wind-Down Reserve or, pursuant to the applicable sale order and asset purchase agreement, by the purchaser of the respective asset of the Estates [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951]. Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims. On the Effective Date, any lien securing any Allowed Priority Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

E.     **Class Action Claims**

The Class Action Adversary Proceeding is a purported class action brought by Laura Forsyth on behalf of herself and other similarly situated employees asserting a violation under the WARN Act for the defendants' alleged failure to provide 60-days' notice of a mass layoff or plant closing as required under law.

The Class Action Adversary Proceeding does not provide a proposed class definition. Rather, the class is loosely defined as employees who were "affected by the mass layoff and/or plant closing" at each facility maintained, owned, and operated within the United States of America by the Debtors and any direct or indirect subsidiary affiliates. The Class Action Adversary Proceeding alleges that all defendants constitute a "single employer" within the meaning of the WARN Act.

The Debtors have raised numerous defenses to the Class Action Claims asserted in the complaint, including the following:

- the defendants do no constitute a "single employer";
- WARN obligations were not triggered at any facility owned, maintained, or operated by any named Debtor where there were less than 50 full-time employees who suffered an employment loss as defined under the WARN Act;
- for those facilities where more than 50 full-time employees suffered an employment loss as defined under the WARN Act, employees and governmental bodies received WARN notices in accordance with the WARN Act; and
- for any employee receiving a WARN Act notice who was laid off prior to the expiration of the 60-day notice period reflected in the notice, the employee received pay representing the amount of back wages and benefits that would have been due had the employee remained employed for the duration of the 60-day notice period.

The Debtors reserve all of their rights to contest the Class Action Claims in full on any grounds, including, but not limited to, waiver, release, no liability, good faith, and faltering business exception. To the extent not resolved prior to the Effective Date, on the Effective Date, the Debtors shall maintain a Claims Reserve for the Disputed Class Action Claims in the amount of $250,000, pending final resolution of such Claims.

F.     **Statutory Fees**

All Statutory Fees incurred prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidating Debtor shall pay any and all such fees when due and payable from the Liquidating Trust Assets, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until such time that the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Summary of Treatment of Claims and Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 – Prepetition Secured Claims | $306,453,923.00 | Impaired | 0% |
| Class 2 – Other Secured Claims | $100,000.00 | Unimpaired | 100% |
| Class 3 – Priority Claims | $100,000.00 | Unimpaired | 100% |
| Class 4 – General Unsecured Claims Class A | $39,800,000.00 | Impaired | 8%-17% |
| Class 5 – General Unsecured Claims Class B | $38,500,000.00 | Impaired | 3-6% |
| Class 6 – General Unsecured Claims Class C | $4,836,648.00 | Impaired | 0% |
| Class 7 – Intercompany Claims | $479,000,000.00 | Impaired, deemed to reject | 0% |
| Class 8 – Equity Interests | N/A | Impaired, deemed to reject | 0% |
| Class 9 – EB-5 Investors | N/A | Impaired | 0% |

### B.    Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

### C.    Treatment of Claims and Interests

#### 1.    Class 1 – Prepetition Secured Claims

Holders of Class 1 Prepetition Secured Claims shall have Allowed Prepetition Secured Claims in the aggregate amount of $306,453,923.00. On the Effective Date, any Remaining Asset shall be transferred to the Prepetition Secured Lender on account of its Allowed Prepetition Secured Claims; provided, however, that the Prepetition Secured Lender in its sole and absolute discretion, may elect not to have such Remaining Asset transferred to it and instead, elect to have the Liquidating Debtor administer such Remaining Asset with any such proceeds thereof being paid promptly to the Prepetition Secured Lender pursuant to the terms of the Settlement; provided, further, that any Remaining Asset administered by the Liquidating Debtor and not previously disposed of shall be transferred to a Liquidating Trust in accordance with Article IX of the Plan,

22

and the Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders of Claims in Class 1 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 2. Class 2 – Other Secured Claims

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, or has been assumed by a purchaser of the collateral securing its Allowed Other Secured Claim, in full and final satisfaction, settlement, and release of each Allowed Other Secured Claim, each such Holder, at the option of the Liquidating Debtor, shall (a) receive the collateral securing its Allowed Other Secured Claim; or (b) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable. In the event the Debtors treat a Claim under clause (a) of this Section, the liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. The Liquidating Debtor specifically reserves the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Other Secured Claims.

Class 2 is unimpaired and is deemed to accept the Plan.

### 3. Class 3 – Priority Claims

Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, or has not been assumed by a purchaser of Assets of the Debtors, each such Holder shall receive, in full satisfaction of such Allowed Priority Claim, Cash in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date; (b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Liquidating Debtor, as the case may be, and the Holder of the Allowed Priority Claim.

Class 3 is unimpaired and is deemed to accept the Plan.

### 4. Class 4 – General Unsecured Claims Class A Recovery Pool

Class 4 is Impaired under the Plan. Except to the extent that a Holder of an Allowed General Unsecured Class A Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Class A Claim has not been paid in full prior to the Effective Date, or has not been assumed by a purchaser of Assets of the Debtors, each such Holder shall receive such Holder's Pro Rata Share of the General Unsecured Claims Class A Recovery Pool Allocation, as full and complete satisfaction of the Claims against the Estates and

23

Liquidating Debtor; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class A Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders in Class 4 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor, with the direct oversight of the Creditor Representative, will oversee the reconciliation of these General Unsecured Class A Claims and distributions to be made on account of Allowed General Unsecured Claims in the General Unsecured Claims Class A Recovery Pool class.

