## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUCKY'S MARKET PARENT COMPANY, LLC, *et al.*,[1] | Case No. 20-10166 (JTD) |
| Debtors. | (Jointly Administered) |

---

### DISCLOSURE STATEMENT FOR JOINT
### CHAPTER 11 PLAN OF LIQUIDATION OF
### LUCKY'S MARKET PARENT COMPANY, LLC AND ITS DEBTOR AFFILIATES

---

**POLSINELLI PC**

Christopher A. Ward (Del. Bar No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com

-and-

Liz Boydston (Admitted *Pro Hac Vice*)
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 661-5557
lboydston@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

Dated: October 29, 2020

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Lucky's Market Parent Company, LLC (2055), Lucky's Farmers Market Holding Company, LLC (5480), Lucky's Market Operating Company, LLC (7064), LFM Stores LLC (3114), Lucky's Farmers Market, LP (0828), Lucky's Farmers Market Resource Center, LLC (7711), Lucky's Market Holding Company 2, LLC (0607), Lucky's Market GP 2, LLC (9335), Lucky's Market 2, LP (8384), Lucky's Market of Longmont, LLC (9789), Lucky's Farmers Market of Billings, LLC (8088), Lucky's Farmers Markets of Columbus, LLC (3379), Lucky's Farmers Market of Rock Hill, LLC (3386), LFM Jackson, LLC (8300), Lucky's Farmers Market of Ann Arbor, LLC (4067), Lucky's Market of Gainesville, LLC (7877), Lucky's Market of Bloomington, LLC (3944), Lucky's Market of Plantation, LLC (4356), Lucky's Market of Savannah, GA, LLC (1097), Lucky's Market of Traverse, City, LLC (2033), Lucky's Market of Naples, FL, LLC (8700), Sinoc, Inc. (0723,) Lucky's Farmers Market of Ellisville, LLC (2875), and Lucky's Farmers Market of Lexington, KY, LLC (3446).

## DISCLAIMERS

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT MAY BE ATTACHED HERETO AND THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND IT WAS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE IMMIGRATION CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE IMMIGRATION CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE LAW AND REGULATIONS. THERE CAN BE NO ASSURANCE THAT THE FEDERAL GOVERNMENT WILL NOT

CHALLENGE ANY OF THE IMMIGRATION CONSEQUENCES DESCRIBED IN THIS DISCLOSURE STATEMENT, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH THEIR OWN IMMIGRATION ADVISOR REGARDIGN ANY IMMIGRATION CONSEQUENCES OF THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND AS SET FORTH THERIN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

<u>MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE</u>.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS THAT WAS AVAILABLE AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DEBTORS MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE

HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND THE DEBTORS EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, THE PLAN AND ARTICLE VII OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED ACCEPT THE PLAN.

# TABLE OF CONTENTS

**ARTICLE I. INTRODUCTION AND OVERVIEW OF THE PLAN** .................................................................. 1
    A.    The Plan ......................................................................................................... 1
    B.    The Adequacy of this Disclosure Statement ................................................ 1
    C.    Summary of Classes and Treatment of Claims and Interests ....................... 2
    D.    Solicitation Procedures ................................................................................. 3
            1.       Administrative Advisor .......................................................... 4
            2.       Solicitation Package .............................................................. 4
            3.       Distribution of the Solicitation Package and Plan Supplement .......... 4
    E.    Voting Procedures ......................................................................................... 5
            1.       Classes Entitled to Vote on the Plan ..................................... 5
            2.       Substantive Consolidation ..................................................... 5
            3.       Voting Deadline ...................................................................... 5
            4.       Votes Required for Acceptance by a Class ............................ 6
            5.       Certain Factors to Be Considered Prior to Voting ................. 6
            6.       Voting Instructions ................................................................ 6
             7.       Deemed Acceptance or Rejection ......................................... 8
            8.       Acceptance by Impaired Classes ........................................... 8
    F.    Confirmation Procedures ............................................................................... 8
            1.       Confirmation Hearing ............................................................ 8
             2.       Plan Objection Deadline ........................................................ 9
            3.       Requirements for Confirmation ............................................. 9

**ARTICLE II. DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES** ................................. 10
    A.    The Debtors' Corporate History and Business Operations ......................... 10
    B.    The Debtors' Organizational and Capital Structure .................................... 10
            1.       Organizational Structure ........................................................ 10
             2.       The Debtors' Capital Structure ............................................. 11

**ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES** .......................................................... 14
    A.    The Debtors' Strategic Growth and Operational Challenges ...................... 14
    B.    The Debtors Begin to Market Assets and Consider Restructuring Options .................. 15

**ARTICLE IV. EVENTS DURING THE CHAPTER 11 CASES** ................................................................. 16
    A.    First Day Pleadings and Other Case Matters .............................................. 16
            1.       First Day Pleadings ............................................................... 16
            2.       "Second Day" Pleadings ....................................................... 17
            3.       The Debtors' Retention of Professionals ............................... 17
            4.       Appointment of the Committee and the Committee's Retention of Professionals ......... 17
    B.    Claims Bar Dates ........................................................................................ 18
    C.    Schedules and Statements ........................................................................... 18
    D.    Objections to Claims ................................................................................... 18
    E.    Sales of the Debtors' Assets ........................................................................ 18
            1.       Store Closing and FF&E Sales .............................................. 20
            2.       Stalking Horse Agreement Sales ........................................... 21
             3.       CBRE Sales ........................................................................... 28
            4.       Other Sales of Miscellaneous Personal Property ................... 29
    F.    Executory Contracts and Unexpired Leases ............................................... 30
            1.       Deadline to Assume and Reject Unexpired Leases and Executory Contracts ............... 30
            2.       Non-Sale related Assumption of Unexpired Leases and Executory Contracts ............. 30
            3.       Rejection of Unexpired Leases and Executory Contracts ...... 31
            4.       Cure of Defaults for Assumed Executory Contracts .............. 32
            5.       Claims Based on Rejection of Executory Contracts ............... 33

i

**TABLE OF CONTENTS**
(continued)

G.   Pending Litigation ................................................................................................... 33
    1.   Class Action Adversary Proceeding ........................................................ 33
    2.   Special Committee Investigation ............................................................. 34
    3.   Committee Investigation .......................................................................... 34
    4.   Winn-Dixie Adversary Proceeding .......................................................... 34
H.   Settlement of Claims against the Debtors' Estates .................................................. 35
    1.   1916, LLC ................................................................................................ 35
    2.   Lowry Economic Redevelopment Authority ........................................... 35
    3.   Albertson's LLC ....................................................................................... 35
    4.   Market at McKnight I, LLC ...................................................................... 35
    5.   U.S. Bank Equipment Finance, a division of U.S. Bank National Association ............. 36
    6.   Global Settlement Between Debtors, Committee, and Prepetition Secured
       Lender ....................................................................................................... 36
I.   COVID-19 Pandemic Declared During The Chapter 11 Cases .................................. 36

**ARTICLE V. SUMMARY OF THE PLAN ................................................................................ 36**
A.   Unclassified Claims .................................................................................................. 37
    1.   PACA Claims and PASA Claims ............................................................. 37
    2.   Administrative Expense Claims ................................................................ 37
    3.   Professional Fee Claims ........................................................................... 38
    4.   Priority Tax Claims .................................................................................. 38
    5.   Class Action Claims ................................................................................. 39
    6.   Statutory Fees .......................................................................................... 40
B.   Classification and Treatment of Claims and Interests .............................................. 40
    1.   Classification of Claims and Interests ...................................................... 40
    2.   Treatment of Claims and Interests ........................................................... 40
    3.   Impaired Claims and Equity Interests ...................................................... 43
    4.   Cramdown and No Unfair Discrimination ................................................ 43
    5.   Special Provision Regarding Settled Claims ............................................ 44
C.   Implementation and Execution of the Plan .............................................................. 44
    1.   Effective Date .......................................................................................... 44
    2.   Implementation of the Plan ...................................................................... 44
    3.   Records .................................................................................................... 45
    4.   Provisions Governing Distributions Under the Plan .................................. 45
D.   Executory Contracts and Unexpired Leases .............................................................. 48
    1.   Executory Contracts and Unexpired Leases ............................................. 48
    2.   Rejection Claims ...................................................................................... 48
E.   Procedures For Resolving Contingent, Unliquidated, and Disputed Claims and Interests .......... 49
    1.   Resolution of Disputed Claims and Interests ............................................ 49
    2.   Disallowance of Claims ........................................................................... 50
    3.   Amendments to Claims ............................................................................ 50
F.   Conditions Precedent to Confirmation and the Effective Date .................................. 50
    1.   Conditions Precedent to Confirmation ..................................................... 50
    2.   Conditions Precedent to the Effective Date .............................................. 51
    3.   Waiver of Conditions .............................................................................. 51
    4.   Effect of Non-Occurrence of Conditions ................................................. 51
G.   Settlement, Injunction, Exculpation, Release, and Related Provisions ........................ 52
    1.   Settlement Released Claims ...................................................................... 52
    2.   Injunction ................................................................................................ 55
    3.   Exculpation .............................................................................................. 56
    4.   Releases by the Debtors ........................................................................... 56
    5.   Third Party Releases ................................................................................ 57
H.   Substantive Consolidation ........................................................................................ 58

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| I. | | Liquidating Trust | 61 |
| | 1. | Establishment of the Liquidating Trust | 61 |
| | 2. | Purpose of the Liquidating Trust | 61 |
| | 3. | Liquidating Trust Assets | 61 |
| | 4. | Administration of the Liquidating Trust | 62 |
| | 5. | Liquidating Trustee's Tax Powers for Debtors | 62 |
| | 6. | Cash Investments | 62 |
| | 7. | Distribution of Liquidating Trust Interests | 62 |
| | 8. | Federal Income Tax Treatment of Liquidating Trust | 62 |
| | 9. | Dissolution | 63 |
| J. | | Rights and Authority of the Creditor Representative | 64 |
| K. | | Retention of Jurisdiction | 65 |
| L. | | Miscellaneous Provisions | 67 |
| | 1. | Amendment or Modification of the Plan | 67 |
| | 2. | Exhibits/Schedules | 67 |
| | 3. | Plan Supplement | 67 |
| | 4. | Filing of Additional Documents | 67 |
| | 5. | Binding Effect of Plan | 67 |
| | 6. | Governing Law | 67 |
| | 7. | Time | 68 |
| | 8. | Severability | 68 |
| | 9. | Revocation | 68 |
| | 10. | Dissolution of the Committee | 68 |
| | 11. | Claims Agent | 68 |
| | 12. | Inconsistency | 68 |
| | 13. | No Admissions | 69 |
| | 14. | Reservation of Rights | 69 |
| | 15. | Compromise of Controversies | 69 |
| | 16. | No Discharge | 69 |

**ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ... 70**
| | | | |
|---|---|---|---|
| A. | | Confirmation Hearing | 70 |
| B. | | Confirmation Standards | 71 |
| | 1. | Feasibility | 71 |
| | 2. | Best Interests Test | 71 |
| C. | | Alternative Plans | 72 |
| D. | | Acceptance by Impaired Classes | 72 |
| E. | | Confirmation Without Acceptance by All Impaired Classes | 73 |
| | 1. | No Unfair Discrimination | 73 |
| | 2. | Fair and Equitable Test | 73 |

**ARTICLE VII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING ... 74**
| | | | |
|---|---|---|---|
| A. | | Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims and Allowed Interests Under the Plan | 75 |
| | 1. | The Amount of Allowed Claims May Adversely Affect Recoveries | 75 |
| | 2. | The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims and Allowed Interests in the Voting Classes | 75 |
| | 3. | Any Valuation of the Debtors' Assets is Speculative and Could Potentially Be Zero | 75 |
| | 4. | The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries | 75 |
| | 5. | Certain Tax Implications of the Debtors' Chapter 11 Cases | 76 |
| B. | | Certain Bankruptcy Law Considerations | 76 |

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
|  | 1. | Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests | 76 |
|  | 2. | Failure to Satisfy Vote Requirements | 76 |
|  | 3. | The Debtors May Not Be Able to Secure Confirmation of the Plan | 76 |
|  | 4. | Nonconsensual Confirmation | 77 |
|  | 5. | Risk of Nonoccurrence of the Effective Date | 78 |
|  | 6. | Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan | 78 |
| C. | | Disclosure Statement Disclaimer | 78 |
|  | 1. | The Financial Information Contained in this Disclosure Statement Has Not Been Audited | 78 |
|  | 2. | Information Contained in this Disclosure Statement Is for Soliciting Votes | 78 |
|  | 3. | This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission | 78 |
|  | 4. | This Disclosure Statement May Contain Forward Looking Statements | 78 |
|  | 5. | No Legal or Tax Advice is Provided to You by this Disclosure Statement | 79 |
|  | 6. | No Admissions Made | 79 |
|  | 7. | Failure to Identify Projected Objections | 79 |
|  | 8. | No Waiver of Right to Object or to Recover Transfers and Assets | 79 |
|  | 9. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 79 |
|  | 10. | Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update | 80 |
|  | 11. | No Representations Outside this Disclosure Statement Are Authorized | 80 |
|  | 12. | Immigration Consequences | 80 |
| D. | | Liquidation Under Chapter 7 | 80 |

**ARTICLE VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ... **80**
| A. | | Tax Consequences to the Debtors | 81 |
| B. | | Tax Consequences for Holders of Claims | 82 |

**ARTICLE IX. RECOMMENDATION OF THE DEBTORS** ... **83**

## <u>EXHIBITS</u>

EXHIBIT A    Debtors' Chapter 11 Plan of Liquidation

EXHIBIT B    Disclosure Statement Order (and all attachments thereto)

EXHIBIT C    Liquidation Analysis

# ARTICLE I.

## INTRODUCTION AND OVERVIEW OF THE PLAN

This disclosure statement (this "**Disclosure Statement**") provides information regarding the Joint Chapter 11 Plan of Liquidation of Lucky's Market Parent Company, LLC and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"), which the Debtors are seeking to have confirmed by the Bankruptcy Court.[1] A copy of the Plan is attached hereto as **Exhibit A**.[2] The rules of interpretation set forth in Article II of the Plan shall govern the interpretation of this Disclosure Statement.

The Plan and Disclosure Statement reflect substantial arms' length settlement negotiations among the Debtors, the Prepetition Secured Lender, and Official Committee of Unsecured Creditors (the "**Committee**"), and the EB-5 Investors, which culminated in the Global Settlement. The Special Committee has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates.

**As such, the Debtors recommend that all Holders of Claims and Interests entitled to vote accept the Plan by returning their Ballots so as to be actually received by Omni no later than [December 18, 2020] at 4:00 p.m. (prevailing Eastern Time). Assuming that the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing on [December 23, 2020] at [1:00 p.m.] (prevailing Eastern Time).**

A.    *The Plan*

The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan. To that end, the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on the Petition Date. The Plan, which is more fully described herein, contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation" as contemplated and permitted by Bankruptcy Code section 1123(a)(5)(D). Most of the Debtors' assets have been sold to third party buyers through Bankruptcy Court approved lease and asset sales. There are, however, a few Identified Assets which are in the process of being sold or liquidated. Those Identified Assets are listed on Schedule A to the Plan. With respect to any Remaining Assets, those are being treated as set forth in the Plan.

Each Holder of an Impaired Claim against the Debtors entitled to vote to accept or reject the Plan is encouraged to read the Plan and this Disclosure Statement in their entirety before voting.

B.    *The Adequacy of this Disclosure Statement*

Before soliciting acceptances of a proposed chapter 11 plan, Bankruptcy Code section 1125 requires a plan proponent to prepare a written disclosure statement containing information of a

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2] Copies of the Plan, the Disclosure Statement, and all other documents related to the Chapter 11 Cases are available for review without charge on the bankruptcy case website at: https://cases.omniagentsolutions.com/luckysmarket.

kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. In accordance with such requirement, the Debtors submit this Disclosure Statement, which includes, without limitation, information about:

- the procedures for voting on the Plan and projected recoveries under the Plan (Article I hereof);

- the Debtors' organizational structure and business operations (Article II hereof);

- the events leading to the Chapter 11 Cases (Article III hereof);

- the events during the Chapter 11 Cases, including significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Article IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims and Interests entitled to vote on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing Distributions to certain Holders of Claims and Interests pursuant to the Plan, the procedures for resolving Disputed Claims and Interests, and other significant aspects of the Plan (Article V hereof);

- the Release by Debtors contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article V hereof);

- the statutory requirements for confirming the Plan (Article VI hereof);

- information regarding alternatives to Confirmation of the Plan and certain risk factors that Holders of Claims and Interests should consider before voting to accept or reject the Plan (Article VII hereof); and

- certain United States federal income tax consequences of the Plan (Article VIII hereof).

In light of the foregoing, the Debtors believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of Bankruptcy Code section 1125.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

C.      *Summary of Classes and Treatment of Claims and Interests*

As set forth in Article IV of the Plan, and in accordance with Bankruptcy Code sections 1122 and 1123(a)(1), all Claims and Interests (other than unclassified Claims described under Article III of the Plan) are classified into Classes for all purposes, including voting, Confirmation, and Distributions. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the

extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan. The estimated amounts of Allowed Claims set forth in the following table are based on the Debtors' books and records. ***Additionally, the recoveries available to Holders of Claims and Interests set forth below are estimates, and actual recoveries may materially differ based on, among other things, the amount of Claims and Interests actually Allowed. Depending on the amount of Allowed Claims and Allowed Interests, the actual recoveries available to Holders of Allowed Claims and Allowed Interests could be materially lower compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.***

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 – Prepetition Secured Claims | $306,453,923.00 | Impaired | 0% |
| Class 2 – Other Secured Claims | $100,000.00 | Unimpaired | 100% |
| Class 3 – Priority Claims | $100,000.00 | Unimpaired | 100% |
| Class 4 – General Unsecured Claims Class A | $39,800,000.00 | Impaired | 8%-17% |
| Class 5 – General Unsecured Claims Class B | $38,500,000.00 | Impaired | 3%-6% |
| Class 6 – General Unsecured Claims Class C | $4,836,648.00 | Impaired | 0% |
| Class 7 – Intercompany Claims | $479,000,000.00 | Impaired, deemed to reject | 0% |
| Class 8 – Equity Interests | N/A | Impaired, deemed to reject | 0% |
| Class 9 – EB-5 Investors | N/A | Impaired | 0% |

Except to the extent that a Holder of an Allowed Claim or Allowed Interest agrees to a less favorable treatment, such Holder shall receive, under the Plan, the treatment described in Article V below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest.

D.    *Solicitation Procedures*

The Court's Disclosure Statement Order establishes the voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "**Solicitation Procedures**"). A copy of the Disclosure Statement Order, including the Solicitation Procedures attached thereto as Exhibit 1, will be filed with the Court and will be attached as **Exhibit B**.

      1.       Administrative Advisor

The Debtors retained Omni as their administrative agent to, among other things, assist with solicitation of the Plan and the voting process in the Chapter 11 Cases.[3]

      2.       Solicitation Package

Accompanying the Plan for the purposes of soliciting votes on the Plan are Solicitation Packages, which contain copies of:

      (a)       the Disclosure Statement, which shall include all exhibits attached thereto;

      (b)       a letter from the Creditors Committee recommending that all creditors cast their ballots in favor of the Plan;

      (c)       the Confirmation Hearing Notice, substantially in the form attached to the Disclosure Statement Order;

      (d)       a Ballot with a postage-prepaid return envelope; and

      (e)       any supplemental documents filed with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package, including any letters in support of the Plan.

Only Holders of Claims and Interests in Voting Classes will receive Solicitation Packages that include all of the foregoing materials. Holders of Claims and Interests that are not eligible to vote on the Plan will receive only: (a) the Confirmation Hearing Notice; and (b) a notice of such Holder's non-voting status.

      3.       Distribution of the Solicitation Package and Plan Supplement

The Debtors will cause Omni to distribute the Solicitation Packages to Holders of Claims and Interests in the Voting Classes within three (3) business days after entry of the Disclosure Statement Order. Accordingly, Holders of Claims and Interests in the Voting Classes will have sufficient time to review the information contained in the Solicitation Packages and make a judgment with respect to the Plan before the deadline to vote on the Plan (*i.e.*, 4:00 p.m. prevailing Eastern Time on [December 18, 2020] (the "**Voting Deadline**")).

