## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUCKY'S MARKET PARENT COMPANY, *et al.*, | Case No. 20-10166 (JTD) (Jointly Administered) |
| Debtors. | **Re: D.I. 656** |

### OPINION[1]

### INTRODUCTION

ATA Forum Louisville KY, LLC ("ATA") moved for approval of an administrative expense claim relating to its non-residential real property lease with the Debtors.  ATA alleged that it was entitled to an administrative expense because the Debtors: (i) violated a court order regarding removal of property from the leased premises, (ii) wrongfully converted ATA's property, (iii) negligently caused damage to ATA's property, and (iv) breached the terms of its lease prior to rejection.  An evidentiary hearing was held on November 3, 2020 and January 8, 2021.  During the hearing eight witnesses testified live, and five declarations, a deposition transcript from an unavailable witness, and nearly a hundred exhibits were admitted into evidence.  Having considered the evidence and the arguments of the parties, I will deny the motion.

### I.     Jurisdiction

The Court has jurisdiction over the Debtors' bankruptcy cases and ATA's application for an administrative claim pursuant to 28 U.S.C. §§ 157(b) and 1334. The Application presents a core proceeding as defined in 28 U.S.C. § 157(b) over which the Court has the jurisdiction to enter a final order.

---

[1] This Opinion will constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II.    **Factual Background**

### A.  The Parties

Lucky's Market Parent Company, LLC and its debtor affiliates (collectively, the "Debtors") operated organic grocery stores throughout the United States. Am. Decl. Andrew T. Pillari, Chief Fin. Officer of Debtors, in Support of Chapter 11 Pet. and First Day Pleadings ("First Day Declaration") [D.I. 47]. As of the petition date, Debtors were operating 39 stores. *Id*. Each store averaged approximately 31,000 square feet and had full-service departments including produce, meat, seafood, culinary, apothecary, beer/wine/spirits, and grocery. *Id*. at ¶ 11. The Debtors leased 37 of the stores and owned the other two. *Id*.

ATA is a subsidiary of Arciterra Companies, a private real estate company that owns approximately 70-100 shopping centers and other retail properties throughout the country. Larmore Decl. ¶ 5. ATA was the landlord for one of the Debtors' stores located in Louisville, Kentucky. Trial Ex. 2.

### B.  Procedural History

On January 27, 2020, the Debtors commenced these cases by filing petitions for relief under chapter 11 of the Bankruptcy Code. On the same day, the Debtors filed their *Motion of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement* (the "Closing Procedures Motion") [D.I. 13]. On January 28, 2020, I entered an *Interim Order Authorizing (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement* (the "Interim Order") [D.I. 51], establishing the Interim Store Closing Procedures. On March 3, 2020, I entered a *Final Order Authorizing (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement* (the "Final Order") [D.I. 321].

2

On April 24, 2020, ATA filed its *Application for Allowance of Administrative Claims Under 11 U.S.C. secs. 105, 503(b) and 365(d)(3)* (the "Application") [D.I. 656], alleging that the Debtors violated the Interim Order and Final Order, converted and damaged ATA's property, and breached the Lease by removing fixtures from ATA's real property and causing damage during the removal process.  On June 17, 2020, the Debtors and the Official Committee of Unsecured Creditors filed their objections to the Application. [D.I. 805 and 806]. ATA submitted a reply to the objections on July 2, 2020. [D.I. 849]. During a preliminary hearing, I found there were issues of fact requiring an evidentiary hearing.

On October 30, 2020, ATA filed a *Motion to Strike Portions of the Declaration of Andrew Pillari* ("Pillari Motion to Strike") [D.I. 1169]; *ATA Forum Louisville KY, LLC's Evidentiary Objections and Motion to Strike Portions of the Trial Declaration of Chad A. Renier in Support of the Objection of the Debtors to ATA Forum Louisville KY, LLC's Application for Allowance of Administrative Claim Under §§ 105, 503(b), and 365(d)(3)* ("Renier Motion to Strike") [D.I. 1170]; *ATA Forum Louisville KY, LLC's Evidentiary Objections and Motion to Strike Portions of the Declaration of Peter Wyke (related document(s)656, 805) Filed by ATA Forum Louisville, KY, LLC* ("Wyke Motion to Strike") [D.I. 1173] (collectively, the "Motions to Strike").

Prior to the beginning of the evidentiary hearing on November 3, 2020, I heard argument relating to the Motions to Strike. Following oral argument, I granted the Pillari Motion to Strike in all respects and the Wyke Motion to Strike except as to paragraphs 10–16. Tr. Evidentiary Hr'g, at 22:7–24:22; 29:16–23 (November 3, 2020) ("11/3/20 Tr.") [D.I. 1196].[2] With respect to the Renier Motion to Strike, I ruled that Mr. Renier could testify based on his experience under Federal

---

[2] The transcript from the continued evidentiary hearing held on January 8, 2021 is filed at D.I. 1484 and shall be referred to herein as the "1/8/21 Tr."

3

Rule of Evidence 701 "as a lay witness testifying in a quasi-capacity as an expert witness." *Id*. 32:17–19. In addition, the parties stipulated to the admission of all ATA exhibits, Trial Exhibits 1–81, and Trial Exhibit 88. Trial Exhibits 82 and 84–87 were deposition transcripts that were not admitted in full but used only for impeachment purposes. *See* 11/3/20 Tr., 33:7–37:15. The deposition transcript of Clarissa McLean marked as Exhibit 83 (the "McLean Tr.") was admitted in full due to the unavailability of Ms. McLean at trial. *Id*.

The parties also stipulated to the admission of some of the Debtor's Exhibits as follows: Trial Exhibits C, J, K, L, M, N, O, P, T, U, and V. *Id*.