### 5. Class 5 – General Unsecured Claims Class B Recovery Pool

Class 5 is Impaired under the Plan. Except to the extent that a Holder of an Allowed General Unsecured Class B Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Class B Claim has not been paid prior to the Effective Date or has not been assumed by a purchaser of Assets of the Debtors, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Class B Claim, each Holder of an Allowed General Unsecured Class B Claim shall receive such Holder's Pro Rata Share of the General Unsecured Claims Class B Recovery Pool Allocation, as full and complete satisfaction of the Claims against the Estates and the Liquidating Debtor. For the avoidance of doubt, nothing herein shall affect or impair the rights, benefits, and obligations under any guaranty in favor of such Holder by any non-Debtor, including without limitation Kroger; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class B Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders in Class 5 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor, with the direct oversight of the Prepetition Secured Lender, shall conduct the reconciliation of these General Unsecured Class B Claims and distributions to be made on account of Allowed General Unsecured Class B Claims in the General Unsecured Claims Class B; provided, however, the Prepetition Secured Lender shall have the right to consent to (i) any settlement of any General Unsecured Claims Class B Claim and (ii) any distribution from the General Unsecured Creditor Class B Recovery Pool.

### 6. Class 6 – General Unsecured Claims Class C Recovery Pool

Class 6 is Impaired under the Plan. The Prepetition Secured Lender shall receive on account of its Prepetition Secured Lender Deficiency Claim the General Unsecured Claims Class C Recovery Pool Allocation; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class C Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

The Holder in Class 6 is entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor will oversee the reconciliation of the General Unsecured Class C Claims and,

to the extent there are funds remaining in the General Unsecured Claims Class C Recovery Pool, the Liquidating Debtor will oversee any distributions to be made on account of the Prepetition Secured Lender Deficiency Claims and Kroger General Unsecured Claims from the remaining funds in the General Unsecured Claims Class C Recovery Pool.

### 7.    Class 7 – Intercompany Claims

Holders of Claims in Class 7 are Impaired under the Plan. The Debtors estimate that the aggregate amount of Intercompany Claims will be approximately $479,000,000.00. Holders of Intercompany Claims will receive no distribution under the Plan and, on the Effective Date, shall be deemed cancelled, null, and void. Therefore, Holders of Intercompany Claims are deemed to reject the Plan.

### 8.    Class 8 – Equity Interests

Holders of Claims and Equity Interests in Class 8 are Impaired under the Plan. Holders of Equity Interests will retain no ownership interests and receive no distributions under the Plan and, on the Effective Date, shall be deemed cancelled, null, and void. Therefore, Holders of Equity Interests are deemed to reject the Plan.

### 9.    Class 9 – EB-5 Investors

Class 9 is Impaired under the Plan. To the extent that Class 9 voted to accept the Plan, each Holder of a Class 9 Interest shall receive on account of their Interest such Holder's Pro Rata Share of the equity interest in the EB-5 Designated Entity. As soon as practicable after the Effective Date, the Liquidating Debtor or Liquidating Trust shall transfer to the EB-5 Designated Entity all Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC. Holders of Class 9 Interests shall not receive any distribution of Cash or other consideration under the Plan and waive any such distribution under the Plan. The Debtors' rights under the EB-5 Guarantees shall be transferred and assigned to the holder of Class 1 Prepetition Secured Claims or another Debtor prior to any distribution to the EB-5 Investors. The transfer of the equity interests in the EB-5 Designated Entity shall be in full and complete satisfaction of any and all claims the EB-5 Investors may have against the Estates, the Liquidating Debtor, and Kroger and the EB5 Investors shall be Releasing Parties.

The Holders in Class 9 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor will oversee the distribution to Holders in Class 9.

To the extent that Class 9 does not vote to accept its treatment under the Plan, the EB-5 Investors will retain no ownership interests and receive no distributions under the Plan and, on the Effective Date, the EB-5 Investors' Equity Interests shall be deemed cancelled, null, and void.

### D.    Impaired Claims and Equity Interests

Under the Plan, Holders of Claims in Classes 1, 4, 5, 6, 7, 8, and 9 are Impaired Classes pursuant to Bankruptcy Code section 1124 because the Plan alters the legal, equitable or contractual rights of the Holders of such Claims treated in such Class.

E.      **Cramdown and No Unfair Discrimination**

To the extent any Impaired Class does not accept the Plan, the Debtors will seek Confirmation pursuant to Bankruptcy Code section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interest that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Interests describe in the Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

F.      **Special Provision Regarding Settled Claims**

Any and all Settled Causes of Action shall be settled and compromised pursuant the Plan. Distributions on account of the Allowed Claims resulting from such settlement and compromise shall be effected through the distributions to Holders of Allowed Claims pursuant to this Plan.

## V.      IMPLEMENTATION AND EXECUTION OF THE PLAN

A.      **Effective Date**

The Effective Date shall not occur until all conditions for the Effective Date as set forth in Article VII.B. of the Plan are satisfied or otherwise waived in accordance with the terms of the Plan. Upon occurrence of the Effective Date, the Debtors shall File the notice of Effective Date, which shall also be posted on the Case Website.

B.      **Implementation of the Plan**

1.      **General**

The Plan shall be implemented through a series of transactions as described in detail below.

2.      **Corporate Action; Officers and Directors; Effectuating Documents**

On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the officer(s) or director(s) of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the board of the Debtors.