The Solicitation Package materials, with the exception of the Ballot, may also be obtained: (a) from Omni by (i) visiting, free of charge, https://cases.omniagentsolutions.com/luckysmarket; (ii) writing to LMPC Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (iii) via email at luckysmarket@omniagnt.com; or (iv) calling (866) 662-2204; or (b) for a fee via PACER at https://www.deb.uscourts.gov.

The Debtors intend to file the Plan Supplement at least seven (7) days prior to the Voting Deadline. The Plan Supplement will contain, among other things the disclosures as required by the

---

[3] The Debtors also retained Omni as their claims and noticing agent pursuant to 28 U.S.C. § 156(c).

Bankruptcy Code. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

The Plan Supplement may be obtained: (a) from Omni by (i) visiting, free of charge, https://cases.omniagentsolutions.com/luckysmarket; (ii) writing to LMPC Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; (iii) via email at luckysmarket@omniagnt.com; or (iv) calling (866) 662-2204; or (b) for a fee via PACER at https://www.deb.uscourts.gov.

As described above, certain Holders of Allowed Claims and Interests may not be entitled to vote because they are unimpaired or are otherwise presumed to accept the Plan pursuant to Bankruptcy Code section 1126(f). In addition, Holders of Interests in Classes 7 and 8 are receiving no Distribution under the Plan, and they are therefore not entitled to vote because they are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). Accordingly, Holders of Claims and Interests in Classes 7 and 8 will not receive a Solicitation Package and will instead receive only a copy of the Confirmation Hearing Notice and a Notice of Non-Voting Status (as defined in the Disclosure Statement Order).

E.    *Voting Procedures*

1.    Classes Entitled to Vote on the Plan

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims and Interests in Classes 1, 4, 5, 6, and 9 may vote to accept or reject the Plan pursuant to Bankruptcy Code section 1126. To vote on the Plan, a Holder must: (a) hold a Claim in Class 1, 4, 5, 6, or 9; and (b) have (i) timely Filed a Proof of Claim, (ii) a Claim that is identified on the Schedules and is not listed as disputed, unliquidated, or contingent, or (iii) a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 4, 5, 6, AND 9.

2.    Substantive Consolidation

For the purposes of these Chapter 11 Cases and the Plan, other than with respect to the treatment of Class 9 – EB5 Investors, all Assets of and Claims against the Debtors shall be deemed to be substantively consolidated. As a result, Claims Filed against multiple Debtors seeking recovery of the same debt shall only be entitled to receive a single Distribution from the consolidated Estates in accordance with the Plan, and without the need of an objection to such Claim, to the extent such Claim is an Allowed Claim. Claims of Debtors against other Debtors, including any Intercompany Claims, shall be disregarded for both voting and distribution purposes.

3.    Voting Deadline

To be counted as a vote to accept or reject the Plan, Omni must **actually receive** a Ballot no later than the Voting Deadline, which is [December 18, 2020] at 4:00 p.m. (prevailing Eastern time). Ballots can be submitted by mail, overnight delivery, hand delivery, or by completing the Ballot online via Omni's E-Ballot platform, which can be found on the Debtors' case information

website located at https://cases.omniagentsolutions.com/luckysmarket. Ballots received after the Voting Deadline will not be counted.

4.      Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the amount and number of claims voting to accept as a percentage of the allowed claims that have voted. Acceptance of a plan by a class of interests is determined by calculating the amount of interests as a percentage of the allowed interests that have voted. Thus, each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of such Claims entitled to vote and actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims entitled to vote and actually voting in each Class vote to accept the Plan. Each Class of Interests entitled to vote on the Plan will have accepted the Plan if the Holders of at least two-thirds in amount of such Interests entitled to vote and actually voting in each Class vote to accept the Plan.

5.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors cannot assure that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes or Interests entitled to vote in accordance with Bankruptcy Code section 1129(b); and

- any delays of either Confirmation or consummation could result in, among other things, increased Priority Claims.

While the foregoing factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders of Claims and Interests within Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims and Interests within such Voting Classes.

For a further discussion of risk factors, please refer to Article VII hereof, entitled "Certain Risk Factors to be Considered Before Voting."

6.      Voting Instructions

If, as of the Voting Record Date, you are a Holder of a Claim or Interest in Classes 1, 4, 5, 6, or 9 and you are entitled to vote on the Plan pursuant to the Disclosure Statement Order and the

Solicitation Procedures, you may vote to accept or reject the Plan by either completing the Ballot and returning it in the postage prepaid return envelope provided or completing the Ballot online via Omni's E-Ballot platform, which can be found on the Debtors' case information website located at https://omniagentsolutions.com/luckysmarket-ballots.

As described above, the Debtors have retained Omni as their administrative agent to, among other things, assist with the Plan solicitation and voting process in these Chapter 11 Cases. **Omni is available to answer questions, provide additional copies of solicitation materials, oversee the voting process, and process and tabulate Ballots for each Voting Class**.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually received** by Omni by the Voting Deadline, which is [December 18, 2020] at 4:00 p.m. (prevailing Eastern Time) via Omni's E-Ballot platform: https://omniagentsolutions.com/luckysmarket-ballots<br><br>**or** at the following address:<br><br>LMPC Ballot Processing<br>c/o Omni Agent Solutions<br>5955 De Soto Avenue, Suite 100<br>Woodland Hills, CA 91367<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Omni at:<br>(866) 662-2204 |

More detailed instructions regarding the procedures for voting on the Plan are contained on the Ballot distributed to Holders of Claims and Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim and Interest held by such Holder. By signing and returning a Ballot, each Holder of a Claim or Interest entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim or Interest have been cast, or, if any other Ballots have been cast with respect to such Claim or Interest, such earlier Ballots are revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted. The following Ballots will not be counted or considered:

- any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

- any Ballot that is illegible or contains insufficient information;

7

- any Ballot cast by a Person or Entity that does not hold a Claim or Interest in a Voting Class;

- any Ballot cast for a Claim designated as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no Rule 3018 Motion has been Filed by the Rule 3018 Motion deadline;

- any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

- simultaneous duplicative Ballots voted inconsistently;

- Ballots partially rejecting and partially accepting the Plan;

- any attempt to cast a vote on a form other than the official form sent by Omni;

- any unsigned Ballot; and

- any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

7.      Deemed Acceptance or Rejection

Holders of Claims in Classes 2 and 3 are unimpaired and, thus, are deemed to accept the Plan. Under Bankruptcy Code section 1126(f), Holders of such unimpaired Claims are conclusively presumed to have accepted the Plan. Thus, the Debtors will not solicit the votes of Holders of Claims in Classes 2 and 3.

Holders of Claims and Interests in Classes 7 and 8 are not entitled to receive any distribution under the Plan. Under Bankruptcy Code section 1126(g), Holders that will not receive or retain any property under the Plan are conclusively deemed to have rejected the Plan. Thus, the Debtors will not solicit the votes of the Holders in Classes 7 and 8.

8.      Acceptance by Impaired Classes

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of creditors, excluding insiders, as defined in Bankruptcy Code section 101(31), must actually vote to accept the Plan. The Debtors urge holders of Claims and Interests in Classes 1, 4, 5, 6, and 9 to vote to accept the Plan.

F.      *Confirmation Procedures*

1.      Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled on [December 23, 2020] at 1:00 p.m. (prevailing Eastern Time), before the Honorable John T. Dorsey, United States Bankruptcy Judge, in Courtroom No. 5 on the 5th Floor of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, which hearing may be held

virtually if circumstances warrant. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on any entities that have Filed objections to the Plan. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to parties in interest, subject to the terms of the Plan.

### 2.    Plan Objection Deadline

Any objection to Confirmation of the Plan (the "**Confirmation Objection**") must be made in writing and specify in detail, among other things, the name and address of the objecting party, all grounds for the objection and the amount of the Claim held by the objecting party. Any such Confirmation Objection must be Filed by [December 18, 2020] at 4:00 p.m. (prevailing Eastern Time) with the Bankruptcy Court and served on the Debtors' counsel, the Committee, Prepetition Secured Lender, and the U.S. Trustee, and all parties who have Filed a notice of appearance. Unless a Confirmation Objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if the requirements of Bankruptcy Code section 1129 are met. As set forth in the Plan, the Debtors believe that the Plan: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to Bankruptcy Code section 1126, under the Plan, only Holders of Claims in Impaired Classes are entitled to vote to accept or reject the Plan.

73279734.28

## ARTICLE II.

## DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESSES

A.    *The Debtors' Corporate History and Business Operations*

The Debtors' business was focused on affordable organic and locally-grown fruits and vegetables; top-quality, naturally raised meats and seafood; and fresh, daily prepared foods. The Debtors' emphasis was on carrying the highest-quality products at the lowest prices, with the mission of providing "Organic for the 99%". The Debtors' stores offered a broad range of grocery items through their "L" private label at great value that had no artificial colors, flavors, or preservatives. Each of the Debtors' stores averaged approximately 31,000 square feet and had full-service departments, which included produce, meat, seafood, culinary, apothecary, beer/wine/spirits, and grocery.

Prior to the Petition Date, the Debtors owned and operated two (2) stores, and leased and operated thirty-seven (37) stores (each a "**Store**" and, collectively, the "**Stores**"), all of which included extension options and thirty-six (36) of which included options to extend for more than twenty (20) years.

In addition to the operation of thirty-nine (39) Stores, the Debtors (i) operated a produce warehouse in Orlando, Florida to supply nearly all produce for the Debtors' Stores located in Florida and Georgia and (ii) had seventeen (17) additional property leases and one (1) owned property for eighteen (18) future Stores.

Prior to the Petition Date, the Debtors and their advisors identified and commenced the wind down and liquidation of thirty-two (32) Stores. As of the Petition Date, the Debtors operated only seven (7) Stores. During these Chapter 11 Cases, the Debtors wound down and liquidated one (1) of those seven (7) Stores and sold the remaining six (6) operating Stores at an auction conducted on March 26, 2020.

B.    *The Debtors' Organizational and Capital Structure*

1.    <u>Organizational Structure</u>

Debtor LMPC directly owns Debtor Lucky's Market Operating Company and directly or indirectly owns of the other Debtors: Lucky's Farmers Market Holding Company, LLC, LFM Stores LLC, Lucky's Farmers Market, LP, Lucky's Farmers Market Resource Center, LLC, Lucky's Market Holding Company 2, LLC, Lucky's Market GP 2, LLC, Lucky's Market 2, LP, Lucky's Market of Longmont, LLC, Lucky's Farmers Market of Billings, LLC, Lucky's Farmers Markets of Columbus, LLC, Lucky's Farmers Market of Rock Hill, LLC, LFM Jackson, LLC, Lucky's Farmers Market of Ann Arbor, LLC, Lucky's Market of Gainesville, LLC, Lucky's Market of Bloomington, LLC, Lucky's Market of Plantation, LLC, Lucky's Market of Plantation, LLC, Lucky's Market of Savanna, GA, Lucky's Market of Traverse City, LLC, Lucky's Market of Naples, FL, LLC, Sinoc, Inc., Lucky's Farmers Market of Ellisville, LLC, and Lucky's Farmers Market of Lexington, KY, LLC. A chart depicting the Debtors' prepetition organizational structure is attached to the *First Day Declaration* as Exhibit A.

2.      The Debtors' Capital Structure

a.      Prepetition Credit Facility

On or about September 15, 2016, LMPC and Kroger, as lender (the "**Prepetition Secured Lender**"), entered into that certain Promissory Note (as amended prior to the date hereof, the "**A Note**"), pursuant to which the Prepetition Secured Lender agreed to lend LMPC up to $23,328,810 (the "**A Prepetition Secured Loan**"). On or about August 9, 2017, the Prepetition Secured Lender, entered into that certain Secured Loan Agreement (the "**B Prepetition Loan Agreement**"), pursuant to which the Prepetition Secured Lender agreed to lend LMPC up to $25,177,640 (the "**B Prepetition Secured Loan**"). The B Prepetition Secured Loan is evidenced by that certain Promissory Note dated August 9, 2017 made by LMPC in favor of the Prepetition Secured Lender (as amended prior to the date hereof, the "**B Note**").

To secure the obligations under the A Note and B Prepetition Loan Agreement, LMPC and the Prepetition Secured Lender entered into that certain Security Agreement dated as of August 9, 2017 (the "**AB Security Agreement**"). Pursuant to the AB Security Agreement, LMPC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of the personal property with respect to certain identified store locations (the "**AB Security Agreement Collateral**").

The obligations of LMPC under the A Note and B Prepetition Loan Agreement are guaranteed by Debtor Lucky's Market Operating Company, LLC ("**LMOC**") pursuant to that certain Guaranty dated as of August 9, 2017 between LMOC and the Prepetition Secured Lender (the "**AB Guaranty**"). To secure the obligations of LMOC under the AB Guaranty, LMOC and the Prepetition Secured Lender entered into that certain Guaranty Security Agreement dated as of August 9, 2017 between LMOC and the Prepetition Secured Lender (the "**AB Guaranty Security Agreement**"). Pursuant to the AB Guaranty Security Agreement, LMOC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMOC's personal property with respect to certain identified store locations (the "**AB Guarantor Collateral**").

On or about December 4, 2017, LMPC, as borrower, and the Prepetition Secured Lender entered into that certain Secured Loan Agreement (as amended, the "**C Prepetition Loan Agreement**" and together with the B Prepetition Loan Agreement, the "**Prepetition Loan Agreements**"), pursuant to which the Prepetition Secured Lender agreed to make loans to LMPC (the "**C Prepetition Secured Loan**" and together with the A Prepetition Secured Loan and the B Prepetition Secured Loan, the "**Prepetition Secured Loan**"). The Prepetition Secured Lender entered into agreements subsequently to, among other things, lend LMPC additional amounts over time. The C Prepetition Secured Loan is evidenced by that certain Amended and Restated Promissory Note dated December 31, 2019 made by LMPC in favor of the Prepetition Secured Lender (as amended by prior to the date hereof, the "**C Note**" and together with the A Note and B Note, the "**Notes**").

To secure the obligations under the C Prepetition Loan Agreement, LMPC and the Prepetition Secured Lender entered into that certain Security Agreement dated as of December 4, 2017 (the "**C Security Agreement**" and together with the AB Security Agreement, the "**Security**

11

**Agreements**"). Pursuant to the C Security Agreement, LMPC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMPC's personal property (the "**C Security Agreement Collateral**" and together with the AB Security Agreement Collateral, the "**Collateral**").

The obligations of LMPC under the C Prepetition Loan Agreement are guaranteed by LMOC pursuant to that certain Guaranty dated as of December 4, 2017 between LMOC and the Prepetition Secured Lender (the "**C Guaranty**" and together with the AB Guaranty, the "**Guaranties**"). To secure the obligations of LMOC under the C Guaranty, LMOC and the Prepetition Secured Lender entered into that certain Guaranty Security Agreement dated as of December 4, 2017 between LMOC and the Prepetition Secured Lender (the "**C Guaranty Security Agreement**," and together with the AB Guaranty Security Agreement, the "**Guaranty Security Agreements**"). Pursuant to the C Guaranty Security Agreement, LMOC assigned and granted to the Prepetition Secured Lender, a continuing lien on and security interest in substantially all of LMOC's personal property (the "**C Guarantor Collateral**"). The Guaranty Security Agreements together with the Prepetition Loan Agreements, the Notes, the Security Agreements, the Guaranties, and all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, as each has been and may in the future be amended, restated, or replaced, the "**Prepetition Secured Loan Documents**").

        b.        Prepetition Leasehold Interests

As noted above, the Debtors leased the vast majority of their Stores and other real property locations. To facilitate lower rental rates and associated costs, Kroger entered into various guaranties of the Debtors' liabilities under the following thirty-one (31) Store leases.

| Store Location Code | Store No. | Store Opening Date | Store Address | Sold Postpetition |
|---|---|---|---|---|
| CBI | 09 | 1/14/2014 | 111 South Providence Rd., Columbia, MO | Yes |
| ORL | 25 | 6/21/2016 | 11750 E. Colonial Dr., Orlando, FL | No |
| TAL | 29 | 11/8/2016 | 1964 W. Tennessee St., Ste. 10, Tallahassee, FL | No |
| SPR | 37 | 1/9/2018 | 3333 S. Glenstone Ave, Suite 140, Springfield, MO | No |
| CMT | 42 | 3/6/2018 | 1720 East Highway 50, Clermont, FL | Yes |
| HCR | 43 | 10/9/2018 | 4169 W. Town Center Blvd., Orlando, FL | Yes |
| WPK | 45 | 10/9/2018 | 7580 University Blvd., Winter Park, FL | No |
| SOR | 44 | 2/5/2019 | 3171 South Orange Ave., Orlando, FL | Yes |
| VIN | 50 | 2/5/2019 | 12005 Regency Village Dr., Orlando, FL | Yes |
| FTC | 47 | 3/5/2019 | 425 S. College Avenue, Fort Collins, CO | Yes |
| NNP | 57 | 4/16/2019 | 6420-6434 North Naples Blvd., North Naples, FL | No |
| OMB | 64 | 5/7/2019 | 101 East Granada Blvd., Ormond Beach, FL | Yes |
| OKL | 55 | 5/21/2019 | 8396 Merchants Way, Jacksonville, FL | No |
| COL | 52 | 6/18/2019 | 3230 E. Colonial Dr., Orlando, FL | Yes |
| ODC | 74 | 10/13/2019 | 6375 Emperor Drive, Orlando, FL | Yes |

| BSP | 39 | Na | 13583 Tamiami Trail North, Naples, FL | No[4] |
|-----|----|----|----------------------------------------|-------|
| PSL | 40 | Na | 1763 NW St. Lucie West Blvd., Port St. Lucie, FL | No |
| BOC | 51 | Na | 499 NE Spanish River Blvd., Boca Raton, FL | No |
| FTM | 53 | Na | 13300 S. Cleveland Ave, Ft Myers, FL | Yes |
| LKM | 54 | Na | 211 Wheelhouse Ln., Lake Mary, FL | Yes |
| PTC | 56 | Na | 19400 Cochran Blvd., Suite 160, Port Charlotte, FL | No |
| DNB | 58 | Na | 181 S Bryan Rd., Dania Beach, FL | No |
| CCR | 59 | Na | 2605 Santa Barbara Blvd., Cape Coral, FL | No |
| APK | 61 | Na | 2283 E. Semoran Blvd., Apopka, FL | No |
| CLW | 62 | Na | 2170 Gulf to Bay Blvd., Clearwater, FL | No |
| VEN | 63 | Na | 1687 US-41 Bypass S., Venice, FL | Yes |
| KEN | 68 | Na | 12690 SW 88th St., Miami (Kendall), FL | No |
| RVW | 70 | Na | 9802 S. US 301, Riverview, FL | No |
| BDN | 66 | Na | 1602 W Brandon Blvd., Brandon, FL | No |
| WBR | 60 | Na | Glades Rd & US Hwy 441, Boca Raton, FL | No |
| BTN | 69 | Na | 7415 Manatee Ave W., Bradenton, FL | No |

### c.    Prepetition New Market Tax Credits Loan

To complete certain leasehold improvements and purchase and install certain trade fixtures, equipment and other personal property in two of its leased Stores located in Florida, LMOC (the "**Borrower Under NMTC Loan**") entered into a new markets tax credit ("**NMTC**") loan agreement for a total original principal amount of $5,940,000.00 as set forth in detail below.

On June 12, 2018, Borrower Under NMTC Loan and BBIF Subsidiary CDE 3, LLC (the "**Prepetition NMTC Lender**" and, together with the Prepetition Secured Lender, the "**Prepetition Lenders**") entered into that certain Loan Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition NMTC Loan Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition NMTC Loan Documents**" and, together with the Prepetition Secured Loan Documents, the "**Prepetition Loan Documents**"), which evidence the original principal amounts of $4,428,000.00 (the "**A Loan**") and $1,512,000.00 (the "**B Loan**," together with the A Loan, the "**Prepetition NMTC Loan**"). The A Loan is evidenced by that certain QLICI Loan A Note dated June 12, 2018 made by Borrower Under NMTC Loan in favor of the Prepetition NMTC Lender in the original principal amount of the A Loan (the "**A Tax Note**"). The B Loan is evidenced by that certain QLICI Loan B Note dated June 12, 2018 made by Borrower Under NMTC Loan in favor of the Prepetition NMTC Lender in the original principal amount of the B Loan (the "**B Tax Note**," together with the A Tax Note, the "**NMTC Notes**"). The Prepetition NMTC Loan has a final maturity date of the earlier of December 31, 2047 or the date on which the unpaid principal balance of the NMTC Notes becomes due and payable pursuant to the Prepetition NMTC Loan Documents. The Prepetition NMTC Loan is serviced by The Valued Advisor Fund, LLC.