**C.  The Removal of Disputed Property**

ATA and Debtors entered into a commercial lease dated July 30, 2013 (the "Lease"). Trial Ex. 2. The Lease included approximately 30,000 square feet of retail space (the "Store") located within a shopping center in Louisville, Kentucky (the "Shopping Center"). Trial Ex. 2, § 1. The Lease was rejected pursuant to 11 U.S.C. § 365 on February 29, 2020. *See* Order (I) Authorizing (A) The Rejection of Certain Unexpired Leases and Contracts and (B) the Abandonment of Certain Personal Property, if any, Each Effective Nunc Pro Tunc to February 29, 2020 and (II) Granting Related Relief [D.I. 406], granting the Debtors' Omnibus Rejection Motion [D.I. 310].

As explained above, Interim and Final Orders were entered to outline the process Debtors would use to close and liquate their stores. The Interim Order authorized the Debtors to hire Great American Global Partners, LLC (the "Liquidation Consultant") to oversee the store closings. The Interim Order also authorized the Debtors and the Liquidation Consultant to remove and sell:

> the movable furniture, fixtures, or other equipment, excluding all property of the landlord, including all real property improvements located on the Premises (the "FF&E" and, together with the applicable inventory, the "Store Closing Assets") located at the Closing Stores, and any such transaction shall be free and clear of all liens, claims, interests, and other encumbrances.

*Id*. at Store Closing Procedures, ¶ 4. The Store was listed as one of the locations slated for closure. *Id*. at Liquidation Consulting Agreement Ex. B. The Liquidation Consultant hired an independent contractor, Dennis Jenkins, as the lead consultant to help oversee the Debtors' FF&E liquidation sales. 1/8/21 Tr., 96:5–9; 97:5–7. The Liquidation Consultant also retained another independent contractor, Clarissa McLean, to oversee the sale at the Louisville Store. Wyke Decl. ¶ 15.

Ms. McLean arrived at the Store on or about January 31, 2020. McLean Tr. at 25:19–22. She took photographs of certain of the FF&E and took notes as a reference to answer questions from potential buyers. *Id.* at 41:22–42:6; 44:19–24. Through her assessment, Ms. McLean learned that although the Store opened in 2014, most of the FF&E was older because it was purchased used at the time the store was built out. *Id.* at 42:22–23.

On February 4, 2020, pursuant to the Interim Order, the Liquidation Consultant contracted to sell FF&E to Chad Renier of Mechanical Removal & Relocation, LLC (the "Buyer") for a total of $20,000. Trial Ex. 9. Mr. Renier spoke on the phone with and reviewed photos taken by Ms. McLean over the course of four or five days before deciding to submit a bid. Renier Decl. at ¶ 24. The invoice for the sale included the following:

> All removable FF&E to include but not limited to All FF&E located inside the facility, kitchen, bakery, shopping carts, deli equipment, refrigeration equipment, bailer, compactor, POS System, network equipment, server equipment, desktop computers, gondola shelving, butcher equipment, café equipment, walk in coolers, refrigeration racks and compressors (Freon to be removed by Lucky's before dismantling).

Trial Ex. 9. It further stated the following was to be excluded from the sale:

> All leasehold improvements including but not limited to: A/C units, plumbing, lighting, flooring, fire suppressions/sprinkler systems, fire alarms, burglar alarms, doors, walls, ceilings, roofs, windows, electrical transformers, electrical boxes, bathroom fixtures, built in kitchen cabinets, built in work stations, lighting controllers, back up electrical generators, transfer switches and associated controllers, forklift/order pickers (if identified as leased), handheld computers, tablet computers, laptop computers.

5

*Id*. Mr. Wyke testified that in his experience movable FF&E in a grocery store is a broad category that can include deli cases, walk-in coolers, walk-in refrigeration units, compressors, evaporators, condensers, non-bathroom sinks, and kitchen implements. 1/8/21 Tr. at 123:21–124:6; 184:10–16. ATA did not present any evidence to counter this general assertion.

Mr. Renier asked three members of his crew to go directly from a job they were finishing in Michigan to Louisville, Kentucky for initial review and to determine the type and number of machinery and tools needed to remove the FF&E. Renier Decl. at ¶ 28. Mr. Renier took an excel version of the Louisville Fixed Asset List he received from the Liquidation Consultant and deleted line items that Ms. McLean verified were not at the Store or that he was not interested in purchasing. *Id*. at ¶ 29. Mr. Renier also highlighted certain items he was interested in that he wanted his crew to verify were at the Store, and if they so, to get the model numbers and years built. *Id*. Mr. Renier sent the edited excel list to his crewmember, Albert Shumate, to verify which of the FF&E was or was not at the Store. *Id*. ¶ 30.

The three members of the Buyer's crew arrived at the Store on February 6, 2020. *Id.* at ¶ 31. Ms. McLean was present and supervised the Buyer's crew the entire time. *Id*. Mr. Renier's crewmember reported that numerous desirable items of FF&E that Mr. Renier had highlighted on the Louisville Fixed Asset List were not present. *Id*. at ¶ 33. Over the next few days, the Buyer's crew continued to locate the highlighted items so that Mr. Renier could market them for auction and resale. *Id*. at ¶ 34. The Buyer's crew was also disassembling and wrapping smaller items, getting the cases ready to ship, breaking down the cases that were to be scrapped, getting the electronic equipment and POS system together, and removing the hoods, double sinks, and handwashing stations for shipping. *Id*. at ¶¶ 34–36.