On the Effective Date, the composition of the board shall change and Andrew T. Pillari will serve as the sole member of the board of the Liquidating Debtor after the Effective Date and all other directors will cease to serve on the Board. The post-Effective Date board will remain intact until the Liquidating Debtor is dissolved. All corporate action shall be taken in accordance with the certificate of incorporation and the bylaws of the Liquidating Debtor. On the date of dissolution of the Liquidating Debtor, the remaining members of the board and executive officer(s)

72709057.12

of the Liquidating Debtor shall be deemed to have resigned to the extent permissible under applicable law.

The officer(s) and director(s) of each Debtor and Liquidating Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the Liquidating Trust Agreement, if applicable.

C.    **Records**

The Liquidating Debtor shall retain those documents maintained by the Debtors in the ordinary course of business and which were not otherwise transferred to the purchaser of any asset of the Estates pursuant to the applicable asset purchase agreement or to the Prepetition Secured Lender on the Effective Date. The Liquidating Debtor shall not destroy any documents without the consent of the Creditor Representative and Prepetition Secured Lender. Upon the closing of the Chapter 11 Cases, all documents shall be transferred to the Prepetition Secured Lender. The Prepetition Secured Lender shall be authorized to dispose of, destroy, or maintain such documents in its sole discretion.

D.    **Provisions Governing Distributions Under the Plan**

1.    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtors or the Liquidating Debtor shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors, the Liquidating Debtor, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

2.    **Method of Payment**

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made as soon as is reasonably practicable after the date on which such Claim becomes Allowed. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall accrue or be payable with respect to such Claims or any distribution related thereto. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the Liquidating Debtor (including the Debtors' named successor or assign), or Omni, on or after the Effective Date or as otherwise provided herein. For the avoidance of doubt, (i) the Debtors, the Liquidating Debtor, Omni, or such other entity designated by the Debtors, shall act as Disbursing Agent with respect to all Effective Date Distributions, and (ii) the Liquidating Debtor, Omni, or such other entity designated by the Liquidating Debtor, shall act as Disbursing Agent with respect to all General Unsecured Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Unless otherwise expressly agreed in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire.

### 3.    Surrender of Instruments

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or their designee. Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

### 4.    Delivery of Distributions

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notice of address changes Filed on the Docket delivered to the Liquidating Debtor after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules and Statements if no Proof of Claim is filed and the Liquidating Debtor has not received a written notice of a change of address.

Subject to applicable Bankruptcy Rules, all Distributions to Holders of Allowed Claims shall be made to the Disbursing Agent who shall transmit such Distributions to the applicable Holders of Allowed Claims or their designees. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall have no obligation to determine the correct current address of such Holder, and no Distribution to such Holder shall be made unless and until the Disbursing Agent is notified, in writing, by the Holder of the current address of such Holder within 90 days of such Distribution, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of 90 days from the Distribution. After such date, all unclaimed property or interest in property shall revert to the Liquidating Debtor and be distributed in accordance with the terms of the Plan, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 5.    Objection to and Resolution of Claims

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. On or after the Effective Date, the Liquidating Debtor shall be vested with any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately prior to the Effective Date; provided, however, that (i) with respect to the General Unsecured Claims Class B Recovery Pool, the Liquidating Debtor shall be required to obtain the consent of the Prepetition Secured Lender prior to (a) settling any Disputed General Unsecured Class B Claim and (b) making any distribution from the General Unsecured Claims Class B Recovery Pool and (ii) with respect to the General Unsecured Claims Class A Recovery Pools, the Creditor Representative shall have the right and standing to make a motion or file an objection and be heard with respect to any matter which may affect or impair the General Unsecured Claims Class A Recovery Pool or any distribution to Class 4 Creditors, including without limitation the payment and/or allocation of fees and expenses incurred by the Liquidating Trustee pursuant to or in excess of the Wind-Down Budget.

### 6.    The Settlement of Claims

On the Effective Date, the Debtors shall enter into the Settlement, as described herein. The Debtors shall use the Cash on Hand pursuant to the Settlement to fund Distributions under the Plan as set forth herein.

### 7.    Miscellaneous Distribution Provisions

Disputed Claims. At such time as a Disputed Claim becomes an Allowed Claim, the Liquidating Debtor or the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's Pro Rata Share of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

Distributions After Allowance. To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the Distribution to which such Holder is entitled hereunder.

Setoff. The Liquidating Debtor retains the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records and in accordance with the Bankruptcy Code.

Minimum Distributions. Notwithstanding anything herein to the contrary, the Liquidating Debtor shall not be required to make Distributions or payments of less than $50.00.

Unclaimed Distributions. To the extent the aggregate Unclaimed Distributions to any Class exceeds $25,000, the Liquidating Debtors shall redistribute such Unclaimed Distributions to the remaining Holders in such Class. To the extent the aggregate Unclaimed Distributions to any Class equals or is less than $25,000, the Liquidating Debtors shall be donated in equal proportions to (i) American Bankruptcy Institute Endowment Fund, a not-for-profit, non-religious organization dedicated to, among other things, promoting research and scholarship in the area of insolvency, (ii) CARE (Credit Abuse Resistance Education), which educates young adults on the responsible use of credit and the potential consequences of credit card abuse, and (iii) The Honorable Tina Brozman Foundation, Inc., an organization dedicated to fund scientific research for the early detection and prevention of ovarian cancer. To the extent any identified party ceases to exist, the distribution shall be made to the other entities.