---

[4] As set forth in more detail herein, the Debtors have commenced litigation against Winn-Dixie related to this property.

The Prepetition NMTC Loan is guaranteed by Kroger pursuant to that certain Payment and Completion Guaranty dated June 12, 2018 (the "**NMTC Guaranty**"), whereby Kroger agreed to guaranty Borrower Under NMTC Loan's obligations under the Prepetition NMTC Loan Documents.

        d.       <u>EB-5 Investor Financing</u>

Beginning in 2013, certain of the Debtors, including Lucky's Farmers Market, LP and Lucky's Market 2, LP (the "**EB-5 Debtors**"), began offering limited partner interests to a limited number of potential non-U.S. person investors under the Employment Based Immigration Preference program, known as the "EB-5 Immigrant Investor Program." This program offered immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job-creating initiatives in economically challenged localities in the United States. As of the Petition Date, the EB-5 Debtors had made two (2) separate EB-5 private offerings, and in connection therewith, received limited partner investments totaling approximately $16 million and made certain intercompany loans to primarily fund the Debtors' growth strategy through store expansions, as set forth more fully under Article III below.

The general partners of the EB-5 Debtors, Lucky's Farmers Market LP and Lucky's Market 2, LP, are LFM Stores, LLC and Lucky's Market GP 2, LLC, respectively. Pursuant to the Plan, the EB-5 Investors are separately classified from Equity Holders. Equity Holders will have their Interests extinguished pursuant to the Plan. EB-5 Investors will receive the benefit of leaving their EB-5 Investors' Interests intact and the EB-5 Debtors will have their particular Interests transferred to a special purpose entity, the EB-5 SPE, which will be formed to replace these general partners. The EB-5 SPE shall be directly owned by a third party agent (nominated by the EB-5 Investors) or the EB-5 Investors. This structure is necessary to protect the EB-investors and ensure that they receive the intended benefits of the EB-5 Immigrant Investor Program and their investments. In particular, the EB-5 Investors are obligated to sustain their investments in these entities for a set period of time. Therefore, the EB-5 Debtors must remain active entities to permit the EB-5 Investors to satisfy this requirement. Also, pursuant to the Plan, the EB-5 SPE will be managed by an individual with the appropriate and necessary qualifications and will not assume any of the responsibilities or liabilities of the EB-5 Debtors or their general partners. In consideration of such treatment, the EB-5 Investors will consent to the Releases and waive any claims against the Debtors.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 CASES

A.    *The Debtors' Strategic Growth and Operational Challenges*

Beginning in 2015, the Debtors developed and sought to execute on a strategic growth plan, which included accelerated growth in new and existing markets, with a focus on developing stores in Florida. As of April 2016, the Debtors were operating seventeen (17) Stores in eleven (11) states. In April 2016, Kroger acquired a majority membership interest in Lucky's Market Parent Company, LLC, and, thereafter, the Debtors expanded by increasing the number of its Stores and locations in which it conducted business. The Debtors expanded to twenty-three (23) Stores by the

end of fiscal 2016, twenty-seven (27) Stores by the end of fiscal 2017, thirty-three (33) Stores by the end of fiscal 2018, and thirty-nine (39) Stores by the end of fiscal 2019.

The Debtors' strategic growth plan required, among other things, significant upfront investment. To finance the strategic growth plan and operating losses, certain of the Debtors borrowed funds and entered into the capital structure described above to pursue the strategic plan using the lowest possible costs of capital available to the Debtors. As a result of the expansion, between fiscal year end 2016 and 2017, the Debtors' sales revenue grew. However, the Debtors' expansion in Florida coincided with, among other things, increased competition in the grocery industry, including expansions from competing chains such as Sprouts Farmers Market, Fresh Thyme Farmers Market, Earth Fare, The Fresh Market, and expanded natural and organic product offerings from more "conventional" supermarket chains such as Publix. Notwithstanding the Debtors' growth in sales, their portfolio of Stores was unable to achieve sustainable four-wall profitability.

Most recently, fiscal year-to-date through January 4, 2020, the Debtors experienced approximately $22 million in operating losses and a net loss of approximately $100 million. Additionally, through the week ended January 18, 2020, the Debtors had a 10.6% reduction in comparable Store sales versus the prior year-to-date period. Based on performance of the Debtors' business, the Debtors' management determined that it would require approximately $100 million in incremental funding to continue operations until the Debtors would be cash flow positive. Management determined that it would be unable to secure new sources of sufficient funding outside of these Chapter 11 Cases.

B.    *The Debtors Begin to Market Assets and Consider Restructuring Options*

In July 2019, the Debtors engaged PJ Solomon, as their investment banker, to conduct a prepetition marketing process for substantially all of the Debtors' assets. Additionally, the Debtors retained A&M and Polsinelli on or about December 27, 2019 and September 4, 2019, respectively, to assist in evaluating all available restructuring options. The Debtors subsequently retained Great American Group ("**Great American**") to assist with the liquidation of certain assets located in certain of the Stores. Specifically, Great American successfully liquidated all furniture, fixtures, and equipment at twenty-one (21) stores. In addition, the Debtors ran a going out of business process to liquidate its existing inventory at thirty-three (33) of the Stores, leaving six (6) operating Stores to be sold through a separate process.

As a result of the prepetition marketing process, the Debtors, in consultation with their advisors, identified several potential purchasers with respect to the Debtors' assets, including primarily Store leases. Prior to the Petition Date, Debtors entered into a stalking horse agreement with Aldi, Inc. ("**Aldi**") for the purchase and sale of certain Store leases and associated assets, and began to negotiate and finalize terms of sales under additional stalking horse agreements between the Debtors and Carlos Alvarez ("**Alvarez**"), Publix Super Markets, Inc. ("**Publix**"), Seabra Foods XIV, Inc. ("**Seabra**"), Winn-Dixie Stores, Inc. ("**Winn-Dixie**"), and LM Acquisition Co. LLC ("**LMAC**").

Finally, prior to the Petition Date, the Debtors engaged in negotiations with the Prepetition Secured Lender to secure the consensual use of cash collateral necessary for the Debtors to

maximize the value of the Debtors' Estates, to complete the liquidation of certain of the Stores, to consummate the aforementioned sales, continue to operate the six (6) open Stores, and to fund the administration of these Chapter 11 Cases through Confirmation of a liquidating chapter 11 plan that benefits all stakeholders in accordance with the priorities established by the Bankruptcy Code. Accordingly, the Debtors completed negotiations with the Prepetition Secured Lender and commenced the Chapter 11 Cases to conduct further marketing and to sell substantially all of their assets pursuant to Bankruptcy Code section 363. During the pendency of the Chapter 11 Cases, the Prepetition Secured Lender allowed material amounts of its collateral to be used to fund the Chapter 11 Cases, provide for a consensual liquidating plan, which will allow for a distribution to stakeholders.

**ARTICLE IV.**
**EVENTS DURING THE CHAPTER 11 CASES**

On the Petition Date, twenty-two (22) of the Debtors filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On March 3, 2020, Lucky's Farmers Market of Ellisville, LLC and Lucky's Farmers Market of Lexington, KY, LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to manage their properties as debtors in possession in accordance with Bankruptcy Code sections 1107 and 1108.

The filing of the Debtors' bankruptcy petitions triggered the immediate imposition of the automatic stay under Bankruptcy Code section 362, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors, and both the commencement and the continuation of any prepetition litigation against the Debtors.

A.    *First Day Pleadings and Other Case Matters*

1.    First Day Pleadings

On January 27, 2020, the Debtors filed certain "first day" motions (the "**First Day Motions**") seeking various relief to facilitate the efficient administration of the Chapter 11 Cases. The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) appoint Omni as Claims and Noticing Agent; (c) pay employee wages; (d) maintain the Debtors' cash management system; (e) pay taxes; (f) pay insurance obligations; (g) maintain utilities; (h) continue customer programs; (i) pay valid, pre-petition PACA/PASA Claims; (j) implement Store closing procedures; and (k) use cash collateral. In support of the First Day Motions, the Debtors relied upon the First Day Declaration. On January 28, 2020, the Bankruptcy Court held a hearing and granted substantially all of the relief sought in the First Day Motions. *See* Docket Nos. 38, 39, 40, 41, 42, 43, 44, 45, 46, 50, and 51.

The First Day Motions and the resulting First Day Orders, including the Interim Cash Collateral Order [Docket No. 50], are available for review on the Debtors' website maintained by Omni at https://cases.omniagentsolutions.com/luckysmarket.

2.      "Second Day" Pleadings

The Bankruptcy Court held a hearing on February 26, 2020 and entered final orders authorizing the Debtors to: (a) pay employee wages; (b) maintain the Debtors' cash management system; (c) pay taxes; (d) pay insurance obligations; (e) continue customer programs; and (f) pay valid, and pre-petition PACA/PASA Claims. *See* Docket Nos. 268, 267, 262, 261, 260, and 273. That same day, on February 26, 2020, the Bankruptcy Court entered orders: (a) establishing procedures for interim compensation and reimbursement of expenses of professionals; (b) extending the time for filing schedules of assets and liabilities and statement of financial affairs; (c) extending the deadline to assume or reject executory contracts and unexpired leases of nonresidential real property; (d) authorizing the retention and payment of certain professionals utilized by the Debtors in the ordinary course of business; (e) authorizing the rejection of certain executory contracts; (f) authorizing the Debtors' retention and employment of Polsinelli; (g) authorizing the Debtors' retention and employment of A&M; and (h) authorizing the retention and employment of PJ Solomon. *See* Docket Nos. 259, 263, 264, 265, 270, 277, 278, and 279.

On February 27, 2020, the Bankruptcy Court entered the Second Interim Cash Collateral Order. *See* Docket No. 297. This order was extended on April 17, 2020 when the Bankruptcy Court entered the Third Interim Cash Collateral Order. *See* Docket No. 622.

On March 3, 2020, the Bankruptcy Court entered the Store Closing Procedures Final Order, authorizing store closing sale procedures, and a final order prohibiting utility providers from altering refusing, or discontinuing service and approving the Debtors' proposed adequate assurance of payment for postpetition utility services. *See* Docket Nos. 321 and 322.

On March 9, 2020, the Debtors filed a Motion for Joint Administration, which sought the joint administration of Lucky's Farmers Market of Ellisville, LLC and Lucky's Farmers Market of Lexington, KY, LLC, whose voluntary petitions for relief under chapter 11 of the Bankruptcy Code were filed on March 3, 2020. *See* Docket No. 370. The Court granted this motion and entered an Order Directing the Joint Administration on March 10, 2020. *See* Docket No. 386.

3.      The Debtors' Retention of Professionals

The Bankruptcy Court authorized the Debtors to employ the following professional advisors during the Chapter 11 Cases: (a) Polsinelli as counsel [Docket No. 277]; (b) PJ Solomon as investment banker [Docket No. 279]; (c) A&M as financial advisor [Docket No. 278]; (d) Omni as Claims and Noticing Agent and Administrative Agent [Docket Nos. 39 and 616]; and (e) CBRE as real estate advisor [Docket No. 612].

4.      Appointment of the Committee and the Committee's Retention of Professionals

On February 4, 2020, the U.S. Trustee officially appointed the Committee [Docket No. 94]. The Committee is made up of the following parties: (a) United Natural Foods, Inc.; (b) Harvest Meat Company, Inc.; and (c) Benderson Development Company, LLC.

On March 11, 2020, the Bankruptcy Court entered orders authorizing the Committee to employ certain professionals including: (a) Hahn & Hessen LLP as lead counsel [Docket No. 399]; (b) Womble Bond Dickinson (US) LLP as co-counsel [Docket No. 400]; Norton Rose Fulbright

US LLP as special litigation counsel [Docket No. 398]; and Province, Inc. as financial advisor [Docket No. 397].

B.    *Claims Bar Dates*

On March 9, 2020, the Debtors filed their Bar Date Motion [Docket No. 368], and on March 25, 2020, the Bankruptcy Court entered the Bar Date Order [Docket No. 507]. Pursuant to the Bar Date Order, all creditors holding or wishing to assert an unsecured or secured, priority, or nonpriority claim (as defined in Bankruptcy Code section 101(5)) against the Debtors or the Debtors' Estates, arising or accruing prior to the Petition Date, including claims for the value of goods sold to any Debtor within twenty (20) days before the Petition Date arising under Bankruptcy Code section 503(b)(9), were required to file a separate, completed, and executed Proof of Claim form on account of each such claim, together with accompanying documentation, by the General Bar Date, which was **April 24, 2020 at 4:00 p.m. (prevailing Eastern Time)**.

Pursuant to the Bar Date Order, governmental units (as defined by Bankruptcy Code section 101(27)) holding or wishing to assert claims against the Debtors or the Debtors' estates, arising or accruing prior to the Petition Date, are required to file a separate, completed, and executed Proof of Claim form on account of such claim, together with accompanying documentation, by the Governmental Bar Date, which is **July 27, 2020 at 4:00 p.m. (prevailing Eastern Time)**.

C.    *Schedules and Statements*

On March 4, 2020, the Debtors filed their Schedules and Statements of Financial Affairs (the "**Statements**" and together with the Schedules, the "**Schedules and Statements**"). *See* Docket Nos. 328-51. On March 11, 2020, the Debtors filed certain amended Schedules and Statements. *See* Docket Nos. 402-03. These documents contain basic information including, among other things, schedules of creditors holding unsecured priority and non-priority claims against the Debtors. Copies of the Schedules and Statements are available on the Debtors' website maintained by Omni for the Chapter 11 Cases at https://cases.omniagentsolutions.com/luckysmarket.

D.    *Objections to Claims*

Between June 22, 2020 and October 14, 2020, the Bankruptcy Court entered seven (7) orders granting the Debtors' substantive and non-substantive omnibus objections to certain claims filed against the Debtors' Estates. *See* Docket Nos. 815, 816, 894, 895, 969, 970, 1118.  On October 23, 2020, the Debtors filed two additional omnibus objections, substantive and non-substantive. *See* Docket Nos. 1140 and 1141.

E.    *Sales of the Debtors' Assets*

Prior to and since the commencement of the Chapter 11 Cases, the Debtors have been engaged in a marketing process to monetize substantially all of their assets. Through their professionals, including PJ Solomon, Great American, and CBRE, the Debtors' marketing efforts

resulted in an increase of the value of their Estates by at least $50,383,272. These sales, to date, have been successful and are summarized more fully described below.[5]

| Docket No. and Order Entry Date | Purchaser | Purchase Price, subject to adjustments | Purchased Assets |
|---|---|---|---|
| Dkt. No. 569 April 3, 2020 | Dave's Supermarket, Inc. | $1,720,000.00 | Leased Stores located at 2770 North High Street, Columbus, Ohio and 11620 Clifton Boulevard, Cleveland, Ohio |
| Dkt. No. 574 April 7, 2020 | Schnuck Markets, Inc. | $860,000.00 | Leased Store located at 111 South Providence Road, Columbia, Missouri |
| Dkt. No. 589 April 9, 2020 | Oryana Food Cooperative, Inc. | $860,000.00 | Leased Store located at 3587 Marketplace Circle, Traverse City, Michigan |
| Dkt. No. 590 April 9, 2020 | LM Acquisition Co. LLC | $1,010,000.00 | Leased Stores located at 3960 Broadway #104, 3980 Broadway #106, 3990 Broadway, Boulder, Colorado; and 425 South College Avenue, Fort Collins, Colorado |
| Dkt. No. 618 April 15, 2020 | Seabra Foods XIV, Inc. | $1,250,000.00 | Leased Store located at 4169 Town Center Boulevard, Orlando, Florida |
| Dkt. No. 619 April 15, 2020 | Dollar General Corporation | $1,000,000.00 | Leased distribution center located at 6375 Emperor Drive, Orlando, Florida |
| Dkt. No. 629 April 20, 2020 | Winn-Dixie Stores, Inc. | $2,400,000.00 | Leased Stores located at 1459 NW 23rd Avenue, Gainesville, Florida; 3170 W. New Haven Avenue, West Melbourne, Florida; 13300 S. Cleveland Avenue, Suite 44, Fort Myers, Florida; and 211 Wheel House Lane, Lake Mary, Florida |
| Dkt. No. 659 April 27, 2020 | Publix Super Markets, Inc. | $9,186,666.64 | Leased Stores located at 3815 Tamiami Trail East, Naples, Florida; 580 Atlantic Boulevard, Neptune Beach, Florida;[6] 3171 South Orange Avenue, Orlando, Florida; and 101 E. Granada Boulevard, Ormond Beach, Florida |

---

[5] As of the date hereof, certain sales transactions have not closed. Although the Debtors anticipate that such transactions will increase the value of their Estates by at least $2,735,667, there is risk that they may not close and such proceeds will not be realized by the Debtors.

[6] As of the date hereof, the sale of the Store located at 580 Atlantic Boulevard, Neptune Beach, Florida, for a purchase price of $2,296,666.66, has not yet closed.

73279734.28

| Dkt. No. 673 April 30, 2020 | ALDI, Inc. | $7,400,000.00 | Leased Stores located at 9184 Wiles Road, Coral Springs, Florida; 1687 US-41 Bypass South, Venice, Florida; 11601 Regency Village Drive, Orlando, Florida; 3501 S. Tamiami Trail, Sarasota, Florida; and the Owned Store located at 1033 East Oakland Park Boulevard, Fort Lauderdale, Florida. |
|---|---|---|---|
| Dkt. No. 702 May 11, 2020 | Carlos Alvarez | $275,000.00 | Leased Store located at 6765 22nd Avenue North, St. Petersburg, Florida |
| Dkt. Nos. 706 and 715 May 11, 2020 | Publix Super Markets, Inc. | $2,296,666.66 | Leased Store located at 1718 E. Highway 50, Clermont, Florida |
| Dkt. No. 930 Aug. 12, 2020 | Bo Sharon | $30,000.00 | Motor Vehicle |
| TBD | Winn-Dixie Stores, Inc. | $400,000.00 | Leased Store located at 13583 Tamiami Trail N., Naples, Florida[7] |
| Dkt. No. 755 May 22, 2020 | ALDI, Inc. | $400,000.00 | Leased Store located at 3230 E. Colonial Drive, Orlando, Florida |
| Dkt. No. 951 Aug. 18, 2020 | M.B.D. Properties, LLC | $3,700,000.00 | Owned Store located at 2329 Martin Luther King Jr. Boulevard, Panama City, Florida |
| TBD | ALDI (Florida) LLC | $0.00[8] | Leased Store 2150 Gulf to Bay Boulevard, Clearwater, Florida[9] |
| TBD | Nori of Ann Arbor, LLC | $39,000.00 | Class C and SDM license and all other permits registered to Business ID #238760 |

1.    Store Closing and FF&E Sales

As stated above, the Debtors conducted "going out of business," "store closing," "everything must go," or similarly themed sales or dispositions of the Debtors' assets and inventory at thirty-three (33) Stores. Additionally, the Debtors and Great American sold certain of the Debtors' FF&E at twenty-one (21) Stores. In total, the Debtors' increased the value of their Estates through these sales by approximately $23,113,272.

---

[7] As of the date hereof, the sale of the Gateway Shoppes Assets, for a purchase price of $400,000, has not yet closed and is subject to litigation brought by the Debtors against Winn-Dixie.

[8] While no monetary consideration is contemplated, the Aldi (Florida) LLC sale will relieve the Debtors' Estates of significant rejection damage claims and potential subrogation claims by Kroger.

[9] As of the date hereof, entry of the order authorizing the sale of the Store located at 2150 Gulf to Bay Boulevard, Clearwater, Florida has not yet occurred. Objections to the motion seeking approval of this sale are pending. *See* Docket Nos. 1007, 1009, and 1021.