Before removal of any refrigeration units, Freon needed to be safely drained. *Id*. at ¶ 37. Debtors handled the Freon draining and removal, which was not completed until February 11, 2020. *Id*. Once the Freon was completely removed the Buyer's crew removed the copper pipe that runs from each refrigerated case, refrigerated walk-in and freezer to the compressor racks and rooftop compressors to finish preparing the cases for shipping and to prepare the compressor racks and rooftop condensers for removal. *Id*. at ¶ 38. As of February 12, 2020, most of the FF&E was staged for removal, but none had been removed. *Id*. at ¶ 40. Mr. Renier arrived at the Store on February 12, 2020. *Id*. After assessing the progress of the removal preparation, taking photos of certain of the FF&E, and making a few phone calls to buyers, Mr. Renier scheduled a crane to arrive the next day to remove the four rooftop condensers. *Id*.

On February 12, 2020, Jeremy Hamilton, the leasing representative for ATA, learned that the Buyer was onsite and removing or preparing to remove property. Trial Ex. 16 at pp.5–9; 11/3/20 Tr., 61:18–62:14. Mr. Hamilton contacted Ms. McLean by phone and expressly asked her what she was doing and what property was being removed. 11/3/20 Tr., 63:13–64:7. Also on February 12, 2020, Debtor's counsel left a voicemail for ATA stating that "no fixtures were being removed" and the Debtor would cause the removal to cease for the day until an ATA representative could be present to identify disputed items. Trial Ex. 18.

Sometime between February 12, 2020 and February 13, 2020, Mr. Hamilton spoke with Ms. McLean and Mr. Renier on the phone. The exact timing and content of those conversation was hotly contested. Based on email chains entered into evidence, it appears that Mr. Reiner learned on the afternoon of February 13th that ATA would have a representative at the Store on Tuesday, February 18th to identify any fixtures that ATA asserted could not be removed. Trial Ex. 14. Mr. Renier stated that based on a conversation with Mr. Hamilton on February 12th, he was under the

impression ATA's representative would be at the Store on Thursday, February 13th to complete the identification of disputed property. Reiner Decl. ¶ 46. Mr. Hamilton disputes this assertion and maintains that he was not able to make direct contact with any parties until Thursday, February 13th and that in all communications he made it clear an ATA representative could not arrive until Tuesday, February 18th. 11/3/20 Tr. 128:19–130:24; 132:20–133:9. There is no evidence in the record that the Debtor informed ATA that February 18th was not acceptable. Monday, February 17th was President's Day, a federal holiday.[3]

Mr. Renier informed the Liquidation Consultant on the afternoon of Thursday, February 13th that he was unable to remain at the Store beyond February 18th waiting for ATA's representative. Trial Ex. 14; Renier Decl. at ¶ 51. Mr. Renier had already been forced to reschedule contractors, a crane, dumpsters, and his crew numerous times and claimed that the delays caused the loss of multiple sales. Renier Decl. at ¶¶ 51–52. In an email chain, the Debtor and the Liquidation Consultant agreed that the most economical way to proceed with the dispute was to allow Mr. Renier to remove the purchased FF&E and handle ATA's concerns in subsequent litigation. Trial Ex. 10. Around 6:30 p.m. on February 14, 2020, the Debtors and their professionals informed Mr. Renier that he could recommence removal of the purchased FF&E. Renier Decl. at ¶ 53.

On Tuesday, February 18, 2020, Mr. Renier had planned to complete removal of the FF&E and clean the Store but was interrupted by Mr. Hamilton. *Id*. at ¶ 60. Mr. Hamilton instructed Mr.

---

[3] Ultimately, the discrepancies in the events of February 12 and February 13 are irrelevant. The Interim Order provided for the removal process and permitted the Debtor to enter into "Landlord Agreements" with individual landlords to amend the process. Interim Order ¶ 2. There was no evidence presented that ATA and the Debtor entered into such an agreement nor did either party allege that the communications on February 12 and February 13 were sufficient to constitute a Landlord Agreement that altered the terms of the Interim Order. As I explain below, the removal did not violate the terms of the Interim Order.

Renier to stop removal of the FF&E and leave the Store immediately. *Id*. at ¶ 60–61. Mr. Renier was unable to finish removal of the purchased FF&E, was forced to leave behind some of his tools, and was unable to finish cleanup. *Id.* at ¶ 62; *see also* Trial Ex. 48 ("after" photos). The specific items of FF&E that Mr. Renier was unable to remove included all the refrigerated display cases in the beer and wine portion of the store, the walk-in refrigerators, several deli display cases, and one exhaust hood. 1/8/21 Tr. at 29:18–33:15; 193:25–194:1.

ATA argues that certain items removed by the Buyer were fixtures that belonged to ATA at lease termination. These included: (a) many (but not all) of the refrigerated and freezer display cases (the "Refrigerated Cases"); (b) the remote refrigeration system, which includes copper pipes for Freon, evaporative coils, 4 rooftop condensing units, and compressor/motor racks (the "Remote Refrigeration System"); (c) most (but not all) of the hoods (the "Hoods"); (d) most (but not all) of the deli display cases (the "Deli Cases"); (e) the bailer (the "Bailer"); and (f) the two- and three-compartment prep sinks (the "Prep Sinks") (together the "Disputed FF&E"). ATA contends that it intended for Disputed FF&E to be permanent fixtures to remain at the Store after lease termination. Larmore Decl., ¶¶ 28–30. As discussed below, based upon the record and applicable law, I disagree.

### D. The Lease Documents

ATA purchased the Shopping Center in December 2012. Larmore Decl., ¶ 10. At the time, there were significant vacancies in the center. *Id*. The former anchor tenant who occupied the Store sold home goods and was out of business. *Id*. ATA's principal, Jon Larmore, testified that his strategy was to invest significant funds into the Shopping Center and reposition it as a grocery anchored center to draw in new tenants. *Id*. at ¶ 11.