Upon a distribution to any Holder of an Allowed Claim becoming an Unclaimed Distribution, such Holder's Allowed Claim will automatically become null and void and shall be expunged from the Claims Register.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Executory Contracts and Unexpired Leases

All Executory Contracts of the Debtors which have not been assumed, assigned (including to Kroger in connection with the Kroger Assumption Motion or a designation rights bid), or rejected, prior to the Effective Date shall be deemed rejected on the Effective Date, unless any landlord has stipulated to extend the period in which the Debtors or the Liquidating Debtor may assume or assign or reject such lease past August 24, 2020, then such unexpired lease shall be governed by the terms of such stipulation between the Debtors and the landlord. For the avoidance of doubt, the Filing of the Kroger Assumption Motion extended the period in which to assume or reject unexpired leases of non-residential real property under Bankruptcy Code section 365(d)(4) for the Kroger Guaranteed Leases until the Effective Date of the Plan when such Kroger Guaranteed Leases will be assumed and assigned to Kroger. The Debtors reserve their right to file a list of assumed contracts with the Plan Supplement.

### B.    Rejection Claims

In the event that the rejection of an Executory Contract by any of the Debtors pursuant to the Plan results in a Rejection Claim in favor of a counterparty to such Executory Contract, such Rejection Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidating Debtor, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Liquidating Debtor on or before the date that is 30 days after the Effective Date. All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Plan.

## VII.   CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A.   **Conditions Precedent to Confirmation**

The following is the list of conditions precedent to Confirmation:

(1)    the Plan Supplement is Filed;

(2)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Prepetition Secured Lender, and the Committee; and

(3)    the Plan and the Disclosure Statement shall not have been materially amended, altered, or modified from the Plan and the Disclosure Statement as Filed unless such material amendment, alteration or modification has been made as set forth herein.

### B.   **Conditions Precedent to the Effective Date**

The following is the list of conditions precedent to the Effective Date:

(1)    the Bankruptcy Court shall have entered the Confirmation Order, which approves the Global Settlement, and the Confirmation Order shall be a Final Order;

(2)    the Bankruptcy Court shall have entered an Order approving the Kroger Assumption Motion and such Order shall be a Final Order;

(3)    no stay of the Confirmation Order shall then be in effect;

(4)    the Wind-Down Reserve has been established and funded;

(5)    the Remaining Assets are transferred to the Prepetition Secured Lender or, if directed by the Prepetition Secured Lender, the Liquidating Debtor; and

(6)    the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made as set forth herein.

### C.   **Waiver of Conditions**

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by each of the Debtors, the Prepetition Secured Lender, and the Committee, without further order of the Bankruptcy Court.

### D.   **Effect of Nonoccurrence of Conditions**

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may

31

not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (a) the Plan is null and void in all respects; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, Kroger, or any other Person or Entity, or (ii) prejudice, in any manner, the rights of the Debtors, the Committee or any other Person or Entity.

## VIII.   SETTLEMENT, INJUNCTION, EXCULPATION, RELEASE, AND RELATED PROVISIONS

### A.   **Settlement Released Claims**

The Debtors, the Committee, and Kroger submit the Global Settlement embodied within the Plan represents an efficient means of resolving the Debtors' Chapter 11 Cases and allows for a higher recovery to general unsecured creditors than would otherwise be achieved if the Chapter 11 Cases were converted to a chapter 7 liquidation. Furthermore, the Debtors, Committee, and Kroger support an efficient and expedited chapter 11 plan confirmation and disclosure statement approval process.

The Global Settlement provides for payment in full of: Administrative Expense Claims, PACA Claims, PASA Claims, Professional Fee Claims, Secured Tax Claims, Tax Claims, and Priority Claims. The Wind-Down Reserve shall be allocated for post-wind-down costs; any cost incurred over the Wind-Down Reserve shall be paid as set forth in the Plan before distributions are made to the General Unsecured Claim Class A Recovery Pool and the General Unsecured Claim Class B Recovery Pool.

The Kroger General Unsecured Claims, the Prepetition Secured Lender Deficiency Claim, and the Prepetition Secured Lender Subrogation Claim are classified separately in the General Unsecured Claims Class C Recovery Pool. Any amount of the one-quarter of the Wind-Down Reserve allocated to the General Unsecured Claims Class B Recovery Pool remaining after payment or reserve in full of all General Unsecured Claims Class B Recovery Pool shall be distributed to the Prepetition Secured Lender. All remaining Assets of the Debtors' Estates other than Cash on Hand, Identified Assets, and the Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC (*e.g.* causes of action, claims related to guarantees held by the Debtors, future accounts receivable, Equity Interests, rebates, refunds, etc.) shall be assigned or distributed to Kroger in accordance with the Plan.

As part of the Global Settlement, Intercompany Claims shall receive no distribution and be extinguished.

The Debtors waive their rights with respect to any Causes of Action, including Avoidance Actions. The Global Settlement contemplates the Release by Debtors of the Released Parties and the Third Party Releases. For the avoidance of doubt, the Releases do not extend to any lease guaranties, personal guaranties, or other guaranties related to such Released Parties.

The Debtors and Committee, as part of the Global Settlement, shall support any unsold remaining Kroger Guaranteed Leases being assigned to Kroger or its designee.

The Global Settlement provides for the Estates to pay all rent obligations, including all rent on any Kroger Guaranteed Lease, through the conclusion of the outside date under Section 365(d)(4) of the Bankruptcy Code, subject to the Third Interim Cash Collateral Order and Kroger's Rent Reimbursement Obligation.