2.      Stalking Horse Agreement Sales

        a.      Asset Purchase Agreements

The Debtors, through PJ Solomon and the Debtors' other professionals, undertook extensive marketing efforts to identify potential purchasers of the Debtors' owned real property, certain other personal property, and designation rights to the Debtors' leased property. Through this comprehensive prepetition marketing process, the Debtors and their professionals identified a number of potential purchasers for various assets, consisting primarily of Store leases. Ultimately, the prepetition marketing process produced six (6) stalking horse agreements with respect to six (6) different asset packages under the stalking horse agreements with Aldi, Alvarez, LMAC, Publix, Seabra, and Winn-Dixie. Subsequent to the Petition Date, the Debtors, through PJ Solomon, continued to engage in marketing efforts with respect to these assets and as to the Debtors' remaining assets that were not subject to the six (6) stalking horse agreements. The key provisions set forth under the six (6) stalking horse agreements are as follows:

- The Debtors agreed to sell certain of the Debtors' assets related to five (5) of the Debtors' leased Stores and one owned Store located at 1033 East Oakland Park Boulevard, Oakland, Florida (the "**Oakland Park Assets**") to Aldi for the purchase price of $7,800,000, subject to adjustments for prorations;

- The Debtors agreed to sell certain of the Debtors' assets related to one (1) of the Debtors' leased Stores to Alvarez for the purchase price of $275,000, subject to adjustments for prorations;

- The Debtors agreed to sell certain of the Debtors' assets related to the following six (6) operating Stores to LMAC for the purchase price of $3,171,000, subject to adjustments for prorations:

  o  the Store located at 3587 Marketplace Circle, Traverse City, Michigan (the "**Traverse City Assets**");

  o  the Store located at 111 South Providence Road, Columbia, Missouri (the "**Columbia Assets**");

  o  the Store located at 2770 North High Street, Columbus, Ohio (the "**Columbus Assets**");

  o  the Store located at 11620 Clifton Boulevard, Cleveland, Ohio (the "**Cleveland Assets**");

  o  the Store located at 425 South College Avenue, Fort Collins, Colorado (the "**Fort Collins Assets**"); and

  o  the Store located at 3960 Broadway #104, 3980 Broadway #106, and 3990 Broadway, Boulder, Colorado (the "**Boulder Assets**");

- The Debtors agreed to sell certain of the Debtors' assets related to five (5) of the Debtors' leased Stores, all of which are located in Florida, to Publix for the purchase price of $11,483,333.30, subject to adjustments for prorations;

- The Debtors agreed to sell certain of the Debtors' assets related to one (1) of the Debtors' leased Stores to Seabra for the purchase price of $1,250,000, subject to adjustments for prorations; and

- The Debtors agreed to sell certain of the Debtors' assets related to five (5) of the Debtors' leased Stores, including the Debtors' Gateway Shoppes Store, located at 13583 Tamiami Trail N., Naples, Florida (the "**Gateway Shoppes Assets**"), to Winn-Dixie for the purchase price of $2,800,000, subject to adjustments for prorations.

Between January 30, 2020 and February 13, 2020, the Debtors filed seven (7) motions requesting orders of the Court to, among other things, approve the bid procedures and schedule an auction and sale hearing with respect to the six (6) foregoing stalking horse agreements and the Debtors' remaining assets that were not subject to a stalking horse agreement, including, without limitation, the Debtors' distribution center, certain of the Debtors' leases, and certain furniture, fixtures and equipment (the "**Global Assets**"). *See* Docket No. 63 (the "**Publix Sale Motion**"); Docket No. 71 (the "**Aldi Sale Motion**"); Docket No. 73 (the "**LMAC Sale Motion**"); Docket No. 72 (the "**Seabra Sale Motion**"); Docket No. 97 (the "**Winn-Dixie Sale Motion**"); Docket No. 98 (the "**Alvarez Sale Motion**," together with the Publix Sale Motion, the Aldi Sale Motion, the LMAC Sale Motion, the Seabra Sale Motion, and the Winn-Dixie Sale Motion, the "**Stalking Horse Sale Motions**"); and Docket No. 186 (the "**Global Sale Motion**," together with the Stalking Horse Sale Motions, the "**Sale Motions**").

On February 26, 2020, the Court entered orders approving the Sale Motions (the "**Bid Procedures Orders**" and each a "**Bid Procedures Order**"). *See* Docket Nos. 282-288. Among other things, the Bid Procedures Orders established the following dates and deadlines: (a) March 23, 2020 at 4:00 p.m. (prevailing Eastern Time) as the deadline to submit bids (the "**Bid Deadline**"); (b) March 26, 2020 at 10:00 a.m. (prevailing Eastern Time) as the auction date; and (c) March 30, 2020 at 1:00 p.m. (prevailing Eastern Time) for the hearing on the sales of the Debtors' assets (the "**Sale Hearing**").

Pursuant to applicable Bid Procedures Orders, with respect to certain of the Debtors' assets, an auction was conducted virtually via Zoom on March 26, 2020. Thereafter, on March 30, 2020, the Bankruptcy Court conducted the Sale Hearing. Between April 3, 2020 and May 22, 2020, the Bankruptcy Court entered twelve (12) orders approving sales of the Debtors' assets.[10] *See* Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, and 755. By May 22, 2020 all but one of the court approved sales were consummated, resulting in the increase of value to the Debtors' Estates in the amount of approximately $26,361,666.64. These sales represent the culmination of an extensive prepetition and post-petition marketing process by the Debtors that involved outreach to more than 250 parties over a period of more than eight (8) months. Among

---

[10] Note, the Gateway Shoppes Assets are not included in this tally, as the sale of the Gateway Shoppes Assets, for a purchase price of $400,000, has not yet closed and is subject to litigation brought by the Debtors against Winn-Dixie.

those contacted, the Debtors entered into non-disclosure agreements with sixty-four (64) parties, granted access to the data room to forty-three (43) parties, and received fifteen (15) indications of interest.

(i)   <u><em>No Auction Conducted</em></u>

Because qualified, competing bids were not received for all of the Debtors' assets that were subject to stalking horse agreements, an auction was not conducted for all of the Debtors' assets. Prior to the Bid Deadline, Publix, Seabra, Alvarez, and Winn-Dixie submitted qualified bids for, and were designated as the stalking horse purchasers of, the assets subject to those stalking horse agreements between the Debtors and Publix, Seabra, Alvarez, and Winn-Dixie, respectively. The Debtors received a competing bid only with respect to certain of the assets subject to the stalking horse agreement with Winn-Dixie. As a result, these assets - the Gateway Shoppes Assets - were excluded from the assets to be sold to Winn-Dixie pursuant to that stalking horse agreement. Apart from the Gateway Shoppes Assets, the Debtors received no other competing bids relating to the assets subject to these stalking horse agreements. Accordingly, as to these assets, no auction was conducted and Publix, Seabra, Alvarez, and Winn-Dixie were designated as the successful bidders as identified in the successful bidder notices that the Debtors Filed on March 27, 2020. *See* Docket Nos. 516-519.

Additionally, Washington Prime Group ("**WPG**") submitted a qualified bid, in the form of an agreement terminating an unexpired nonresidential real property lease, for certain of the Debtors' Global Assets (the "**Missoula Assets**"). Because the Debtor received no competing bid with respect to the Missoula Assets, no auction was conducted and WPG was deemed to be the successful bidder as identified in the Certification of Counsel regarding Order Authorizing Debtors to Terminate Unexpired Lease of Non-residential Real Property (Missoula, MT Store Lease) Filed on April 3, 2020. *See* Docket No. 567.

Between April 15, 2020 and May 11, 2020, the Bankruptcy Court entered the Sale Order Seabra Assets, Sale Order Winn-Dixie Assets, Sale Order Publix Assets, and Sale Order Carlos Alvarez Assets. *See* Docket Nos. 618, 629, 659, 702, 706, and 715. Between April 22, 2020 and May 29, 2020, the Close of Seabra Sale, the Close of Carlos Alvarez Sale, the Close of Winn-Dixie Sale, and the partial Close of Publix Sale occurred.

Pursuant to the Sale Order Seabra Assets, entered on April 15, 2020, and the APA Seabra Assets, the Debtors sold the Acquired Seabra Assets and assigned that certain Store lease to Purchaser of Seabra Assets for a purchase price of $1,250,000.00, subject to adjustments for prorations as set forth under the APA Seabra Assets.

Pursuant to the Sale Order Winn-Dixie Assets, entered on April 20, 2020, and the APA Winn-Dixie Assets, the Debtors sold the Acquired Winn-Dixie Assets and assigned certain Store leases to Purchaser of Winn-Dixie Assets for a purchase price of $2,400,000,[11] subject to adjustments for prorations as set forth under the APA Winn-Dixie Assets.

---

[11] Purchase price excludes the Gateway Shoppes Assets for a purchase price of $400,000, which has not yet closed and is subject to litigation brought by the Debtors against Winn-Dixie..

73279734.28

Pursuant to the Sale Order Publix Assets, entered on April 27, 2020 and May 11, 2020, respectively, and the APA Publix Assets, the Debtors sold the Acquired Publix Assets and assigned certain Store leases to Purchaser of Publix Assets for a purchase price of $9,186,666.64,[12] subject to adjustments for prorations as set forth under the APA Publix Assets.

Pursuant to the Sale Order Carlos Alvarez Assets, entered on May 11, 2020, and the APA Carlos Alvarez Assets, the Debtors sold the Acquired Carlos Alvarez Assets and assigned that certain Store lease to Purchaser of Carlos Alvarez Assets for a purchase price of $275,000, subject to adjustments for prorations as set forth under the APA Carlos Alvarez Assets.

(ii)     *Auctions Conducted*

Aldi and LMAC submitted qualified bids for, and were designated as the stalking horse purchasers of, the assets subject to stalking horse agreements between the Debtors and Aldi and LMAC, respectively. The Debtors received competing bids with respect to certain of the assets subject to these stalking horse agreements. Thus, with respect to both, an Auction was conducted virtually via Zoom on March 26, 2020 (the "**Auction**"). At the commencement of the Auction, the Debtors provided rules and procedures that would govern the Auction in accordance with the applicable Bid Procedures Orders. Counsel and other representatives for the Debtors, the Committee, the Prepetition Secured Lender, the stalking horse purchasers, the qualified bidders and other parties in interest were present at the Auction. Throughout the Auction, in accordance with the applicable Bid Procedures Orders, the Debtors and their advisors consulted with the Committee and the Prepetition Secured Lender (collectively, the "**Consultation Parties**").

**Aldi Auction**

Pursuant to the Bid Procedures Aldi Order, Aldi submitted a qualified bid and was selected as the stalking horse purchaser for the assets subject to the stalking horse agreement between the Debtors and Aldi (the "**Aldi Assets**"). However, the Debtors received a qualified, competing bid from Juan Diaz for the Oakland Park Assets, a subset of the Aldi Assets, for a purchase price of $5,150,000.

To ensure a fair Auction and to maximize value for the Debtors' Estates, the Debtors, after consultation with the Consultation Parties, determined that they would conduct simultaneous bidding for the Oakland Park Assets as a standalone package and for the Aldi Assets as a collective package. After allowing for overbids on each package, the Debtors would determine the highest and best bid. At the beginning of the Auction, the Debtors announced that Aldi's bid would serve as the starting bid for the Aldi Assets, as a collective package, and Juan Diaz's bid would serve as the starting bid for the Oakland Park Assets. No overbids were submitted for either package. After consulting with the Consultation Parties, the Debtors determined that Aldi's bid to purchase all of the Aldi Assets for a purchase price of $7,800,000 was the successful bid and, thus, Aldi was the successful bidder. Juan Diaz was selected as the backup bidder for the Oakland Park Assets for a purchase price of $5,150,000. The Debtors then concluded the Auction for the Aldi Assets.

---

[12] Purchase price excludes Neptune Beach Assets, which have been approved for sale, but remain pending close while certain city zoning approvals are obtained.

Thereafter, the Debtors determined that Aldi's bid was the highest and best offer for the Aldi Assets and that Aldi should be designated as the successful bidder with respect to the Aldi Assets.

On April 30, 2020 and May 22, 2020, respectively, the Bankruptcy Court entered the Sale Order Aldi Assets. *See* Docket Nos. 673 and 755. On April 30, 2020 and May 22, 2020, the Close of Aldi Sale occurred. Pursuant to the Sale Order Aldi Assets, entered on April 30, 2020, and the APA Aldi Assets, the Debtors sold the Acquired Aldi Assets and assigned certain Store leases to Purchaser of Aldi Assets for a purchase price of $7,400,000, subject to adjustments and prorations as set forth under the APA Aldi Assets. Pursuant to the Sale Order Aldi Assets, entered on May 22, 2020, and the APA Aldi Assets, the Debtors sold the remaining Acquired Aldi Assets and assigned a certain Store lease to Purchaser of Aldi Assets for a purchase price of $400,000, subject to adjustments for prorations as set forth under the APA Aldi Assets.

Pursuant to the Sale Order Aldi Assets, the Final Cash Collateral Order, and other Final Orders of the Bankruptcy Court, Aldi, as Purchaser of Aldi Assets, as set forth above, made payments in satisfaction of certain Claims on or subsequent to the Closing Date.

### LMAC Auction

Pursuant to the Bid Procedures LM Acquisition Order, LMAC submitted a qualified bid and was selected as the stalking horse purchaser for the assets subject to the stalking horse agreement between the Debtors and LMAC (the "**LMAC Assets**").[13] However, the Debtors received four (4) qualified bids from four (4) different potential purchasers for non-overlapping subsets of the LMAC Assets as follows:

- Oryana Food Cooperative, Inc. ("**Oryana**") submitted a qualified bid for the Traverse City Assets for a purchase price of $860,000;

- Schnuck Markets, Inc. ("**Schnuck**") submitted a qualified bid for the Columbia Assets for a purchase price of $860,000;

- Dave's Supermarket, Inc. ("**Dave's Supermarket**") submitted a qualified bid for the Columbus Assets and the Cleveland Assets for a combined purchase price of $1,720,000; and

- Alfalfas, Inc. ("**Alfalfas**") submitted a qualified bid for the Fort Collins Assets for a purchase price of $560,000.

---

[13] LMAC is an affiliate or insider of the Debtors by way of certain officers and directors of the Debtors being part of LMAC; however, LMAC and the Debtors do not have the same directors, stockholders, members, or other equity holders. To ensure the Debtors achieved the best terms possible, without collusion and with respect to the sale of the Debtors' assets subject to the LMAC stalking horse agreement, the Debtors appointed an independent director and created a Special Committee to oversee all matters related to the sale. Neither LMAC nor its principals took part in the decision-making process through which the Debtors decided to enter into the stalking horse agreement with LMAC or made the determination that LMAC's bid at the Auction constituted the highest and best purchase price for the Boulder Assets and the Fort Collins Assets.

Collectively, Oryana, Schnuck, Dave's Supermarket, and Alfalfas shall be referred to herein as the "**Regional Grocers**."

To ensure a fair Auction and compliance with the applicable Bid Procedures Order and to maximize value for the Debtors' Estates, the Debtors, after consultation with the Consultation Parties, determined that they would allow bidding on any and all combinations of the LMAC Assets, including the LMAC Assets as a package, all of the LMAC Assets subject to a Regional Grocer bid as a package, each store in the LMAC Assets as a separate package, and any other combination of the LMAC Assets proposed by a qualified bidder.

The Regional Grocers objected to certain of the rules, including the allowance of bids for each Store individually and for different combinations of the LMAC Assets as discussed above. In an effort to resolve the Regional Grocers' objections, the Debtors, after consultation with the Consultation Parties, instituted additional procedures for the LMAC Assets. Specifically, the Debtors would conduct rounds of bidding on each combination of the LMAC Assets simultaneously. After each round, the Debtors, after consultation with the Consultation Parties, would announce the highest and best bid or bids for all of the LMAC Assets. Such highest and best bid could be one bid for all of the LMAC Assets or a combination of bids for any subset of the LMAC Assets. Bidding for each combination of the LMAC Assets would then be subject to an additional round of bidding to allow for any overbids. This process would continue until no additional overbids were received.

The Debtors conducted four (4) rounds of competitive bidding for the LMAC Assets. After the fourth round of competitive bidding, the following combination of bids was deemed the highest and best bid for the LMAC Assets:

- Oryana was selected as the successful bidder for the Debtors' Traverse City Assets. The terms of Oryana's bid, pursuant to which it has agreed to purchase the Traverse City Assets for a purchase price of $860,000, are set forth in the APA Oryana Assets.

- Schnuck was selected as the successful bidder for the Debtors' Columbia Assets. The terms of Schnuck's bid, pursuant to which it has agreed to purchase the Columbia Assets for a purchase price of $860,000, are set forth in the APA Schnuck Assets.

- Dave's Supermarket was selected as the successful bidder for the Debtors' Columbus Assets and Cleveland Assets. The terms of Dave's Supermarket's bid, pursuant to which it has agreed to purchase the Columbus Assets and the Cleveland Assets for a purchase price of $1,720,000, are set forth in the APA Dave's Assets.

- LMAC was selected as the successful bidder for the Debtors' Fort Collins Assets and Boulder Assets. The terms of LMAC's bid, pursuant to which it has agreed to purchase the Fort Collins Assets and the Boulder Assets for $1,010,000, are set forth in the APA LMAC Assets.

The Debtors determined in their reasonable business judgment, after consultation with their advisors and the Consultation Parties, that the bids as described above are the successful bids for the LMAC Assets. The Debtors also determined that Alfalfas is the backup bidder for the Fort Collins Assets and that its last bid made at the Auction in the amount of $760,000, as announced on the record during the Auction, is the backup bid for the Fort Collins Assets.

Following announcement of the successful bidders for the LMAC Assets, all parties reserved their rights with respect to certain inventory issues. The Debtors then concluded the Auction. Thereafter, as stated above, the Debtors selected Oryana, Schnuck, Dave's Supermarket, and LMAC as the successful bidders as identified in the Debtors' *Notice of Successful Bidders* filed on March 27, 2020. *See* Docket No. 520.

On March 29, 2020, the Debtors filed the *Declaration of Scott Moses in Support of the Debtors' Sale Motions. See* Docket No. 534. Between April 3, 2020 and April 9, 2020, the Bankruptcy Court entered the Sale Order Dave's Assets, Sale Order Schnuck Assets, Sale Order Oryana Assets, Sale Order LMAC Assets. *See* Docket Nos. 569, 574, 589, and 590.

Pursuant to the Sale Order Dave's Assets [Docket No. 569], entered on April 3, 2020, and the APA Dave's Assets, the Debtors sold the Acquired Dave's Assets and assigned certain Store leases to Purchaser of Dave's Assets for a purchase price of $1,720,000, subject to adjustments for prorations as set forth under the APA Dave's Assets.

Pursuant to the Sale Order Schnuck Assets [Docket No. 574], entered on April 7, 2020, and the APA Schnuck Assets, the Debtors sold the Acquired Schnuck Assets and assigned certain Store leases to Purchaser of Schnuck Assets for a purchase price of $860,000, subject to adjustments for prorations as set forth under the APA Schnuck Assets.

Pursuant to the Sale Order Oryana Assets [Docket No. 589], entered on April 9, 2020, and the APA Oryana Assets, the Debtors sold the Acquired Oryana Assets and assigned certain Store leases to Purchaser of Oryana Assets for a purchase price of $860,000, subject to adjustments for prorations as set forth under the APA Oryana Assets.

Pursuant to the Sale Order LMAC Assets [Docket No. 590], entered on April 9, 2020 and the APA LMAC Assets, the Debtors sold the Acquired LMAC Assets and assigned certain Store leases to Purchaser of LMAC Assets for a purchase price of $1,010,000, subject to adjustments for prorations as set forth under the LMAC Assets.

Between April 3, 2020 and April 9, 2020, the Close of Oryana Sale, Close of Schnuck Sale, Close of Dave's Sale, and Close of LMAC Sale occurred.

Pursuant to the Sale Order Oryana Assets, the Sale Order Schnuck Assets, the Sale Order Dave's Assets, the Sale Order LMAC Assets, the Final Cash Collateral Order, and other Final Orders of the Bankruptcy Court, Oryana, Schnuck, Dave's Supermarket, and LMAC, as purchasers of the Debtors' assets, as set forth above, made payments in satisfaction of certain Claims on or subsequent to the Closing Date.