Mr. Larmore was personally involved in the lease negotiations that led to the execution of the Lease. *Id*. at ¶ 12. Mr. Larmore has been in the real estate operations and development business for over 20 years. *Id*. at ¶ 3. Mr. Larmore testified that ATA views grocery store anchored shopping centers as highly attractive. *Id*. at ¶ 13. Grocery stores drive significant foot traffic to a shopping center, which is a selling point to fill other smaller adjacent tenant spaces. *Id*. ATA was willing to invest in significant tenant improvements in the Store to enhance the value of the realty and to reposition the Shopping Center as a grocery anchored center. *Id*. at ¶ 14.

The Store had to be significantly modified in order to convert the space for a grocery store. *Id*. at ¶ 15. At the time the Lease was executed, the Store did not have any refrigeration components or capabilities, including any in-slab refrigeration pipes, in-wall refrigeration pipes, or rooms for refrigeration. *Id*. at ¶¶ 15, 22. In addition, there were no exhaust hoods, sinks/handwashing stations, or other items that are necessary to operate a grocery store. Id. at ¶ 15.

Pursuant to the Lease, ATA was barred from leasing any of the other spaces in the Shopping Center to any business related to a grocery store, such as a "meat market, seafood market, produce market, liquor store, and natural health and food store." Trial Ex. 2 at Ex. I. The exclusivity clause granted to the Debtor affected the tenant mix in the Shopping Center. Larmore Decl. ¶ 24.

The Lease required ATA to construct or otherwise pay for "Landlord's Work" to alter and improve the Store, consisting of, among other things: (1) new electrical meter and distribution panel; (2) water meter and gas line sufficient to meet tenant's use requirements; (3) sewer lines to meet tenant's code requirement; (4) a loading dock to accommodate a 75 foot semi-truck (with a 53 foot trailer with truck cab) with doc leveler seals and proper loading platform … the design to be mutually agreed upon by the parties; (5) concrete Slab repaired or replaced as needed to provide

a clean and level slab ready for floor covering; (6) split-level section of Store to be removed; and (7) a new façade and vestibule with new entry doors. Trial Ex. 2, § 2(a) and Ex. C.

The Lease also provided that the Debtor would perform "Tenant's Work" defined as "all leasehold improvements, fixtures, equipment and merchandise required for Tenant to open the Premises for business to the public that is not included in the Landlord's Work." Trial Ex. 2, § 2(c). The Lease included a "Tenant Improvement Allowance" of $1,203,800, or $40 per square foot, that ATA was to pay to Debtor in two payments at the 50% completion mark and the 100% completion mark. Trial Ex. 2, §2(d).  Payment was conditioned upon receipt of reasonable evidence of completion such as paid invoices and applicable lien waivers of subcontracted work. *Id*.

    *1.  Tenant's Work Provision*

Tenant's Work is defined under the Lease as follows:

> "Tenant's Work" means all leasehold improvements, **fixtures, equipment and merchandise required for Tenant to open the Premises for business** to the public that is not included in the Landlord's Work. Tenant agrees that (i) all plans, specifications and drawings for the Tenant's Work will be subject to Landlord's prior written approval (which approval will not be unreasonably withheld) and (ii) Tenant will be responsible for obtaining all applicable governmental approvals and permits necessary for the completion of Tenant's Work (which permits will be diligently pursued by Tenant) and Tenant's occupancy of the Premises, including, without limitation, a building permit and a certificate of occupancy. Tenant shall diligently pursue Tenant's Work to completion. Landlord shall allow Tenant access to the premises to begin the Tenant's work upon execution of this Agreement ("Landlord's Delivery Date"). Tenant agrees not to interfere with Landlord's work.

Trial Ex. 2, §2(c) (emphasis added). ATA correctly observes that Tenant's Work does not include the specific term "trade fixtures." ATA contends, therefore, that this provision was intended to make any work performed by the Debtors permanent fixtures that were to remain in the Store after termination of the Lease. Larmore Decl. ¶¶ 19–20. ATA's interpretation is without merit.  Indeed,

as discussed below, the language in the Lease is consistent with controlling law on what constitutes

a trade fixture, i.e., property annexed to real estate to aid the tenant in carrying out its business.

    *2.   Tenant Improvement Allowance Provision*

    ATA also contends that the Tenant Improvement Allowance provision of the Lease shows

that it was the intent of the parties that anything provided by the Debtors under Tenant's Work

was to become property of ATA and was to remain on site following lease termination. *Id*. at ¶ 26.

The Lease provides as follows:

> <u>Tenant Improvement Allowance</u>. Landlord will reimburse Tenant for the costs of designing, permitting and performing Tenant's Work in the amount of the Tenant Improvement Allowance defined below. Landlord will pay the amount of the Tenant Improvement Allowance to Tenant in 2 payments within 30 days after receipt by Landlord of Tenant's written request therefore, together with all the required documentation under this Section as follows: (i) $20.00 per square foot of the Tenant Improvement Allowance within 30 days after Tenant's fifty (50%) percent completion of the Tenant's Work and delivery to Landlord of reasonable evidence of the same (including paid invoices and any applicable lien waivers of subcontract work over Twenty-Five Thousand ($25,000.00) Dollars); and (ii) the remaining $20.00 per square foot of the Tenant Improvement Allowance within 30 days of Tenant's: (A) completion of the Tenant's Work as evidenced by a certificate issued by Tenant's architect or general contractor; (B) the issuance of a certificate of occupancy (or its local equivalent) by the applicable governmental authority having jurisdiction over the Premises; (C) submission to Landlord of copies of final unconditional lien waivers from Tenant's general contractor and all third party subcontractors and suppliers providing more than Twenty-Five Thousand ($25,000.00) of services or materials with respect to Tenant's Work; and (D) Tenant being open for business in the Premises. The total of the payments to be paid by Landlord with respect to the Tenant's Work will in no event exceed the amount of the Tenant Improvement Allowance. "<u>Tenant Improvement Allowance</u>" means the sum of $40.00 per square foot of the Premises. In addition to other remedies set forth in this Lease, if Landlord fails to pay Tenant the Tenant Improvement Allowance within 10 days after a written request from Tenant that follows the initial 30-day request, Tenant may offset the unpaid Tenant Improvement Allowance owed by Landlord hereunder, plus interest at the Interest Rate set forth in Section 4(e) from the date due until the date so offset, against Base Rent, CAM Charges and other payments due to Landlord under this Lease. In performing the Tenant's Work, Tenant shall keep the Premises and Shopping Center free from liens and other encumbrances arising in connection with the Tenant's Work. Without limiting the provisions of Section 13(c)(i) and subject to Landlord's payment of the Tenant Improvement Allowance as and when required, Tenant shall indemnify, defend and hold Landlord harmless from and against any loss, cost, claim, expense or demand arising in connection with the Tenant's Work, including, without limitations, claims and demands of