The Third Interim Cash Collateral Order shall be adjourned and the status quo established under the Third Interim Cash Collateral Order shall be maintained until, entry of the Fourth Interim Cash Collateral Order, and then superseded by, the entry of the order confirming the Plan. The Global Settlement is a comprehensive settlement of all issues relating to the Debtors' use of cash collateral securing the claims of the Prepetition Secured Lender.

The Global Settlement shall constitute a settlement of all litigation against the Debtors, Kroger, or other insiders by such parties, and that all pending discovery requests shall be held in abeyance and no future discovery requests shall be propounded.

Accordingly, in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth herein, shall constitute a good-faith compromise and settlement of all Settlement Released Claims. Without limiting the preceding sentence, the Plan provides for the release of the following Settlement Released Claims:

(1) Equitable subordination claims;

(2) Causes of Action, including Avoidance Actions, against Kroger; and

(4) Claims related to Kroger's and directors' and members' that are affiliated with Kroger, and the Debtors related to fulfillment of their fiduciary duties.

The settlement of Settlement Released Claims provided for herein and the distributions and other benefits provided for under the Plan, including the releases set forth herein, shall be in full and final satisfaction of any and all potential Claims that could have been asserted, regardless of whether any of the foregoing Settlement Released Claims are identified herein or could have been asserted. The Liquidating Debtor shall effect Distributions resulting from the Settlement and compromise of the Settlement Released Claims. The approval of such Settlement Released Claims provided for hereunder is solely for the purpose of determining the allocation and distribution to Holders of Allowed Claims pursuant to the Plan, but shall not alter the treatment of the underlying transactions that gave rise to such Settled Causes of Action for any other purpose.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Settled Causes of Action and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and all other parties in interest, and are fair, equitable and within the range of reasonableness. The compromises, settlements and releases

72709057.12

described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

Finally, as part of the Global Settlement, the EB-5 Investors have negotiated with the Debtors the proposed treatment provided to them under Class 9 of this Plan in exchange for not asserting any claims they may have against the Debtors and waiving any distribution they may be entitled to.

B.    **Injunction**

**ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER BANKRUPTCY CODE SECTIONS 105 OR 362, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF (A) THE EFFECTIVE DATE, OR (B) THE DATE INDICATED IN THE ORDER PROVIDING FOR SUCH INJUNCTION OR STAY. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL BE OTHERWISE DEEMED TO MODIFY, LIMIT, AMEND OR SUPERSEDE ANY INJUNCTIONS OR STAYS GRANTED IN THE SALE ORDER.**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR TO THE EXTENT NECESSARY TO ENFORCE THE TERMS AND CONDITIONS OF THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN ON ACCOUNT OF ANY SUCH CLAIMS OR EQUITY INTERESTS: (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT SUCH ENTITIES SHALL NOT BE PRECLUDED FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN OR THE CONFIRMATION ORDER; PROVIDED, FURTHER, THAT THE FOREGOING SHALL NOT APPLY TO ANY ACTS, OMISSIONS, CLAIMS, CAUSES OF ACTION OR OTHER OBLIGATIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR ANY DEFENSES THERETO. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL BE OTHERWISE DEEMED TO MODIFY, LIMIT, AMEND OR SUPERSEDE ANY INJUNCTIONS OR STAYS GRANTED IN ANY ORDER APPROVING THE SALE OF ANY ASSET OF THE ESTATES.**

C.    **Exculpation**

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR INTEREST (INCLUDING ESTATE CLAIMS) FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE PURSUIT OF CONFIRMATION, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, THE PROPERTY TO BE LIQUIDATED AND/OR DISTRIBUTED UNDER THE PLAN OR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE LIQUIDATION OF THE DEBTORS, EXCEPT FOR THEIR WILLFUL OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, AND IN ALL RESPECTS SHALL BE ENTITLED TO RELY REASONABLY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.**

**THE FOREGOING PARAGRAPH SHALL APPLY TO ATTORNEYS TO THE GREATEST EXTENT PERMISSIBLE UNDER APPLICABLE BAR RULES AND CASE LAW.**

D.    **Releases by the Debtors**

**PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES SHALL BE DEEMED RELEASED BY THE DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ANY OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR**

RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES. FOR PURPOSES OF THE RELEASES CONTAINED IN THE PLAN, THE LIQUIDATING DEBTOR IS DEEMED TO BE A SUCCESSOR TO THE ESTATES AND, THEREFORE, IS BOUND BY THE RELEASES CONTAINED IN THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL, SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS OR THE ESTATES; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTORS OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY THE DEBTORS OR THE ESTATES.