### Global Remainder Assets Auction

Prior to the Auction and after consultation with the Consultation Parties, the Debtors entered into an APA with SFM, LLC d/b/a Sprouts Farmers Market ("**Sprouts**") stipulating that Sprouts' bid in the amount of $500,000 would be the starting bid for the Debtors' Florida distribution center, located at 6375 Emperor Drive, Orlando, Florida (the "**Distribution Center Assets**"). Pursuant to the Bid Procedures Global Order, Dollar General Corporation ("**Dollar General**") also submitted a qualified bid for the Distribution Center Assets. After four (4) rounds of bidding with respect to the Distribution Center Assets, Dollar General submitted an overbid of $1,000,000 and Sprouts declined to submit any further overbid. The Debtors determined in their reasonable business judgment, after consultation with their advisors and the Consultation Parties that Dollar General's bid to purchase the Distribution Center Assets for a purchase price of $1,000,000 was the successful bid and, thus, Dollar General was designated as the successful bidder. Sprouts was selected as the backup bidder for a purchase price of $900,000. The Debtors then concluded the Auction.

On April 15, 2020, the Bankruptcy Court entered the Sale Order Dollar General Assets. *See* Docket No. 619. Pursuant thereto and to the APA Dollar General Assets, the Debtors assigned that certain Store lease and sold the Acquired Dollar General Assets to Dollar General for a purchase price of $1,000,000, subject to certain adjustments for prorations as set forth under the APA Dollar General Assets.

On April 21, 2020, the Close of the Dollar General Sale occurred.

3.      CBRE Sales

The Debtors, through CBRE and the Debtors' other professionals, undertook extensive marketing efforts to identify potential purchasers of the Debtors' owned and leased real property and designation rights to the Debtors' leased property. Through this comprehensive marketing process, the Debtors and their professionals identified a number of potential purchasers for Debtor's remaining owned real property. Ultimately, the marketing process produced one (1) stalking horse agreement for an asset package with M.B.D. Properties, LLC ("**MBD**"). The key provisions set forth under the stalking horse agreement are as follows:

- The Debtors agreed to sell certain of the Debtors' assets related to the Debtors' owned Store located at 2329 Martin Luther King Jr. Boulevard, Panama City, Florida (the "**Panama City Assets**") to MBD for the purchase price of $3,300,000, subject to adjustments for prorations.

- On June 23, 2020, the Debtors filed the Motion For Sale of Property Free and Clear of Liens under Section 363(f)(FEE) / Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C)

28

Granting Related Relief (M.B.D. Properties, LLC) [Docket No. 828] (the "**MBD Bid Procedures Motion**").

- The Order granting the MBD Bid Procedures Motion was entered on July 10, 2020. *See* Docket No. 864 (the "**MBD Bid Procedures Order**").

a.    *Auction Conducted*

Pursuant to the Bid Procedures MBD Order, MBD submitted a qualified bid and was selected as the stalking horse purchaser for the Panama City Assets subject to the stalking horse agreement between the Debtors and MBD. However, the Debtors received a qualified, competing bid from Mobama, LLC for the Panama City Assets for a purchase price of $3,400,000.

Thus, an auction was conducted telephonically on August 12, 2020 (the "**Panama City Auction**"). At the commencement of the Panama City Auction, the Debtors provided rules and procedures that would govern the Panama City Auction in accordance with the MBD Bid Procedures Order. Counsel and other representatives for the Debtors, the Committee, the Prepetition Secured Lender, the stalking horse purchaser, the qualified bidders and other parties in interest were present at the Panama City Auction. Throughout the Panama City Auction, in accordance with the MBD Bid Procedures Order, the Debtors and their advisors consulted with the Consultation Parties.

After three (3) rounds of bidding with respect to the Panama City Assets, MBD submitted an overbid of $3,700,000 and Mobama, LLC declined to submit any further overbid. The Debtors determined in their reasonable business judgment, after consultation with their advisors and the Consultation Parties that MBD's bid to purchase the Panama City Assets for a purchase price of $3,700,000 was the successful bid and thus MBD was designated as the successful bidder. Mobama, LLC was selected as the backup bidder for a purchase price of $3,600,000. The Debtors then concluded the Panama City Auction.

On August 18, 2020, the Bankruptcy Court entered the Sale Order MBD Assets. *See* Docket No. 951. Pursuant thereto and to the APA MBD Assets, the Debtors sold the Acquired MBD Assets to MBD for a purchase price of $3,700,000, subject to certain adjustments for prorations as set forth under the APA MBD Assets.

On August 27, 2020, the Closing of the MBD Sale occurred.

4.    Other Sales of Miscellaneous Personal Property

On July 28, 2020, the Debtors filed a motion to approve the sale of certain personal property, including a motor vehicle, and in connection therewith the assumption and assignment of certain lease agreements to Bo Sharon. *See* Docket No. 903.

5.    Private Sale to Aldi

On August 24, 2020, the Debtors filed a motion to approve the private sale of certain of the Debtors' assets related to two (2) of the Debtors' leased Stores located at 2605 Santa Barbara Blvd., Cape Coral, Florida (the "**Cape Coral Lease**") and 2150 Gulf to Bay Boulevard,

Clearwater, Florida (the "**Clearwater Lease**" and, together with the Cape Coral Lease, the "**Private Sale Leases**") to Aldi (Florida) LLC for no monetary compensation (the "**Aldi Private Sale Motion**"). *See* Docket No. 975. Aldi Inc., the parent company of Aldi (Florida) LLC proposes to guaranty the Private Sale Leases as part of the assignment and assumption of the Private Sale Leases. Kroger, the Prepetition Secured Lender and guarantor of the Private Sale Leases, has agreed to pay the cure amounts related to the Private Sale Leases. The savings to the Debtors' Estates generated from the assignment and assumption of the Private Sale Leases to Aldi (Florida) LLC and Kroger's payment of cure amounts, if any, related to the Private Sale Leases, constitute the purchase price consideration. On October 22, 2020, the Court entered an *Order Approving Stipulation between Debtor Lucky's Market Operating Company, LLC and SB-Vets-1, LLC* [Docket No. 1138], which recognized the Clearwater Lease was rejected on October 14, 2020. The Aldi Private Sale Motion will only go forward as it relates to the Clearwater Lease.

F.    *Executory Contracts and Unexpired Leases*

1.    Deadline to Assume and Reject Unexpired Leases and Executory Contracts

On February 25, 2020, the Bankruptcy Court entered an order extending the Debtors' deadline to assume or reject unexpired leases of non-residential real property by ninety days (90) from the end of the period determined under Bankruptcy Code section 365(d)(4)(A) through and including August 24, 2020. *See* Docket No. 264.

Certain landlords and counterparties to unexpired leases filed motions to compel Debtors to make an immediate determination with respect to their leases, and the Debtors, the Committee and the Prepetition Secured Lender each filed objections to these motions. *See* Docket Nos. 578, 593, 638, 639, and 641. The Bankruptcy Court held an evidentiary hearing on April 24, 2020 and entered orders denying the motions on April 30, 2020. *See* Docket Nos. 688 and 689.

Certain landlords and counterparties to unexpired leases entered into court approved stipulations with the Debtors wherein the parties agreed to extend the deadline to assume or reject the unexpired leases from August 24, 2020 to October 30, 2020 [Docket Nos. 980, 1077, 1102, 1127, and 1142] and December 22, 2020 [Docket Nos. 982 and 1143].

2.    Non-Sale related Assumption of Unexpired Leases and Executory Contracts

On August 24, 2020, the Debtors filed a motion requesting authority to assume and assign thirteen unexpired leases of non-residential real property to Kroger LM Real Estate Holdings, LLC, which is a wholly owned subsidiary of Kroger (the "**Kroger Assumption Motion**") [Docket No. 977]. In response to the Kroger Assumption Motion, a number of landlords filed objections, disputing, among other things, proposed cure amounts and reserving rights with respect thereto. *See* Docket Nos. 1012-1014, 1016, and 1023. The Kroger Assumption Motion (and related objections) were set for hearing on September 14, 2020 and then adjourned to October 14, 2020; however, the Court determined to proceed with the September 14 hearing with respect to two (2) grounds supporting the objection of Tamiami Investment Partners, LLC (the "**Tamiami Objection**") [Docket No. 1016]. Prior to the September 14 hearing, the parties reached an agreement resolving the Tamiami Objection and, pursuant thereto, the Debtors filed *Certification of Counsel Regarding Agreed Order Rejecting and Terminating Lease of Real Property Between*

30

*Debtor Lucky's Market Operating Company, LLC and Tamiami Investment Partners, LLC and Releasing Certain Claims* [Docket No. 1042]. On September 14, 2020, the Court entered the agreed order resolving the Tamiami Objection. *See* Docket No. 1044.

At the September 14 hearing, the Debtors reiterated their unequivocal intent to assume and assign the remaining twelve unexpired leases of non-residential real property. Subsequent to the September 14 hearing, the Debtors continued to work with the remaining objecting landlords. Certain unresolved objections, Docket Nos. 1012, 1013, 1014, and 1023, will be heard at the October 14, 2020 hearing.

The Bankruptcy Court set the hearing for the Kroger Assumption Motion on October 14, 2020, which has further been adjourned to November 3, 2020.

3.    Rejection of Unexpired Leases and Executory Contracts

Between February 25, 2020 and September 14, 2020, the Bankruptcy Court entered eight (8) orders authorizing the rejection of certain unexpired nonresidential real property leases and executory contracts. *See* Docket Nos. 270, 406, 587, 766, 803, 865, 931 and 1044.

The Debtors also entered into a court-approved stipulation related to a non-residential lease agreement with Glades 95th Owner LLC ("**Glades 95th**"). In that stipulation with Glades 95th, the Debtors acknowledged that the non-residential lease agreement was deemed rejected in accordance with the Bankruptcy Code on August 24, 2020. *See* Docket No. 981.

On the Effective Date, except as otherwise provided in the Plan, each of the Debtors' Executory Contracts not previously assumed, assumed and assigned, or rejected pursuant to an order of the Court will be deemed rejected as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123 except any Executory Contract (a) identified on the Assumed Executory Contract/Unexpired Lease List (which shall be filed with the Court on or before the filing of the Plan Supplement) as an Executory Contract designated for assumption, (b) that is the subject of a separate motion or notice to assume (including a motion or notice pursuant to which the requested effective date of such rejection is after the Effective Date) filed by the Debtors, (c) that has been previously assumed pursuant to a Court order, or (d) that previously expired or terminated pursuant to its own terms.

Entry of the Confirmation Order by the Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts as set forth in the Plan, all pursuant to Bankruptcy Code sections 365(a) and 1123 and effective on the occurrence of the Effective Date. Each Executory Contract assumed pursuant to the Plan or a Court order and not assigned to a third party on or prior to the Effective Date, shall be fully enforceable by the Liquidating Debtor in accordance with its terms (a) except as such terms may have been validly modified by order of the Court and (b) notwithstanding, to the maximum extent permitted by law, any provision in any such assumed Executory Contract that restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract (including any "change of control" provision); therefore, consummation of the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the Executory Contracts identified on the Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List prior to the Effective Date on notice to the non-Debtor entities affected by such alteration, amendment, modification, or supplement (and upon such entities' counsel, if known) to be filed and served no less than: (a) three Business Days prior to the effective date of the rejection of the affected Executory Contracts or (b) fourteen days prior to the effective date of the assumption of the affected Executory Contracts; provided that, solely with respect to Unexpired Leases of nonresidential real property, the Debtors shall not alter, amend, modify, or supplement the Assumed Executory Contract/Unexpired Lease List and the Rejected Executory Contract/Unexpired Lease List after the Confirmation Date unless the affected non-Debtor Entity party to such Unexpired Lease either (a) consents or (b) attempts to prosecute an untimely objection to the assumption of such Unexpired Lease or related Cure Cost.

4.      Cure of Defaults for Assumed Executory Contracts

Any monetary defaults under each Executory Contract to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the Cure Cost in Cash on or prior to the Effective Date, subject to the limitation described in the following paragraph, or on such other terms as the parties to such Executory Contract may otherwise agree. As part of the Plan Supplement, to the extent not previously filed with the Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed Cure Cost (and, to the extent the Debtors seek to assume and assign an Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee and provide adequate assurance of future performance by such assignee within the meaning of Bankruptcy Code section 365) to be filed and served upon applicable contract and lease counterparties (and upon such entities' counsel, if known), together with procedures for objecting thereto and resolution of disputes by the Court. Any objection by a contract or lease counterparty to a proposed Cure Cost must be filed, served, and actually received by the Debtors before the objection deadline provided in the notice of proposed assumption and Cure Cost, which deadline shall be no less than fourteen (14) days after the date on which the applicable notice of proposed assumption and proposed Cure Cost is filed and served. Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or adequate assurance (other than with respect to a proposed Cure Cost) must be filed, served, and actually received by the Debtors before the Plan Objection Deadline.

Any counterparty to an Executory Contract that fails to object timely to the proposed assumption or Cure Cost will be deemed to have assented to such assumption or Cure Cost. Any objection to a proposed assumption, assumption and assignment, or Cure Cost will be scheduled to be heard by the Court at the Debtors' first scheduled omnibus hearing after which such objection is timely filed. In the event of a dispute regarding (a) the amount of any Cure Cost, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365(b), if applicable, under the Executory Contract to be assumed or assumed and assigned, and/or (c) any other matter pertaining to assumption and/or assignment, then such Cure Costs shall be paid following the entry of a Final Order resolving the dispute and approving the assumption and assignment of such Executory Contracts or as may be agreed upon by the Debtors and the counterparty to such Executory Contract; *provided* that the

Debtors may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Court; *provided*, *further*, that notwithstanding anything to the contrary in the Plan or this Disclosure Statement, the Debtors reserve the right to reject, or nullify the assumption of, any Executory Contract within twenty-five days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost under an Executory Contract that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract in an amount higher than sought by the Debtors.

5.    Claims Based on Rejection of Executory Contracts

Unless otherwise provided by a Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be filed with Omni on or before the later of: (a) the General Bar Date; and (b) thirty (30) days after the later of (i) fourteen (14) days after the date on which the applicable notice of proposed rejection is filed and served, if no objection is filed and (ii) the date that all such filed objections have either been overruled or withdrawn; provided that, with respect to nonresidential real property leases rejected pursuant to the Plan, Proofs of Claim arising from the rejection or repudiation of such lease must be filed with Omni within thirty (30) days after the effective date of such rejection. **Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely filed shall be deemed disallowed**. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall constitute General Unsecured Claims and shall be treated in accordance with Article IV.B of the Plan.

G.    *Pending Litigation*

1.    Class Action Adversary Proceeding

On February 3, 2020, Laura Forsyth, on behalf of herself and on behalf of all others similarly situated, filed a complaint (the "**Class Action Complaint**"), commencing an adversary proceeding (Adv. No. 20-50449 (JTD)) against Lucky's Market Parent Company, LLC; Lucky's Farmers Market Holding Company, LLC; Lucky's Market Operating Company, LLC; LFM Stores LLC; Lucky's Farmers Market, LP; Lucky's Farmers Market Resource Center, LLC; Lucky's Market Holding Company 2, LLC; Lucky's Market GP 2, LLC; Lucky's Market 2, LP; Lucky's Market of Longmont, LLC; Lucky's Farmers Market of Billings, LLC; Lucky's Farmers Markets of Columbus, LLC; Lucky's Farmers Market of Rock Hill, LLC; LFM Jackson, LLC; Lucky's Farmers Market of Ann Arbor, LLC; Lucky's Market of Gainesville, LLC; Lucky's Market of Bloomington, LLC; Lucky's Market of Plantation, LLC; Lucky's Market of Savannah, GA, LLC; Lucky's Market of Traverse, City, LLC; Lucky's Market of Naples, FL, LLC; and Sinoc, Inc. (collectively, the "**Debtor Defendants**"). The Class Action Complaint asserts, among other things, claims for alleged violations of the WARN Act and seeks, among other things, an allowed administrative priority claim for unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other benefits. On April 27, 2020, the Debtor Defendants filed an answer, asserting affirmative defenses, among other things. Case No. 20-50449, Docket No. 6. The Debtor Defendants believe they have valid defenses to the Class Action Claims, as set forth more fully under Article V.A below.

2.      Special Committee Investigation

Prior to the Petition Date, the Board appointed an Independent Director and formed the Special Committee of the Board of Managers of the Debtors. The Board authorized the Special Committee to address certain issues that could potentially confront the Debtors. Among other things, the Special Committee conducted an independent investigation ("**Independent Investigation**") of certain potential claims or causes of action that may belong to the Debtors' Estates. As a result of the Independent Investigation, the Special Committee determined that the Debtors' Estates did not have any valuable claims or causes of action that warranted pursuing, and to the extent that such claims or cause of action did exist, the Debtors' Estates were receiving adequate consideration in the Settlement, which is set forth herein.

3.      Committee Investigation

Prior to the Petition Date, the Debtors and Kroger had a complicated financial and operational relationship. Among other things, Kroger was the Debtors' largest creditor and principal equity holder. Moreover, Kroger guaranteed certain significant liabilities of the Debtors. Upon its formation, the Committee recognized that it would need to conduct its own separate investigation into potential claims and causes of action belonging to the Debtors' Estates arising from, related to, or in connection with any transactions between Kroger and the Debtors and their affiliates, including, without limitation, Kroger's purported loans to the Debtors, Kroger's guarantees of any of the Debtors' liabilities, and Kroger's role in the Debtors' financial affairs. Consequently, the Committee retained Norton Rose Fulbright US LLP to lead that investigation.

The Committee, aided by its professionals, conducted an investigation into the dealings between Kroger and the Debtors. In particular, the Committee reviewed the documents and information publicly available as well as a substantial amount of documents voluntarily produced by the Debtors and Kroger. Based on its review of the publicly available information and the documents produced, the Committee determined that the Debtors' Estates may be able to allege certain claims or causes of action against Kroger that could potentially yield significant recoveries in a litigation. The Committee is nonetheless mindful that the Estates have limited resources at its disposable. Accordingly, rather than adopting a full litigation posture and potentially exhausting significant Estates' resources, the Committee and its professionals engaged the Debtors and Kroger in settlement discussions shortly after the review of the various transactions between Kroger and the Debtors and the related documents. Ultimately, those discussions led to the Settlement pursuant to which the Estates and their creditors will receive considerable consideration in exchange for a release of the Estates' claims against Kroger without the risk and expense associated with litigation.

4.      Winn-Dixie Adversary Proceeding

On June 30, 2020, the Debtors filed a complaint, initiating an adversary proceeding (Adv. No. 20-50631 (JTD)) against Winn-Dixie Stores, Inc. (the "**Winn-Dixie Defendant**") and Southeastern Grocers, Inc. The complaint asserted, among other things, claims for specific performance and breach of contract in connection with the Gateway Shoppes Assets, located at 13585 N. Tamiami Trail, Bonita Springs, Florida, which the Winn-Dixie Defendant agreed to

34

purchase and was approved by the Bankruptcy Court. As explained in Article IV hereof, after the auction and sale were continued to a later, date, the Gateway Shoppes Assets were carved out of the Sale Order Winn-Dixie Assets entered on April 20, 2020. *See* Docket No. 629. Subsequently, the Winn-Dixie Defendant attempted to terminate its agreement to purchase the Store. As a result, the Debtors commenced the adversary proceeding. On July 30, 2020, the Winn-Dixie Defendant filed an answer and both the Winn-Dixie Defendant and Southeastern Grocers, Inc. filed a motion to dismiss. *See* Adv. No. 20-50631, Docket Nos. 4-5. On August 20, 2020, the Debtors and Southeastern Grocers, Inc. filed a *Stipulation of Voluntary Dismissal with Prejudice of Complaint Solely Against Southeastern Grocers, Inc. See* Adv. No. 20-50631; Docket No. 15.

H.    *Settlement of Claims against the Debtors' Estates*

1.    1916, LLC

On or about February 27, 2020, the Debtors entered into a stipulation with 1916, LLC, pursuant to which 1916, LLC agreed to purchase certain furniture, fixtures, and equipment owned by the Debtor Lucky's Market of South Boulder, CO, LLC for a purchase price of $35,000. On March 3, 2020, the Court approved this stipulation. *See* Docket No. 320.