contractors, subcontractors, suppliers and other parties providing materials and services in connection with the performance of the Tenant's Work ("Tenant's Work Claims").

Trial Ex. 2, §2(d). ATA contends that it never would have paid over $1.8 million for the Tenant's Work if the Tenant had the option to remove the items affixed to the Store at lease termination. Larmore Decl. ¶ 30. None of Landlord's witnesses indicated that they made this intent known to the Debtors while negotiating the Lease. Mr. Larmore testified that "[t]he document speaks for itself, and that's the intent, the intent is within the document." 1/8/21 Tr., 21:5–13. There is no evidence that the Debtors were aware of ATA's interpretation of the Tenant Improvement Allowance Provision while the parties were negotiating the Lease.

I agree that the document speaks for itself and find that nothing in the plain text of this provision indicates an agreement between the parties to transfer title of the purchases from the Debtor to ATA. There is nothing in the Tenant Improvement Allowance provision indicating that the Allowance covers all construction or buildout costs or the entirety of the Tenant's Work. The Tenant Improvement Allowance does not require that itemized receipts be provided to ATA, nor that the funds be applied to any particular purchases. Landlord's interpretation of the Tenant Improvement Allowance Provision would lead to inconsistent and absurd results. For example, Tenant's Work includes "equipment and merchandise," two categories that Landlord does not and cannot claim title to. 1/8/21 Tr. at 41:24–42:15.

I find, therefore, that the Tenant Improvement Allowance provides for payment of a predetermined amount to be used by the Debtor in the buildout of the Store as an incentive to enter into the Lease and not as a mechanism for the transfer of title to ATA.

### 3. *Personalty and Alteration and Additions Provisions*

Several other provisions of the Lease also express the intent of the parties regarding what constituted the Debtors' property at lease termination. These three provisions define Debtors' personal property or personalty as follows:

> Tenant's Financing. Tenant may, from time to time, without Landlord's consent, secure financing or general credit lines and grant the lenders thereof: as security therefor, (a) a security interest in **Tenant's fixtures, trade fixtures, furnishings, inventory and equipment (collectively, "Personalty")**, (b) the right to enter the Premises to realize upon any Personalty so pledged, provided that the Premises is repaired, and/or (c) a collateral assignment of or leasehold encumbrance in Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness to such lenders and will be subject to Landlord's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed and provided further that any such financing documents shall provide that such lender must agree to be bound by and perform all of Tenant's obligations hereunder (including payment of all applicable Rent) in order to use or possess the Premises, whether in connection with a sale of collateral or the assignment of this Lease. Upon Tenant's written request, Landlord will evidence its consent in writing to such security interest and agreement subject to the foregoing.

Trial Ex. 2, § 22 (emphasis added).

> Tenant's Property: Waiver of Landlord's Liens. **All of the Personalty will be and remain the personal property of Tenant**. Landlord waives and releases any liens that Landlord may have against Tenant's owned or leased personal property, trade fixtures or equipment or against Tenant's merchandise, cash or accounts receivable, whether such lien is statutory, constitutional or contractual, or arises out of operation of law or otherwise.

Trial Ex. 2, § 23 (emphasis added).

> Alterations. After completion of Tenant's initial leasehold improvements, Tenant will not make any exterior or structural alterations or additions to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld. Tenant, at Tenant's sole cost and expense, will have the right in its sole discretion to make any interior, nonstructural alterations or additions or perform any interior remodeling of a nonstructural nature. All alterations and additions to the Premises by Tenant must be made in accordance with all applicable laws and, **except for trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs and other personal property of Tenant**, will remain at the end of the Term for the benefit of Landlord.

Trial Ex. 2, § 11 (emphasis added). These three provisions indicate that Debtors' personal property was intended to be a broad category that would include tenant's fixtures, trade fixtures, furnishings, equipment and inventory. While ATA correctly observes that the Alteration Provision does not reference Personalty, fixtures, or Tenant fixtures, I do not find the absence of those terms to be dispositive. Rather, I find that the inclusion of the term "other personal property of Tenant" indicates that this is a broad provision meant to capture a relatively wide range of property.