E. **Third Party Releases**

EFFECTIVE AS OF THE EFFECTIVE DATE, EACH OF THE RELEASING PARTIES CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASES (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) EACH AND ALL OF THE RELEASED PARTIES, AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER (OTHER THAN FOR ILLEGAL CONDUCT, GROSS NEGLIGENCE, BAD FAITH, OR FRAUD), INCLUDING WITH RESPECT TO ANY RIGHTS OR CLAIMS THAT COULD HAVE BEEN ASSERTED AGAINST ANY OR ALL OF THE RELEASED PARTIES WITH RESPECT TO ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS

72709057.12

**GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OR ANY ALLEGED RESTRUCTURING OR REORGANIZATION OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION), AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES, PROVIDED THAT NOTHING IN THIS PLAN SHALL CONSTITUTE A RELEASE OF THE PRIOR OWNERS BY KROGER.**

**ENTRY OF THE CONFIRMATION ORDER SHALL, SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE RELEASING PARTIES; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; (F) CONSENSUAL; AND (G) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.**

F.     **Substantive Consolidation**

In connection with confirmation of the Plan, the Debtors assert the Plan substantively consolidates the Estates of all of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan, including voting on the Plan and distributions under the Plan. *See generally, In re SportCo Holdings, Inc.* (19-11299-LSS), Nov. 1, 2019 Hearing Transcript, 18:24 – 27:24 [Docket No. 515] and *Order Confirming Debtors' Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 525] (Bankr. D. Del. Nov. 6, 2019). On the Effective Date: (i) all assets and liabilities of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim, including General Unsecured Claims, against the Debtors will be deemed a single Claim against, and a single obligation of, the Debtors, (iii) any Claim filed

or to be filed in the Chapter 11 Cases will be deemed a single Claim against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.

Substantive consolidation is appropriate for a number of reasons. Subject to the Committee's challenge rights, the Prepetition Secured Lender obtained a lien on substantially all of the personal property assets of the Debtors prepetition, all as set forth in greater detail in the Prepetition Secured Loan Documents, the motion to approve the use of cash collateral, and the various Orders approving the use of cash collateral. The Prepetition Secured Lender's obligations are guaranteed by LMPC and LMOC. Regardless of corporate formalities, subject to the Committee's challenge rights, the Prepetition Secured Lender has a lien on substantially all of the Debtors' assets.

Before the Petition Date, the Prepetition Secured Lender extended credit to LMPC and LMOC. Under the Prepetition Secured Loan documents, the Prepetition Secured Lender received combined financial reports from the Debtors and calculated covenant compliance based on the assets and liabilities of all the Debtor entities. The reporting requirements and financial covenants that the Debtors were subject to prior to the Petition Date indicate the Prepetition Secured Lender relied on the collective identity of the Debtors as prepetition borrowers and prepetition guarantors when extending credit.

The Debtors have not allocated professional fees and the cost of administering the Chapter 11 Cases amongst all of the Debtors. The restructuring costs have been booked on a consolidated basis.

Substantive consolidation of the Debtors' Estates avoids the inefficiency of proposing and voting in respect of entity-specific Claims where there would be no impact on distributions. The Debtors, the Prepetition Secured Lender, and the Committee believe creditors would receive less under separate plans than they stand to receive under the Plan because, in accordance with the Global Settlement, the Plan provides for a recovery on account of General Unsecured Claims that Holders of such Claims would not otherwise receive. The benefits of substantive consolidation outweigh any potential harm to Creditors.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Third Circuit in *Owens Corning* discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on a debtors' creditors and their rights and recoveries. The Third Circuit provided the following baseline standards for approval of non-consensual substantive consolidation, while

leaving the trial court with discretion to assess what facts are necessary to meet these standards: (1) prepetition the debtors disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one entity; or (2) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. Id. at 211.

Substantive consolidation is also appropriate where the parties consent to it. *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

Here, where the Debtors assert the Plan substantively consolidates the Estates, the entry of the Confirmation Order constitutes approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) for all purposes relating to the Plan, including for purposes of voting, confirmation, and distributions. The Plan substantively consolidates the Estates, therefore, for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) will be treated as though they merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, will be considered eliminated so that any Claim and guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, will be treated as one collective obligation of the Debtors. Moreover, (a) no distribution will be made under the Plan on account of any Intercompany Claims held by any one of the Debtors in any of the other Debtors except to the extent necessary to effectuate the substantive consolidation provided for in the Plan, (b) all guarantees of any one of the Debtors of the obligations of any of the other Debtors, to the extent any exist, will be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, will be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely filed or to be filed in the Chapter 11 Cases of any of the Debtors will be deemed filed against the consolidated Estates and will be one Claim against, and one obligation of, the Estates.

Additionally, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, will be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts will be Allowed only once as if such Claim were against a single Debtor.

The Debtors believe that substantive consolidation is in the best interest of General Unsecured Creditors.

If the Debtors seek and receive approval of substantive consolidations, to avoid additional administrative expense, then the Debtors shall be authorized to submit an order to the Bankruptcy Court under certification of counsel that is in form and substance reasonably acceptable to the U.S. Trustee and the Committee that closes each of the Chapter 11 Cases, except for Lucky's Market Parent Company, LLC's Chapter 11 Case. The Debtors' consolidated estate would thereafter be administered through Lucky's Market Parent Company, LLC's Chapter 11 Case. Once the Plan

has been fully administered, the Liquidating Debtor would thereafter file a final report and a motion seeking a Final Decree of the one remaining Estate.