2.    Lowry Economic Redevelopment Authority

On or about March 31, 2020, the Debtor Lucky's Market Parent Company, LLC entered into that certain Repurchase Agreement with Lowry Economic Redevelopment Authority (the "**Authority**"), pursuant to which the Authority exercised its right to repurchase for $721,952.00, less certain costs and fees, a parcel of land that it had previously sold to a predecessor in interest of the Debtor Lucky's Market Parent Company, LLC. On April 28, 2020, the Court entered an order approving the Debtors' settlement with Authority. *See* Docket No. 661.

3.    Albertson's LLC

On or about April 10, 2020, the Debtors entered into a stipulation with Albertson's LLC to resolve an objection to, among other things, the proposed cure amount with respect to a trademark license agreement. Pursuant to this stipulation, which was approved by the Court on April 13, 2020 [Docket No. 601], the parties agreed that the amount necessary to cure any defaults under the agreement was $0 and further agreed that Albertson's LLC would make a payment of $2,500 to the Debtors.

4.    Market at McKnight I, LLC

On or about May 6, 2020, the Debtors entered into a stipulation with Market at McKnight I, LLC to resolve an objection to, among other things, the proposed cure amount with respect to a real property lease and certain claims relating to the sale of certain furniture, fixtures, and equipment. Pursuant to this stipulation, which was approved by the Court on May 8, 2020 [Docket No. 698], the parties agreed to a settlement amount of $15,000.

5.      U.S. Bank Equipment Finance, a division of U.S. Bank National Association

On or about July 10, 2020, the Debtors entered into a stipulation with U.S. Bank Equipment Finance, a division of U.S. Bank National Association, to resolve: (i) an objection to, among other things, the Debtors' request for retroactive rejection, effective as of April 30, 2020, to equipment lease agreements and (ii) an administrative expense motion requesting administrative expense payments relating in connection with an alleged outstanding balance of $570,144.88 based on alleged defaults under the equipment lease agreements. Pursuant to this stipulation, which was approved by the Court on July 14, 2020 [Docket No. 873], the parties agreed to a settlement amount of $146,000.

6.      Global Settlement Between Debtors, Committee, and Prepetition Secured Lender

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise and settlement of the Settlement Released Claims, to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest. As set forth more fully under Article V.G hereof and Article VIII.A of the Plan, the Global Settlement allows for a higher recovery to Holders of Claims in Class 4 than could otherwise be achieved if the Chapter 11 Cases were converted to chapter 7 liquidation and provides for payment in full of: Administrative Expense Claims; PACA Claims/PASA Claims; Professional Fee Claims; Secured Tax Claims; Tax Claims; and Priority Claims.

I.      *COVID-19 Pandemic Declared During The Chapter 11 Cases*

Approximately six weeks after the commencement of the Chapter 11 Cases, the COVID-19 pandemic created a national and public health and economic crisis in the United States. As the pandemic evolves, governmental authorities and businesses continue to respond by implementing restrictions or policies that have, in many ways, adversely impacted spending and the economy. The Debtors continued to operate six (6) grocery stores during the global pandemic as grocery stores became an essential service to the public. The Debtors continue to monitor (and comply with) such responses to the pandemic; however, the extent of pandemic's impact on the Debtors and their Estates in these Chapter 11 Cases is uncertain.

## ARTICLE V.
## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and it is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and the definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and their Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Unclassified Claims*

1.    PACA Claims and PASA Claims

The Liquidating Debtor shall pay the PACA Claims and PASA Claims consistent with the resolution procedures outlined in the PACA and PASA Final Order. To the extent not previously paid in full, the Allowed PACA Claims and PASA Claims will be paid in full from the Wind-Down Reserve when such PACA and PASA Claims are Allowed to the extent that such PACA Claim or PASA Claim is asserted prior to the Effective Date. Any distributions on PACA Claims or PASA Claims held by Kroger (or any affiliate thereof) may be used to satisfy the Kroger Rent Reimbursement Obligation in accordance with the terms of the Plan. For the avoidance of doubt, Kroger (or any affiliate thereof) shall not be required to File a Proof of Claim or other request for allowance and/or payment of any PACA Claims or PASA Claims by the Bar Date or any other claims bar date.

2.    Administrative Expense Claims

Requests for payment of Administrative Expense Claims must be Filed no later than the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the applicable Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or the Estates. Kroger (or any affiliate thereof) shall not be required to File a Proof of Claim or other request for allowance and/or payment of any Administrative Expense Claim by the Administrative Expense Bar Date or any other claims bar date.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by any applicable Liquidating Debtor or Purchaser prior to the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for release of each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash (or other available funds in the Estate) from the Wind-Down Reserve: (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due; or (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Expense Claims that have been assumed by purchasers pursuant to purchase agreements approved by the Bankruptcy Court shall not be an obligation of the Liquidating Debtor.

Any distributions on any Administrative Expense Claims, including Section 503(b)(9) Claims, held by Kroger (or any affiliate thereof) may be used to satisfy the Kroger Rent Reimbursement Obligation in accordance with the terms of the Plan.

### 3.   Professional Fee Claims

All Professionals requesting compensation or reimbursement of Professional Fee Claims for services rendered before or on the Effective Date shall File a Professional Final Fee Application for final allowance of compensation and reimbursement of expenses no later than the Professional Final Fee Application Claims Bar Date.

The Final Fee Hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Final Fee Application Claims Bar Date. The Liquidating Debtor's counsel shall File a notice of the Final Fee Hearing. Such notice shall be posted on the Case Website, and served upon counsel for the Committee, all Professionals, the U.S. Trustee and all parties on the Liquidating Debtor's Bankruptcy Rule 2002 service list.

Allowed Professional Fee Claims of the Professionals shall be paid in full from Cash in the Wind-Down Reserve: (a) as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court; or (b) upon such other terms as agreed by the Holder of such an Allowed Professional Fee Application Claims. After the Effective Date and the resolution of Professional Final Fee Applications filed before the expiration of the Professional Final Fee Application Claims Bar Date, no Professional shall file any additional fee application.

Pursuant to the Fourth Interim Cash Collateral Order, the Liquidating Debtor shall pay in cash, without the need for the filing of formal fee applications, the reasonable and documented out-of-pocket professional fees, expenses and disbursements for one primary law firm and one local counsel incurred by the Prepetition Secured Lender arising after the Petition Date and prior to the Effective Date. After delivery of a monthly summary statement of any such requested fees (which shall include the total number of hours billed by attorney and a summary description of services) to counsel for the Liquidating Debtor, the U.S. Trustee and counsel to the Committee, the Liquidating Debtor shall pay such fees, costs and expenses within ten (10) days from delivery thereof. Any and all amounts paid by the Liquidating Debtor as such fees are deemed permitted uses of cash collateral, not subject to the Wind-Down Budget or any variance report and shall reduce any Adequate Protection Superpriority Claim (as defined in the Fourth Interim Cash Collateral Order) on account of such fees to the extent of such fees paid.

### 4.   Priority Tax Claims

Except to the extent the Debtors and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, the Liquidating Debtor, or the purchaser of any asset of the Estates pursuant to the applicable sale order and asset purchase agreement [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, Cash from the Wind-Down Reserve (solely in the event the Liquidating Debtor, and not the Purchasers, must pay such claims), in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective

Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due from the Wind-Down Reserve or, pursuant to the applicable sale order and asset purchase agreement, by the purchaser of the respective asset of the Estates [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951]. Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims. On the Effective Date, any lien securing any Allowed Priority Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

5.     Class Action Claims

The Class Action Adversary Proceeding is a purported class action brought by Laura Forsyth on behalf of herself and other similarly situated employees asserting a violation under the WARN Act for the defendants' alleged failure to provide 60-days' notice of a mass layoff or plant closing as required under law.

The Class Action Adversary Proceeding does not provide a proposed class definition. Rather, the class is loosely defined as employees who were "affected by the mass layoff and/or plant closing" at each facility maintained, owned, and operated within the United States of America by the Debtors and any direct or indirect subsidiary affiliates. The Class Action Adversary Proceeding alleges that all defendants constitute a "single employer" within the meaning of the WARN Act.

The Debtors have raised numerous defenses to the Class Action Claims asserted in the complaint, including the following:

- the defendants do not constitute a "single employer";
- WARN obligations were not triggered at any facility owned, maintained, or operated by any named Debtor where there were less than 50 full-time employees who suffered an employment loss as defined under the WARN Act;
- for those facilities where more than 50 full-time employees suffered an employment loss as defined under the WARN Act, employees and governmental bodies received WARN notices in accordance with the WARN Act; and
- for any employee receiving a WARN Act notice who was laid off prior to the expiration of the 60-day notice period reflected in the notice, the employee received pay representing the amount of back wages and benefits that would have been due had the employee remained employed for the duration of the 60-day notice period.

The Debtors reserve all of their rights to contest the Class Action Claims in full on any grounds, including, but not limited to, waiver, release, no liability, good faith, and faltering business exception. To the extent not resolved prior to the Effective Date, on the Effective Date,

the Debtors shall maintain a Claims Reserve for the Disputed Class Action Claims in the amount of $250,000, pending final resolution of such Claims.

### 6. Statutory Fees

All Statutory Fees incurred prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidating Debtor shall pay any and all such fees when due and payable from the Liquidating Trust Assets, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until such time that the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

B.   *Classification and Treatment of Claims and Interests*

The chart set forth under Article I.C below summarizes the classification and treatment of the Classes.

### 1. Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and distribution, pursuant to Article IV of the Plan and Bankruptcy Code sections 1122 and 1123.

### 2. Treatment of Claims and Interests

Except to the extent that a Holder of an Allowed Claim or Allowed Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest.

#### a. Class 1 – Prepetition Secured Claims

Holders of Class 1 Prepetition Secured Claims shall have Allowed Prepetition Secured Claims in the aggregate amount of $306,453,923.00. On the Effective Date, any Remaining Asset, shall be transferred to the Prepetition Secured Lender on account of its Allowed Prepetition Secured Claims; provided, however, that the Prepetition Secured Lender in its sole and absolute discretion, may elect not to have such Remaining Asset transferred to it and instead, elect to have the Liquidating Debtor administer such Remaining Asset with any such proceeds thereof being paid promptly to the Prepetition Secured Lender pursuant to the terms of the Settlement; provided, further, that any Remaining Asset administered by the Liquidating Debtor and not previously disposed of shall be transferred to a Liquidating Trust in accordance with Article IX of the Plan, and the Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders of Claims in Class 1 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

b.     <u>Class 2 – Other Secured Claims</u>

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, or has been assumed by a purchaser of the collateral securing its Allowed Other Secured Claim, in full and final satisfaction, settlement, and release of each Allowed Other Secured Claim, each such Holder, at the option of the Liquidating Debtor, shall (a) receive the collateral securing its Allowed Other Secured Claim; or (b) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable. In the event the Debtors treat a Claim under clause (a) of this Section, the liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. The Liquidating Debtor specifically reserves the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Other Secured Claims.

Class 2 is unimpaired and is deemed to accept the Plan.

c.     <u>Class 3 – Priority Claims</u>

Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, or has not been assumed by a purchaser of Assets of the Debtors, each such Holder shall receive, in full satisfaction of such Allowed Priority Claim, Cash in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date; (b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Liquidating Debtor, as the case may be, and the Holder of the Allowed Other Priority Claim.

Class 3 is unimpaired and is deemed to accept the Plan.

d.     <u>Class 4 – General Unsecured Claims Class A Recovery Pool</u>

Class 4 is Impaired under the Plan. Except to the extent that a Holder of an Allowed General Unsecured Class A Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Class A Claim has not been paid in full prior to the Effective Date, or has not been assumed by a purchaser of Assets of the Debtors, each such Holder shall receive such Holder's Pro Rata Share of the General Unsecured Claims Class A Recovery Pool Allocation, as full and complete satisfaction of the Claims against the Estates and Liquidating Debtor; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class A Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders in Class 4 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor, with the direct oversight of the Creditor Representative, will oversee the reconciliation of these General Unsecured Class A Claims and Distributions to be made on account of Allowed General Unsecured Claims in the General Unsecured Claims Class A Recovery Pool class.

e.       Class 5 – General Unsecured Claims Class B Recovery Pool

Class 5 is Impaired under the Plan. Except to the extent that a Holder of an Allowed General Unsecured Class B Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Class B Claim has not been paid prior to the Effective Date or has not been assumed by a purchaser of Assets of the Debtors, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Class B Claim, each Holder of an Allowed General Unsecured Class B Claim shall receive such Holder's Pro Rata Share of the General Unsecured Claims Class B Recovery Pool Allocation, as full and complete satisfaction of the Claims against the Estates and the Liquidating Debtor. For the avoidance of doubt, nothing herein shall affect or impair the rights, benefits, and obligations under any guaranty in favor of such Holder by any non-Debtor, including without limitation Kroger; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class B Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

Holders in Class 5 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor, with the direct oversight of the Prepetition Secured Lender, shall conduct the reconciliation of these General Unsecured Class B Claims and distributions to be made on account of Allowed General Unsecured Class B Claims in the General Unsecured Claims Class B; provided, however, the Prepetition Secured Lender shall have the right to consent to (i) any settlement of any General Unsecured Claims Class B Claim and (ii) any distribution from the General Unsecured Creditor Class B Recovery Pool.

f.       Class 6 – General Unsecured Claims Class C Recovery Pool

Class 6 is Impaired under the Plan. The Prepetition Secured Lender shall receive on account of its Prepetition Secured Lender Deficiency Claim the General Unsecured Claims Class C Recovery Pool Allocation; provided, however, if and to the extent any Holder has not received its full distribution prior to the transfer of the General Unsecured Claims Class C Recovery Pool to a Liquidating Trust in accordance with Article IX of the Plan, such Holder shall receive a Liquidating Trust Interest entitling it to continuing distributions consistent with the foregoing.

The Holder in Class 6 is entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor will oversee the reconciliation of the General Unsecured Class C Claims and, to the extent there are funds remaining in the General Unsecured Claims Class C Recovery Pool, the Liquidating Debtor will oversee any distributions to be made on account of the Prepetition Secured Lender Deficiency Claims and Kroger General Unsecured Claims from the remaining funds in the General Unsecured Claims Class C Recovery Pool.

g.      Class 7 – Intercompany Claims

Holders of Claims in Class 7 are Impaired under the Plan. The Debtors estimate that the aggregate amount of Intercompany Claims will be approximately $479,000,000.00. Holders of Intercompany Claims will receive no distribution under the Plan and, on the Effective Date, shall be deemed cancelled, null, and void. Therefore, Holders of Intercompany Claims are deemed to reject the Plan.

h.      Class 8 – Equity Interests

Holders of Claims and Equity Interests in Class 8 are Impaired under the Plan. Holders of Equity Interests will retain no ownership interests and receive no distributions under the Plan and, on the Effective Date, shall be deemed cancelled, null, and void. Therefore, Holders of Equity Interests are deemed to reject the Plan.

i.      Class 9 – EB-5 Investors

Class 9 is Impaired under the Plan. To the extent that Class 9 voted to accept the Plan, each Holder of a Class 9 Interest shall receive on account of their Interest such Holder's Pro Rata Share of the equity interest in the EB-5 Designated Entity. As soon as practicable after the Effective Date, the Liquidating Debtor or Liquidating Trust shall transfer to the EB-5 Designated Entity all Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC. Holders of Class 9 Interests shall not receive any distribution of Cash or other consideration under the Plan. The Debtors' rights under the EB-5 Guarantees shall be transferred and assigned to the holder of Class 1 Prepetition Secured Claims or another Debtor prior to any distribution to the EB-5 Investors. The transfer of the equity interests in the EB-5 Designated Entity shall be in full and complete satisfaction of any and all claims the EB-5 Investors may have against the Estates, the Liquidating Debtor, and Kroger and the EB5 Investors shall be Releasing Parties.

The Holders in Class 9 are entitled to vote to accept or reject the Plan. The Debtors and Liquidating Debtor will oversee the distribution to Holders in Class 9.

To the extent that Class 9 does not vote to accept its treatment under the Plan, the EB-5 Investors will retain no ownership interests and receive no distributions under the Plan and, on the Effective Date, the EB-5 Investors' Equity Interests shall be deemed cancelled, null, and void.

3.      Impaired Claims and Equity Interests

Under the Plan, Holders of Claims in Classes 1, 4, 5, 6, 7, 8, and 9 are Impaired Classes pursuant to Bankruptcy Code section 1124 because the Plan alters the legal, equitable or contractual rights of the Holders of such Claims and Interests treated in such Classes.

4.      Cramdown and No Unfair Discrimination

To the extent that any Impaired Class does not accept the Plan, the Debtors will seek Confirmation pursuant to Bankruptcy Code section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly

discriminate and is fair and equitable with respect to each class of claims and interest that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Interests as described in the Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

### 5.    Special Provision Regarding Settled Claims

Any and all Settled Causes of Action shall be settled and compromised pursuant to the Plan. Distributions on account of the Allowed Claims resulting from such settlement and compromise shall be effected through the Distributions to Holders of Allowed Claims pursuant to the Plan.

## C.    *Implementation and Execution of the Plan*

### 1.    Effective Date

The Effective Date shall not occur until all conditions for the Effective Date as set forth in Article VII.B of the Plan are satisfied or otherwise waived in accordance with the terms of the Plan. Upon occurrence of the Effective Date, the Debtors shall File the notice of Effective Date, which shall also be posted on the Case Website.

### 2.    Implementation of the Plan

#### a.    General

The Plan shall be implemented through a series of transactions as described in detail below.

#### b.    Corporate Action; Officers and Directors; Effectuating Documents

On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the officer(s) or director(s) of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the board of the Debtors.

On the Effective Date, the composition of the board shall change and Andrew T. Pillari will serve as the sole member of the board of the Liquidating Debtor after the Effective Date and all other directors will cease to serve on the Board. The post-Effective Date board will remain intact until the Liquidating Debtor is dissolved. All corporate action shall be taken in accordance with the certificate of incorporation and the bylaws of the Liquidating Debtor. On the date of dissolution of the Liquidating Debtor, the remaining members of the board and executive officer(s) of the Liquidating Debtor shall be deemed to have resigned to the extent permissible under applicable law.

The officer(s) and director(s) of each Debtor and Liquidating Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the Liquidating Trust Agreement, if applicable.

3.    Records

The Liquidating Debtor shall retain those documents maintained by the Debtors in the ordinary course of business and which were not otherwise transferred to the purchaser of any asset of the Estates pursuant to the applicable asset purchase agreement or to the Prepetition Secured Lender on the Effective Date. The Liquidating Debtor shall not destroy any documents without the consent of the Creditor Representative and Prepetition Secured Lender. Upon the closing of the Chapter 11 Cases, all documents shall be transferred to the Prepetition Secured Lender. The Prepetition Secured Lender shall be authorized to dispose of, destroy, or maintain such documents in its sole discretion.

4.    Provisions Governing Distributions Under the Plan

a.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtors or the Liquidating Debtor shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors, the Liquidating Debtor, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

b.    Method of Payment

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made as soon as is reasonably practicable after the date on which such Claim becomes Allowed. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the Liquidating Debtor (including the Debtors' named successor or assign), or Omni, on or after the Effective Date or as otherwise

provided herein. For the avoidance of doubt, (i) the Debtors, the Liquidating Debtor, Omni, or such other entity designated by the Debtors, shall act as Disbursing Agent with respect to all Effective Date Distributions, and (ii) the Liquidating Debtor, Omni, or such other entity designated by the Liquidating Debtor, shall act as Disbursing Agent with respect to all General Unsecured Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Unless otherwise expressly agreed in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire.

### c.     Surrender of Instruments

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or their designee. Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

### d.     Delivery of Distributions

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notice of address changes Filed on the Docket delivered to the Liquidating Debtor after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules and Statements if no Proof of Claim is filed and the Liquidating Debtor has not received a written notice of a change of address.