### E.  ATA's Damage Claim

In addition to alleging Debtors removed property belonging to it, ATA also claims that the Buyer caused damage to the Store when it removed the FF&E, and Debtors are responsible for the necessary repairs. The Lease provides that "Tenant will promptly repair any damage to the Premises occasioned by the removal of the Personalty (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business…" Trial Ex. 2, §25. To support its claim for damages, ATA submitted numerous photographs of the property showing where holes had been cut into walls to assist with the removal of the FF&E, exposed wires and pipes where FF&E had been removed, and scratches on the concrete floor where FF&E had been dragged during removal. Trial Ex. 24–26; Trial Ex. 33; Trial Ex. 35–47. ATA called Elmer Howard from Indiana Retail Construction Co. ("IRRC") regarding his estimate to repair the damage that ATA alleges was caused by the removal of the FF&E.[4] Trial Ex. 19; Trial Ex. 20; Howard Decl., at ¶¶ 14–17. Mr. Howard stated

---

[4] ATA also called Mr. Howard and a second witness, David Lawrence, to testify regarding the cost of replacing the Disputed FF&E. Since I conclude that the Disputed FF&E was property of the Debtors, I do not need to address this testimony. Even if I considered this testimony, for the reasons stated below, Mr. Howard's testimony lacked credibility and Mr. Lawrence admitted on cross examination that his estimate to replace the Disputed FF&E was inaccurate because he quoted the wrong equipment. 1/8/21 Tr., 84:24–85:5.

that in his opinion the removal of the Debtors' personalty caused excessive damage to the Store.[5] Howard Decl., at ¶¶ 14–15. Mr. Howard testified that after viewing the Store following removal of the FF&E, the cost of repairs would be $386,695.00. *See generally,* Howard Decl.; Trial Ex. 20. He further testified that this would be the cost to render the space move-in ready for a new grocery tenant and mimic the condition of the Store when the Debtors opened for business. Howard Decl. at ¶15.

On cross examination, Mr. Howard admitted that IRRC only does work for ATA and ATA's affiliates. 11/3/20 Tr. at 203:2–10. Mr. Howard also testified that IRRC's primary business is maintenance work, and that the average project price of IRRC's jobs is $2,500. *Id*. at 204:6–19. Despite Mr. Hamilton's testimony that ATA believed that Mr. Howard was a general contractor working under the license for Freeman Construction, Mr. Howard admitted that he is not a general contractor. *Id*. at 174:12–23; 205:14–22. Mr. Howard also testified that while he personally was not affiliated with Freeman Construction, his significant other, Loretta White, was a former partner in that company. *Id*. at 205:1–16; 226:10–227:13. Mr. Howard further testified that Richard Freeman, the owner of Freeman Construction, authorized him to use Freeman Construction's general contractor license through December of 2020 because Ms. White paid for half of the license. *Id*. at 206:1–18. He added that Mr. Freeman was aware that Mr. Howard is affiliated with IRRC and was using the Freeman Construction license when necessary to obtain permits. *Id*. at 206:1–18; 228:24–229:2.

---

[5] ATA also submitted a purported estimate from a Bosse Construction to support Mr. Howard's estimate. No witness testified regarding the Bosse estimate and I have no basis to determine whether the estimate is accurate or exactly what was considered in creating it. Therefore, I give it no weight.

In response to Mr. Howard's testimony, the Debtors called Richard Freeman who testified that he has been the owner of Freeman Construction for 30 years. 1/8/21 at 128:21–24. Mr. Freeman testified that he never authorized Mr. Howard to request a general contractor agent's license under Freeman Construction's name. *Id*. at 129:11–13. Mr. Freeman further testified that the license Mr. Howard purported to be working under, admitted into evidence as ATA Exhibit 21, was fabricated, and based on his experience it was not a valid Indiana general contractor's license. *Id*. at 129:20–130:13. Mr. Freeman testified that he was never partners with Ms. White and that Ms. White did not pay for any portion of Freeman Construction's general contractor license. *Id*. at 130:20–24. Mr. Freeman also testified that he had never heard of IRRC and that he never authorized IRRC to do business using Freeman Construction's general contractor's license. *Id*. at 130:25–131:6.

Having heard Mr. Freeman testify, I am satisfied that he is a credible witness who provided significant impeachment testimony undermining the credibility of Mr. Howard. Moreover, having observed Mr. Howard, I find that his testimony lacks credibility. Thus, while the photographs submitted into evidence show that there was damage caused by the removal of the FF&E beyond just "small holes caused by nails, fasteners and the like" I have no credible estimate of the repair costs by which damages could be measured. In addition, the evidence at trial showed that ATA interfered with the ability of the Debtors to complete whatever repairs they intended to make. 1/8/21 Tr. 189:2–12; 191:24–198:19. As noted above, Mr. Renier was ordered by Mr. Hamilton to immediately stop all removal of the FF&E forcing Mr. Renier to leave behind certain equipment he had purchased along with some of his own tools. Renier Decl. ¶¶ 60–62. This also prevented him from completing cleanup of the property. *Id*. at ¶ 62.

### III.    <u>Analysis</u>

### A.  Burdens of Proof

The burden of proving that a claim is entitled to treatment as an administrative expense is

on the claimant. *In re Phila. Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012). ATA must show

by a preponderance of the evidence that it is entitled to an administrative claim. *Matter of*

*Columbia Gas System, Inc.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998).   For the reasons stated

below, ATA has failed to meet its burden.

### B.  Contract Interpretation

The Lease is governed by Kentucky law; therefore, my interpretation of the Lease will be

driven by Kentucky common law. *See* Trial Ex. 2, §32(i). Under Kentucky law, "[t]he construction

and interpretation of a contract, including questions regarding ambiguity, are questions of law to

be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835

(Ky. Ct. App. 2000). "Absent an ambiguity in the contract, the parties' intentions must be discerned

from the four corners of the instrument without resort to extrinsic evidence. A contract is

ambiguous if a reasonable person would find it susceptible to different or inconsistent

interpretations. The fact that one party may have intended different results, however, is insufficient

to construe a contract at variance with its plain and unambiguous terms." *Cantrell Supply, Inc. v.*

*Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (internal citations omitted).

ATA asserted in its briefing that the Lease is ambiguous. As noted above, ATA's own

witness, Mr. Larmore, testified that the intent of the parties concerning what was to remain after

lease termination can be determined from the language of the Lease. 1/8/21 Tr., 21:5–13. I agree

with Mr. Larmore. There are no provisions within the Lease that a reasonable person would find

to be subject to different or inconsistent interpretations. Since the Lease is unambiguous, there is

no need to consider extrinsic evidence and the intent of the parties is determined from the four corners of the document.