## IX.   LIQUIDATING TRUST

### A.   **Establishment of the Liquidating Trust.**

All Assets of the Liquidating Debtor shall be transferred to a Liquidating Trust for the benefit of holders of Allowed Claims no later than January 15, 2022, to the extent not previously disposed or distributed, and the Liquidating Debtor shall be dissolved without any further action no later than the following business day. The Liquidating Debtor may determine at any time whether it is in its best interest to establish a Liquidating Trust as of an earlier date. The Liquidating Debtor and the Liquidating Trustee shall execute the Liquidating Trust Agreement, and shall take all other necessary steps to establish the Liquidating Trust for the benefit of Liquidating Trust Beneficiaries. In the event of any conflict between the terms of this Article IX.A and the terms of the Liquidating Trust Agreement as such conflict relates to the establishment of the Liquidating Trust, the terms of this Article IX.A shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not adversely affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

### B.   **Purpose of the Liquidating Trust.**

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in consultation with Kroger and/or the Creditor Representative as appropriate, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### C.   **Liquidating Trust Assets.**

The Liquidating Trust shall consist of Liquidating Trust Assets. After the creation of the Liquidating Trust pursuant to Article IX.A of the Plan, the Liquidating Debtor shall transfer all of the Liquidating Trust Assets to the Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in the Liquidating Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

### D.   **Administration of the Liquidating Trust.**

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and the Liquidating Trust Agreement as such conflict relates to anything other than the establishment of the Liquidating Trust, the Liquidating Trust Agreement shall control so long as such conflict does not adversely affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

E.     **Liquidating Trustee's Tax Power for Debtors.**

The Liquidating Trustee shall have the same authority and responsibility in respect of all taxes of the Debtors and the Liquidating Debtor, and to the same extent, as if the Liquidating Trustee were the Debtors and the Liquidating Debtor.

F.     **Cash Investments.**

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings or other controlling authorities.

G.     **Distribution of Liquidating Trust Interests.**

The Liquidating Trustee shall, at least semi-annually, distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests certain Cash on Hand (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Article IX.G), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), (c) satisfy Disputed Claims, or (d) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a Distribution pursuant to this Article IX.G of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

H.     **Federal Income Tax Treatment of Liquidating Trust.**

In furtherance of this Article IX of the Plan, (i) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of Liquidating Trust Interests, consistent with the terms of the Plan; (ii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, the Liquidating Debtor, holders of Liquidating Trust Interests and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Liquidating Trust Interests, followed by the deemed transfer of such assets to the Liquidating Trust); (iv) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (v) the Liquidating Trustee shall be responsible for filing returns for the

Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Liquidating Trustee shall annually send to each holder of Liquidating Trust Interests a separate statement regarding the receipts and expenditures of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may timely elect to (a) treat any portion of the Liquidating Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidating Debtor, the holders of Liquidating Trust Interests and the Liquidating Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. As to any assets allocable to, or retained on account of, Disputed Claims, all distributions shall be net of any expenses, including taxes, relating to the retention or disposition of such assets, and the Liquidating Trustee shall be responsible for payment, solely out of the assets of such retained assets, of any taxes imposed on or in respect of such assets. All parties (including, without limitation, the Liquidating Debtor, the Liquidating Trustee and the holders of Liquidating Trust Interests) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including any reserve for Disputed Claims, or of the Debtors or the Liquidating Debtor under Section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtors or the Liquidating Debtor for all taxable periods through the dissolution of the Liquidating Trust.

I.    **Dissolution.**

The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the creation of the Liquidating Trust pursuant to Article IX.A of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as the Liquidating Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from United States federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation", as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.

## X.    RIGHTS AND AUTHORITY OF THE CREDITOR REPRESENTATIVE

Following the Effective Date, the Creditor Representative shall have the following rights, duties and authorities:

(1)    The Committee shall select the Creditor Representative prior to the Effective Date;

(2)    The Creditor Representative shall be charged with (a) overseeing the Distributions to the Creditors under Class 4 of the Plan, (b) protecting the rights, benefits  and interests of the Holders of General Unsecured Claims in the General Unsecured Claims Class A Recovery Pool, (c) ensuring that all Cash, Cash on Hand, Identified Assets, and Assets are properly allocated and distributed in accordance with the terms of the Plan, (d) resolving with the Liquidating Debtor or otherwise litigating any disputes or uncertainties concerning the proper allocation of costs, fees and expenses incurred in administering the Estates after depletion of the funds available in the Wind-Down Budget, (e) resolving with the Liquidating Debtor or otherwise litigating any disputes or uncertainties concerning the Wind-Down Reserve, and (f) otherwise exercising any rights, duties, or authorities specified for the Creditor Representative in this Plan;

(3)    The Creditor Representative shall have standing to object to and be heard on any matter brought before the Bankruptcy Court, including any appeal thereof, including without limitation the allowance, disallowance, classification, reclassification or estimation of any Administrative Expense Claim, Priority Tax Claim, Priority Claim, and/or General Unsecured Claim in the General Unsecured Claims Class A Recovery Pool or General Unsecured Claims Class B Recovery Pool solely in the event a Claim is reclassified from a Class B Claim to a Class A Claim;

(4)    The Creditor Representative has the right to retain professionals to assist in the exercise of his or her duties and responsibilities under the Plan; it shall not be a conflict for the Creditor Representative to retain any of the professionals previously retained by the Committee; and

(5)    The Liquidating Debtor shall pay the reasonable fees and expenses incurred by Creditor Representative and his or her professionals from the Wind-Down Reserve;

provided, however, any fees and expenses incurred by the Creditor Representative and his or her professionals in excess of $150,000 in the aggregate shall be paid solely from the funds in the General Unsecured Claims Class A Recovery Pool.

## XI.    RETENTION OF JURISDICTION

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)     to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)     to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Bankruptcy Code section 1142;

(4)     to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(7)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of any order entered by the Bankruptcy Court;

(8)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns of the Debtors and of any Liquidating Trusts for any and all taxable periods ending after the Petition Date through the Closing Date;

(9)     to hear and determine any application, motion, objection or other matter Filed by the Creditor Representative;

(10)    to hear any other matter not inconsistent with the Bankruptcy Code;

(11)    to enter the Final Decree;

(12)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

72709057.12

(13)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(14)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

(15)    to determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

(16)    to determine any other matters that may arise in connection with or related to any Order approving the sale of an asset of the Estates or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with any order entered by the Bankruptcy Court;

(17)    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(18)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(19)    to hear and determine any matter raised by the Creditor Representative; and

(20)    to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose.