Subject to applicable Bankruptcy Rules, all Distributions to Holders of Allowed Claims shall be made to the Disbursing Agent who shall transmit such Distributions to the applicable Holders of Allowed Claims or their designees. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall have no obligation to determine the correct current address of such Holder, and no Distribution to such Holder shall be made unless and until the Disbursing Agent is notified, in writing, by the Holder of the current address of such Holder within 90 days of such Distribution, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of 90 days from the Distribution. After such date, all unclaimed property or interest in property shall revert to the Liquidating Debtor and be distributed in accordance with the terms of the Plan, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

e.      Objection to and Resolution of Claims

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. On or after the Effective Date, the Liquidating Debtor shall be vested with any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately prior to the Effective Date; provided however, that (i) with respect to the General Unsecured Claims Class B Recovery Pool, the Liquidating Debtor shall be required to obtain the consent of the Prepetition Secured Lender prior to (a) settling any Disputed General Unsecured Class B Claim and (b) making any distribution from the General Unsecured Claims Class B Recovery Pool and (ii) with respect to the General Unsecured Claims Class A Recovery Pool, the Creditor Representative shall have the right and standing to make a motion or file an objection and be heard with respect to any matter that may have affect or impair the General Unsecured Claims Class A Recovery Pool or any distribution to Class 4 Creditors, including, without limitation, the payment and/or allocation of fees and expenses incurred by the Liquidating Trustee pursuant to or in excess of the Wind-Down Budget.

f.      The Settlement of Claims

On the Effective Date, the Debtors shall enter into the Settlement, as described more fully in the Plan. The Debtors shall use the Cash on Hand pursuant to the Settlement to fund Distributions under the Plan as set forth therein.

a.      Miscellaneous Distribution Provisions

Disputed Claims. At such time as a Disputed Claim becomes an Allowed Claim, the Liquidating Debtor or the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's Pro Rata Share of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

Distributions After Allowance. To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the Distribution to which such Holder is entitled hereunder.

Setoff. The Liquidating Debtor retains the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records and in accordance with the Bankruptcy Code.

Minimum Distributions. Notwithstanding anything herein to the contrary, the Liquidating Debtor shall not be required to make Distributions or payments of less than $50.00.

Unclaimed Distributions. To the extent the aggregate Unclaimed Distributions to any Class exceeds $25,000, the Liquidating Debtors shall redistribute such Unclaimed Distributions to the remaining Holders in such Class. To the extent the aggregate Unclaimed Distributions to any Class equals or is less than $25,000, the Liquidating Debtors shall be donated in equal proportions to (i) American Bankruptcy Institute Endowment Fund, a not-for-profit, non-religious organization dedicated to, among other things, promoting research and scholarship in the area of insolvency, (ii) CARE (Credit Abuse Resistance Education), which educates young adults on the responsible use of credit and the potential consequences of credit card abuse, and (iii) The Honorable Tina Brozman Foundation, Inc., an organization dedicated to fund scientific research for the early detection and prevention of ovarian cancer.  To the extent any identified entity ceases to exist, the distribution shall be made to the other entities.

Upon a distribution to any Holder of an Allowed Claim becoming an Unclaimed Distribution, such Holder's Allowed Claim will automatically become null and void and shall be expunged from the Claims Register.

D.      *Executory Contracts and Unexpired Leases*

1.      Executory Contracts and Unexpired Leases

All Executory Contracts of the Debtors which have not been assumed, assigned (including to Kroger in connection with the Kroger Assumption Motion or a designation rights bid), or rejected, prior to the Effective Date shall be deemed rejected on the Effective Date, unless any landlord has stipulated to extend the period in which the Debtors or the Liquidating Debtor may assume or assign or reject such lease past August 24, 2020, then such unexpired lease shall be governed by the terms of such stipulation between the Debtors and the landlord. For the avoidance of doubt, the Filing of the Kroger Assumption Motion extended the period in which to assume or reject unexpired leases of non-residential real property under Bankruptcy Code section 365(d)(4) for the Kroger Guaranteed Leases until the Effective Date of the Plan when such Kroger Guaranteed Leases will be assumed and assigned to Kroger.  The Debtors reserve their right to file a list of assumed contracts with the Plan Supplement.

2.      Rejection Claims

In the event that the rejection of an Executory Contract by any of the Debtors pursuant to the Plan results in a Rejection Claim in favor of a counterparty to such executory contract, such Rejection Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidating Debtor, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Liquidating Debtor on or before the date that is 30 days after the Effective Date. All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Plan.

E.    *Procedures For Resolving Contingent, Unliquidated, and Disputed Claims and Interests*

    1.    <u>Resolution of Disputed Claims and Interests</u>

        a.    <u>Allowance of Claims and Interests</u>

Prior to the Effective Date, the Debtors, and, on and after the Effective Date, the Liquidating Debtor, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.

        b.    <u>Prosecution of Objections to Claims and Interests</u>

Prior to the Effective Date, the Debtors, and on or after the Effective Date, the Liquidating Debtor shall have the authority and all requisite standing to File objections to Claims and Interests, and the exclusive authority and standing to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all such Claims and Interests, regardless of whether such Claims and Interests are in a Class or otherwise. From and after the Effective Date, the Liquidating Debtor shall have the sole authority to administer and adjust the Claims Register with respect to Claims and Interests to reflect any such settlements or compromises. No further notice to or action, Order, or approval of the Bankruptcy Court with respect to such settlements or compromises entered into with a Holder of any Claim or Interest shall be required.

        c.    <u>Claims Estimation</u>

On and after the Effective Date, the Liquidating Debtor may, at any time, request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, in each case regardless of whether the Debtors or the Liquidating Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any such Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Liquidating Debtor may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding Bankruptcy Code section 502(j), in no event shall any Holder of a Claim that has been estimated pursuant to Bankruptcy

Code section 502(c) or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.    Expungement or Adjustment to Claims and Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be marked as satisfied, adjusted or expunged (as applicable) on the Claims Register by the Claims and Noticing Agent at the direction of the Debtors without an objection having to be Filed and without any further notice to or action, Order or approval of the Bankruptcy Court; provided, that the Liquidating Debtor shall provide thirty (30) days' notice of any of the foregoing modifications to the Claims Register to the Holder of any affected Claim or Interest during which period the Holder may object thereto.

### e.    Deadline to File Objections to Claims or Interests

Any objections to Claims or Interests shall be Filed no later than the Claims Objection Bar Date.

### 2.    Disallowance of Claims

To the maximum extent provided by Bankruptcy Code section 502(d), all Claims of any Entity from which property is recoverable by the Debtors under Bankruptcy Code sections 542, 543, 550, or 553 or that the Debtors allege is a transferee of a transfer that is avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be disallowed if (a) the Entity, on the one hand, and the Liquidating Debtor, on the other hand, agree or it has been determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

### 3.    Amendments to Claims

After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, Order, or approval of the Bankruptcy Court; provided, that such Holder may amend the Claim Filed solely to decrease, but not to increase, the amount, number, or priority of such Claim, unless otherwise provided by the Bankruptcy Court.

F.    *Conditions Precedent to Confirmation and the Effective Date*

### 1.    Conditions Precedent to Confirmation

The following is a list of conditions precedent to Confirmation:

- the Plan Supplement is Filed;

- the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Prepetition Secured Lender, and the Committee; and

- the Plan and the Disclosure Statement shall not have been materially amended, altered, or modified from the Plan and the Disclosure Statement as Filed unless such material amendment, alteration or modification has been made as set forth in the Plan.

2.      Conditions Precedent to the Effective Date

The following is the list of conditions precedent to the Effective Date:

- the Bankruptcy Court shall have entered the Confirmation Order, which approves the Global Settlement, and the Confirmation Order shall be a Final Order;

- the Bankruptcy Court shall have entered an Order approving the Kroger Assumption Motion and such Order shall be a Final Order;

- no stay of the Confirmation Order shall then be in effect;

- the Wind-Down Reserve shall have been established and funded;

- the Remaining Assets are transferred to the Prepetition Secured Lender or, if directed by the Prepetition Secured Lender, the Liquidating Debtor; and

- the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made as set forth herein.

3.      Waiver of Conditions

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by each of the Debtors, the Prepetition Secured Lender, and the Committee, without further order of the Bankruptcy Court.

4.      Effect of Non-Occurrence of Conditions

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may

not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (a) the Plan is null and void in all respects; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, Kroger or any other Person or Entity or (ii) prejudice, in any manner, the rights of the Debtors, the Committee or any other Person or Entity.

G.    *Settlement, Injunction, Exculpation, Release, and Related Provisions*

1.    Settlement Released Claims

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise and settlement of the Settlement Released Claims, to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest.

Bankruptcy Code section 105(a) provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019 provides: on motion of the trustee, after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Citing this authority, the Third Circuit emphasized that "[c]ompromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also *In re World Health Alternatives, Inc.,* 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" *In re Penn Cent. Transp. Co.,* 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer Ferry),* 390 U.S. 414, 424 (1968)). Courts in this District also recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. *See, e.g., In re Coram Healthcare Corp.,* 315 B.R. 321, 329 (Bankr. D. Del. 2004).

To approve a settlement under Bankruptcy Rule 9019, a court determines whether "the compromise is fair, reasonable, and in the interest of the estate." *In re Marvel Entm't Grp., Inc.,* 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.,* 211 B.R. 798, 801 (D. Del. 1997)). Part of the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 424-25. The court need not be convinced that the settlement is the best possible compromise in order to approve it. *In re Coram Healthcare Corp.,* 315 B.R. at 330. Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." *Travelers Cas. & Sur. Co. v. Future Claimants Representative,* No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing *In re Jasmine, Ltd.,* 258 B.R. 119 (D.N.J. 2000)). *See also In re Coram Healthcare Corp.,* 315 B.R. at 330.

The Third Circuit established four criteria for a bankruptcy court to consider when evaluating a settlement proposal: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393. Here, the probability of success in litigation is low, the difficulty in collection is high, the litigation in question is very complex, and the creditors' interests are best served via the proposed Settlement.

The Debtors submit that the Global Settlement embodied within the Plan satisfies the requirements of Bankruptcy Rule 9019. The Debtors' Independent Director conducted an exhaustive investigation into any potential claims and causes of action that could be asserted against the LMPC Board, the LMPC Officers and LMOC Officers who were serving in such capacity as of the Petition Date and the Prepetition Secured Lender. The Independent Director investigation found that there were no viable claims or causes of action against the Released Parties. Moreover, to the extent that there were any potential claims or causes of action against the Prepetition Secured Lender, the Prepetition Secured Lender has allowed material amounts of its collateral to be used since the Petition Date to administer the Chapter 11 Cases and provide for the recoveries contemplated by the Global Settlement. The Prepetition Secured Lender has made a substantial contribution to the Chapter 11 Cases. Accordingly, the Debtors' Independent Director believes that the Global Settlement is in the best interest of the Debtors and all of their creditor constituencies.

The Debtors, the Committee, and Kroger submit the Global Settlement embodied within the Plan represents an efficient means of resolving the Debtors' Chapter 11 Cases and allows for a higher recovery to general unsecured creditors than would otherwise be achieved if the Chapter 11 Cases were converted to a chapter 7 liquidation. Furthermore, the Debtors, Committee, and Kroger support an efficient and expedited chapter 11 plan confirmation and disclosure statement approval process.

The Global Settlement provides for payment in full of: Administrative Expense Claims, PACA Claims, PASA Claims, Professional Fee Claims, Secured Tax Claims, Tax Claims, and Priority Claims. The Wind-Down Reserve shall be allocated for post-wind-down costs; any cost incurred over the Wind-Down Reserve shall be paid as set forth in the Plan before distributions are made to the General Unsecured Claim Class A Recovery Pool and the General Unsecured Claim Class B Recovery Pool.

The Kroger General Unsecured Claims, the Prepetition Secured Lender Deficiency Claim, and the Prepetition Secured Lender Subrogation Claim are classified separately in the General Unsecured Claims Class C Recovery Pool. Any amount of the one-quarter of the Wind-Down Reserve allocated to the General Unsecured Claims Class B Recovery Pool remaining after payment or reserve in full of all General Unsecured Claims Class B Recovery Pool shall be distributed to the Prepetition Secured Lender. All remaining Assets of the Debtors' Estates other than Cash on Hand, Identified Assets and the Equity Interests in Lucky's Market GP 2, LLC and LFM Stores, LLC (*e.g.* causes of action, claims related to guarantees, future accounts receivable, Equity Interests, rebates, refunds, etc.) shall be assigned or distributed to Kroger in accordance with the Plan.

As part of the Global Settlement, Intercompany Claims shall receive no distribution and be extinguished.

The Debtors waive their rights with respect to any Causes of Action, including Avoidance Actions. The Global Settlement contemplates the Release by Debtors of the Released Parties and the Third Party Releases. For the avoidance of doubt, the Releases do not extend to any lease guaranties, personal guaranties, or other guaranties related to such Released Parties.

The Debtors and Committee, as part of the Global Settlement, shall support any unsold remaining Kroger Guaranteed Leases being assigned to Kroger or its designee.

The Global Settlement provides for the Estates to pay all rent obligations, including all rent on any Kroger Guaranteed Lease, through the conclusion of the outside date under Section 365(d)(4) of the Bankruptcy Code, subject to the Third Interim Cash Collateral Order and Kroger's Rent Reimbursement Obligation.

The Third Interim Cash Collateral Order shall be adjourned and the status quo established under the Third Interim Cash Collateral Order shall be maintained until, entry of the Fourth Interim Cash Collateral Order, and then superseded by, the entry of the order confirming the Plan. The Global Settlement is a comprehensive settlement of all issues relating to the Debtors' use of cash collateral securing the claims of the Prepetition Secured Lender.

The Global Settlement shall constitute a settlement of all litigation against the Debtors, Kroger, or other insiders by such parties, and that all pending discovery requests shall be held in abeyance and no future discovery requests shall be propounded.

Accordingly, in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth herein, shall constitute a good-faith compromise and settlement of all Settlement Released Claims. Without limiting the preceding sentence, the Plan provides for the release of the following Settlement Released Claims:

(1)     Equitable subordination claims;

(2)     Causes of Action, including Avoidance Actions, against Kroger; and

(3)     Claims related to Kroger's and directors' and members' that are affiliated with Kroger, and the Debtors related to fulfillment of their fiduciary duties.

The settlement of Settlement Released Claims provided for herein and the distributions and other benefits provided for under the Plan, including the releases set forth herein, shall be in full and final satisfaction of any and all potential Claims that could have been asserted, regardless of whether any of the foregoing Settlement Released Claims are identified herein or could have been asserted. The Liquidating Debtor shall effect Distributions resulting from the Settlement and compromise of the Settlement Released Claims. The approval of such Settlement Released Claims provided for hereunder is solely for the purpose of determining the allocation and distribution to

54

Holders of Allowed Claims pursuant to the Plan, but shall not alter the treatment of the underlying transactions that gave rise to such Settled Causes of Action for any other purpose.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Settled Causes of Action and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and all other parties in interest, and are fair, equitable and within the range of reasonableness. The compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

Finally, as part of the Global Settlement, the EB-5 Investors have negotiated with the Debtors the proposed treatment provided to them under Class 9 of the Plan in exchange for not asserting any claims they may have against the Debtors and waiving any distribution they may be entitled to.

2.    <u>Injunction</u>

**ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER BANKRUPTCY CODE SECTIONS 105 OR 362, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF (A) THE EFFECTIVE DATE, OR (B) THE DATE INDICATED IN THE ORDER PROVIDING FOR SUCH INJUNCTION OR STAY. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL BE OTHERWISE DEEMED TO MODIFY, LIMIT, AMEND OR SUPERSEDE ANY INJUNCTIONS OR STAYS GRANTED IN THE SALE ORDER.**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR TO THE EXTENT NECESSARY TO ENFORCE THE TERMS AND CONDITIONS OF THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN ON ACCOUNT OF ANY SUCH CLAIMS OR EQUITY INTERESTS: (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT SUCH ENTITIES SHALL NOT BE PRECLUDED FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN OR THE CONFIRMATION ORDER; <u>PROVIDED</u>, <u>FURTHER</u>, THAT THE FOREGOING SHALL NOT APPLY TO**

ANY ACTS, OMISSIONS, CLAIMS, CAUSES OF ACTION OR OTHER OBLIGATIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR ANY DEFENSES THERETO. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL BE OTHERWISE DEEMED TO MODIFY, LIMIT, AMEND OR SUPERSEDE ANY INJUNCTIONS OR STAYS GRANTED IN ANY ORDER APPROVING THE SALE OF ANY ASSET OF THE ESTATES.

   3. <u>Exculpation</u>

   **EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR INTEREST (INCLUDING ESTATE CLAIMS) FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE PURSUIT OF CONFIRMATION, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, THE PROPERTY TO BE LIQUIDATED AND/OR DISTRIBUTED UNDER THE PLAN OR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE LIQUIDATION OF THE DEBTORS, EXCEPT FOR THEIR WILLFUL OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, AND IN ALL RESPECTS SHALL BE ENTITLED TO RELY REASONABLY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.**

   **THE FOREGOING PARAGRAPH SHALL APPLY TO ATTORNEYS TO THE GREATEST EXTENT PERMISSIBLE UNDER APPLICABLE BAR RULES AND CASE LAW.**

   4. <u>Releases by the Debtors</u>

   **PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES SHALL BE DEEMED RELEASED BY THE DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ANY OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR**

INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES. FOR PURPOSES OF THE RELEASES CONTAINED IN THE PLAN, THE LIQUIDATING DEBTOR IS DEEMED TO BE A SUCCESSOR TO THE ESTATES AND, THEREFORE, IS BOUND BY THE RELEASES CONTAINED IN THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL, SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS OR THE ESTATES; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTORS OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY THE DEBTORS OR THE ESTATES.

5.    Third Party Releases

EFFECTIVE AS OF THE EFFECTIVE DATE, EACH OF THE RELEASING PARTIES CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASES (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) EACH AND ALL OF THE RELEASED PARTIES, AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER (OTHER THAN FOR ILLEGAL CONDUCT, GROSS NEGLIGENCE, BAD FAITH, OR FRAUD), INCLUDING WITH RESPECT TO ANY RIGHTS OR CLAIMS THAT COULD HAVE BEEN ASSERTED AGAINST ANY OR ALL OF THE RELEASED PARTIES WITH RESPECT TO ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER

73279734.28

**ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OR ANY ALLEGED RESTRUCTURING OR REORGANIZATION OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION), AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES, PROVIDED THAT NOTHING IN THE PLAN SHALL CONSTITUTE A RELEASE OF THE PRIOR OWNERS BY KROGER.**

**ENTRY OF THE CONFIRMATION ORDER SHALL, SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE RELEASING PARTIES; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; (F) CONSENSUAL; AND (G) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.**

H.    *Substantive Consolidation*

In connection with confirmation of the Plan, the Debtors assert the Plan substantively consolidates the Estates of all of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan, including voting on the Plan and distributions under the Plan. *See*

*generally, In re SportCo Holdings, Inc.* (19-11299-LSS), Nov. 1, 2019 Hearing Transcript, 18:24 – 27:24 [Docket No. 515] and *Order Confirming Debtors' Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 525] (Bankr. D. Del. Nov. 6, 2019). On the Effective date: (i) all assets and liabilities of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim, including General Unsecured Claims, against the Debtors will be deemed a single Claim against, and a single obligation of, the Debtors, (iii) any Claim filed or to be filed in the Chapter 11 Cases will be deemed a single Claim against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.

Substantive consolidation is appropriate for a number of reasons. Subject to the Committee's challenge rights, the Prepetition Secured Lender obtained a lien on substantially all of the personal property assets of the Debtors prepetition, all as set forth in greater detail in the Prepetition Secured Loan Documents, the motion to approve the use of cash collateral, and the various Orders approving the use of cash collateral. The Prepetition Secured Lender's obligations are guaranteed by LMPC and LMOC. Regardless of corporate formalities, subject to the Committee's challenge rights, the Prepetition Secured Lender has a lien on substantially all of the Debtors' assets.

Before the Petition Date, the Prepetition Secured Lender extended credit to LMPC and LMOC. Under the Prepetition Secured Loan documents, the Prepetition Secured Lender received combined financial reports from the Debtors and calculated covenant compliance based on the assets and liabilities of all the Debtor entities. The reporting requirements and financial covenants that the Debtors were subject to prior to the Petition Date indicate the Prepetition Secured Lender relied on the collective identity of the Debtors as prepetition borrowers and prepetition guarantors when extending credit.

The Debtors have not allocated professional fees and the cost of administering the Chapter 11 Cases amongst all of the Debtors. The restructuring costs have been booked on a consolidated basis.