The Lease does not define "fixture" or "trade fixture." Therefore, I must look to Kentucky common law to determine the meaning. There is no disagreement between the parties on the proper test to determine a fixture under Kentucky law. The relevant factors are "[f]irst, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose that the part of the realty to which it is connected is appropriated; and, third, the intention of the parties to make the article a permanent accession to freehold." *Scanlon v. Scanlon*, 545 S.W.3d 311, 315 (Ky. Ct. App. 2018) (citing *Doll v. Guthrie*, 24 S.W.2d 947, 948 (Ky. 1929). "The controlling factor is the intention of the parties." *Id*.

"Actual annexation occurs when an item is physically attached to the real property, such that it could not be removed without considerable force or damage to the item or the real property." *Id*. "[T]he 'adaptation' of the item, is met when an item is adapted or applied to the use or purpose to which it is connected." *Id*. at 316. "The third test stated, the intention of the party making the annexation, has been said by some of the authorities to be a controlling consideration, and generally is held to be the chief test. It is not always determinative, but in cases of doubt it has a controlling influence. To have this effect, the intention to make an article a permanent accession to the realty must affirmatively and plainly appear, and if the matter is left in doubt and uncertainty the legal qualities of the article are not changed, and it must be deemed a chattel." *Doll*, 24 S.W.2d at 948.

Under Kentucky law, a "trade fixture" is an exception to the general rule governing fixtures. *Southern Industrial, LLC v. Maxine, LLC*, 2009 WL 4060698, *4 (Ky. Ct. App. 2009). "This exception provides that an item of property that a lessee annexes to realty, belonging to a

lessee, and used by the lessee for purposes of trade is generally regarded as remaining personal property, rather than becoming real property, based upon principles of public policy and a desire to encourage trade and manufacturing. This is because the intent of annexing a trade fixture to the land is to benefit the business of the party annexing the fixture to the land, not the land itself." *Id*. (citing *Van Ness v. Pacard*, 27 U.S. 137, 143-44 (1829). "Kentucky law defines a 'trade fixture' as the personal property of the lessee, specifically an article annexed by the lessee to the real estate to aid him in carrying on his business on the premises, which may be removed at the end of a tenant's term." *Id*. (citing *Bank of Shelbyville v. Hartford*, 104 S.W.2d 217, 219 (Ky. 1937)). "[T]he hallmark for the trade fixtures test, like the *Doll* fixtures analysis, is intent: the sole question is, whether it is designed for proposes of trade or not." *Id*. (citing *Van Ness*, 27 U.S. at 146; *see also Doll*, 24 S.W.2d at 948).

All the Disputed FF&E constitute trade fixtures under Kentucky law that remained property of the Debtors at the end of Lease term. The Disputed FF&E was sourced, purchased, brought into the Store, and installed solely by the Debtors to aid in operating their grocery store. ATA contends that because they made certain modifications to the Store, had to specifically approve certain architectural plans, and paid a Tenant Improvement Allowance, the Disputed FF&E became fixtures. As I have already noted, the Lease is unambiguous, and the intent of the parties can be found within the four corners of the document. As I found above, nothing in the Lease contemplated that the actions taken by ATA were meant to transfer title in any property from the Debtors to ATA. Nor does anything in the Lease imply an intent that the property installed by the Debtor for their grocery store was meant to become a fixture.

ATA asserts that the Debtors breached the Lease by their failure to "promptly repair any damage to the Premises occasioned by the removal of the Personalty (except for small holes caused

by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business…" Trial Ex. 2, § 25. Kentucky law demands good faith and fair dealing in all contracts, stating "[a] contracting party impliedly obligated himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 718 (Ky. Ct. App. 2016) (quoting *Ligon v. Parr*, 471 S.W.2d 1,3 (Ky. 1971). In this case, ATA forced the Buyer and Liquidation Consultant to leave the Store before any repairs could be made. Through ATA's actions, they forced the Debtors to surrender the Store in a specific condition without the opportunity to fulfill their contractual obligation. Therefore, even if I determined that ATA put forward sufficient evidence as to the amount of contractual damages, which I already concluded they have not, they would not be permitted to pursue such damages when they created the obstacle that prevented performance.

### C. ATA's Administrative Priority Status

#### 1. *Administrative Priority Under § 503(b)(1)*

Under Bankruptcy Code § 503(b)(1), a creditor is entitled to an administrative priority claim for "the actual, necessary costs and expenses of preserving the estate...." Damages resulting from post-petition torts committed by the debtor are also entitled to administrative priority under Bankruptcy Code § 503(b)(1). *In re Phila. Newspapers, LLC*, 690 F.3d at 173 (citing *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968)). For a claimant to be entitled to an administrative expense claim under the Reading Doctrine, it must demonstrate that its allegations support a tort cause of action. *Id.*

ATA is unable to prove the existence of any tort that would give rise to an administrative expense claim under the Reading Doctrine and is therefore not entitled to an administrative expense claim under § 503(b)(1). ATA advanced two tort claims to support its administrative priority claim: (1) conversion and (2) negligence and negligent supervision.

Under Kentucky law, a party commits the tort of conversion when "(1) the plaintiff had legal title to the converted property; (2) the plaintiff had the right to possess the property at the time of the conversion; (3) the defendant exercised dominion over the plaintiff's property in a way that deprived the plaintiff of its use and enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff demanded return of the property and the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damages from the loss of the property. *Ford v. Baerg*, 532 S.W.3d 638, 641 n.2 (Ky. 2017).