## XII.    MISCELLANEOUS PROVISIONS

### A.    **Amendment or Modification of the Plan**

The Debtors, in consultation with the Prepetition Secured Lender, and, the Committee to the extent the economic recovery of Holders in Class 4 is adversely impacted by such amendments, may modify the Plan at any time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

B.     **Exhibits/Schedules**

All exhibits and schedules to the Disclosure Statement and the Plan Supplement are incorporated into and are part of the Plan as if set forth in full herein.

C.     **Plan Supplement**

The Debtors will File the Plan Supplement by _____ __, 2020 at 4:00 p.m.

D.     **Filing of Additional Documents**

On or before substantial consummation of the Plan, the Liquidating Debtor shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

E.     **Binding Effect of Plan**

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns. Notwithstanding anything to the contrary herein, nothing in the Plan modifies, alters, or amends the respective rights and obligations of the Debtors or the purchasers of any asset of the Estates under the applicable sale Order, the asset purchase agreement [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], or any other document governing such sale.

F.     **Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

G.     **Time**

To the extent that any time for the occurrence or happening of an event as set forth in the Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

H.     **Severability**

Should any provision of the Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

I.     **Revocation**

The Debtors, in consultation with the Prepetition Secured Lender and the Committee, reserve the right to revoke and withdraw the Plan prior to the entry of the Confirmation Order. If the Debtors revoke or withdraw the Plan, the Plan shall be deemed null and void, and nothing

contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

### J.      **Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve and its members deemed released of any continuing duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention and employment of the Committee's Professionals shall terminate, except with respect to: (a) prosecuting applications for Professionals' compensation and reimbursement of expenses incurred as a member of the Committee; (b) asserting, disputing and participating in resolution of Professional Fee Claims; or (c) prosecuting or participating in any appeal of the Confirmation Order or any request for consideration thereof. Upon the resolution of (a) through (c), the Committee shall be immediately dissolved, and released.

### K.      **Claims Agent**

Omni, in its capacity as Claims and Noticing Agent and as Administrative Agent, shall be relieved of such duties on the date of the entry of the Final Decree or upon written notice by the Debtors or Liquidating Debtor, and subject to approval by the Bankruptcy Court.

### L.      **Inconsistency**

To the extent that the Plan conflicts with or is inconsistent with any agreement related to the Plan, the provisions of the Plan shall control.

### M.      **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

### N.      **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. The filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Equity Interests before the Effective Date.

### O.      **Compromise of Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan and in the Chapter 11 Cases, including the Global Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements, provided for in the Plan and the Chapter 11 Cases,

including the Global Settlement. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estate, and all Holders of Claims and Equity Interests against the Debtors.

P.      **No Discharge**

As set forth in Bankruptcy Code section 1141(d)(3), the Plan does not grant the Debtors a discharge. However, notwithstanding the foregoing, except as otherwise provided herein, the rights afforded pursuant to the Plan and the treatment of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Filing Date, against the Debtors or any of their Assets. All Persons and Entities shall be precluded form asserting against the Debtors, or any of their assets any further Claims or Equity Interests based upon any act, or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

Dated:  October 29, 2020
          Wilmington, Delaware                    **Lucky's Market Parent Company, LLC,** *et al.*
                                                  Debtors and Debtors in Possession

                                                  */s/ Andrew T. Pillari*
                                                  Andrew T. Pillari
                                                  Chief Financial Officer

48

## SCHEDULE A

### IDENTIFIED ASSETS

1.  Cash proceeds received prior to, on or after the Effective Date from any of the following assets of the Estates:
    A.    Visa/Mastercard Interchange Fee Claims
    B.    Adequate Assurance Utility Deposit
    C.    Remaining Leases
    - Neptune Beach:  0028 – NEP – Neptune Beach, FL
    - Bonita Springs: 0039 – BSP – Bonita Springs, FL (Adv. Pro. 20-50631 with Winn-Dixie)
    - Orlando:  0025 – ORL – Orlando, FL
    - Cape Coral:  0059 – CCR – Cape Coral, FL
    - Clearwater:  0062 – CLW – Clearwater, FL
    - Other Stores
        - Tallahassee:  0029 – TAL – Tallahassee, FL
        - Naples:  0024 – NAP – Naples, FL
        - Winter Park:  0045 – WPK – Winter Park, FL
        - East Boca Raton:  0051 – BOC – Boca Raton, FL
        - Jacksonville:  0055 – OKL – Oakleaf, FL
        - North Naples:  0057 – NNP – North Naples, FL
        - Dania Beach:  0058 – DNB – Dania Beach, FL
        - Brandon: 0066 – BTN – Brandon, FL
        - Kendall:  0068 – KEN – Kendall, FL (Miami)
        - Riverview:  0070 – RVW – Riverview, FL

2.  Cash proceeds received prior to the Effective Date from any of the following assets of the Estates:
    A.  Accounts Receivable collections
    B.  Liquor Licenses
        - Ann Arbor
        - Other
    C.  Utility Deposits
    D.  Tax Refunds
    E.  Holdbacks
    F.  Other