Substantive consolidation of the Debtors' Estates avoids the inefficiency of proposing and voting in respect of entity-specific Claims where there would be no impact on distributions. The Debtors, the Prepetition Secured Lender, and the Committee believe creditors would receive less under separate plans than they stand to receive under the Plan because, in accordance with the Global Settlement, the Plan provides for a recovery on account of General Unsecured Claims that Holders of such Claims would not otherwise receive. The benefits of substantive consolidation outweigh any potential harm to Creditors.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Third Circuit in Owens Corning discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on a debtors' creditors and their rights and recoveries. The Third Circuit provided the following baseline standards for approval of non-consensual substantive consolidation, while leaving the trial court with discretion to assess what facts are necessary to meet these standards: (1) prepetition the debtors disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one entity; or  (2) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. Id. at 211.

Substantive consolidation is also appropriate where the parties consent to it. *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

Here, where the Debtors assert the Plan substantively consolidates the Estates, the entry of the Confirmation Order constitutes approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) for all purposes relating to the Plan, including for purposes of voting, confirmation, and distributions. The Plan substantively consolidates the Estates, therefore, for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors (other than Lucky's Market GP 2, LLC and LFM Stores, LLC) will be treated as though they merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, will be considered eliminated so that any Claim and guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, will be treated as one collective obligation of the Debtors. Moreover, (a) no distribution will be made under the Plan on account of any Intercompany Claims held by any one of the Debtors in any of the other Debtors except to the extent necessary to effectuate the substantive consolidation provided for in the Plan, (b) all guarantees of any one of the Debtors of the obligations of any of the other Debtors, to the extent any exist, will be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, will be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely filed or to be filed in the Chapter 11 Cases of any of the Debtors will be deemed filed against the consolidated Estates and will be one Claim against, and one obligation of, the Estates.

Additionally, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, will be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts will be Allowed only once as if such Claim were against a single Debtor.

The Debtors believe that substantive consolidation is in the best interest of General Unsecured Creditors.

If the Debtors seek and receive approval of substantive consolidations, to avoid additional administrative expense, then the Debtors shall be authorized to submit an order to the Bankruptcy Court under certification of counsel that is in form and substance reasonably acceptable to the U.S. Trustee and the Committee that closes each of the Chapter 11 Cases, except for Lucky's Market Parent Company, LLC's Chapter 11 Case. The Debtors' consolidated estate would thereafter be administered through Lucky's Market Parent Company, LLC's Chapter 11 Case. Once the Plan has been fully administered, the Liquidating Debtor would thereafter file a final report and a motion seeking a Final Decree of the one remaining Estate.

I.    *Liquidating Trust*

    1.    <u>Establishment of the Liquidating Trust</u>

All Assets of the Liquidating Debtor shall be transferred to a Liquidating Trust for the benefit of holders of Allowed Claims no later than January 15, 2022, to the extent not previously disposed or distributed, and the Liquidating Debtor shall be dissolved without any further action no later than the following business day. The Liquidating Debtor may determine at any time whether it is in its best interest to establish a Liquidating Trust as of an earlier date. The Liquidating Debtor and the Liquidating Trustee shall execute the Liquidating Trust Agreement, and shall take all other necessary steps to establish the Liquidating Trust for the benefit of Liquidating Trust Beneficiaries. In the event of any conflict between the terms of Article IX.A of the Plan and the terms of the Liquidating Trust Agreement as such conflict relates to the establishment of the Liquidating Trust, the terms of Article IX.A of the Plan shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not adversely affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

    2.    <u>Purpose of the Liquidating Trust</u>

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in consultation with Kroger and/or the Creditor Representative as appropriate, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

    3.    <u>Liquidating Trust Assets</u>

The Liquidating Trust shall consist of Liquidating Trust Assets. After the creation of the Liquidating Trust pursuant to Article IX.A of the Plan, the Liquidating Debtor shall transfer all of the Liquidating Trust Assets to the Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in the Liquidating Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

4.      Administration of the Liquidating Trust

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and the Liquidating Trust Agreement as such conflict relates to anything other than the establishment of the Liquidating Trust, the Liquidating Trust Agreement shall control so long as such conflict does not adversely affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

5.      Liquidating Trustee's Tax Powers for Debtors

The Liquidating Trustee shall have the same authority and responsibility in respect of all taxes of the Debtors and the Liquidating Debtor, and to the same extent, as if the Liquidating Trustee were the Debtors and the Liquidating Debtor.

6.      Cash Investments

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings or other controlling authorities.

7.      Distribution of Liquidating Trust Interests

The Liquidating Trustee shall, at least semi-annually, distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests certain Cash on Hand (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Article IX.G), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), (c) satisfy Disputed Claims, or (d) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a Distribution pursuant to this Article IX.G of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

8.      Federal Income Tax Treatment of Liquidating Trust

In furtherance of this Article IX of the Plan, (i) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of Liquidating Trust Interests, consistent with the terms of the Plan; (ii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with

Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, the Liquidating Debtor, holders of Liquidating Trust Interests and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Liquidating Trust Interests, followed by the deemed transfer of such assets to the Liquidating Trust); (iv) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (v) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the Liquidating Trustee shall annually send to each holder of Liquidating Trust Interests a separate statement regarding the receipts and expenditures of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may timely elect to (a) treat any portion of the Liquidating Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidating Debtor, the holders of Liquidating Trust Interests and the Liquidating Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. As to any assets allocable to, or retained on account of, Disputed Claims, all distributions shall be net of any expenses, including taxes, relating to the retention or disposition of such assets, and the Liquidating Trustee shall be responsible for payment, solely out of the assets of such retained assets, of any taxes imposed on or in respect of such assets. All parties (including, without limitation, the Liquidating Debtor, the Liquidating Trustee and the holders of Liquidating Trust Interests) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including any reserve for Disputed Claims, or of the Debtors or the Liquidating Debtor under Section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtors or the Liquidating Debtor for all taxable periods through the dissolution of the Liquidating Trust.

9.    Dissolution

The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, that in no event shall the Liquidating Trust

be dissolved later than five (5) years from the creation of the Liquidating Trust pursuant to Article IX.A of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as the Liquidating Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from United States federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation", as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.

J.      *Rights and Authority of the Creditor Representative*

Following the Effective Date, the Creditor Representative shall have the following rights, duties and authorities:

(1)     The Committee shall select the Creditor Representative prior to the Effective Date;

(2)     The Creditor Representative shall be charged with (a) overseeing the Distributions to the Creditors under Class 4 of the Plan, (b) protecting the rights, benefits and interests of the Holders of General Unsecured Claims in the General Unsecured Claims Class A Recovery Pool, (c) ensuring that all Cash, Cash on Hand, Identified Assets, and Assets are properly allocated and distributed in accordance with the terms of the Plan, (d) resolving with the Liquidating Debtor or otherwise litigating any disputes or uncertainties concerning the proper allocation of costs, fees and expenses incurred in administrating the Estates after depletion of the funds available in the Wind-Down Budget, (e) resolving with the Liquidating Debtor or otherwise litigating any disputes or uncertainties concerning the Wind-Down Reserve, and (f) otherwise exercising any rights, duties, or authorities specified for the Creditor Representative in the Plan;

(3)     The Creditor Representative shall have standing to object to and be heard on any matter brought before the Bankruptcy Court, including any appeal thereof, including without limitation the allowance, disallowance, classification, reclassification or estimation of any Administrative Expense Claim, Priority Tax Claim, Priority Claim, and/or General Unsecured Claim in the General Unsecured Claims Class A Recovery Pool or General Unsecured Claims Class B Recovery

Pool solely in the event a Claim is reclassified from a Class B Claim to a Class A Claim;

(4)     The Creditor Representative has the right to retain professionals to assist in the exercise of his or her duties and responsibilities under the Plan; it shall not be a conflict for the Creditor Representative to retain any of the professionals previously retained by the Committee; and

(5)     The Liquidating Debtor shall pay the reasonable fees and expenses incurred by Creditor Representative and his or her professionals from the Wind-Down Reserve; provided, however, any fees and expenses incurred by the Creditor Representative and his or her professionals in excess of $150,000 in the aggregate shall be paid solely from the funds in the General Unsecured Claims Class A Recovery Pool.

K.     *Retention of Jurisdiction*

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)     to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)     to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Bankruptcy Code section 1142;

(4)     to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(7)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of any order entered by the Bankruptcy Court;

(8)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns of the Debtors and of any Liquidating Trusts for any and all taxable periods ending after the Petition Date through the Closing Date;

(9)     to hear and determine any application, motion, objection or other matter filed by the Creditor Representative;

(10)    to hear any other matter not inconsistent with the Bankruptcy Code;

(11)    to enter the Final Decree;

(12)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(13)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(14)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

(15)    to determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

(16)    to determine any other matters that may arise in connection with or related to any Order approving the sale of an asset of the Estates or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with any order entered by the Bankruptcy Court;

(17)    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(18)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(19)    to hear and determine any matter raised by the Creditor Representative; and

(20)    to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose.

L.   *Miscellaneous Provisions*

1.   Amendment or Modification of the Plan

The Debtors, in consultation with the Prepetition Secured Lender and the Committee, to the extent the economic recovery of Holders in Class 4 is adversely impacted by such amendments, may modify the Plan at any time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

2.   Exhibits/Schedules

All exhibits and schedules to the Disclosure Statement and the Plan Supplement are incorporated into and are part of the Plan as if set forth in full therein.

3.   Plan Supplement

The Debtors will File the Plan Supplement by [December 11, 2020] at 4:00 p.m.

4.   Filing of Additional Documents

On or before substantial consummation of the Plan, the Liquidating Debtor shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

5.   Binding Effect of Plan

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns. Notwithstanding anything to the contrary herein, nothing in the Plan modifies, alters, or amends the respective rights and obligations of the Debtors or the purchasers of any asset of the Estates under the applicable sale Order, the asset purchase agreement [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], or any other document governing such sale.

6.   Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

7.    Time

To the extent that any time for the occurrence or happening of an event as set forth in the Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

8.    Severability

Should any provision of the Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

9.    Revocation

The Debtors, in consultation with the Prepetition Secured Lender and the Committee, reserve the right to revoke and withdraw the Plan prior to the entry of the Confirmation Order. If the Debtors revoke or withdraw the Plan, the Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

10.    Dissolution of the Committee

On the Effective Date, the Committee shall be dissolved and its members deemed released of any continuing duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention and employment of the Committee's Professionals shall terminate, except with respect to: (a) prosecuting applications for Professionals' compensation and reimbursement of expenses incurred as a member of the Committee; (b) asserting, disputing and participating in resolution of Professional Fee Claims; or (c) prosecuting or participating in any appeal of the Confirmation Order or any request for consideration thereof. Upon the resolution of (a) through (c), the Committee shall be immediately dissolved, and released.

11.    Claims Agent

Omni, in its capacity as Claims and Noticing Agent and as Administrative Agent, shall be relieved of such duties on the date of the entry of Final Decree or upon written notice by the Debtors or Liquidating Debtor, and subject to approval by the Bankruptcy Court.

12.    Inconsistency

To the extent that this Disclosure Statement conflicts with or is inconsistent with any agreement related to the Plan and, the provisions of the Plan shall control; provided, however, that nothing in the Plan shall be deemed to supersede, amend, modify the provisions of the or purchasers under the sale orders and respective asset purchase agreements [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], the bid procedures orders [Docket Nos. 282-288, and 864], or the Final Cash Collateral Order.

In the event of any inconsistency between any provision of any of the foregoing documents, and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence; provided, however, that nothing in the Confirmation Order shall be deemed to supersede, amend, modify the provisions of the sale orders and respective asset purchase agreements [Docket Nos. 569, 574, 589, 590, 618, 619, 629, 659, 673, 702, 706, 715, 755, 930, and 951], the bid procedures orders [Docket Nos. 282-288, and 864] or the Final Cash Collateral Order.

### 13.   No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

### 14.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. The filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Equity Interests before the Effective Date.

### 15.   Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan and in the Chapter 11 Cases, including the Global Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements, provided for in the Plan and the Chapter 11 Cases, including the Global Settlement. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estate, and all Holders of Claims and Equity Interests against the Debtors.

### 16.   No Discharge

As set forth in Bankruptcy Code section 1141(d)(3), the Plan does not grant the Debtors a discharge. However, notwithstanding the foregoing, except as otherwise provided herein, the rights afforded pursuant to the Plan and the treatment of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Filing Date, against the Debtors or any of their Assets. All persons and entities shall be precluded form asserting against the Debtors, or any of their assets any further Claims or Equity Interests based upon any act, or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Plan.

## ARTICLE VI.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

A.    *Confirmation Hearing*

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of a plan. The Confirmation Hearing pursuant to Bankruptcy Code section 1128 will be held on [•] at [•], prevailing Eastern Time, before the Honorable John T. Dorsey, United States Bankruptcy Judge, in Courtroom No. 5 on the 5th Floor of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following notice parties so as to be actually received on or before [•] at [•], prevailing Eastern Time:

| Counsel to the Debtors | |
|---|---|
| **Polsinelli PC**<br>Christopher A. Ward<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801<br><br>Liz Boydston<br>2950 N. Harwood, Suite 2100<br>Dallas, Texas 75201 | |
| *Counsel to the Committee* | |
| **Hahn & Hessen LLP**<br>Mark S. Indelicato<br>Mark T. Power<br>Jeffrey Zawadzki<br>Emma Fleming<br>488 Madison Avenue<br>New York, New York 10022 | **Womble Bond Dickinson (US) LLP**<br>Matthew P. Ward<br>Morgan L. Patterson<br>1313 North Market Street, Suite 1200<br>Wilmington, Delaware 19801 |

| *U.S. Trustee* |
|:---:|
| **Office of the United States Trustee** |
| 844 King Street, Suite 2207 |
| Wilmington, Delaware 19801 |
| Attn: Timothy J. Fox |

B.    *Confirmation Standards*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of Bankruptcy Code section 1129, including those set forth below.

1.    Feasibility

Pursuant to Bankruptcy Code section 1129(a)(11), among other things, the Bankruptcy Court must determine that Confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

2.    Best Interests Test

The "best interests" test under Bankruptcy Code section 1129 requires as a condition to confirmation of a plan that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a liquidation carried out under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Allowed Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established by the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same

73279734.28

priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

Substantially all of the Debtors' assets were liquidated in accordance with the APAs. Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that Confirmation of the Plan will result in a greater recovery for Holders of Allowed Claims and Allowed Interests in Class 4 than would result from a chapter 7 liquidation. This is due in part to the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense that would be incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' assets and liabilities. Finally, the conversion to chapter 7 would require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Allowed against the Debtors' Estates could materially increase, thereby reducing creditor recoveries.

The information contained in the Liquidation Analysis attached hereto as **Exhibit C** compares the anticipated recoveries under the Plan and the recoveries that could be expected in a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, and for the reasons outlined above, the Debtors believe that a hypothetical chapter 7 liquidation would result in reduced recoveries for Holders of Allowed Claims and Allowed Interests in Classes 3, 4, and 5.

C.    *Alternative Plans*

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described therein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

D.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. *See* 11 U.S.C. § 1129(a)(8). A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. *See* 11 U.S.C. § 1126(f). Pursuant to Bankruptcy Code section 1124, a class is "impaired" unless the plan, among other things: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (ii) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question. *See* 11 U.S.C. § 1124.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class that are entitled to vote on the plan, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number entitled to vote and actually voting cast their Ballots in favor of acceptance.

Bankruptcy Code section 1126(d) defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds (2/3) in amount of those interests who are entitled to vote and actually vote to accept or reject a plan. Votes that have been "designated" under Bankruptcy Code section 1126(e) are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount entitled to vote and actually voting cast their Ballots in favor of acceptance, not counting designated votes.

Only Holders of Claims and Interests in the Voting Classes will be entitled to vote on the Plan.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court deem the Plan accepted by the Holders of such Claims or Interests in such Class. Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies Bankruptcy Code section 1129(a)(10). *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 14, 259–63 (Bankr. S.D.N.Y. 2007).

E.      *Confirmation Without Acceptance by All Impaired Classes*

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan if it is accepted by at least one impaired voting class even if other impaired voting classes vote to reject it. Pursuant to Bankruptcy Code section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. *See* 11 U.S.C. § 1129(b).

1.      No Unfair Discrimination

The "unfairly discriminates" test under Bankruptcy Code section 1129(b)(1) applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual confirmation.

2.      Fair and Equitable Test

The "fair and equitable" test under Bankruptcy Code section 1129(b)(1) and (2) applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type

of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

### a.   Secured Claims

A plan is "fair and equitable" with respect to a non-accepting class of secured creditors if either (a) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (a) or (b) above. *See* 11 U.S.C. § 1129(b)(2)(A).

### b.   Unsecured Claims

A plan is "fair and equitable" with respect to a non-accepting class of unsecured creditors if either: (a) the plan provides that each holder of a claim in such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(B).

### c.   Equity Interests

A plan is "fair and equitable" with respect to a non-accepting class of equity interests if: (a) the plan provides that each holder of an interest in such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property. *See* 11 U.S.C. § 1129(b)(2)(C).

## ARTICLE VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims and Interests should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      *Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims and Allowed Interests Under the Plan*

1.      The Amount of Allowed Claims May Adversely Affect Recoveries

The Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Depending on the accuracy of the Debtors' various assumptions, even those Holders who are anticipated to be entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

2.      The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims and Allowed Interests in the Voting Classes

The Debtors cannot know with certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty the extent of recoveries that may be available to Holders of Allowed Claims and Allowed Interests in the Voting Classes.

3.      Any Valuation of the Debtors' Assets is Speculative and Could Potentially Be Zero

A portion of the Cash to be distributed to Holders of Allowed Claims and Allowed Interests under the Plan has not yet been realized from the liquidation of the Debtors' Assets. Any valuation of these assets is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Claims and Interests in the Voting Classes.

4.      The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries

Although the Debtors have made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated. In addition, the timing of actual Distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim or Allowed Interest.

5.      Certain Tax Implications of the Debtors' Chapter 11 Cases

Holders of Allowed Claims and Allowed Interests should carefully review Article VIII hereof, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases.

B.      *Certain Bankruptcy Law Considerations*

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim or Interest. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim or Interest that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2.      Failure to Satisfy Vote Requirements

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as, among other things, an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, or conversion to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3.      The Debtors May Not Be Able to Secure Confirmation of the Plan

The Debtors will need to satisfy Bankruptcy Code section 1129, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by

a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class of claims has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and that the Debtors may request such nonconsensual Confirmation in accordance with Bankruptcy Code section 1129(b). Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.      Risk of Nonoccurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

6.      Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan

The existence and extent of distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

C.      *Disclosure Statement Disclaimer*

1.      The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      Information Contained in this Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking

terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.      No Legal or Tax Advice is Provided to You by this Disclosure Statement

*This Disclosure Statement is not legal advice to you.* The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, each of the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.      Failure to Identify Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Liquidating Debtor, as applicable, may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies objections to such Claims or Interests.

8.      No Waiver of Right to Object or to Recover Transfers and Assets

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors, including the Professionals, have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.     <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.     <u>No Representations Outside this Disclosure Statement Are Authorized</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

12.     <u>Immigration Consequences</u>

The immigration consequences to holders of Claims and Interests may vary based upon the individual circumstances of certain aspects of the Plan are uncertain due to the lack of applicable legal precedent and the possibility of changes in the applicable law and regulations. There can be no assurance that the federal government will not challenge any of the immigration consequences described herein, or that such a challenge, if asserted, would be sustained. Accordingly, each Holder of a Claim or Interest is strongly urged to consult with his/her own immigration advisor regarding the immigration consequences of the Plan.

D.     *Liquidation Under Chapter 7*

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

## ARTICLE VIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    *Tax Consequences to the Debtors*

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The Tax Attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD

81

Income is realized. Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

B.      *Tax Consequences for Holders of Claims*

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, may be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

## ARTICLE IX.

## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is superior and preferable to the alternatives described in the Plan. Further, the value being provided to creditors under the Plan was subject to a competitive process. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

Respectfully Submitted,

Dated:  October 29, 2020

Lucky's Market Parent Company, LLC, *et al.*
Debtors and Debtors in Possession

By:   */s/ Andrew T. Pillari*
Name:  Andrew T. Pillari
Title:    Chief Financial Officer

Prepared by:

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Email: cward@polsinelli.com

-and-

Liz Boydston (admitted *Pro Hac Vice*)
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 661-5557
Email: lboydston@polsinelli.com

*Counsel for Debtors and Debtors-in-Possession*