As explained above, the Disputed FF&E belonged to the Debtor, not ATA. Debtor purchased and at all times retained title to the Disputed FF&E, and nothing in the Lease or the actions of the parties transferred title to ATA. Because ATA failed to prove title, removal of the Disputed FF&E cannot support a claim for conversion.

Under Kentucky law, to prove negligence "a plaintiff must prove the existence of a duty, breach of that duty, causation between the breach of duty and the plaintiff's injury and damages." *Hayes v. D.C.I. Properties-D KY, LLC*, 563 S.W.3d 619, 622 (Ky. 2018).

ATA contends that the Debtor, through the Liquidation Consultant and its agents, had a duty to supervise the removal of the Disputed FF&E to ensure that it was done in compliance with the Interim Order and that none of ATA's property was removed or damaged. Everything that was removed from the Store was property of the Debtors, therefore as to that portion of the claim, ATA

has failed to meet its burden to show that a duty was breached. ATA also contends that during the removal process, the Store was damaged. As noted above, while ATA provided photos that showed the Store was left with more than small holes caused by nails fasteners and the like, it also interfered with the ability of the Debtors to complete the cleanup of the Store after removal of the FF&E.

Even if ATA was able to establish that Debtors were negligent in removing the FF&E, it failed to present credible evidence of damages, thus failing to meet one of the requirements for proving a tort.  ATA presented Mr. Howard as their primary fact witness regarding to the alleged damages. As I stated above, Mr. Howard was not a credible witness and I do not accept his testimony about the cost to repair the alleged damage caused by Debtors. ATA, therefore, failed to meet its burden of proving negligence.

Additionally, Kentucky is a pure comparative negligence commonwealth that finds it proper to allocate fault between plaintiffs and defendants when each side has contributed to the damages. *Hilen v. Hays*, 673 S.W.2d 713, 719 (Ky. 1984). The amount of a plaintiff's recovery is therefore properly reduced by the fault they contributed. *Id*. In order to determine such reduction of damages, I would "consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *KY St §411.182(2)*.[6] In this case, ATA forced the Buyer and Liquidation Consultant to leave the Store without affording them an opportunity to conduct any necessary repairs. Therefore, even if I determined that ATA put forward sufficient evidence of the damages they suffered, which I already concluded they have not, such damages would be subject to further reduction based on their own conduct.

---

[6] In order to apply §411.182(2), a finding of the amount of damages under §411.182(1)(a) would be required and there is insufficient evidence in this case to make such a finding.

2. *Administrative Priority Under § 365(d)(3)*

Under Bankruptcy Code § 365(d)(3), prior to rejection, the debtor is required to comply with all post-petition obligations under an unexpired lease of nonresidential real property. *See* 11 U.S.C. § 365(d)(3). ATA alleges that because the Debtors breached the Lease, they are entitled to an administrative claim for their damages under § 365(d)(3).

It is not necessary for me to rule on the merits of this argument. As I have explained above, I find that ATA failed to prove either that the Debtors breached the Lease or the amount of any alleged damages; therefore, their argument as to the priority of those non-existent damages is moot.

3. *Breach of Court Orders*

ATA contends that the Debtors breached the Interim and Final Orders when they removed the Disputed FF&E, and, therefore, ATA is entitled to an administrative priority claim under Bankruptcy Code § 105. ATA contends that the Debtors sold ATA's property in violation of the Orders. They further contend that the Debtors sold property that was not "movable" in violation of the Orders.

The Debtor did not breach the Orders when it sold the Disputed FF&E. As already explained the property belonged to the Debtors and they had the right to sell it. The property was also "movable" as it was understood by the Orders.

Kentucky law contemplates and allows movable trade fixtures to include property that is large, heavy, and cumbersome. *See Southern Industrial, LLC*, 2009 WL 406098, *5 (forty-foot tall, several ton silos described as moveable trade fixtures). Mr. Wyke testified that movable FF&E in a grocery store is a broad category that can include deli cases, walk-in coolers, walk-in refrigeration units, compressors, evaporators, condensers, non-bathroom sinks, and kitchen

implements. 1/8/21 Tr. at 123:21–124:6; 184:10–16. No testimony was offered to counter this assertion.

Based on the evidence before me, I conclude that all the Disputed FF&E sold is movable and therefore the sale did not violate the Court's Orders.

### D. **Spoliation**

Finally, ATA alleges that the Debtors' spoliation of evidence requires finding an adverse inference that shifts the burden of proof to the Debtors as to when damage to the property occurred, and the cost of repairs and replacement of the Disputed FF&E.[7] Under Third Circuit law, "[s]poliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). If spoliation has occurred, the court must consider three factors in determining the appropriate sanction: (i) the degree of fault of the party who altered or destroyed the evidence; (ii) the degree of prejudice suffered by the opposing party; and (iii) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

There has been nothing in this case to indicate that the Debtors caused spoliation of any evidence. The fact that the Disputed FF&E was packaged and partially removed before ATA arrived at the Store does not equate "actual suppression or withholding of evidence." Even if I

---

[7] ATA did not raise spoliation in their Application, nor was it raised during trial or at any other time until it submitted its Proposed Findings of Fact and Conclusions of Law. Since the argument was not properly raised in a manner that allowed Debtors to respond, I could simply deny the relief for that reason. Since I also deny the relief on the merits, I will address it in my ruling.

were to determine that spoliation occurred, there would be no prejudice to the opposing party as the Disputed FF&E were trade fixtures and thus property of the Debtors.

**IV.**     **Conclusion**

Having determined this Court has jurisdiction to enter a final order, it is ordered, adjudged, and decreed that, for the reasons stated herein, ATA has failed to meet their burden of proof with respect to their entitlement to an administrative claim. ATA's Application for an Administrative Claim is denied.

SO ORDERED

Dated: March 17, 2021

_____
JOHN T. DORSEY, U.S.B.J.